I.

Under the federal removal statute, "any civil action brought in a state court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court." 28 U.S.C. § 1441(a). Federal district courts have original jurisdiction over all civil actions between citizens of different states if the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. § 1332(a)(1). Complete diversity, of course, is required. State Farm Fire & Cas. Co. v. Tashire, 386 U.S. 523, 530-31 (1967). If an action originally instituted in a state court could have been brought in federal court pursuant to diversity jurisdiction, the defendants may remove it to federal court provided certain procedures are followed and certain conditions met. 28 U.S.C. §§ 1441 and 1446. Similarly, if the federal court subsequently determines that it does not have subject matter jurisdiction over a removed action, it must remand the action to the state court where it originated. 28 U.S.C. § 1447(c). A plaintiff or a defendant may seek to remand the case, or the court may do so on its own motion. American Fire & Cas. Co. v. Finn, 341 U.S. 6, 16-19 (1951); 16 Moore's Federal Practice, § 107.41[1][b][i] (Matthew Bender 3d ed.). See also Moses v. Ski Shawnee, Inc., 2000 WL 1053568 at *2 (E.D. Pa. July 31, 2000).

Under our Court of Appeals decision in Boyer v. Snap-on Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990), joinder is

-3-

fraudulent 'where there is no reasonable basis in fact or
colorable ground supporting the claim against the joined
defendant, or no real intention in good faith to prosecute the
action against the defendant or seek a joint judgment.' The
presence of a party fraudulently joined cannot defeat removal.
Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 97 (1921).

As an MDL court sitting within the Third Circuit, we
must apply our Court of Appeals' fraudulent joinder standard.
See In re Korean Airlines Disaster, 829 F.2d 1171, 1174 (D.C.
Cir. 1987); In re Ikon Office Solutions, Inc. Secs. Litig., 86 F.
Supp. 2d 481, 485 (E.D. Pa. 2000). As discussed above, we must
decide whether there is a "reasonable basis in fact or colorable
ground supporting the claim against the joined defendant."
Boyer, 935 F.2d at 111.

We recognize that the burden on Wyeth to establish
fraudulent joinder is a heavy one. Wilson, 257 U.S. at 111.
While we "must resolve all contested issues of substantive fact
in favor of plaintiff," we do not take this to mean we must
blindly accept whatever plaintiff or the defendant seeking remand
may say no matter how incredible or how contrary to the
overwhelming weight of the evidence. Id. We are also cognizant
that the removal statute must be construed narrowly, and "all
doubts should be resolved in favor of remand." Steel Valley
Auth. v. Union Switch and Signal Div., 809 F.2d 1006, 1010 (3d
Cir. 1987) (citation omitted). The Supreme Court made it clear
in Wilson that if a plaintiff contests a defendant's assertion

-4-

that joinder of another defendant was a sham to defeat removal,
the District Court must determine the facts from the evidence.
Wilson, 257 U.S. at 98.  We are not to decide automatically in
favor of remand simply because some facts may be said to be in
dispute.

On matters of substantive law, "[i]f there is even a
possibility that a state court would find that the complaint
states a cause of action against any one of the resident
defendants, the federal court must find that joinder was proper
and remand the case to state court."  Boyer, 913 F.2d at 111
(citation omitted).  We are mindful that our inquiry into Wyeth's
claim of fraudulent joinder is less searching than that
permissible when a party seeks to dismiss a claim under Rule
12(b)(6) of the Federal Rules of Civil Procedure.  Batoff v.
State Farm Ins. Co., 977 F.2d 848, 852 (3d Cir. 1992); see also
Gaul v. Neurocare Diagnostic, Inc., No. 02-CV-2135, 2003 WL
230800, at *2 (E.D. Pa. Jan. 3, 2003).  In other words, simply
because a claim against a party may ultimately be dismissed for
failure to state a claim does not necessarily mean that the party
was fraudulently joined.  The test is whether this court thinks
there is a "reasonable basis" for finding the claim to be
colorable, that is, whether it is "wholly insubstantial and
frivolous."  Batoff, 977 F.2d at 852.

II.

We first address defendant Wyeth's contention that Dr.
Luis Franco, the prescribing physician and a citizen of Alabama,

-5-

was fraudulently joined solely for the purpose of destroying diversity of citizenship and preventing removal. Plaintiff has brought claims against him for medical negligence, as well as general claims for fraud and fraudulent concealment.

Wyeth argues that the complaint does not state a colorable claim against Dr. Franco because it is time-barred under the Alabama Medical Liability Act ("AMLA"), which states in relevant part:

> All actions against physicians, surgeons, dentists, medical institutions or other health care providers ... must be commenced within two years ... and not afterwards; provided, that if the cause of action is not discovered and could not reasonably have been discovered within such period, then the action may be commenced within six months from the date of such discovery or the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier, provided further, that in no event may the action be commenced more than four years after such act ....

Ala. Code § 6-5-482(a) (emphasis added). This statute governs all claims by a patient against her physician that arise from the physician-patient relationship, Collins v. Ashurst, 821 So. 2d 173, 175 (Ala. 2001), and sets forth a two year limitations period. Ala. Code § 6-5-482(a). Pondimin was withdrawn from the market in September, 1997, while plaintiff's lawsuit was not filed until November, 2002. Plaintiff does not deny that more than two years have elapsed between the time when plaintiff ingested the diet drug and the time when the doctor was sued. Rather, she first argues that the two year statute of limitations does not bar the action because of the Alabama discovery rule,

-6-

which allows a plaintiff to file suit within six months after the discovery of a medical injury.

The limitations period for a medical malpractice action under the AMLA begins to run upon the accrual of a cause of action, that is, when the act complained of results in legal injury to the plaintiff. McCormick v. Aderholt, 293 F.3d 1254, 1260 (11th Cir. 2002) (applying Alabama law). See also Grabert v. Lightfoot, 571 So. 2d 293, 294 (Ala. 1990). The key inquiry in determining the accrual date of a claim is not the date of the doctor's negligent act, or the date on which the plaintiff became aware of the degeneration, but the time when she first suffered the ill effect of the wrongful act. Ex parte Sonnier, 707 So. 2d 635, 637 (Ala. 1997). Since there is no latency period between ingestion of Pondimin and any injury,[4] plaintiff's injury at the latest commenced, and thus the limitations period began to run, shortly after Pondimin went off the market in late 1997. Based on the two-year statute of limitations alone, plaintiff would have needed to file her complaint by late 1999. Clearly, her November, 2002 filing is well beyond this deadline.

---

4.  Judge Louis C. Bechtle, who presided over the fairness hearing in connection with the approval of the Nationwide Class Action Settlement, found that there is no latency period between the time of diet drug use and injury. In his August 20, 2000 Order approving settlement, Judge Bechtle stated "[t]he absence of a latency period between ingestion of [the diet drug] and the development of clinically detectable [heart disease] is ... confirmed by a number of studies ..., [each of which finds] that there was no emergence of new disease after some latency period." Memorandum and Pretrial Order No. 1415 at 46 (Aug. 28, 2000).

-7-

However, as stated above, the discovery provision in
Ala. Code § 6-5-482(a) modifies the AMLA's two year limitation
and gives an additional six months to file a claim from the time
of discovery or when it would have been reasonable to discover
such injury.  Plaintiff claims that she did not discover her
injury until October, 2002, when she had an electrocardiogram
("EKG").  She therefore contends her action, filed a month later
in November, 2002, falls within the six month safe harbor period.

We find that plaintiff's allegation that she did not
discover her injury until October, 2002 has no reasonable basis
in fact.  Boyer, 913 F.2d at 111.  Plaintiff admitted knowledge
of her injury in March, 2000.  On a form ("Orange Form #1")
signed by plaintiff on March 29, 2000 to exercise her right to
opt out of the national diet drug settlement, she was asked to
respond to the following:  "If you believe you have an adverse
condition related to the use of Pondimin ..., please briefly
describe your condition below."  Plaintiff answered "yes."
Directly below this question, right above where plaintiff signed
and dated the form, it stated that plaintiff "had an opportunity
to read the Official Court Notice transmitted to Class Members in
connection with the nationwide Class Action Settlement."  The
Official Court Notice of the Nationwide Diet Drug Class Action
Settlement contained a penalty provision for false claims
specifying that "[a]ll Settlement Forms must be signed under
penalties of perjury."  By signing and dating the Orange Form #1,
plaintiff swore that she knew of her injury as early as March,

-8-



2000. Yet, she did not initiate the suit within the six month
period allowed under the discovery provision of the AMLA. Ala.
Code § 6-5-482(a).

The fact that plaintiff may not have known about the
seriousness of her injury in March, 2000 is inconsequential. As
noted above, the limitation period "begins to run when the first
injury, however slight occurs, even though that injury may later
become greater or different." Free v. Granger, 887 F.2d 1552,
1555-56 (11th Cir. 1989). See also McCormick v. Aderholt, 293
F.3d 1254, 1260 (11th Cir. 2002).

Plaintiff relies upon this court's Memorandum and
Pretrial Order No. 2710 in Price v. American Home Products,
CIV.A. No. 02-20229 (E.D. Pa. Jan. 17, 2003). However, that
decision does not support plaintiff's position. In that case,
also part of the national diet drug litigation, we deemed Wyeth's
removal to have been improper and remanded. Among other things,
the plaintiff there had not provided information on an Orange
Form akin to the information given by the plaintiff here.
Moreover, Price involved the law of the District of Columbia, not
the law of Alabama.

Alternatively, the plaintiff contends that she has
properly pleaded fraud and fraudulent concealment against the
doctor, and therefore those claims at least are not barred by the
statute of limitations. Where there is fraud or concealment of
tortious conduct, the AMLA specifies that the statute of
limitations may be tolled "until the discovery by the aggrieved

-9-

party of the fact constituting the fraud, after which he must
have two years within which to prosecute his action." Ala. Code
§§ 6-2-3, 6-5-482(b).  Plaintiff claims in her complaint that the
doctor committed actionable fraud by "failing to adequately warn
her of the dangers and side effects associated with Pondimin use
... knowingly concealing the dangers associated with the diet
drug and failing to advise her to undergo a[n] ... [EKG]."  She
alleges she did not learn about the fraud until October, 2002
when an EKG revealed heart damage.

        There is no reasonable basis in fact to accept the
October, 2002 date.  As discussed above, plaintiff had <u>actual</u>
knowledge of the injuries in March, 2000.  <u>Constant v. Wyeth</u>, No.
3:03-0052, slip op. at 9 (M.D. Tenn. April 9, 2003).  Thus, her
fraud claims against Dr. Franco do not support her quest for
remand.

        The plaintiff's claims against Dr. Franco are barred by
the statute of limitations.  There is no colorable ground to
support the claims against him, <u>Boyer</u>, 913 F.2d at 111, and he is
fraudulently joined.  Thus, we need not reach the issue of
whether plaintiff's claims are also barred by the language in the
AMLA that provides that "in no event may the action be commenced"
after four years. Ala. Code § 6-5-482(a).

                                III.

        We next turn to Wyeth's contention that nine sales
representatives were fraudulently joined – Joy Boozer, David
Wurm, Michael Crawford, Neil Blanton, Sam Wright, Steven Sells,

                                -10-

Mitchell DeLoach, William Owen, and Karen Cunningham.  At least
eight of them are Alabama citizens and thus non-diverse
defendants.  Plaintiff has brought claims against the sales
representatives, along with Wyeth, for their alleged fraudulent,
negligent and/or wanton marketing, promotion, selling, and/or
distribution of Pondimin.

        We note first that there is no indication in the
complaint that the plaintiff, or the plaintiff's physician Dr.
Franco, received any drugs from the sales representative
defendants.  In fact, according to an uncontested affidavit
submitted by Dan J. Shepherd, the Zone Vice President of Wyeth's
Southern Business Unit, no Wyeth sales representative ever
promoted Pondimin.  Additional affidavits submitted by eight of
the nine sales representative defendants further confirm that
they never advertised, assembled, created, designed, detailed,
distributed, labeled, made, manufactured, marketed, packaged,
promoted, sold, sterilized, supplied or tested Pondimin, or
trained anyone to do so, nor did they call or meet with Dr.
Franco.[5]  Since Alabama law only holds corporate employees liable
for wrongful actions in which they personally participate,
plaintiff has no colorable claim against the sales
representatives.  Ex Parte Charles Bell Pontiac-Buick-Cadillac-
GMC, Inc., 496 So. 2d 774, 775 (Ala. 1986); Turner v. Hayes, 719
So. 2d 1184, 1188 (Ala. Civ. App. 1997).  In fact, in the

5. No affidavit was submitted for defendant Crawford, who
plaintiff has been unable to serve.  However, Mr. Shepherd states
that Mr. Crawford similarly could not have promoted Pondimin.

-11-

complaint, plaintiff barely discusses the sales representatives except generally to aver their involvement in marketing and promoting Pondimin.  In her brief in support of the motion to remand, she does not even mention them.

Plaintiff has not provided a scintilla of evidence that the sales representative either promoted Pondimin generally or specifically to Dr. Franco.  Since she has no colorable claim against them, we therefore find that they too were fraudulently joined.

IV.

Accordingly, the motions of plaintiff and of defendant Franco[6] to remand to the state court of Alabama will be denied.

---

6.  Defendant Franco alternatively requests, seemingly as an afterthought, that this court sever the plaintiff's claims against him and remand these claims to state court.  However, Dr. Franco cites no authority for this proposition, and there does not appear to be consent by the parties to sever the claims against him.  Further, as this court has determined as a matter of law that Dr. Franco was fraudulently joined, we will not sever and remand a non-colorable claim.

-12-

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: DIET DRUGS | : | MDL DOCKET NO. 1203 |
| (PHENTERMINE, FENFLURAMINE, | : | |
| DEXFENFLURAMINE) PRODUCTS | : | |
| LIABILITY LITIGATION | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| PERRY MICHAEL FRENCH, et al. | : | |
| | : | |
| v. | : | |
| | : | |
| WYETH, et al. | : | CIVIL ACTION NO. 03-20353 |

PRETRIAL ORDER NO. 3281

AND NOW, this 18th day of February, 2004, for the
reasons set forth in the accompanying Memorandum, it is hereby
ORDERED that:

(1)   the motion of plaintiffs to remand to the Circuit
Court of Jones County Mississippi is DENIED; and

(2)   all claims against defendants Eric Dyess, M.D.,
Arthur Wood, M.D., Earl Lee Stewart, M.D., William Edwin Powell,
M.D., John M. Beaman, M.D., Jacob E. Ulmer, M.D., Stephen A.
Tramill, M.D., Todd Fulcher, M.D., E. Kelton Pace, M.D., Stanford
Owen, M.D., and Richard Miller, M.D. are DISMISSED.

BY THE COURT:

_____, J.

Feb-20-04   11:23am   From-REED SMITH LLP          215-851-1417      T-292  P.002/016  F-550

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: DIET DRUGS                :    MDL DOCKET NO. 1203
(PHENTERMINE, FENFLURAMINE,      :
DEXFENFLURAMINE) PRODUCTS        :
LIABILITY LITIGATION             :
                                 :
THIS DOCUMENT RELATES TO:        :
                                 :
PERRY MICHAEL FRENCH, et al.     :
                                 :
          v.                     :
                                 :
WYETH, et al.                    :    CIVIL ACTION NO. 03-20353

MEMORANDUM AND PRETRIAL ORDER NO. 3281

Bartle, J.                              February 18, 2004

        Before the court is the motion of the eleven plaintiffs

to remand their complaint against defendant Wyeth and eleven non-

diverse physicians to the Circuit Court of Jones County,

Mississippi.[1]  This motion is before the undersigned as

transferee judge in MDL 1203, the mass tort litigation involving

the diet drugs commonly known as fen-phen.  Plaintiffs assert

claims for negligence, negligence per se, strict liability

(design defect and failure to warn), misrepresentation, and

breach of warranties against Wyeth as well as claims against

_____

1.  The plaintiffs named in this action are:  Perry Michael
French, Brenda Thigpen, Shirley Allen, Angela Chapman, David
Graham, Beverly Hill, Margo Jones, Mildred Long, Brenda McDonald-
Lott, Gwendolyn Ratliff, and Paula Webb respectively.

Feb-20-04  11:23am  From-REED SMITH LLP                    215-851-1417        T-292  P.003/016  F-550

their prescribing physicians for medical negligence.[2]  No federal
claim for relief is alleged.

Plaintiffs originally filed their complaint in the
state court on December 30, 2002, more than five years after
Pondimin and Redux, the products manufactured by Wyeth, were
withdrawn from the market in September, 1997.  Wyeth timely
removed the action to the United States District Court for the
Southern District of Mississippi.  Thereafter, plaintiffs moved
to remand this action under 28 U.S.C. § 1447(c).  The Mississippi
court deferred ruling on plaintiffs' motion, and the case was
then transferred to this court as part of MDL 1203.

II.

Under the removal statute, "any civil action brought in
a state court of which the district courts of the United States
have original jurisdiction, may be removed by the defendant or
defendants, to the district court ...."  28 U.S.C. § 1441(a).

---

2.  Specifically, plaintiffs have brought claims against the
following physicians:  Perry Michael French contends that Eric
Dyess, M.D. prescribed Pondimin and/or Redux to him; Brenda
Thigpen maintains that Arthur Wood, M.D. prescribed Pondimin
and/or Redux to her; Shirley Allen alleges that Earl Lee Stewart,
M.D. prescribed Pondimin and/or Redux to her; Angela Chapman
avers that William Edwin Powell, M.D. prescribed Pondimin and/or
Redux to her; David Graham claims that John M. Beaman, M.D.
prescribed Pondimin and/or Redux to him; Beverly Hill contends
that Jacob E. Ulmer, M.D. prescribed Pondimin and/or Redux to
her; Margo Jones maintains that Stephen A. Tramill, M.D.
prescribed Pondimin and/or Redux to her; Mildred Long alleges
that Todd Fulcher, M.D. prescribed Pondimin and/or Redux to her;
Brenda McDonald-Lott maintains that E. Kelton Pace, M.D.
prescribed Pondimin and/or Redux to her; Gwendolyn Ratliff avers
that Stanford Owen, M.D. prescribed Pondimin and/or Redux to her;
and Paula Webb claims that Richard Miller, M.D. prescribed
Pondimin and/or Redux to her.

-2-

Federal district courts have original jurisdiction over all civil
actions between citizens of different states if the amount in
controversy exceeds $75,000, exclusive of interest and costs.
See 28 U.S.C. § 1332(a).  If an action originally filed in a
state court could have been brought in federal court pursuant to
diversity jurisdiction, the defendants may remove it to federal
court.  28 U.S.C. §§ 1441, 1446.  If a federal court subsequently
determines that it does not have subject matter jurisdiction over
a removed action, it must remand the action to the state court
from which it originated.  See 28 U.S.C. § 1447(c).

Wyeth bears a heavy burden to establish fraudulent
joinder.  See Boyer v. Snap-on Tools Corp., 913 F.2d 108, 111 (3d
Cir. 1990).  In determining whether Wyeth has met its burden, the
court must "resolve all contested issues of substantive fact in
favor of the plaintiff."  Id.  We are also cognizant of the fact
that the removal statute must be construed narrowly, and "all
doubts should be resolved in favor of remand."  Steel Valley
Auth. v. Union Switch & Signal Div., 809 F.2d 1006, 1010 (3d Cir.
1987) (citation omitted).  The heavy burden placed upon Wyeth to
establish fraudulent joinder does not mean we must accept blindly
whatever plaintiffs may assert no matter how incredible or how
contrary to the overwhelming weight of the evidence.  The Supreme
Court made it clear in Wilson v. Republic Iron & Steele Co., 257
U.S. 92 (1921), that if a plaintiff contests a defendant's
assertion that joinder of another defendant was a sham to defeat
removal, the District Court must determine the facts from the

-3-

evidence.  <u>Wilson</u>, 257 U.S. at 98.  We are not to decide
automatically in favor of remand simply because some facts may be
in dispute.

      As an MDL court sitting within the Third Circuit, we
must apply our Court of Appeals' fraudulent joinder standard.
<u>See In re Korean Airlines Disaster</u>, 829 F.2d 1171, 1174 (D.C.
Cir. 1987); <u>In re Ikon Office Solutions, Inc.</u>, 86 F. Supp. 2d
481, 485 (E.D. Pa. 2000).  This court must decide whether there
is "a reasonable basis in fact or colorable ground supporting the
claim against the joined defendant."  <u>Boyer</u>, 935 F.2d at 111.

      On matters of substantive law, "[i]f there is even a
possibility that a state court would find that a plaintiff's
complaint states a cause of action against any one of the
resident defendants, the federal court must find that joinder was
proper and remand the case to state court."  <u>Boyer</u>, 913 F.2d at
111 (citation omitted).  We are mindful that our inquiry into
Wyeth's claim of fraudulent joinder is less searching than that
permissible when a party seeks to dismiss a claim under Rule
12(b)(6) of the Federal Rules of Civil Procedure.  <u>Batoff v.
State Farm Ins. Co.</u>, 977 F.2d 848, 852 (3d Cir. 1992); <u>see also</u>,
<u>Gaul v. Neurocare Diagnostic, Inc.</u>, No. 02-CV-2135, 2003 WL
230800, at *2 (E.D. Pa. Jan. 3, 2003).  Simply because a claim
against a party may ultimately be dismissed for failure to state
a claim does not necessarily mean that the party was fraudulently
joined.  The test is whether a claim is colorable, that is, not
"wholly insubstantial and frivolous."  <u>Batoff</u>, 977 F.2d at 852.

-4-

Feb-20-04   11:24am   From-REED SMITH LLP                    215-851-1417        T-282   P.006/016   F-550

### III.

It is undisputed that plaintiffs' ingestion of fen-phen occurred more than two years prior to the filing of this action. While plaintiffs concede as much, they contend that the statute of limitations did not begin to run until they discovered their injuries after receiving echocardiograms. Plaintiffs claim that it is "unrealistic to expect a layperson to perceive their injury at the time of the alleged wrongful act." Pls.' Mot. to Remand at 7. Accordingly, plaintiffs argue that their claims are not time barred because under Mississippi law they have two years from the discovery of an alleged injury in which to file a claim. MISS. CODE. ANN. § 15-1-36 (2002).

In Mississippi, a tort claim against a health care provider is subject to a two-year statute of limitations. Id. The statute provides in relevant part:

> For any claim accruing on or before June 30, 1998, and except as otherwise provided in this section, no claim in tort may be brought against a licensed physician, osteopath, dentist, hospital, institution for the aged or the infirm, nurse, pharmacist, podiatrist, optometrist or chiropractor for injuries or wrongful death arising out of the course of medical, surgical or other professional services unless it is filed <u>within two (2) years from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered</u>.

-5-

MISS. CODE. ANN. § 15-1-36(1) (emphasis added).  For any claim

accruing on or after July 1, 1998, the statute of limitations is

the same for all relevant purposes.[3]

Under Mississippi law, an action accrues when a patient

can reasonably be held to have knowledge of the injury itself,

cause of injury, and the conduct of the medical practitioner.

Fortenberry v. Memorial Hosp. At Gulfport, Inc., 676 So.2d 252

(Miss. 1996).  A plaintiff has a duty of reasonable inquiry upon

receiving information that indicates a claim exists.  "The would-

be plaintiff need not have become absolutely certain that he had

a cause of action; he need merely be on notice - or should be -

that he should carefully investigate the materials that suggest

that a cause probably or potentially exists."  First Trust Nat'l

Ass'n v. First Nat'l Bank of Commerce, 220 F.3d 331, 336-37 (5th

Cir. 2000) (emphasis in original).  In other words, "plaintiffs

need not have actual knowledge of the facts before the duty of

due diligence arises; rather, knowledge of certain facts which

are 'calculated to excite inquiry' give rise to the duty to

inquire."  In re Catfish Antitrust Litig., 826 F. Supp. 1019,

1031 (N.D. Miss. 1993) (citations omitted).

---

3.  The statute of limitations for claims accruing after July 1,
1998 adds tolling provisions for fraudulent concealment and
instances when a foreign object is left in a patient's body.  See
MISS. CODE. ANN. § 15-1-36(2)(a),(b).  Both provisions require a
plaintiff to bring an action within two years of the time when
the alleged injury or fraud should have been discovered, and no
later than seven years after the alleged act of neglect.  See id.

-6-

      Plaintiffs contend that they brought their actions
within two years "from the date the alleged act ... with
reasonable diligence might have been first known or discovered."
MISS. CODE. ANN. § 15-1-36(1). According to plaintiffs, they could
not have reasonably discovered their purported injuries until
their alleged heart problems were diagnosed after reviewing their
echocardiograms. Plaintiffs claim that their diagnosis occurred
less than two years prior to filing their complaint. Wyeth
counters that plaintiffs should have been on notice of their
stated injuries as a result of the widespread publicity
accompanying the withdrawal of the diet drugs from the market in
September, 1997. Wyeth further contends that plaintiffs should
have known about their alleged injuries at the very latest in
March, 2000, after Wyeth's extensive publicity campaign.

      The publicity began on September 15, 1997. At
10:00 p.m., the Jackson, Mississippi NBC affiliate reported a
story announcing the withdrawal of the diet drugs from the market
at the urging of the Food and Drug Administration ("FDA"). The
story went on to report the FDA's findings that approximately 30
percent of diet drug patients who were evaluated had abnormal
echocardiograms, even though symptoms had yet to manifest.
Earlier that day, at approximately 12:30 p.m., the same local NBC
affiliate station reported that the FDA advised people taking
diet drugs to discontinue use and contact their doctors
immediately. The very next day, September 16, 1997, the <u>Clarion
Ledger</u>, a Jackson, Mississippi based newspaper distributed

-7-

Feb-20-04    11:25am    From-REED SMITH LLP                    215-851-1417        T-282  P.008/016  F-550

throughout the state, reported on its front page an article
entitled "2 Popular Diet Drugs Removed From Stores."  The text of
the news article echoed the findings of a 1997 FDA study and the
subsequent urging by the FDA for individuals taking diet drugs to
immediately discontinue their use.  On November 14, 1997, a story
written by the Associated Press appeared in the <u>Clarion Ledger</u>
with the headline "Fen-Phen users need exam, says government."
The first sentence of this article paraphrased the FDA's
suggestion that individuals who had taken diet drugs for any
amount of time should see their doctors immediately for
examination.

        Media coverage of the withdrawal of the diet drugs from
the market was not limited to local news outlets.  Reports about
the withdrawal were the leading stories on major network news
programs on television, including NBC Nightly News, CBS Evening
News and the Today Show.  <u>USA Today</u>, a daily newspaper with a
national readership, ran a front-page story regarding the
withdrawal of diet drugs, its effects, and the response by
various organizations throughout the United States regarding the
news.  The article went so far as to report that potential
litigation was imminent and people who had taken diet drugs were
signing up with attorneys to take part in a large class action
lawsuit.

        Wyeth also informed consumers about the recall of its
diet drugs as well.  Immediately after removing the drugs from
the market on September 15, 1997, Wyeth issued a press release

-8-

advising patients who had used diet drugs to consult their
physicians. It included the same message in full page
advertisements that it purchased in leading national and regional
newspapers. These advertisements led with a banner in large
print, stating "An Important Message To Patients Who Have Used
Pondimin or Redux." Furthermore, Wyeth sent a "Dear Health Care
Provider Letter" to approximately 450,000 doctors and pharmacists
informing them of the withdrawal of the drugs from the market and
of the potential association between use of the drugs and
instances of valvular heart disease.

> Even if the plaintiffs were somehow not apprised of
their potential claims as a result of this extensive publicity,
they certainly were put on notice by the end of March, 2000, by
the comprehensive publicity campaign regarding the proposed
nationwide class action Settlement Agreement with Wyeth. <u>See</u>
Memorandum and Pretrial Order ("PTO") No. 997 at 7 (E.D. Pa.
Nov. 23, 1999).[4] This notice program "employed sophisticated
media techniques and was designed to reach all class members" to
make them "aware of the potential risks posed by Pondimin and
Redux." PTO No. 1415 at 79-80. This court described the
exhaustive and far-reaching nature of this notice campaign in PTO
No. 1415:

> > A television commercial was developed ...
> > [which] broadcast 106 times over a period of
> > five weeks on network television. The
> > television commercial message was also

---

4.  <u>See</u> <u>also</u> PTO No. 1415 at 62-66 (E.D. Pa. Aug. 28, 2000).

-9-

broadcast 781 times, for six consecutive
weeks on various cable networks.

A summary notice was prepared for use in the
print media.  The summary notice appeared
repeatedly in several magazines between
January and March 2000.  The summary notice
appeared as a one-third page black and white
ad in four national newspapers, 77 local
newspapers, 3 newspapers distributed
throughout the U.S. Territories and four
newspapers targeted to the Hispanic market.
These newspapers were selected because they
were national publications, or because they
represented the principal newspapers in the
top 15 markets in the United States, or
because they were published in geographic
areas having the highest usage of Pondimin
and Redux, and/or because they were targeted
to African-American or Spanish speaking
populations.  In addition, the summary form
of notice was published in a variety of
publications targeted to healthcare providers
and pharmacists.  Banner ads were also
developed for use on the Internet, directing
potential class members to the official
settlement website where class members could
receive information concerning the settlement
and obtain a notice package.  These banner
advertisements were placed within several
media categories on a variety of Internet
publishers.

In addition to the above, notice was
transmitted by mail to all pharmacists in the
United States and to doctors who were likely
to have prescribed Pondimin or Redux or
treated patients for complications resulting
from the use of those drugs.  Notices to
these healthcare providers contained a
"notice package," a letter of explanation and
a counter card reflecting the summary form of
notice described above, which pharmacists and
physicians could display to alert patients
about the existence of the settlement and the
opportunity to obtain a "notice package" by
contacting the 1-800 number or official web
site ....  Such mailings were transmitted to
784,128 physicians and to 108,288
pharmacists.

Id. at 80-82 (citations and footnotes omitted).

-10-

Feb-20-04   11:25am   From-REED SMITH LLP                        215-851-1417        T-292   P.012/016   F-550

The court also explained that the summary notice
appeared ten times between January and February, 2000 in the form
of a full page black and white advertisement in Parade, People,
and Time magazine.  A full page black and white version of the
summary notice was inserted into eight monthly magazines during
February, 2000, including Better Homes & Gardens, Ladies Home
Journal, Family Circle, McCalls, Women's Day, Redbook, Good
Housekeeping and Ebony.  Additional insertions of the summary
notice appeared as full page black and white advertisements in
the March editions of Better Homes & Gardens and Good
Housekeeping.  Finally, a two-page black and white version of the
summary notice was placed in Reader's Digest during February and
March, 2000.

This court found that the media program concerning the
proposed settlement was "highly successful" at reaching targeted
women.  PTO No. 1415 at 83.  It explained:

> 97% of women between the ages of 25 and 54
> viewed one or more forms of televised or
> printed notice an average of 10 times.  A
> reach and frequency analysis indicated that
> almost 80% of women between the ages of 25
> and 54 were exposed to the messages contained
> in televised or printed forms of notice a
> minimum of five times ....  In addition, a
> reach and frequency analysis indicated that
> the settlement message reached 97% of women
> 35 years and older an average of 11.4 times
> and that it reached 81% of women 35 years and
> older a minimum of five times.  With respect
> to African-American women between the ages of
> 25 and 54, the reach and frequency analysis
> shows that the settlement message reached 97%
> of those women an average of 10.2 times and
> that 79% of African-American women between
> the ages of 25 and 54 viewed the message a minimum of
> five times.

-11-

Id. at 83 n.16 (citations omitted).

In support of plaintiffs' contention that their
injuries occurred within two years of the filing of their
complaint, they provide the court with affidavits from James H.
Oury, M.D. and George K. Massing, M.D., both of whom opine that
diet drug induced valvular heart disease is a latent disease.
However, they say nothing about when the disease manifested
itself in any of the plaintiffs.

Wyeth counters plaintiffs' position by referring to
this court's ruling after receiving evidence on the latency issue
at the fairness hearing in connection the nationwide class action
Settlement Agreement.  The court determined in PTO No. 1415 that
Pondimin and Redux did not cause latent heart valve injuries but
rather that any injury occurred at or near the time of last use.
In the August 28, 2000 Order approving the Settlement Agreement,
Judge Bechtle stated:  "[t]he absence of a latency period between
the ingestion of [the diet drug] and the development of
clinically detectable [heart disease] is ... confirmed by a
number of studies ... , [each of which finds] that there was no
emergence of new disease after some latency period."  PTO No.
1415 at 46.

The plaintiffs in these matters are class members and
as such were parties to the Settlement Agreement.  The issue of
latency was actually litigated in the fairness hearing and is one
of the same issues that the plaintiffs are now raising to defeat
the bar of the statute of limitations.  Judge Bechtle's

-12-

determination of no latency, that is that the class members'
injuries occurred within a short time after ingesting fen-phen,
was an essential finding, for it directly affected the adequacy
of class representation.  See PTO No. 1415 at 104-08.  Finally,
PTO No. 1415, in which Judge Bechtle approved the Settlement
Agreement, is a final and valid judgment, upheld on appeal.
Thus, plaintiffs are collaterally estopped from re-litigating the
issue of latency through the affidavits of Dr. Oury and Dr.
Massing.

IV.

In light of the massive publicity concerning the health
risks associated with the use of diet drugs, the comprehensive
notice program associated with the settlement, and this court's
determination that diet drug induced valvular heart disease is
not a latent disease, we find that plaintiffs, through the
exercise of reasonable diligence, should have discovered their
alleged injuries at the very latest by the end of March, 2000.
Since plaintiffs did not file this action until December 30,
2002, their claims against their prescribing physicians are
clearly time barred.

Accordingly, Wyeth has shown that the in-state
physician defendants are fraudulently joined.  We will deny the
motion of the plaintiffs to remand this action to the Circuit

-13-

Feb-20-04   11:26am   From-REED SMITH LLP                    215-851-1417        T-292  P.015/016  F-550

Court of Jones County, Mississippi and dismiss the complaint as to these physician defendants.[5]

---

5.  Having determined that the court properly retains jurisdiction over this action based upon the fraudulent joinder of in-state physicians, we need not consider Wyeth's remaining arguments for the exercise of federal jurisdiction.

-14-

# EXHIBIT 7

## DECLARATION OF SHARON L. TAYLOR

I, the undersigned, declare as follows:

1. My name is Sharon L. Taylor, and I am over the age of 18.  I am an attorney with the law firm of Arnold & Porter, licensed to practice law in the District of Columbia and Maryland (inactive).  Arnold & Porter is national counsel for Wyeth[1] in the diet drug litigation.

2. I submit this declaration in support of Wyeth's Notice of Removal to provide the Court with a small but illustrative sample of the extensive public information linking diet drugs with heart valve problems that was available in 1997-2000.  I have personal knowledge of the materials described herein.

3. Wyeth is not endorsing the accuracy of these or any other public reports; it is merely documenting the extent of publicity the diet drugs received.

4. This declaration specifically provides illustrative examples of the massive nationwide and local publicity concerning (1) the July 1997 announcements about the possible association between certain diet drugs and valvular heart disease; (2) the withdrawal of those diet drugs from the market in September 1997; (3) the U.S. Department of Health and Human Services' warning in November 1997 that diet drug users should visit their

---

[1] American Home Products Corporation changed its name to Wyeth on March 11, 2002.

doctors for evaluation; and (4) diet drug litigation and the nationwide class action settlement of that litigation in 1999 and 2000.

## I.    Publicity Concerning the July 1997 Announcements About the Possible Association Between Diet Drugs and Valvular Heart Disease

5. On July 8, 1997, the Mayo Clinic issued a press release describing health risks possibly associated with the use of diet drugs.[2]  The United States Department of Health and Human Services issued a similar press release that same day.[3]

### A.    National Publicity About Announcements Concerning Diet Drugs and Valvular Heart Disease

6. The contents of the Mayo Clinic announcement were widely reported in the national press.  For example, *USA Today* and the *New York Times* both ran front-page articles concerning the report on July 9, 1997, bearing the headlines "Diet Drug Patients Get Heart Warning" and "2 Popular Diet Pills Linked to Problems With Heart Valves."[4]  *The Wall Street Journal* likewise ran an article that same day announcing that "Diet Drug Mix May Damage Heart Valves."[5]  *USA Today* ran similar follow-up articles

---

[2] Press release, Mayo Clinic, Valvular Heart Disease Associated with Fenfluramine-Phentermine (July 8, 1997).

[3] Press release, U.S. Dept. Health and Human Servs., Health Advisory on Fenfluramine/Phentermine for Obesity (July 8, 1997).

[4] Nancy Hellmich, *Diet Drug Patients Get Heart Warning*, USA TODAY, at 1A, July 9, 1997; Gina Kolata, *2 Popular Diet Pills Linked to Problems With Heart Valves*, N.Y. TIMES, at A1, July 9, 1997.

[5] Robert Langreth & Bruce Ingersoll, *Pharmaceuticals: Diet-Drug Mix May Damage Heart Valves*, WALL ST. J., at B1, July 9, 1997.

on July 10[6] and the *New York Times* addressed the issue again with an article published on July 11.[7]

## B.    Local Publicity About the Announcements

7. The Mayo Clinic announcement also received substantial publicity in local newspapers and television news broadcasts throughout the country.

8. News of the Mayo Clinic announcement was featured on the front pages of newspapers in the western United States. For example, on July 9, 1997, the *San Francisco Chronicle* ran a front-page story entitled "Diet Drug Mix May be Deadly, FDA Warns" and provided extensive detail of the Mayo Clinic's findings.[8] The *Los Angeles Times* published an equally in-depth feature on the same date under the headline "Fen-Phen May Cause Damage to Heart Valves."[9] Other California newspapers ran comparable articles.[10]

---

[6] Nanci Hellmich, *Diet Drug Warning Puts Patients in Limbo*, USA TODAY, July 10, 1997, at 1D; Nanci Hellmich, *Diet Drug Risks Are a Balancing Act; Fen-Phen's Link to Heart-Valve Problems Raises Other Concerns*, USA TODAY, July 10, 1997, at 10D.

[7] Dana Canedy, *Diet Centers Reconsider Prescription Drug Use*, N.Y. TIMES, July 11, 1997, at D4.

[8] Chris Tomlinson, *Diet-Drug Mix May be Deadly FDA Warns*; *'Fen-Phen' Linked to Heart, Lung Damage*, SAN FRANCISCO EXAMINER, July 9, 1997, at A1.

[9] Terence Monmaney, *Fen-Phen May Cause Damage to Heart Valves*, LOS ANGELES TIMES, July 9, 1997, at A1.

[10] *See, e.g.*, Sharline Chiang & Yvette Cabrera, *Doctors, Diet Experts Split on Fen-Phen*, LOS ANGELES DAILY NEWS, July 9, 1997, at N8; Angela La Voie, *Diet-Drug Danger: Heart Ailment Linked to Fen-Phen*, LOS ANGELES DAILY NEWS, July 9, 1997, at N1; Michelle Nicolosi, *Mayo Study Links Heart Disease, 'Fen-Phen' Diet; Medicine: Doctors Are Warned About Wildly Popular Drugs*, ORANGE COUNTY REG. (Cal.), July 9, 1997, at A01; Chris Tomlinson, *Diet-Drug Combination 'Fen-Phen' Linked to Heart, Lung Damage*, METROPOLITAN NEW-ENTERPRISE (Los Angeles, Cal.), July 9, 1997; *Diet Pill Users File Civil Suit*, SAN FRANCISCO CHRON., July 10, 1997, at A24; *Lawsuit Filed Against Fen-Phen Firms*, LOS ANGELES TIMES, July 10, 1997, at D2; Michelle Nicolosi, *Warning Weighs on O.C. Dieters; Health: Talk at Obesity Clinics Centers Around*
[Footnote continued on next page]