Under Virginia law, a cause of action accrues when all essential elements are present. Locke v. Johns-Manville Corp., 275 S.E.2d 900, 904 (Va. 1981). Here, where the plaintiffs claim medical negligence, the cause of action accrues when (1) the defendants have a legal obligation to the plaintiffs, (2) the defendants violate or breach that duty, and (3) harm or damage occurs as a proximate result of the breach or violation. See id. Accordingly, the statue of limitations begins to run when there is injury to the plaintiffs, "without which no cause of action would come into existence." Id.

The crucial issue we must resolve is the time when the plaintiffs were first injured. See Locke, 275 S.E.2d at 905. Wyeth claims that the last possible date on which plaintiffs could have sustained injuries was September 15, 1997, or shortly thereafter, when fen-phen was pulled from the market. Plaintiffs, on the other hand, contend that their respective injuries did not accrue until they were diagnosed with various heart problems within the past two years.[8] To determine when

8. Plaintiffs, in their motions for judgment, aver that their injuries are as follows: Audrey Alexander claims that an echocardiogram in May, 2002 reveals moderate mitral regurgitation as a result of her usage of Pondimin; Ida Haynes maintains that an echocardiogram in March, 2002 reveals moderate mitral regurgitation with left atrium enlargement as a result of her usage of Pondimin; Ruth Higginbottom claims that an echocardiogram in July, 2002 reveals moderate mitral regurgitation with left atrium enlargement as a result of her usage of Pondimin; Thomas Jarrell asserts that he became FDA positive (moderate or greater mitral regurgitation) within the past two years as a result of his usage of Redux; Cynthia Kanode claims that an echocardiogram in July, 2002 reveals moderate mitral regurgitation with left atrium enlargement as a result of
(continued...)

plaintiffs' alleged injuries occurred, it is necessary to examine the relevant medical evidence.  See id.  "The 'time plaintiff was hurt' is to be established from available competent evidence, produced by a plaintiff or a defendant, that pinpoints the precise date of injury with a reasonable degree of medical certainty."  Id.  Because Wyeth claims that plaintiffs' claims are barred by the statute of limitations, it "bears the burden of proving the date on which the injury was sustained with a reasonable degree of medical certainty."  St. George, 484 S.E.2d at 890.  Wyeth is "not required to establish as a matter of law the exact date that the injury was first sustained; [it] need only to establish that it was more probable than not that it occurred more than two years prior to the filing of suit."  Wade, 5 F. Supp. 2d at 383.  To support their position that their injuries occurred within two years of filing their motions for judgment, plaintiffs each submit an affidavit from either Dr. Emeki Nkadi or Dr. Peter S. Ro, board certified cardiologists, which states that "within a reasonable degree of medical probability and certainty, ... the plaintiff in this action sustained the injury to her heart that is the basis of this lawsuit within two years prior to the filing of this suit," Nkadi Decls. at ¶ 5, or "that the plaintiff in this action was injured

_____

8.(...continued)
her usage of Pondimin, Redux, and/or Phentermine; and Linda
Trisvan maintains that an echocardiogram in July, 2002 reveals
moderate aortic regurgitation as a result of her usage of Redux.

and became FDA+ within two years prior to the filing of this suit." Ro Decl. at ¶ 5.[9]

Wyeth, on the other hand, points out that Judge Louis C. Bechtle,[10] in PTO No. 1415, determined that Pondimin and Redux did not cause latent heart valve injuries but that the injury occurred at or near the time of last use.[11] See PTO No. 1415, Brown v. American Home Products Corporation, CIV.A. No. 99-20593 (E.D. Pa. Aug. 28, 2000). After a full hearing, Judge Bechtle found:

> Pondimin and Redux were withdrawn from the market in September 1997 accompanied by an unprecedented amount of publicity which effectively warned diet drug users that they may have developed valvular lesions which could be detected through non-invasive echocardiograms. Also, these lesions are not latent. If they are going to occur, they are going to occur during drug use (or shortly thereafter) and be demonstrable on echocardiogram.

PTO No. 1415 at 41. In reaching this conclusion, Judge Bechtle considered a number of studies that tracked former Pondimin and/or Redux patients for a number of years to find that "there was no emergence of new disease after some latency period." Id.

9.  Plaintiff Thomas Jarrell submitted an affidavit from Dr. Ro. The rest of the plaintiffs submitted an affidavit from Dr. Nkadi.

10.  Judge Bechtle was the original MDL 1203 judge who presided over the class action settlement in Brown. He retired on June 30, 2001.

11.  Plaintiff Cynthia Kanode claims damages resulting from Redux, Pondimin, and Phentermine, "either individually or in combination." Kanode Mot. for J. at ¶ 18. Because Judge Bechtle determined in PTO No. 1415 that the ingestion of Phentermine did not cause damage, we need not address Ms. Kanode's allegations of damages resulting from Phentermine.

at 106-07. In addition, Judge Bechtle relied upon the experts
who testified in the case, all of whom agreed that Pondimin,
Redux, and the fen-phen combination "do not cause latent valvular
regurgitation" and "that there is no evidence of significant
progression among such patients after they cease taking the
drugs." Id. at 108.

Importantly, class counsel, whom this court determined
adequately represented all class members including plaintiffs
here, had an opportunity but did not object to the contentions or
the finding of "no latency." Judge Bechtle found that those who
did object ("objectors") "presented no evidence from any study to
support the contrary view that [heart disease] is either latent
or that it progresses in most former patients." PTO No. 1415 at
107. Judge Bechtle carefully analyzed the studies cited by the
objectors and determined that the studies did not support the
objectors' argument for latency.[12] Specifically, one study cited
by the objectors found that "the prevalence and severity of [diet
drug] associated [heart problems] fifteen years after exposure is
similar to published reports of patients with recent exposure,
suggesting a lack of significant regression or progression of
[heart problems] over time." PTO No. 1415 at 129. Another study
cited by the objectors similarly noted that there does not appear
to be a progression of diet drug related heart problems. Id.
The "competent medical evidence," as presented by Wyeth and

_____

12. Judge Bechtle reviewed the studies of Eichelberger and
Fischer. See PTO No. 1415 at 129 (citing Ex. P-118; Ex. P-119).

-13-

reviewed in detail by Judge Bechtle in PTO No. 1415, establishes "with a reasonable degree of medical certainty" that the diet drugs Pondimin and Redux do not create latent injuries.  <u>Locke</u>, 275 S.E.2d at 905.

Wyeth contends that the principle of collateral estoppel, that is issue preclusion, prevents the plaintiffs from relitigating the question when class members first suffered injuries from Pondimin and Redux.  Collateral estoppel bars the relitigation of an issue which has already been tried between the same parties or their privies.  It applies when "(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment."  <u>Nat'l R.R. Passenger Corp. v. Pennsylvania Public Util. Comm'n</u>, 342 F.3d 242, 252 (3d Cir. 2003) (citation omitted).

Here, the plaintiffs are class members and were thus parties to the Settlement Agreement.  The issue of latency was actually litigated in the fairness hearing and is the same issue that the plaintiffs are now raising to defeat the bar of the statute of limitations.  Judge Bechtle's determination of no latency, that is that class members' injuries occurred within a short time after ingesting fen-phen, was an essential finding, for it directly affected the adequacy of class representation. <u>See</u> PTO No. 1415 at 104-08.  Finally, PTO No. 1415, in which Judge Bechtle approved the Settlement Agreement, is a final and

-14-

valid judgment, upheld on appeal.  Thus, plaintiffs are
collaterally estopped from relitigating the issue of latency
through the affidavits of Dr. Ro and Dr. Nkadi.

Based on the record in this nationwide class action as
set forth in PTO No. 1415, we find that plaintiffs' injuries were
sustained and the cause of action accrued, at the latest, shortly
after September 15, 1997, when fen-phen was withdrawn from the
market.  Plaintiffs' motions for judgment were filed in the
Virginia state courts over five years after September 1997 and
thus over five years after their respective physicians prescribed
these drugs.  Accordingly, there is "no reasonable basis in fact
or colorable ground" that plaintiffs' motions for judgment
against the defendant physicians and their practice groups were
timely.  <u>Boyer</u>, 913 F.2d at 111.

IV.

Plaintiffs also bring claims against John Does 1-3 --
anonymous detail persons and marketing representatives of Wyeth
whom plaintiffs believe to be citizens of Virginia.  Plaintiffs
appear to join John Does 1-3 in an effort to defeat diversity.
However, the removal statute, in relevant part, provides that
"the citizenship of defendants sued under fictitious names shall
be disregarded."  28 U.S.C. § 1441(a).  Thus, for the purposes of
determining whether complete diversity exists so that these
actions may remain in federal court, the citizenship of John Does
1-3 is irrelevant.

V.

Finally, we turn to the issue of whether a statute of limitations defense may be considered in support of a fraudulent joinder claim. We previously answered this question in the affirmative in PTO No. 2710 in <u>Price v. American Home Products</u>, CIV.A. No. 02-20229 (E.D. Pa. Jan. 17, 2003) and PTO No. 3207 in <u>Ross v. Wyeth, et al.</u>, CIV.A. No. 03-20362 (E.D. Pa. Jan. 12, 2004), which are also part of the nationwide diet drug litigation. Because we have previously ruled on the same legal issue, we need not revisit it here. Instead, we refer the parties to our prior analysis of this issue. <u>See</u> <u>e.g.</u>, PTO No. 3207 at 11-12.

We find that Wyeth has met its burden of proving that the statute of limitations defense "unquestionably" precludes plaintiffs from obtaining relief from their respective physicians and the physicians' practice groups. <u>See</u> <u>Gaul</u>, <u>supra</u>, 2003 WL 230800, at *3. Plaintiffs' attempts to join their physicians as defendants are improper efforts to prevent Wyeth from exercising its statutory right under 28 U.S.C. § 1441 to remove cases based on diversity of citizenship to federal court. Because Wyeth has met its heavy burden of establishing fraudulent joinder, we will deny plaintiffs' motions to remand these actions to the several Virginia state courts and dismiss plaintiffs' claims against defendant physicians, their respective practice groups, and John Does 1-3. Plaintiffs' motions for costs are without merit and will be denied.

-16-

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: DIET DRUGS | : | MDL DOCKET NO. 1203 |
| (PHENTERMINE, FENFLURAMINE, | : | |
| DEXFENFLURAMINE) PRODUCTS | : | |
| LIABILITY LITIGATION | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| _____ | : | |
| | : | |
| AUDREY ALEXANDER v. WYETH, et al. | : | CIVIL ACTION NO. 03-20206 |
| | : | |
| IDA HAYNES v. WYETH, et al. | : | CIVIL ACTION NO. 03-20143 |
| | : | |
| RUTH HIGGINBOTTOM v. WYETH, et al. | : | CIVIL ACTION NO. 03-20142 |
| | : | |
| THOMAS JARRELL v. WYETH, et al. | : | CIVIL ACTION NO. 03-20144 |
| | : | |
| CYNTHIA KANODE v. WYETH, et al. | : | CIVIL ACTION NO. 03-20145 |
| | : | |
| LINDA TRISVAN v. WYETH, et al. | : | CIVIL ACTION NO. 03-20141 |

**PRETRIAL ORDER NO. _____**

AND NOW, this 29th day of January, 2004, for the
reasons set forth in the accompanying Memorandum, it is hereby
ORDERED that:

(1)   the motion of plaintiff Audrey Alexander in
Audrey Alexander v. Wyeth, et al., CIV.A. No. 03-20206 (E.D. Pa.)
to remand to the Circuit Court for the City of Lynchburg,
Virginia is DENIED;

(2)   the claims against defendants Thomas W. Eppes,
Jr., M.D., Central Virginia Family Physicians, Inc., and John
Does 1-3 in Audrey Alexander v. Wyeth, et al. are DISMISSED;

(3)  the motion of plaintiff Ida Haynes in <u>Ida Haynes</u>
<u>v. Wyeth, et al.</u>, CIV.A. No. 03-20143 (E.D. Pa.) to remand to the
Circuit Court for the City of Richmond, Virginia is DENIED;

(4)  the claims against defendants Vanessa O. Johnson,
M.D., U.S. Medical Weight Loss Centers, and John Does 1-3 in
<u>Ida Haynes v. Wyeth, et al.</u> are DISMISSED;

(5)  the motion of plaintiff Ruth Higginbottom in <u>Ruth</u>
<u>Higginbottom v. Wyeth, et al.</u>, CIV.A. No. 03-20142 (E.D. Pa.) to
remand to the Circuit Court for the City of Richmond, Virginia is
DENIED;

(6)  the claims against defendants Eric Joel DeMaria,
M.D. and John Does 1-3 in <u>Ruth Higginbottom v. Wyeth, et al.</u> are
DISMISSED;

(7)  the motion of plaintiff Thomas Jarrell in <u>Thomas</u>
<u>Jarrell v. Wyeth, et al.</u>, CIV.A. No. 03-20144 (E.D. Pa.) to
remand to the Circuit Court for the City of Richmond, Virginia is
DENIED;

(8)  the claims against defendants James C. Barr,
M.D., Virginia Physicians, Inc., and John Does 1-3 in <u>Thomas</u>
<u>Jarrell v. Wyeth, et al.</u> are DISMISSED;

(9)  the motion of plaintiff Cynthia Kanode in <u>Cynthia</u>
<u>Kanode v. Wyeth, et al.</u>, CIV.A. No. 03-20145 (E.D. Pa.) to remand
to the Circuit Court for the City of Richmond, Virginia is
DENIED;

(10)  the claims against defendants John R. Partridge,
M.D., Corinne N. Tuckey-Larus, M.D., Virginia Physicians for

Women, Ltd., and John Does 1-3 in <u>Cynthia Kanode v. Wyeth, et al.</u> are DISMISSED;

(11)  the motion of plaintiff Linda Trisvan in <u>Linda Trisvan v. Wyeth, et al.</u>, CIV.A. No. 03-20141 (E.D. Pa.) to remand to the Circuit Court for the County of Greensville, Virginia is DENIED;

(12)  the claims against defendants Thomas Walker, M.D. and John Does 1-3 in <u>Linda Trisvan v. Wyeth, et al.</u> are DISMISSED; and

(13)  the motions of all plaintiffs for costs pursuant to 28 U.S.C. § 1447(c) are DENIED.

BY THE COURT:

_Harvey Bartle_ J.

# EXHIBIT 7

RECEIVED

FEB 2 5 2004

BrownGreer PLC
Richmond

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: DIET DRUGS          :    MDL DOCKET NO. 1203
(PHENTERMINE, FENFLURAMINE, :
DEXFENFLURAMINE) PRODUCTS   :
LIABILITY LITIGATION        :
                            :
THIS DOCUMENT RELATES TO:   :
_____     :
PERRY MICHAEL FRENCH, et al. :
                            :
          v.                :
                            :
WYETH, et al.               :    CIVIL ACTION NO. 03-20353

MEMORANDUM AND PRETRIAL ORDER NO. 3281

Bartle, J.                             February 18, 2004

          Before the court is the motion of the eleven plaintiffs

to remand their complaint against defendant Wyeth and eleven non-

diverse physicians to the Circuit Court of Jones County,

Mississippi.[1]  This motion is before the undersigned as

transferee judge in MDL 1203, the mass tort litigation involving

the diet drugs commonly known as fen-phen.  Plaintiffs assert

claims for negligence, negligence per se, strict liability

(design defect and failure to warn), misrepresentation, and

breach of warranties against Wyeth as well as claims against

_____

1.  The plaintiffs named in this action are:  Perry Michael
French, Brenda Thigpen, Shirley Allen, Angela Chapman, David
Graham, Beverly Hill, Margo Jones, Mildred Long, Brenda McDonald-
Lott, Gwendolyn Ratliff, and Paula Webb respectively.

their prescribing physicians for medical negligence.[2]  No federal claim for relief is alleged.

Plaintiffs originally filed their complaint in the state court on December 30, 2002, more than five years after Pondimin and Redux, the products manufactured by Wyeth, were withdrawn from the market in September, 1997.  Wyeth timely removed the action to the United States District Court for the Southern District of Mississippi.  Thereafter, plaintiffs moved to remand this action under 28 U.S.C. § 1447(c).  The Mississippi court deferred ruling on plaintiffs' motion, and the case was then transferred to this court as part of MDL 1203.

## II.

Under the removal statute, "any civil action brought in a state court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court ...."  28 U.S.C. § 1441(a).

---

2.  Specifically, plaintiffs have brought claims against the following physicians:  Perry Michael French contends that Eric Dyess, M.D. prescribed Pondimin and/or Redux to him; Brenda Thigpen maintains that Arthur Wood, M.D. prescribed Pondimin and/or Redux to her; Shirley Allen alleges that Earl Lee Stewart, M.D. prescribed Pondimin and/or Redux to her; Angela Chapman avers that William Edwin Powell, M.D. prescribed Pondimin and/or Redux to her; David Graham claims that John M. Beaman, M.D. prescribed Pondimin and/or Redux to him; Beverly Hill contends that Jacob E. Ulmer, M.D. prescribed Pondimin and/or Redux to her; Margo Jones maintains that Stephen A. Tramill, M.D. prescribed Pondimin and/or Redux to her; Mildred Long alleges that Todd Fulcher, M.D. prescribed Pondimin and/or Redux to her; Brenda McDonald-Lott maintains that E. Kelton Pace, M.D. prescribed Pondimin and/or Redux to her; Gwendolyn Ratliff avers that Stanford Owen, M.D. prescribed Pondimin and/or Redux to her; and Paula Webb claims that Richard Miller, M.D. prescribed Pondimin and/or Redux to her.

Federal district courts have original jurisdiction over all civil actions between citizens of different states if the amount in controversy exceeds $75,000, exclusive of interest and costs. See 28 U.S.C. § 1332(a). If an action originally filed in a state court could have been brought in federal court pursuant to diversity jurisdiction, the defendants may remove it to federal court. 28 U.S.C. §§ 1441, 1446. If a federal court subsequently determines that it does not have subject matter jurisdiction over a removed action, it must remand the action to the state court from which it originated. See 28 U.S.C. § 1447(c).

Wyeth bears a heavy burden to establish fraudulent joinder. See Boyer v. Snap-on Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990). In determining whether Wyeth has met its burden, the court must "resolve all contested issues of substantive fact in favor of the plaintiff." Id. We are also cognizant of the fact that the removal statute must be construed narrowly, and "all doubts should be resolved in favor of remand." Steel Valley Auth. v. Union Switch & Signal Div., 809 F.2d 1006, 1010 (3d Cir. 1987) (citation omitted). The heavy burden placed upon Wyeth to establish fraudulent joinder does not mean we must accept blindly whatever plaintiffs may assert no matter how incredible or how contrary to the overwhelming weight of the evidence. The Supreme Court made it clear in Wilson v. Republic Iron & Steele Co., 257 U.S. 92 (1921), that if a plaintiff contests a defendant's assertion that joinder of another defendant was a sham to defeat removal, the District Court must determine the facts from the

-3-

evidence. <u>Wilson</u>, 257 U.S. at 98. We are not to decide automatically in favor of remand simply because some facts may be in dispute.

As an MDL court sitting within the Third Circuit, we must apply our Court of Appeals' fraudulent joinder standard. See <u>In re Korean Airlines Disaster</u>, 829 F.2d 1171, 1174 (D.C. Cir. 1987); <u>In re Ikon Office Solutions, Inc.</u>, 86 F. Supp. 2d 481, 485 (E.D. Pa. 2000). This court must decide whether there is "a reasonable basis in fact or colorable ground supporting the claim against the joined defendant." <u>Boyer</u>, 935 F.2d at 111.

On matters of substantive law, "[i]f there is even a possibility that a state court would find that a plaintiff's complaint states a cause of action against any one of the resident defendants, the federal court must find that joinder was proper and remand the case to state court." <u>Boyer</u>, 913 F.2d at 111 (citation omitted). We are mindful that our inquiry into Wyeth's claim of fraudulent joinder is less searching than that permissible when a party seeks to dismiss a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. <u>Batoff v. State Farm Ins. Co.</u>, 977 F.2d 848, 852 (3d Cir. 1992); <u>see also</u>, <u>Gaul v. Neurocare Diagnostic, Inc.</u>, No. 02-CV-2135, 2003 WL 230800, at *2 (E.D. Pa. Jan. 3, 2003). Simply because a claim against a party may ultimately be dismissed for failure to state a claim does not necessarily mean that the party was fraudulently joined. The test is whether a claim is colorable, that is, not "wholly insubstantial and frivolous." <u>Batoff</u>, 977 F.2d at 852.

III.

It is undisputed that plaintiffs' ingestion of fen-phen occurred more than two years prior to the filing of this action. While plaintiffs concede as much, they contend that the statute of limitations did not begin to run until they discovered their injuries after receiving echocardiograms. Plaintiffs claim that it is "unrealistic to expect a layperson to perceive their injury at the time of the alleged wrongful act." Pls.' Mot. to Remand at 7. Accordingly, plaintiffs argue that their claims are not time barred because under Mississippi law they have two years from the discovery of an alleged injury in which to file a claim. MISS. CODE. ANN. § 15-1-36 (2002).

In Mississippi, a tort claim against a health care provider is subject to a two-year statute of limitations. Id. The statute provides in relevant part:

> For any claim accruing on or before June 30, 1998, and except as otherwise provided in this section, no claim in tort may be brought against a licensed physician, osteopath, dentist, hospital, institution for the aged or the infirm, nurse, pharmacist, podiatrist, optometrist or chiropractor for injuries or wrongful death arising out of the course of medical, surgical or other professional services unless it is filed <u>within two (2) years from the date the alleged act, omission or neglect shall or with reasonable diligence might have been first known or discovered.</u>

MISS. CODE. ANN. § 15-1-36(1) (emphasis added). For any claim

accruing on or after July 1, 1998, the statute of limitations is

the same for all relevant purposes.[3]

Under Mississippi law, an action accrues when a patient

can reasonably be held to have knowledge of the injury itself,

cause of injury, and the conduct of the medical practitioner.

Fortenberry v. Memorial Hosp. At Gulfport, Inc., 676 So.2d 252

(Miss. 1996). A plaintiff has a duty of reasonable inquiry upon

receiving information that indicates a claim exists. "The would-

be plaintiff need not have become absolutely certain that he had

a cause of action; he need merely be on notice - or should be -

that he should carefully investigate the materials that suggest

that a cause probably or potentially exists." First Trust Nat'l

Ass'n v. First Nat'l Bank of Commerce, 220 F.3d 331, 336-37 (5th

Cir. 2000) (emphasis in original). In other words, "plaintiffs

need not have actual knowledge of the facts before the duty of

due diligence arises; rather, knowledge of certain facts which

are 'calculated to excite inquiry' give rise to the duty to

inquire." In re Catfish Antitrust Litig., 826 F. Supp. 1019,

1031 (N.D. Miss. 1993) (citations omitted).

---

3. The statute of limitations for claims accruing after July 1,
1998 adds tolling provisions for fraudulent concealment and
instances when a foreign object is left in a patient's body. See
MISS. CODE. ANN. § 15-1-36(2)(a),(b). Both provisions require a
plaintiff to bring an action within two years of the time when
the alleged injury or fraud should have been discovered, and no
later than seven years after the alleged act of neglect. See id.

Plaintiffs contend that they brought their actions within two years "from the date the alleged act ... with reasonable diligence might have been first known or discovered." MISS. CODE. ANN. § 15-1-36(1). According to plaintiffs, they could not have reasonably discovered their purported injuries until their alleged heart problems were diagnosed after reviewing their echocardiograms. Plaintiffs claim that their diagnosis occurred less than two years prior to filing their complaint. Wyeth counters that plaintiffs should have been on notice of their stated injuries as a result of the widespread publicity accompanying the withdrawal of the diet drugs from the market in September, 1997. Wyeth further contends that plaintiffs should have known about their alleged injuries at the very latest in March, 2000, after Wyeth's extensive publicity campaign.

The publicity began on September 15, 1997. At 10:00 p.m., the Jackson, Mississippi NBC affiliate reported a story announcing the withdrawal of the diet drugs from the market at the urging of the Food and Drug Administration ("FDA"). The story went on to report the FDA's findings that approximately 30 percent of diet drug patients who were evaluated had abnormal echocardiograms, even though symptoms had yet to manifest. Earlier that day, at approximately 12:30 p.m., the same local NBC affiliate station reported that the FDA advised people taking diet drugs to discontinue use and contact their doctors immediately. The very next day, September 16, 1997, the <u>Clarion Ledger</u>, a Jackson, Mississippi based newspaper distributed

-7-

throughout the state, reported on its front page an article
entitled "2 Popular Diet Drugs Removed From Stores." The text of
the news article echoed the findings of a 1997 FDA study and the
subsequent urging by the FDA for individuals taking diet drugs to
immediately discontinue their use. On November 14, 1997, a story
written by the Associated Press appeared in the <u>Clarion Ledger</u>
with the headline "Fen-Phen users need exam, says government."
The first sentence of this article paraphrased the FDA's
suggestion that individuals who had taken diet drugs for any
amount of time should see their doctors immediately for
examination.

     Media coverage of the withdrawal of the diet drugs from
the market was not limited to local news outlets. Reports about
the withdrawal were the leading stories on major network news
programs on television, including NBC Nightly News, CBS Evening
News and the Today Show. <u>USA Today</u>, a daily newspaper with a
national readership, ran a front-page story regarding the
withdrawal of diet drugs, its effects, and the response by
various organizations throughout the United States regarding the
news. The article went so far as to report that potential
litigation was imminent and people who had taken diet drugs were
signing up with attorneys to take part in a large class action
lawsuit.

     Wyeth also informed consumers about the recall of its
diet drugs as well. Immediately after removing the drugs from
the market on September 15, 1997, Wyeth issued a press release

-8-

advising patients who had used diet drugs to consult their physicians. It included the same message in full page advertisements that it purchased in leading national and regional newspapers. These advertisements led with a banner in large print, stating "An Important Message To Patients Who Have Used Pondimin or Redux." Furthermore, Wyeth sent a "Dear Health Care Provider Letter" to approximately 450,000 doctors and pharmacists informing them of the withdrawal of the drugs from the market and of the potential association between use of the drugs and instances of valvular heart disease.

Even if the plaintiffs were somehow not apprised of their potential claims as a result of this extensive publicity, they certainly were put on notice by the end of March, 2000, by the comprehensive publicity campaign regarding the proposed nationwide class action Settlement Agreement with Wyeth. See Memorandum and Pretrial Order ("PTO") No. 997 at 7 (E.D. Pa. Nov. 23, 1999).[4] This notice program "employed sophisticated media techniques and was designed to reach all class members" to make them "aware of the potential risks posed by Pondimin and Redux." PTO No. 1415 at 79-80. This court described the exhaustive and far-reaching nature of this notice campaign in PTO No. 1415:

> A television commercial was developed ...
> [which] broadcast 106 times over a period of
> five weeks on network television. The
> television commercial message was also

---

4. See also PTO No. 1415 at 62-66 (E.D. Pa. Aug. 28, 2000).

broadcast 781 times, for six consecutive
weeks on various cable networks.

A summary notice was prepared for use in the
print media.  The summary notice appeared
repeatedly in several magazines between
January and March 2000.  The summary notice
appeared as a one-third page black and white
ad in four national newspapers, 77 local
newspapers, 3 newspapers distributed
throughout the U.S. Territories and four
newspapers targeted to the Hispanic market.
These newspapers were selected because they
were national publications, or because they
represented the principal newspapers in the
top 15 markets in the United States, or
because they were published in geographic
areas having the highest usage of Pondimin
and Redux, and/or because they were targeted
to African-American or Spanish speaking
populations.  In addition, the summary form
of notice was published in a variety of
publications targeted to healthcare providers
and pharmacists.  Banner ads were also
developed for use on the Internet, directing
potential class members to the official
settlement website where class members could
receive information concerning the settlement
and obtain a notice package.  These banner
advertisements were placed within several
media categories on a variety of Internet
publishers.

In addition to the above, notice was
transmitted by mail to all pharmacists in the
United States and to doctors who were likely
to have prescribed Pondimin or Redux or
treated patients for complications resulting
from the use of those drugs.  Notices to
these healthcare providers contained a
"notice package," a letter of explanation and
a counter card reflecting the summary form of
notice described above, which pharmacists and
physicians could display to alert patients
about the existence of the settlement and the
opportunity to obtain a "notice package" by
contacting the 1-800 number or official web
site ....  Such mailings were transmitted to
784,128 physicians and to 108,288
pharmacists.

Id. at 80-82 (citations and footnotes omitted).

-10-

The court also explained that the summary notice
appeared ten times between January and February, 2000 in the form
of a full page black and white advertisement in <u>Parade</u>, <u>People</u>,
and <u>Time</u> magazine. A full page black and white version of the
summary notice was inserted into eight monthly magazines during
February, 2000, including <u>Better Homes & Gardens</u>, <u>Ladies Home
Journal</u>, <u>Family Circle</u>, <u>McCalls</u>, <u>Women's Day</u>, <u>Redbook</u>, <u>Good
Housekeeping</u> and <u>Ebony</u>. Additional insertions of the summary
notice appeared as full page black and white advertisements in
the March editions of <u>Better Homes & Gardens</u> and <u>Good
Housekeeping</u>. Finally, a two-page black and white version of the
summary notice was placed in <u>Reader's Digest</u> during February and
March, 2000.

This court found that the media program concerning the
proposed settlement was "highly successful" at reaching targeted
women. PTO No. 1415 at 83. It explained:

> 97% of women between the ages of 25 and 54
> viewed one or more forms of televised or
> printed notice an average of 10 times. A
> reach and frequency analysis indicated that
> almost 80% of women between the ages of 25
> and 54 were exposed to the messages contained
> in televised or printed forms of notice a
> minimum of five times .... In addition, a
> reach and frequency analysis indicated that
> the settlement message reached 97% of women
> 35 years and older an average of 11.4 times
> and that it reached 81% of women 35 years and
> older a minimum of five times. With respect
> to African-American women between the ages of
> 25 and 54, the reach and frequency analysis
> shows that the settlement message reached 97%
> of those women an average of 10.2 times and
> that 79% of African-American women between
> the ages of 25 and 54 viewed the message a minimum of
> five times.

-11-

Id. at 83 n.16 (citations omitted).

In support of plaintiffs' contention that their injuries occurred within two years of the filing of their complaint, they provide the court with affidavits from James H. Oury, M.D. and George K. Massing, M.D., both of whom opine that diet drug induced valvular heart disease is a latent disease. However, they say nothing about when the disease manifested itself in any of the plaintiffs.

Wyeth counters plaintiffs' position by referring to this court's ruling after receiving evidence on the latency issue at the fairness hearing in connection the nationwide class action Settlement Agreement. The court determined in PTO No. 1415 that Pondimin and Redux did not cause latent heart valve injuries but rather that any injury occurred at or near the time of last use. In the August 28, 2000 Order approving the Settlement Agreement, Judge Bechtle stated: "[t]he absence of a latency period between the ingestion of [the diet drug] and the development of clinically detectable [heart disease] is ... confirmed by a number of studies ... , [each of which finds] that there was no emergence of new disease after some latency period." PTO No. 1415 at 46.

The plaintiffs in these matters are class members and as such were parties to the Settlement Agreement. The issue of latency was actually litigated in the fairness hearing and is one of the same issues that the plaintiffs are now raising to defeat the bar of the statute of limitations. Judge Bechtle's

-12-

determination of no latency, that is that the class members' injuries occurred within a short time after ingesting fen-phen, was an essential finding, for it directly affected the adequacy of class representation. See PTO No. 1415 at 104-08. Finally, PTO No. 1415, in which Judge Bechtle approved the Settlement Agreement, is a final and valid judgment, upheld on appeal. Thus, plaintiffs are collaterally estopped from re-litigating the issue of latency through the affidavits of Dr. Oury and Dr. Massing.

IV.

In light of the massive publicity concerning the health risks associated with the use of diet drugs, the comprehensive notice program associated with the settlement, and this court's determination that diet drug induced valvular heart disease is not a latent disease, we find that plaintiffs, through the exercise of reasonable diligence, should have discovered their alleged injuries at the very latest by the end of March, 2000. Since plaintiffs did not file this action until December 30, 2002, their claims against their prescribing physicians are clearly time barred.

Accordingly, Wyeth has shown that the in-state physician defendants are fraudulently joined. We will deny the motion of the plaintiffs to remand this action to the Circuit

-13-

Court of Jones County, Mississippi and dismiss the complaint as
to these physician defendants.[5]

---

5.  Having determined that the court properly retains
jurisdiction over this action based upon the fraudulent joinder
of in-state physicians, we need not consider Wyeth's remaining
arguments for the exercise of federal jurisdiction.



FEB 2 5 2004

BrownGreer PLC
Richmond

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: DIET DRUGS                    :    MDL DOCKET NO. 1203
(PHENTERMINE, FENFLURAMINE,          :
DEXFENFLURAMINE) PRODUCTS            :
LIABILITY LITIGATION                 :
                                     :
THIS DOCUMENT RELATES TO:            :
_____    :
PERRY MICHAEL FRENCH, et al.         :
                                     :
        v.                           :
                                     :
WYETH, et al.                        :    CIVIL ACTION NO. 03-20353

PRETRIAL ORDER NO. 328|

        AND NOW, this 18th day of February, 2004, for the
reasons set forth in the accompanying Memorandum, it is hereby
ORDERED that:

        (1)  the motion of plaintiffs to remand to the Circuit
Court of Jones County Mississippi is DENIED; and

        (2)  all claims against defendants Eric Dyess, M.D.,
Arthur Wood, M.D., Earl Lee Stewart, M.D., William Edwin Powell,
M.D., John M. Beaman, M.D., Jacob E. Ulmer, M.D., Stephen A.
Tramill, M.D., Todd Fulcher, M.D., E. Kelton Pace, M.D., Stanford
Owen, M.D., and Richard Miller, M.D. are DISMISSED.

                        BY THE COURT:

                        _____
                                                      J.

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: DIET DRUGS (Phentermine/ Fenfluramine/Dexfenfluramine) PRODUCTS LIABILITY LITIGATION | : : : | FILED  MAR - 5 2004<br><br>MDL DOCKET NO. 1203 |
| THIS DOCUMENT RELATES TO: | : : | |
| ELSIE D. JAMISON<br>     v.<br>WYETH, et al. | : : : : | CIVIL ACTION NO. 03-20317 |
| SHIRLEY R. JOBE, et al.<br>     v.<br>WYETH, et al. | : : : | CIVIL ACTION NO. 03-20232 |
| KATHY MORTON<br>     v.<br>WYETH, et al. | : : : | CIVIL ACTION NO. 03-20127 |
| JEAN G. RAMSEY, et al.<br>     v.<br>WYETH, et al. | : : : | CIVIL ACTION NO. 03-20344 |
| JENNIFER STIMAGE, et al.<br>     v.<br>WYETH, et al. | : : : | CIVIL ACTION NO. 03-20230 |

## MEMORANDUM AND PRETRIAL ORDER NO. 3339

Bartle, J.                                              March 5 , 2004

          Before the court are the motions of numerous class

members in five separate actions to remand to the original

Mississippi state courts their actions against defendants Wyeth,[1]

the physicians who have prescribed Wyeth's diet drugs Pondimin

and/or Redux for them and the various pharmacies throughout the

state of Mississippi that filled plaintiffs' prescriptions for

**ENTERED**

_____

1.  Wyeth was previously known as American Home Products
Corporation ("AHP").

MAR - 8 2004

**CLERK OF COURT**

these diet drugs.[2]  The state court actions were captioned <u>Elsie</u>
<u>D. Jamison, et al. v. Wyeth, et al.</u> (Miss. Cir. Ct. Claiborne
County filed Sept. 9, 2002); <u>Shirley R. Jobe, et al. v. Wyeth, et</u>
<u>al.</u> (Miss. Cir. Ct. Holmes County filed Sept. 6, 2002); <u>Kathy</u>
<u>Morton, et al. v. Wyeth, et al.</u> (Miss. Cir. Ct. Lee County filed
Sept. 11, 2002); <u>Jean G. Ramsey, et al. v. Wyeth, et al.</u> (Miss.
Cir. Ct. Hinds County filed Dec. 20, 2002); and <u>Jennifer Stimage,</u>
<u>et al. v. Wyeth, et al.</u> (Miss. Cir. Ct. Hinds County filed
Sept. 6, 2002).

        According to Wyeth, the plaintiffs in these actions,
with the exception of three,[3] have exercised their right of
intermediate opt-out under the Nationwide Class Action Settlement
Agreement ("Settlement Agreement") in <u>Brown v. American Home</u>
<u>Products Corporation</u>, CIV.A. No. 99-20593 (E.D. Pa. Aug. 28,
2000) ("Pretrial Order ("PTO") No. 1415"), which encompassed
persons who ingested Wyeth's diet drugs Pondimin and Redux.  <u>See</u>
<u>e.g.</u>, Settlement Agreement at § IV(A), (B), and (D)(4).  Under
the Settlement Agreement, those who have exercised an
intermediate or back-end opt-out may sue Wyeth for compensatory
damages in the tort system rather than obtain benefits from the
AHP Settlement Trust.  Unlike initial opt-outs, these plaintiffs

---

2.  Fifty-nine plaintiffs in <u>Ramsey, et al. v. Wyeth, et al.</u>
filed suit against various pharmacy establishments in
Mississippi.

3.  Wyeth alleges that plaintiffs Anne Brown and Valerie Riddle
exercised initial opt-out rights and that plaintiff Nancy Stevens
never opted out of the settlement class.  We need not decide
those issues here.