(5)    a claim that the physician's or pharmacist's liability stems solely from the prescription or dispensing of a defective or unreasonably dangerous product.

Physicians, pharmacists and pharmacies are not Released Parties with respect to any claims based on their independent negligence or culpable conduct, not consisting of the conduct described in paragraphs (1)-(5) of this Subsection I.48.e.

Notwithstanding the foregoing, manufacturers, sellers, wholesalers, or distributors of any Phentermine hydrochloride or Phentermine resin pharmaceutical product are not Released Parties with respect to the manufacture, sale, or distribution of any Phentermine hydrochloride or Phentermine resin pharmaceutical product, and Les Laboratoires Servier S.A. and all of its affiliates and subsidiaries, including, without limitation, Servier S.A.S., Oril, Orsem, Servier Amerique, Science Union et Cie, Institut de Recherches Internationales Servier, Servier Research (collectively hereinafter "Servier") and Interneuron Pharmaceuticals, Inc. (hereinafter "Interneuron") are not Released Parties.

49.    "Screening Period" refers to the 12-month period beginning on the Final Judicial Approval Date during which benefits shall be available in the Screening Program.  Class Members who have timely registered for benefits by Date 1 and who are otherwise eligible for Screening Program benefits may receive the Echocardiogram and associated interpretative physician visit benefits after the end of this Screening Period, provided that: (i) all such Echocardiograms must be conducted no later than July 3, 2003, unless the Court, upon a showing of good cause and due diligence by or on behalf of a Class Member or group of Class Members, allows the Class Member or group of Class Members to receive an Echocardiogram and associated interpretative physician visit after such date; and (ii) any Class Member who receives an Echocardiogram provided by the Trust after the end of the Screening Period shall be considered to have been diagnosed during the Screening Period for all purposes under this Settlement Agreement, and shall have a period of 120 days after the date of the Echocardiogram to exercise, if otherwise eligible, a right of Intermediate Opt-Out under Section IV.D.3.b.

50.    "Screening Program" refers to the program for providing Transthoracic Echocardiograms and associated interpretive physician visit benefits, as set forth in Sections IV.A.1.a and IV.A.2.b.

51.    "Security Fund" has the meaning provided for in Section III.E.2.

52.    "Security Fund Escrow Account" has the meaning provided in Section III.E.8.

53.    "Settled Claims" shall mean any and all claims, including assigned claims, whether known or unknown, asserted or unasserted, regardless of the legal theory, existing now or arising in the future by any or all members of the Settlement Class arising out of or relating to the purchase, use, manufacture, sale, dispensing, distribution, promotion, marketing, clinical investigation, administration, regulatory approval, prescription, ingestion, and labeling of Pondimin® and/or Redux™, alone or in combination with any other substance, including, without limitation, any other drug, dietary supplement, herb, or botanical. These "Settled Claims" include, without limitation and by way of example, all claims for damages or remedies of whatever kind or character, known or unknown, that are now recognized by law or that may be created or recognized in the future by statute, regulation, judicial decision, or in any other manner, for:

a.    personal injury and/or bodily injury, damage, death, fear of disease or injury, mental or physical pain or suffering, emotional or mental harm, or loss of enjoyment of life;

b.    compensatory damages, punitive, exemplary, statutory and other multiple damages or penalties of any kind;

c.    loss of wages, income, earnings, and earning capacity, medical expenses, doctor, hospital, nursing, and drug bills;

d.    loss of support, services, consortium, companionship, society or affection, or damage to familial relations, by spouses, parents, children, other relatives or "significant others" of Settlement Class Members;

e.    consumer fraud, refunds, unfair business practices, deceptive trade practices, Unfair and Deceptive Acts and Practices ("UDAP"), and other similar claims whether arising under statute, regulation, or judicial decision;

f.    wrongful death and survival actions;

g.    medical screening and monitoring, injunctive and declaratory relief;

h.    economic or business losses or disgorgement of profits arising out of personal injury; and

i.    prejudgment or post-judgment interest.

Notwithstanding the foregoing, Settled Claims do not include claims based on PPH, including claims for compensatory, punitive, exemplary or multiple damages based on PPH; provided, however, that if a Class Member receives settlement benefits from Fund B, he/she may not bring a

lawsuit based upon a claim for PPH, unless the Class Member was diagnosed with PPH before the Class Member had left-sided heart valve abnormalities (other than those which produce trivial, clinically insignificant left-sided regurgitation) or Endocardial Fibrosis. In addition, notwithstanding the foregoing, Settled Claims do not include claims arising from the exposure of unborn children, *in utero*, to Pondimin® or Redux™, and persons alleging exposure *in utero* to Pondimin® or Redux™ shall not be considered Diet Drug Recipients eligible for benefits under this Agreement.

54.   "Transthoracic Echocardiogram" means a non-invasive, standard Echocardiogram which includes an M-Mode and 2D Echocardiogram, and Doppler and color Doppler evaluations of all four chambers of the heart and all four heart valves.

55.   "Trial Court Approval" shall mean the granting, by order, of the approval of the Settlement Agreement by the Federal District Court.

56.   "Trial Court Approval Date" shall mean the date upon which Trial Court Approval occurs.

57.   "Trust" or "Settlement Trust" shall mean a trust established to receive funds to be paid by AHP as provided in this Settlement Agreement pursuant to a Trust Agreement substantially in the form appended hereto as Exhibit "1."

58.   "Trustees" shall mean those individuals approved by the Court as Trustees of the Settlement Trust in accordance with Section VI.A.3 herein.

## II.   SCOPE OF THE SETTLEMENT CLASS

A.   The Parties shall seek certification by the Federal District Court of a nationwide class solely for Settlement purposes (the "Settlement Class") in the case entitled *Sheila Brown, et al. v. American Home Products Corporation*, Civil Action No. 99-20593, pending in the United States District Court for the Eastern District of Pennsylvania.

B.   The Settlement Class will consist of:

All persons in the United States, its possessions and territories who ingested Pondimin® and/or Redux™ ("Diet Drug Recipients"), or their estates, administrators or other legal representatives, heirs or beneficiaries ("Representative Claimants"), and any other persons asserting the right to sue AHP or any Released Party independently or derivatively by reason of their personal relationship with a Diet Drug Recipient, including without limitation, spouses, parents, children, dependents, other relatives or "significant others" ("Derivative Claimants"). The Settlement Class does not include any individuals whose claims against AHP and/or the AHP Released Parties, arising from the use of Diet Drugs, have been resolved by judgment on the merits or by release (other than releases provided pursuant to this Settlement).

C.   There will be five subclasses as follows:

1.(a)   "Subclass 1(a)" shall consist of all Diet Drug Recipients in the Settlement Class (1) who ingested Pondimin® and/or Redux™ for sixty (60) days or less, and (2) who have not been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and September 30, 1999, and all Representative and Derivative Claimants in the Settlement Class whose claims are based on their personal or legal relationship with a Diet Drug Recipient (1) who ingested Pondimin® and/or Redux™ for 60 days or less, and (2) who has not been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and September 30, 1999.

1.(b)   "Subclass 1(b)" shall consist of all Diet Drug Recipients in the Settlement Class (1) who ingested Pondimin® and/or Redux™ for sixty-one (61) or more days, and (2) who have not been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and September 30, 1999, and all Representative and Derivative Claimants in the Settlement Class whose claims are based on a personal or legal relationship with a Diet Drug Recipient (1) who

ingested Pondimin® and/or Redux™ for sixty-one (61) or more days, and (2) who has not been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and September 30, 1999.

2.(a)    "Subclass 2(a)" shall consist of all Diet Drug Recipients in the Settlement Class (1) who ingested Pondimin® and/or Redux™ for sixty (60) days or less, and (2) who have been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram which was performed between the commencement of Diet Drug use and September 30, 1999, and all Representative and Derivative Claimants in the Settlement Class whose claims are based on a personal or legal relationship with a Diet Drug Recipient (1) who ingested Pondimin® and/or Redux™ for sixty (60) days or less, and (2) who has been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram which was performed between the commencement of Diet Drug use and September 30, 1999.

2.(b)    "Subclass 2(b)" shall consist of all Diet Drug Recipients in the Settlement Class (1) who ingested Pondimin® and/or Redux™ for sixty-one (61) or more days, and (2) who have been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram which was performed between the commencement of Diet Drug use and September 30, 1999, and all Representative and Derivative Claimants in the Settlement Class whose claims are based on a personal or legal relationship with a Diet Drug Recipient (1) who ingested Pondimin® and/or Redux™ for sixty-one (61) or more days, and (2) who has been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram which was performed between the commencement of Diet Drug use and September 30, 1999.

3.    "Subclass 3" (which may include persons also included in Subclasses 1(a) and 1(b)) shall consist of all Diet Drug Recipients in the Settlement Class who have been diagnosed by a Qualified Physician as having Mild Mitral Regurgitation by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period, but who have not been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period, and all Representative and Derivative Claimants in the Settlement Class whose claims are based on a personal or legal relationship with a Diet Drug Recipient who has been diagnosed by a Qualified Physician as having Mild Mitral Regurgitation by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period, but who has not

been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period.

III.    **AHP'S PAYMENT OBLIGATIONS**

A.    **ESTABLISHMENT OF SETTLEMENT TRUST**

1.    A Settlement Trust shall be established to receive the Fund A Amounts and Fund B Amounts to be paid by AHP under the terms of this Settlement Agreement pursuant to the terms of a Trust Agreement substantially in the form appended to the Settlement Agreement as Exhibit "1."

2.    The Parties agree that, as provided in the Trust Agreement, the Trustees of the Settlement Trust will be nominated by the Parties and that each nomination will be subject to agreement of the Parties and subject to approval by the Court consistent with the provisions stated in Section VI.A.3 herein and the Trust Agreement substantially in the form appended to the Settlement Agreement as Exhibit "1."

3.    The Settlement Trust will begin as a reversionary trust and will become non-reversionary upon Final Judicial Approval. If Final Judicial Approval is not obtained, or if the Settlement Agreement is terminated in accordance with its terms for any other reason, all amounts remaining in the Settlement Trust after payment of any charges and expenses which the Settlement Agreement expressly authorized or required to be incurred and expended prior to the reversion date, including any amounts expended to assist in seeking Final Judicial Approval, shall be returned to AHP, except as provided in Section V hereof relating to the administration of claims of Class Members who have accepted the Accelerated Implementation Option.

4.    AHP shall have no right to any of the funds previously deposited, nor to any of the funds subsequently deposited into the Settlement Trust, as of the date the Trust becomes non-reversionary. AHP shall have no further claim to such funds for any purpose.

5.    Subject to the conditions set forth in this Settlement Agreement, AHP shall be obligated to make payments as set forth in Sections III.B ("Fund A") and III.C ("Fund B") below to the Settlement Trust. Such payments shall be made by wire transfer. If any date of payment provided herein is not a Business Day, such payment shall be due and payable on the first Business Day following such date.

**B.    FUND A**

1.    AHP shall make payments into Fund A as follows (such amounts collectively referred to herein as the "Fund A Amounts"):

    a.    $50 million five Business Days after the Preliminary Approval Date.

    b.    $383 million five Business Days after the Trial Court Approval Date.

    c.    $383 million 180 days after the preceding payment of $383 million.

    d.    $184 million five Business Days after the Final Judicial Approval Date.

2.    The monies held by Fund A shall be available and shall be used to pay all benefits payable from Fund A, out-of-pocket and pre-settlement litigation expenses of Plaintiffs' Counsel approved by the Court for reimbursement in relation to Fund A, and all proper administrative expenses associated with the administration of the Settlement and the Settlement Trust insofar as they relate to Fund A.

3.    In addition to the foregoing, within five Business Days after the Final Judicial Approval Date, AHP shall pay $200 million into an escrow account under the supervision of the Court (the "Fund A Escrow Account"). The funds in the Fund A Escrow Account shall be used to pay compensation to Plaintiffs' Counsel. In addition, the funds in the Fund A Escrow Account may be used to make incentive awards to the Class Representatives in the following State and Federal Court class actions involving Pondimin® and Redux™: United States District Court for the Eastern District of Pennsylvania, *Brown v. American Home Products Corp.*, C.A. No. 99-20593; *Jeffers v. American Home Products Corp.,* C.A. No. 98-CV-20626 (E.D. Pa.) (*In re Diet Drug Products Liability Litigation*, MDL 1203); New Jersey (*Vadino et al. v. AHP*, Docket No. MID-L-425-98); New York *(New York Diet Drug Litigation*, Index No. 700000/98); Pennsylvania (*Pennsylvania Diet Drug Litigation*, Master Docket No. 9709-3162 C.C.P. Phila.); Washington (*St. John v. AHP*, 97-2-06368-4); Illinois *(Rhyne v. American Home Products,* 98 CH 4099); and Texas *(Earthman v. AHP*, No. 97-10-03970 CV, Dist. Ct. Montgomery Co. Texas). The payment of said compensation, relating to Fund A, to Plaintiffs' Counsel and the certified State and Federal Court Class Representatives shall be in such manner and in such amounts as

the Court, with advice and counsel of the State Court Judicial Advisory Committee, may determine is appropriate, as contemplated by Sections VIII.B.3 and VIII.E.1.a hereof and pursuant to a Fund A Escrow Account Agreement substantially in the form attached hereto as Exhibit "2." AHP shall take no position on the amount of such fees to be awarded as attorneys' fees or incentive awards or the allocation thereof. All Class Members shall have standing to object to or support the award of attorneys' fees and incentive awards for Class Representatives from the Fund A Escrow Account. Any amount in the Fund A Escrow Account not awarded in attorneys' fees shall be returned to AHP by order of the Court.

4.    Funds remaining in Fund A shall be transferred to Fund B as follows:

a.    On the later of (i) January 31, 2003 or (ii) thirty days after the date on which the Trial Court enters an Order approving the Fifth Amendment to the Settlement Agreement, the Trust shall transfer to Fund B all funds remaining in Fund A at such time. The Date of this transfer shall be referred to as the "Merger Date." After the Merger Date, Fund A shall be considered merged into Fund B and the resulting fund shall be referred to as the "Settlement Fund." Before making such transfer, the Trust shall pay refunds under Section IV.A.1.d and reimbursements for privately-obtained echocardiograms under Section IV.A.3.d to those Diet Drug Recipients (or their associated Representative Claimants) that the Trust has determined to be eligible for such benefits by that time and any other benefits from Fund A as are ready for payment at such time. The resulting amount transferred from Fund A to Fund B pursuant to this Section III.B.4.a shall be referred to as the "Fund A Transfer Amount."

b.    After the Merger Date, all payments that otherwise would have been properly payable out of Fund A for the payment or provision of Fund A benefits under Section IV.A shall be made out of the Settlement Fund. The Trust shall make all such payments as soon as reasonably practicable after the Merger Date. If the balance in the Settlement Fund at the time any such amounts are payable is inadequate to fund the payments, AHP shall, within five Business Days after receipt of a written request from the Trust, deposit the necessary funds into the Settlement Fund. Amounts deposited by AHP into the Settlement Fund for this purpose shall not reduce the Maximum Available Fund B Amount

or the Adjusted Maximum Available Fund B Amount under Section I.1. AHP's obligation for Fund A benefits and the cost of administering such benefits shall not exceed $1 billion plus the amounts necessary, if any, to pay or provide the additional medical services or cash benefits under Section IV.A.1.c and Section IV.A.2.c to eligible Class Members, provided that any amounts deposited by AHP into the Settlement Fund for such purpose shall not reduce the Maximum Available Fund B Amount.

c. As of the date on which the Trial Court enters an Order approving the Fifth Amendment to the Settlement Agreement, the Trust and the Settlement Fund shall be deemed to possess sufficient funds to pay refunds under Section IV.A.1.d and reimbursements for privately-obtained echocardiograms under Section IV.A.3.d, and the Trustees shall pay such benefits to eligible Diet Drug Recipients (or their associated Representative Claimants) within forty-five days after the date on which the Trustees receive a completed claim for such benefit, or within such other period as the Trial Court may direct. After the Merger Date, the provisions of this Section III.B.4.c shall supercede the provisions of Section VI.C.3.l and Section VI.C.3.n regarding the time of payment of such benefits.

d. After the Merger Date, the Fund A Transfer Amount also shall be used by the Trust to pay Matrix Compensation Benefits under Section IV.B. and administrative expenses of the Trust, in addition to the payment and provision of Fund A benefits under Section IV.A, until the balance in the Settlement Fund reaches the Administrative Reserve to be maintained in the Settlement Fund pursuant to Section III.C.3.b or Section III.C.4.e, whereupon the Trust may resume funding the payment of Matrix Compensation Benefits to eligible Class Members pursuant to Settlement Fund Quarterly Notices or such other requests as agreed upon by the Parties. The Fund A Transfer Amount will not reduce the maximum obligation of AHP to make payments to Fund B under Section III.C.

C. **FUND B**

1. **Fund B Amounts.** Fund B shall consist of (i) the Fund B Initial Payment under Section III.C.2; (ii) all Fund B Deposit Amounts paid pursuant to Fund B Quarterly Notices under Section III.C.3; (iii) all Fund B AIO Deposit Amounts paid pursuant to Requests

---

for Fund B AIO Payments under Section V.F; and (iv) all interest and other income earned by the Trust on such amounts.

2. **Fund B Initial Payment.** No later than five Business Days after the Preliminary Approval Date, AHP shall pay $25 million into Fund B.

3. **Additional Fund B Deposits.** Beginning on the Final Judicial Approval Date, the Trustees may request in writing on a quarterly basis (each a "Fund B Quarterly Notice") an additional amount (such amount being referred to as a "Fund B Deposit Amount"):

   a. to pay claims received which qualify for payment from Fund B pursuant to Section IV.B, awards of counsel fees and costs under Section VIII.E.1.b, and authorized administrative expenses which have not been paid due to an insufficient cash balance in Fund B, and/or

   b. to maintain a $50 million reserve in Fund B for administrative expenses (the "Administrative Reserve").

   AHP shall pay each Fund B Deposit Amount so requested no later than fifteen (15) days after the date on which AHP receives from the Trustees a Fund B Quarterly Notice requesting such Fund B Deposit Amount; provided, however, that AHP's obligation to pay Fund B Deposit Amounts shall at all times be limited to the Maximum Available Fund B Amount. At any time that the total value of the Security Fund under Section III.E.2 is equal to or greater than the Maximum Available Fund B Amount, the Trustees shall limit requests for deposits for purposes of maintaining the Administrative Reserve in Fund B to those sums that the Trustees believe will be necessary to satisfy the reasonably anticipated administrative expenses of the Trust for the Fiscal Quarter in which the request is made.

4. **Termination of AHP's Fund B Payment Obligations.**

   a. AHP's obligation to make payments to Fund B shall terminate upon the earlier of: (i) the date of AHP's payment into Fund B of the amount that reduces the Maximum Available Fund B Amount to zero; or (ii) the date of AHP's payment to Fund B of the Final Projected Amount under Section III.C.4.b below. Such payment shall be referred to in this Agreement as the "Final Payment."

   b. The Final Projected Amount shall be determined as follows:

---

(i)     As of the end of the sixteenth Fiscal Year, the Trustees shall cause an actuarial determination to be made, based on the experience of the Settlement Trust, as to the amount of additional funds, if any, which will be required to fund payments to Class Members who have qualified or who are likely to qualify in the future for benefits from Fund B in accordance with the provisions of Section IV.B and Section IV.C, determined without regard to any limitation on the obligation of AHP to make Fund B payments under this Agreement, and to fund the payment of associated administrative expenses. The Trustees shall also take into consideration the then cash balance in Fund B (including the Administrative Reserve), its projected future investment and other income, and an estimate of required future administrative expenses.

(ii)    No later than thirty (30) days after the date on which the Trustees are required to make the estimate under Section III.C.4.a. (i), the Trustees shall provide a written report ("Final Projected Amount Report") to Class Counsel and to AHP setting forth the Trustees' projection of the amount of additional funds, if any, which will be necessary to meet the obligations of Fund B as described in Section III.C.4.a.(i). The Final Projected Amount Report shall contain all supporting information necessary to allow Class Counsel and AHP to evaluate the accuracy and reasonableness of the estimate. Such supporting information shall include, without limitation, the Trustees' methodology for making the estimate and any assumptions used in making the estimate. AHP and/or Class Counsel shall have the right to obtain from the Trustees any additional information reasonably requested by them relating to the estimate contained in the Final Projected Amount Report.

(iii)    Within 30 days after the date of the Final Projected Amount Report, Class Counsel and/or AHP may appeal the Trustees' estimate to the Court, which shall modify the Trustees' estimate to the extent appropriate upon a judicial finding that the

Trustees' estimate was either unreasonable or lacking in substantial support. If such an appeal is not taken or if such an appeal is taken and the Court determines not to modify the Trustees' estimate, then the Trustees' estimate, as set forth in the Final Projected Amount Report, will become the "Final Projected Amount" for purposes of this Agreement. If such an appeal of the Trustees' estimate is taken and the Court modifies the estimated amount in connection with such an appeal, then the estimated amount determined by the Court will become the "Final Projected Amount" for purposes of this Agreement. The Parties waive any right to appeal any determination of the Court with respect to the Final Projected Amount.

(iv)    If the Maximum Available Fund B Amount as of the date on which the Final Projected Amount is determined exceeds the Final Projected Amount, then within five business days after the date of the determination of the Final Projected Amount in accordance with this Agreement, AHP shall pay the Final Projected Amount into Fund B and such payment shall constitute the Final Payment under this Agreement. If the Final Projected Amount exceeds the Maximum Available Fund B Amount as of the date on which the Final Projected Amount is determined, then within five business days after the date of the determination of the Final Projected Amount in accordance with this Agreement, AHP shall pay the Maximum Available Fund B Amount into Fund B and such payment shall constitute the Final Payment under this Agreement. In no event shall AHP's payment into Fund B exceed the Maximum Available Fund B Amount.

c.    The monies held by Fund B shall be available and shall be used to pay all benefits payable from Fund B, all attorneys' fees and common benefit fees and costs awarded by the Court in relation to Fund B and all proper administrative expenses associated with the administration of the Settlement and the Settlement Trust insofar as they relate to Fund B, and for the purposes described in Section III.C.4.d.

d.    After the Merger Date, Fund B shall be referred to as the Settlement Fund, all references in this Settlement

Agreement to Fund B shall be read as referring to the "Settlement Fund" rather than to "Fund B", and Fund B Quarterly Notices shall be known as "Settlement Fund Quarterly Notices." After the Merger Date, the Trust shall continue to maintain accurate records of the Maximum Available Fund B Amount and the Adjusted Maximum Available Fund B Amount for purposes of determining AHP's payment obligations to Fund B and the Settlement Fund under Section III.C.4 and the total amount available to the Trust to pay benefits to Class Members and for the costs of administration of such benefits.

e.  The Parties may agree in writing to a more frequent schedule for the Fund B Quarterly Notices, Settlement Fund Quarterly Notices (or such other notices as agreed upon by the Parties), and Fund B Deposit Amounts paid by AHP into Fund B or the Settlement Fund than the schedule provided in Section III.C.3, to eliminate or reduce the administrative reserve in Fund B under Section III.C.3.b, and to increase the principal value of the Security Fund under Section III.E.2 to accommodate such adjustments. The Parties shall report all such agreements to the Court. At any time during which AHP is timely making deposits into Fund B on a schedule at least as often as every two weeks, the Administrative Reserve under Section III.C.3.b shall be no greater than $5 million. Funds held in the Administrative Reserve shall be considered available for the payment of Matrix Compensation Benefits as and when the Maximum Available Fund B Amount is $50 million or less, and/or in the Trust's calculation of the Final Projected Amount under Section III.C.4.

## D.  OTHER PROVISIONS

1.  The Settlement Trust shall be structured and managed to qualify as a Qualified Settlement Fund under Section 468B of the Internal Revenue Code and related regulations and will contain customary provisions for such trusts including obligations of the Settlement Trust to make tax filings and to provide to AHP information to permit AHP to report deductions properly for tax purposes.

2.  The Parties agree that all of the amounts being paid pursuant to the terms of this Settlement are being paid as damages (other than punitive damages) on account of alleged physical personal injuries or alleged physical sickness of the members of the Settlement Class as described in Section 104(a)(2) of the Internal Revenue Code of 1986, as amended (the "Code"). The Parties further agree

that the claims set forth in the definition of Settled Claims in Section I.53 have their origin in such alleged physical personal injuries or physical sickness.

3.     Except as provided in Section V herein relating to the Accelerated Implementation Option, AHP shall have no financial obligations under this Settlement Agreement other than as explicitly set forth in this Section III (AHP's Payment Obligations). AHP shall have no responsibility for the management of the Settlement Trust or any liability to any Class Member arising from the handling of claims by the Trustees.

## E.   SECURITY ARRANGEMENTS

1.     During the period beginning on the first Business Day following the Trial Court Approval Date and ending on the fifth Business Day following the Final Judicial Approval Date, AHP shall maintain credit facilities in an aggregate principal amount of One Billion Dollars ($1,000,000,000) exclusively as security for its obligations under this Settlement Agreement over the sum of (1) the greater of (a) the aggregate minimum principal amount of credit facilities that would be required by Moody's Investors Service to satisfy back-up liquidity on AHP's commercial paper obligations or (b) the aggregate minimum principal amount of credit facilities that would be required by Standard & Poor's Rating Services as sufficient to satisfy back-up liquidity on AHP's commercial paper obligations, *plus* (2) the amount of any uses (other than the payments under this Settlement Agreement) for which such credit facilities have been committed, *plus* (3) outstanding drawings under such credit facilities.

2.     Fifteen days after the Final Judicial Approval Date, or the first Business Day thereafter if such fifteenth day is not a Business Day, AHP shall establish and thereafter maintain, subject to all the provisions of this Section III.E, a fund (the "Security Fund") consisting of cash and high-grade marketable commercial securities (which shall consist of the "Permitted Investments," defined herein) selected by AHP having a principal value equal to $370 million. If at any time the Administrative Reserve in Fund B under Section III.C.3 is required to be no greater than $5 million, AHP shall deposit into and maintain in the Security Fund cash and/or Permitted Investments having a principal value equal to $45 million and if, after such deposit, AHP deposits funds to increase the Administrative Reserve above $5 million, AHP shall be entitled to withdraw from the Security Fund assets and/or cash equal in value to such Administrative Reserve deposits, not to exceed $45 million. Fifteen days after the Merger Date, or the first

Business Day thereafter if the fifteenth day is not a Business Day, AHP shall deposit cash and/or Permitted Investments into the Security Fund having a principal value equal to 80% of the Fund A Transfer Amount, less any amounts deposited into the Security Fund by AHP before such time (other than the original $370 million deposit and the $45 million deposit referred to above) (the "Merger Security Deposit"). AHP may satisfy its obligation to make the Merger Security Deposit by causing a wholly-owned subsidiary of AHP to deposit assets of the subsidiary consisting of cash and/or Permitted Investments into the Security Fund, provided that (i) such subsidiary becomes a primary obligor together with AHP for AHP's funding obligations under the Settlement Agreement to the extent of 110% of the Merger Security Deposit; and (ii) AHP provides to Class Counsel a written opinion satisfactory to Class Counsel that the Merger Security Deposit by the subsidiary is a bona fide transaction supported by good and valuable consideration, is a valid and enforceable obligation of the subsidiary under applicable law, and that the transfer will afford the Trust a valid and enforceable security interest in the Merger Security Deposit to secure to that extent AHP's payment obligations to the Trust under the Settlement Agreement. Any other deposits agreed upon by the Parties and approved by the Court under Section III.C.4.e shall be added to the Security Fund. If the credit rating for AHP as reported by both Moody's Investors Service and Standard & Poor's Rating Services is below investment grade at any time during which the Security Fund must be maintained hereunder, AHP shall deposit additional cash and/or Permitted Investments selected by AHP having an aggregate principal value of an additional $180 million. For purposes of this Section III.E, the term "Permitted Investments" shall mean any of the following: (a) readily marketable direct obligations of the United States or any agency or instrumentality thereof or obligations unconditionally guaranteed by the full faith and credit of the United States, maturing within 365 days of purchase (in the case of all such obligations other than direct obligations of the United States Treasury); (b) certificates of deposit or time deposits maturing within 365 days of purchase with any commercial bank that (1) has deposits insured by the Federal Deposit Insurance Corporation, (2) is organized under the laws of the United States or any state thereof, (3) has a minimum long-term rating of "A-3" (or the then equivalent) by Moody's Investors Service and a long-term rating of "A-" (or the then equivalent) by Standard & Poor's Rating Services, and (4) has combined capital and surplus of at least $10 billion; (c) commercial paper issued by any corporation organized under the laws of any state of the United States and rated at least "Prime-1" short-term (or the then

equivalent grade) and "A-1" long-term (or the then equivalent grade) by Standard & Poor's Rating Services, in each case with a maturity of not more than 180 days from the date of acquisition thereof; or (d) investments, classified as current assets of AHP or any of its subsidiaries under generally accepted accounting principles, in money market investment programs registered under the Investment Company Act of 1940, as amended, which are administered by financial institutions that have the highest rating obtainable from either Moody's Investors Service or Standard & Poor's Rating Services, and the portfolios of which are limited solely to investments of the character, quality and maturity described in clauses (a), (b) or (c) of this definition.

3.  If at any time the Security Fund Amount is greater than 110% of the Maximum Available Fund B Amount, AHP may withdraw, at its option, free of any lien under Section III.E.5, cash and/or Permitted Investments from the Security Fund, provided that: (i) the Security Fund Amount must at all times equal or exceed 110% of the Maximum Available Fund B Amount; and (ii) AHP may make such withdrawals from the Security Fund no more frequently than once monthly. The Security Fund and the lien under Section III.E.5 shall be terminated completely upon AHP's making the Final Payment provided for in Section III.C.4.a.

4.  AHP shall be entitled to withdraw from the Security Fund all income earned thereby. However, in the event that, and so long as, the credit rating of AHP reported by both Moody's Investors Service and Standard & Poor's Rating Services is below investment grade at any time during which the Security Fund must be maintained, AHP shall no longer be entitled to withdraw from the Security Fund the income earned thereby, except that AHP shall thereafter be entitled to withdraw, at each tax payment date, such amount thereof as shall equal all federal, state and local taxes payable by AHP with respect to or on account of the whole amount of the Security Fund. AHP shall be responsible for the payment of all federal, state and local taxes payable with respect to or on account of the Security Fund.

5.  AHP shall grant to the Trustees a perfected security interest in the Security Fund as collateral for AHP's obligations under the Settlement Agreement pursuant to the terms of a Security Fund and Escrow Agreement in the form appended hereto as "Revised Exhibit 3." No later than the date of the Merger Security Deposit, AHP (or its subsidiary as applicable) shall grant to the Trustees a perfected security interest in the Merger Security Deposit in the Security Fund as collateral for AHP's obligations under the Settlement Agreement pursuant to the terms of the Security Fund

and Escrow Agreement attached hereto as "Revised Exhibit 3" or such other Security Fund and Escrow Agreement as is agreed upon by the Parties and approved by the Trial Court.

6.    For purposes of this Settlement Agreement, an "Uncured Failure to Make Payment" is an event in which:

a.    AHP fails to make a payment to Fund B which was due and not timely paid, and such failure to make payment was due to either a financial inability to pay or a deliberate unwillingness to pay, such determinations having been made by order of the Court after an evidentiary hearing (a "Nonpayment Hearing"); and

b.    AHP fails to make that payment within thirty (30) days after such order becomes final after exhaustion of all appeals, if any, or AHP fails to make that payment thirty (30) days after a Trial Court order declaring an Uncured Failure to Make Payment and is unable to obtain a stay of that order pending an appeal from such order.

7.    At least thirty (30) days prior to any Nonpayment Hearing, AHP and Class Counsel shall have the right to receive from the Trustees such information as they reasonably request relating to the Trustees' claim that such payment was due and owing, as to which issue the Trustees shall have the burden of proof.

8.    In the event of an Uncured Failure to Make Payment, securities and/or cash in the Security Fund having a principal value equal to the entire amount of the Security Fund shall be transferred to the escrow agent of an escrow account to be maintained under the supervision of the Court (the "Security Fund Escrow Account"), without impairing the security interest of the Trust. The portion of the Security Fund Escrow Account, if any, needed to satisfy the obligations of AHP under the Settlement Agreement shall be paid to the Trust pursuant to order of the Court or on agreement of the Parties. Any unused amount of the Security Fund Escrow Account shall be returned to AHP at the time the Final Payment is made or deemed to have been made. Any income earned on the account shall remain the property of the account, and all federal, state and local taxes payable with respect to the Security Fund Escrow Account shall be paid out of the account. Additional conditions and procedures for the establishment, operation and distribution of the Security Fund Escrow Account are set forth in Exhibit "3," which is to be executed substantially in that form by the escrow agent.

9.    In the event of the following occurrences:

--------------------------------

**III. AHP'S PAYMENT OBLIGATIONS**                                   29

a.     The occurrence of more than one Uncured Failure to Make Payment within a two-year period; and

b.     The depletion of the amount of the assets which AHP is required to have on deposit in the Security Fund or in the Security Fund Escrow Account described above by more than fifty percent (50%) of the then-required amount of assets; and

c.     A determination by the Court after notice and an opportunity to be heard by all interested parties that the remaining assets in the Security Fund or in the Security Fund Escrow Account are not likely to be sufficient to pay the remaining Fund B obligations to Class Members as of that point in time;

all Diet Drug Recipients who (i) are diagnosed by a Qualified Physician as FDA Positive or as having Mild Mitral Regurgitation by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period and who have registered for settlement benefits by Date 2, or (ii) are diagnosed as having Endocardial Fibrosis by September 30, 2005, and have registered for Fund B benefits by January 31, 2006, together with their associated Representative and/or Derivative Claimants, will have a right to opt out of the Settlement and pursue all of their Settled Claims (except for those claims set forth in subparagraphs (e) and (g) of Section I.53 of this Agreement), against AHP and the other Released Parties, including claims for punitive and multiple damages (hereinafter the "Financial Insecurity Opt-Out Right"), provided such Class Members have not received Matrix-Level V benefits set forth in Section IV.B.2.

10.     Within thirty (30) days of the date of the entry of any Order determining that the remaining assets in the Security Fund or in the Security Fund Escrow Account are not likely to be sufficient to pay the remaining Fund B obligations, as referred to in Sections III.E.6.a and III.E.9.c, above, the Trustees and/or Claims Administrator(s) shall provide written notice to all affected Class Members of the circumstances giving rise to the Financial Insecurity Opt-Out Right by first class mail, postage prepaid. Within 120 days of the transmission of that notice, each Class Member who is eligible to exercise a Financial Insecurity Opt-Out Right may send a written notice advising the Trustees and/or Claims Administrator(s) of the Class Member's election to exercise the Financial Insecurity Opt-Out Right on a form prescribed by the Trustees and/or Claims Administrator(s). In the event of such an opt-out, the Class Member may pursue any and all claims (except for those claims set forth in subparagraphs (e) and (g) of Section

I.53 of this Agreement) against AHP in the legal system, and none of the Released Parties may assert any defense to such claims based on any statute of limitations or repose, the doctrine of laches, any other defense predicated on the failure to timely pursue the claim, any defense based on "splitting" a cause of action, any defense based on any release signed pursuant to the Settlement Agreement, and/or any other defense based on the existence of the Settlement Agreement, except to the extent provided in Section III.E.9 of this Agreement.  In any legal action commenced by a Class Member exercising a right of opt-out under these circumstances, the Class Member shall reduce the amount of his or her recovery by the amount of any cash that the Class Member has received from AHP and/or the Trust under any terms of the Settlement.  There shall be no deduction, offset, or reduction for any Medical Screening or Medical Services received by a Class Member.

11.    Nothing contained in this Section of the Agreement shall be construed to be a waiver of or a limitation on rights which the Class Members, Class Representatives or Trustees would otherwise have under the law in the event of a breach of the Settlement Agreement.

12.    Immediately upon termination of the Security Fund under Section III.E.3 above, any remaining balance in the Security Fund, including any income earned thereon, shall be released to AHP.

## IV.    CLASS MEMBER RIGHTS AND BENEFITS

### A.    SCREENING/REFUND/MEDICAL SERVICES/CASH/RESEARCH BENEFITS PAYABLE FROM FUND A

1.    BENEFITS FOR CLASS MEMBERS WHO INGESTED PONDIMIN® AND/OR REDUX™ FOR 61 OR MORE DAYS

a.    **SCREENING PROGRAM:** Diet Drug Recipients in Subclass 1(b) will be eligible for one Transthoracic Echocardiogram and an associated interpretive physician visit. Eligible Class Members must register for this benefit by Date 1. This Screening Program shall be conducted for a twelve-month period after Final Judicial Approval. This period may be extended for up to an additional six months by the Court for good cause shown.

b.    **COST OF TRANSTHORACIC ECHOCARDIOGRAM:** Diet Drug Recipients in Subclass 1(b) who do not elect the Accelerated Implementation Option described in Section V below and who, independent of the Screening Program, obtain an Echocardiogram after the end of the Initial Opt-Out Period but before the Final Judicial Approval Date, may recover from Fund A the lesser of (i) the Trust's direct cost of providing for a Transthoracic Echocardiogram and associated interpretive physician visit under the Screening Program and (ii) the actual amount paid by the Class Member for the Echocardiogram and associated interpretive physician visit, net of amounts paid or reimbursed by an insurance carrier or other third-party payor, but only in the event that the Settlement receives Final Judicial Approval. Eligible Class Members must submit a claim for this benefit by Date 2. Class Members receiving such a payment may not also participate in the Screening Program benefits described in Section IV.A.1.a.

c.    **ADDITIONAL MEDICAL SERVICES OR CASH:** All Diet Drug Recipients in Subclass 2(b) and those Diet Drug Recipients in Subclass 1(b) who have been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period, will be entitled to receive, at the Class Member's election, either (i) valve-related medical services up to $10,000 in value to be provided by the Trust; or (ii) $6,000 in cash. Such cash payments and funds for such medical services will come from Fund A. Eligible Class Members must register for

this benefit and make the affirmative election as to whether they wish to receive cash or services by Date 2.

d.  **REFUND:** Diet Drug Recipients in Subclasses 1(b) and 2(b), or their associated Representative Claimants, will be eligible for a refund in the fixed amount of $30 per month of use for Pondimin® and $60 per month of use for Redux™, subject to a maximum of $500 per Class Member; provided, however, that such benefits will be made available to members of Subclasses 1(b) and 2(b) only if, and to the extent that, Fund A possesses sufficient assets to pay such benefits after paying or creating a reserve for payment of all other authorized expenses and benefits to be provided by Fund A. Eligible Class Members must register for this benefit by Date 1.

2.  **BENEFITS FOR CLASS MEMBERS WHO INGESTED PONDIMIN® AND/OR REDUX™ FOR 60 DAYS OR LESS:**

a.  **REFUND:** Diet Drug Recipients in Subclasses 1(a) and 2(a) or their associated Representative Claimants will be eligible for a refund in the fixed amount of $30 per month of use for Pondimin® and $60 per month of use for Redux™. Eligible Class Members must register for this refund benefit by Date 1.

b.  **SCREENING PROGRAM:**

(1)  In general, members of Subclass 1(a) are not entitled to screening benefits.

(2)  LIMITED REIMBURSEMENT FOR SCREENING EXAMINATIONS. If, however, during the Screening Period, a Diet Drug Recipient in Subclass 1(a), independent of the Screening Program, obtains an Echocardiogram and is diagnosed by a Qualified Physician as FDA Positive based on that Echocardiogram, he/she may recover from Fund A the lesser of (i) the direct cost to the Trust of providing a Transthoracic Echocardiogram and an associated interpretive physician visit under the Screening Program, and (ii) the actual amount paid by the Class Member for the Echocardiogram and associated interpretive physician visit, net of amounts paid or reimbursed by an insurance carrier or other third-party payor, but only in the event that the Settlement receives Final Judicial Approval.

Eligible Subclass 1(a) members must register for this benefit by Date 2.

(3)    COMPASSIONATE AND HUMANITARIAN PROGRAM. In addition, the Trustees may, in their discretion in appropriate cases for compassionate and humanitarian reasons, provide a Transthoracic Echocardiogram and associated interpretive physician visit during the Screening Period for members of Subclass 1(a) who are Diet Drug Recipients, where the Trustees determine that (a) such persons are in need of such services and are otherwise unable to obtain them; or (b) where there are other compelling reasons to provide such services to such persons. Total disbursements for such services shall not exceed $20 million. Eligible Subclass 1(a) members must apply for such benefits by Date 1.

c.    **ADDITIONAL MEDICAL SERVICES OR CASH.** All members of Subclass 2(a) who are Diet Drug Recipients as well as those members of Subclass 1(a) who are Diet Drug Recipients and who have been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period, will be entitled to receive, at the Class Member's election, either (i) valve-related medical services up to $5,000 in value to be provided by the Trust or (ii) $3,000 in cash. Such cash payments and funds for such medical services will come from Fund A. Eligible Class Members must register for this benefit and make the affirmative election as to whether they wish to receive cash or services by Date 2.

3.    **BENEFITS FOR ALL CLASS MEMBERS**

a.    **MEDICAL RESEARCH AND EDUCATION FUND.** An amount in Fund A not to exceed $25 million may be used to finance medical research and education related to heart disease. The Medical Research and Education Fund will be funded by the transfer of up to $25 million from Fund A to an organization formed for that purpose and described in Subsection (c)(3) of Section 501 of the Internal Revenue Code pursuant to Articles of Incorporation and Bylaws substantially in the form appended hereto as revised Exhibit "4." The management of the Medical Research and Education Fund will be by an independent Board of

Directors. The Parties agree that the Directors of the Medical Research and Education Fund will be nominated by the Parties and that each nominee will be subject to agreement of the Parties and subject to Court approval.

b.    **MEDICAL/LEGAL REGISTRY.** The Trustees shall apply a portion of Fund A to establish, operate and maintain a "Registry" to track the medical condition of Class Members, both for purposes of processing claims for benefits under the terms of the Settlement and for purposes of medical research and education. The funds expended to create, maintain and operate this Registry shall be considered administrative expenses of Fund A and shall not reduce the $25 million which is available for medical education and research.

c.    **ECHOCARDIOGRAM IN THE CASE OF FINANCIAL HARDSHIP.** In addition, the Trustees may, in their discretion, for members of Subclasses 1(a) and 1(b), in cases of true financial hardship provide a Transthoracic Echocardiogram and associated interpretive physician visit to such persons after Trial Court Approval of this Settlement. Total disbursements for such services shall not exceed $10 million.

d.    **REIMBURSEMENT FOR CERTAIN PRIVATELY-OBTAINED ECHOCARDIOGRAMS.** Diet Drug Recipients or their Representative Claimants will be eligible for reimbursement of the cost of Echocardiograms and associated interpretive visits not otherwise reimbursed under this Agreement where such procedures were performed after the commencement of Diet Drug use; provided, however, that such reimbursement benefits will be made available to Diet Drug Recipients or their Representative claimants only if, and t o the extent that, Fund A possesses sufficient assets to pay such benefits after paying or creating a reserve for payment of all other authorized expenses and benefits to be provided by Fund A, except for the refund benefits described in Section IV.A.1.d of the Settlement Agreement, which refund benefits described in Section IV.A.1.d shall be paid only after paying or creating a reserve for the payment of the reimbursement benefit described in this Section IV.A.3.d. The reimbursement to be provided hereunder shall be the lesser of (i) the direct cost to the Trust of providing a Transthoracic Echocardiogram and associated interpretive visit under the Screening Program and (ii) the actual

amount paid by the Class Member for the Echocardiogram and associated interpretive visit, net of amounts paid or reimbursed by an insurance carrier or other third-party payor. Class Members seeking such reimbursement must apply for it by Date 1.

4. **TERMS OF MEDICAL SCREENING PROGRAM AND PROVISION OF ADDITIONAL MEDICAL SERVICES.**

    a.    In order to supply Transthoracic Echocardiograms and associated interpretive physician visits pursuant to Sections IV.A.1.a, IV.A.1.b, IV.A.2.b.(2), IV.A.2.b.(3) and IV.A.3.c of this Settlement Agreement, and the additional medical services which Class Members are entitled to receive in accordance with Sections IV.A.1.c and IV.A.2.c of this Settlement Agreement, the Trustees and/or Claims Administrator(s) may enter into a contract with a network of providers of health services.

    b.    The "additional medical services" which eligible Class Members are entitled to receive under Sections IV.A.1.c and IV.A.2.c of this Settlement Agreement shall be determined by the Trustees and may include the following services, when performed, supervised, or prescribed by a physician specializing in internal medicine, cardiology, or cardiothoracic surgery:

        (1)    Comprehensive physical examinations;

        (2)    Chest x-rays;

        (3)    Electrocardiograms;

        (4)    Standard laboratory testing;

        (5)    Medically-appropriate Echocardiograms;

        (6)    Medically-supervised nutritional counseling; and/or

        (7)    Any new, accepted technology or modalities for the management of valvular heart disease.

5. **SOURCE OF FUND A BENEFITS.** The benefits referred to in Section IV.A.1 through and including Section IV.A.4 shall be paid only out of Fund A.

B.    **COMPENSATION BENEFITS PAYABLE FROM FUND B**

    1.    **ELIGIBLE CLASS MEMBERS.** The following Class Members, and only such Class Members, shall be entitled to the compensation benefits from Fund B ("Matrix Compensation Benefits"):

        a.    Diet Drug Recipients who have been diagnosed by a Qualified Physician as FDA Positive or as having Mild Mitral Regurgitation by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period and who have registered for further settlement benefits by Date 2;

        b.    The Representative Claimants of Diet Drug Recipients who have been diagnosed by a Qualified Physician as FDA Positive or as having Mild Mitral Regurgitation by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period, where either the Diet Drug Recipient or the Representative Claimant(s) for the Diet Drug Recipient has registered for further settlement benefits by Date 2;

        c.    The Derivative Claimants of Diet Drug Recipients who have been diagnosed by a Qualified Physician as FDA Positive or as having Mild Mitral Regurgitation by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period, where the Derivative Claimants have registered for further settlement benefits by Date 2, to the extent that such persons have a legally recognized claim for loss of services, consortium, support, or the like, arising from injury to the associated Diet Drug Recipient;

        d.    Diet Drug Recipients who have been diagnosed by a Qualified Physician as having Endocardial Fibrosis by September 30, 2005, and have registered for Fund B benefits by January 31, 2006;

        e.    The Representative Claimants of Diet Drug Recipients who have been diagnosed by a Qualified Physician as having Endocardial Fibrosis by September 30, 2005, where either the Diet Drug Recipient or the Representative Claimant(s) of the Diet Drug Recipient has registered for Fund B benefits by January 31, 2006;

    f.    The Derivative Claimants of Diet Drug Recipients who have been diagnosed by a Qualified Physician as having Endocardial Fibrosis by September 30, 2005, where the Derivative Claimants have registered for Fund B benefits by January 31, 2006, to the extent that such persons have a legally recognized claim for loss of services, consortium, support, or the like, arising from injury to the associated Diet Drug Recipient.

2.    **BENEFITS AVAILABLE**

    a.    For purposes of providing Matrix Compensation Benefits to those Class Members eligible to receive such payments, the following four payment matrices (hereinafter the "Matrices" or "Matrix") are established:

**Matrix A-1**

Age at diagnosis/event

| Severity | ≤ 24 | 25-29 | 30-34 | 35-39 | 40-44 | 45-49 | 50-54 | 55-59 | 60-64 | 65-69 | 70 - 79 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I | $123,750 | $117,563 | $111,685 | $106,100 | $100,795 | $95,755 | $90,967 | $86,419 | $82,098 | $73,888 | $36,944 |
| II | $643,500 | $611,325 | $580,759 | $551,721 | $524,135 | $497,928 | $473,032 | $449,381 | $426,912 | $384,221 | $192,111 |
| III | $940,500 | $893,475 | $848,801 | $806,361 | $766,043 | $727,741 | $691,354 | $656,786 | $623,947 | $561,552 | $280,776 |
| IV | $1,336,500 | $1,269,675 | $1,206,191 | $1,145,881 | $1,088,587 | $1,034,158 | $982,450 | $933,327 | $886,661 | $797,995 | $398,998 |
| V | $1,485,000 | $1,410,750 | $1,340,213 | $1,273,202 | $1,209,542 | $1,149,065 | $1,091,612 | $1,037,031 | $985,180 | $886,662 | $443,331 |

**Matrix A-2**

Age at diagnosis/event

| Severity | ≤ 24 | 25-29 | 30-34 | 35-39 | 40-44 | 45-49 | 50-54 | 55-59 | 60-64 | 65-69 | 70 - 79 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I | $1,250 | $1,187 | $1,128 | $1,072 | $1,018 | $967 | $919 | $873 | $829 | $739 | $500 |
| II | $6,500 | $6,175 | $5,866 | $5,573 | $5,294 | $5,030 | $4,778 | $4,539 | $4,312 | $3,842 | $1,921 |
| III | $9,500 | $9,025 | $8,574 | $8,145 | $7,738 | $7,351 | $6,983 | $6,634 | $6,302 | $5,616 | $2,808 |
| IV | $13,500 | $12,825 | $12,184 | $11,575 | $10,996 | $10,446 | $9,924 | $9,428 | $8,956 | $7,980 | $3,990 |
| V | $15,000 | $14,250 | $13,537 | $12,861 | $12,218 | $11,607 | $11,026 | $10,475 | $9,951 | $8,867 | $4,433 |

**Matrix B-1**

Age at diagnosis/event

| Severity | ≤ 24 | 25-29 | 30-34 | 35-39 | 40-44 | 45-49 | 50-54 | 55-59 | 60-64 | 65-69 | 70 - 79 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I | $24,750 | $23,513 | $22,337 | $21,221 | $20,159 | $19,152 | $18,194 | $17,284 | $16,420 | $14,778 | $7,389 |
| II | $128,700 | $122,265 | $116,152 | $110,344 | $104,827 | $99,586 | $94,606 | $89,876 | $85,383 | $76,844 | $38,422 |
| III | $188,100 | $178,695 | $169,760 | $161,272 | $153,208 | $145,548 | $138,270 | $131,357 | $124,790 | $112,310 | $56,155 |
| IV | $267,300 | $253,935 | $241,238 | $229,176 | $217,717 | $206,831 | $196,489 | $186,665 | $177,332 | $159,599 | $79,800 |
| V | $297,000 | $282,150 | $268,043 | $254,641 | $241,908 | $229,813 | $218,322 | $207,406 | $197,036 | $177,332 | $88,666 |

**Matrix B-2**

Age at diagnosis/event

| Severity | ≤ 24 | 25-29 | 30-34 | 35-39 | 40-44 | 45-49 | 50-54 | 55-59 | 60-64 | 65-69 | 70 - 79 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| I | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 |
| II | $1,300 | $1,235 | $1,173 | $1,115 | $1,059 | $1,006 | $956 | $908 | $862 | $768 | $500 |
| III | $1,900 | $1,805 | $1,715 | $1,629 | $1,548 | $1,470 | $1,397 | $1,327 | $1,260 | $1,123 | $562 |
| IV | $2,700 | $2,565 | $2,437 | $2,315 | $2,199 | $2,089 | $1,985 | $1,885 | $1,791 | $1,596 | $798 |
| V | $3,000 | $2,850 | $2,707 | $2,572 | $2,444 | $2,321 | $2,205 | $2,095 | $1,990 | $1,773 | $886 |

===========================================

**IV.  CLASS MEMBER RIGHTS AND BENEFITS**          

b.  Each Matrix describes the amount which an eligible Class Member is entitled to recover based on (1) the level of severity of a Diet Drug Recipient's disease pursuant to Section IV.B.2.c below, and (2) the age at which the Diet Drug Recipient is first diagnosed as suffering from that level of disease severity.

c.  The levels of disease severity in a Diet Drug Recipient which qualify eligible Class Members for payment on the Matrices are as follows:

    (1)  **MATRIX LEVEL I** is severe left sided valvular heart disease without complicating factors, and is defined as one of the following:

        (a)  Severe aortic regurgitation (AR) > 49% jet height/left ventricular outflow tract height (JH/LVOTH)[14] and/or severe mitral regurgitation (MR) > 40% regurgitant jet area/left atrial area (RJA/LAA)[15,16] and no complicating factors as defined below;

        (b)  FDA Positive valvular regurgitation[17] with bacterial endocarditis contracted after commencement of Pondimin® and/or Redux™ use.

    (2)  **MATRIX LEVEL II** is left sided valvular heart disease with complicating factors, and is defined as:

        (a)  Moderate AR (25% - 49% JH/LVOTH)[18] or Severe AR (> 49% JH/LVOTH)[19] with one or more of the following:

---

[14]  *See* Singh, *supra* note 2.

[15]  *See id.*

[16]  *See* Frederick Helmcke, *et al.*, *Color Doppler Assessment of Mitral Regurgitation with Orthogonal Planes*, 75 circulation 175, 177, 183 (1987) [hereinafter "Helmcke"].

[17]  *See* Centers for Disease Control and Prevention, U.S. Dep't of Health and Human Services, *Cardiac Valvulopathy Associated with Exposure to Fenfluramine or Dexfenfluramine: US Department of Health and Human Services Interim Public Health Recommendations*, 46 Morbidity & Mortality Weekly Rep. 1061, 1061-1066 (1997).

[18]  *See* Singh, *supra* note 2.

[19]  *See id.*

i)     Pulmonary hypertension secondary to severe aortic regurgitation with a peak systolic pulmonary artery pressure > 40 mm Hg measured by cardiac catheterization or with a peak systolic pulmonary artery pressure > 45 mm Hg[20] measured by Doppler Echocardiography, at rest, utilizing standard procedures[21,22] assuming a right atrial pressure of 10 mm Hg;

ii)    Abnormal left ventricular end-systolic dimension > 50 mm[23] by M-mode or 2-D Echocardiography or abnormal left ventricular end-diastolic dimension > 70 mm[24] as measured by M-mode or 2-D Echocardiography;

iii)   Ejection fraction of < 50%[25]; and/or

(b)    Moderate MR (20% - 40% RJA/LAA)[26] or Severe MR (> 40% RJA/LAA)[27] with one or more of the following:

i)     Pulmonary hypertension secondary to valvular heart disease with peak systolic pulmonary artery pressure >

---

[20]   *See* Braunwald I, *supra* note 1 at 796-98.

[21]   *See* Feigenbaum, *supra* note 3 at 201-03.

[22]   *See* Kwan-Leung Chan, *et al.*, *Comparison of Three Doppler Ultrasound Methods in the Prediction of Pulmonary Artery Disease*, 9 J. Am. C. Cardiology 549, 550 (1987) [hereinafter "Chan"].

[23]   *See* Robert O. Bonow, et al*., Guidelines for the Management of Patients With Valvular Heart Disease: A Report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (Committee on Management of Patients With Valvular Heart Disease)*, 32 J. Am. C. Cardiology 1486, 1511 (1998) [hereinafter "Bonow"].

[24]   *See id.*

[25]   *See id.* at 1512.

[26]   *See* Singh, *supra* note 2.

[27]   *See id.*

---

**IV.  CLASS MEMBER RIGHTS AND BENEFITS**          40

40 mm Hg measured by cardiac catheterization or with a peak systolic pulmonary artery pressure > 45 mm Hg[28] measured by Doppler Echocardiography, at rest, utilizing the procedures described in Section IV.B.2.c.(2)(a)(i) above;

ii)    Abnormal left atrial supero-inferior systolic dimension > 5.3 cm[29] (apical four chamber view) or abnormal left atrial antero-posterior systolic dimension > 4.0 cm (parasternal long axis view) measured by 2-D directed M-mode or 2-D echocardiography with normal sinus rhythm using sites of measurement recommended by the American Society of Echocardiography;[30]

iii)    Abnormal left ventricular end-systolic dimension $\geq$ 45 mm[31] by M-mode or 2-D Echocardiogram;

iv)    Ejection fraction of $\leq$ 60%[32];

v)    Arrhythmias, defined as chronic atrial fibrillation/flutter that cannot be converted to normal sinus rhythm, or atrial fibrillation/flutter requiring ongoing medical therapy, any of which are associated with left atrial enlargement; as defined above in Section IV.B.2.c.(2)(b)(ii).

---

[28]    *See* Braunwald I, *supra* note 1 at 796-98.

[29]    *See* Weyman, *supra* note 4 at 1290-92.

[30]    *See* Walter L. Henry, et al., *Report of the American Society of Echocardiography Committee on Nomenclature and Standards in Two-dimensional Echocardiography*, 62 Circulation 212, 212-13 (1980) [hereinafter "Henry"].

[31]    *See* Bonow, *supra* note 23 at 1533-35.

[32]    *See id.*

(3)   **MATRIX LEVEL III** is left sided valvular heart disease requiring surgery or conditions of equal severity, and is defined as:

(a)   Surgery to repair or replace the aortic and/or mitral valve(s) following the use of Pondimin® and/or Redux™; or

(b)   Severe regurgitation and the presence of ACC/AHA Class I indications for surgery to repair or replace the aortic[33] and/or mitral[34] valve(s) and a statement from the attending Board-Certified Cardiothoracic Surgeon or Board-Certified Cardiologist supported by medical records regarding the recommendations made to the patient concerning valvular surgery, with the reason why the surgery is not being performed; or

(c)   Qualification for payment at Matrix Level I(b) (as described in Section IV.B.2.c.(1)(b) above) or Matrix Level II and, in addition, a stroke due to bacterial endocarditis contracted after use of Pondimin® and/or Redux™ or as a consequence of chronic atrial fibrillation with left atrial enlargement as defined in Section IV.B.2.c.(2)(b)(ii) which results in a permanent condition which meets the criteria of AHA Stroke Outcome Classification[35] Functional Level II, determined six months after the event.

(4)   **MATRIX LEVEL IV** is defined as follows:

(a)   Qualification for payment at Matrix Level I(b) (as described in Section IV.B.2.c.(1)(b) above), II or III and, in addition, a stroke due to Bacterial Endocarditis contracted

---

[33]   *See id.* at 1510.

[34]   *See id.* at 1533-35.

[35]   *See* Margaret Kelley-Hayes, *et al.*, *The American Heart Association Stroke Outcome Classification*, 29 Stroke 1274, 1275 (1998) [hereinafter "Kelley-Hayes"]. It should be noted that this classification was approved by the American Heart Association Science Advisory and Coordinating Committee.