after use of Pondimin® and/or Redux™ or as a consequence of chronic atrial fibrillation with left atrial enlargement as defined in Section IV.B.2.c.(2)(b)(ii) which results in a permanent condition which meets the criteria of AHA Stroke Outcome Classification[36] Functional Level III, determined six months after the event; or

(b)     Qualification for payment at Matrix Level I.b, II, or III and, in addition, a peripheral embolus due to Bacterial Endocarditis contracted after use of Pondimin® and/or Redux™ or as a consequence of atrial fibrillation with left atrial enlargement as defined in Section IV.B.2.c.(2)(b)(ii) which results in severe permanent impairment to the kidneys, abdominal organs, or extremities, where severe permanent impairment means:

   i)     for the kidneys, chronic severe renal failure requiring hemodialysis or continuous abdominal peritoneal dialysis for more than six months;

   ii)    for the abdominal organs, impairment requiring intra-abdominal surgery;

   iii)   for the extremities, impairment requiring amputation of a major limb; or

(c)     The individual has the following:

   i)     Qualification for payment at Matrix Level III; and

   ii)    New York Heart Association Functional Class I or Class II symptoms as documented by the attending Board-Certified Cardiothoracic Surgeon or Board-Certified Cardiologist; and

---
[36]   *See id.*

iii)    Valvular repair and replacement surgery or ineligibility for surgery due to medical reasons as documented by the attending Board-Certified Cardiothoracic Surgeon or Board-Certified Cardiologist; and

iv)    Significant damage to the heart muscle, defined as: (a) a left ventricular ejection fraction < 30% with aortic regurgitation or a left ventricular ejection fraction < 35% with mitral regurgitation in patients who have not had surgery and meet the criteria of Section IV.B.2.c.(3)(b) above or (b) a left ventricular ejection fraction < 40% six months after valvular repair or replacement surgery in patients who have had such surgery; or

(d)    The individual has had valvular repair or replacement surgery and has one or more of the following complications which occur either during surgery, within thirty (30) days after surgery, or during the same hospital stay as the surgery:

i)    Renal failure, defined as chronic, severe renal failure requiring regular hemodialysis or continuous abdominal peritoneal dialysis for greater than six months following aortic and/or mitral valve replacement surgery;

ii)    Peripheral embolus following surgery resulting in severe permanent impairment to the kidneys, abdominal organs, or extremities;

iii)    Quadriplegia or paraplegia resulting from cervical spine injury during valvular heart surgery; or

(e)    A stroke caused by aortic and/or mitral valve surgery and the stroke has produced a

---

permanent condition which meets the criteria of the AHA Stroke Outcome Classification[37] Functional Levels II or III determined six months after the event;

(f)    The individual has had valvular repair or replacement surgery and suffers from post operative endocarditis, mediastinitis or sternal osteomyelitis, any of which requires reopening the median sternotomy for treatment, or a post-operative serious infection defined as HIV or Hepatitis C within six months of surgery as a result of blood transfusion associated with the heart valve surgery.

(g)    The individual has had valvular repair or replacement surgery and requires a second surgery through the sternum within eighteen months of the initial surgery due to prosthetic valve malfunction, poor fit, or complications reasonably related to the initial surgery.

(5)    **MATRIX LEVEL V** is defined as:

(a)    Endocardial Fibrosis (1) diagnosed by (a) endomyocardial biopsy that demonstrates fibrosis and cardiac catheterization that demonstrates restrictive cardiomyopathy or (b) autopsy that demonstrates endocardial fibrosis and (2) other causes, including dilated cardiomyopathy, myocardial infarction, amyloid, Loeffler's endocarditis, endomyocardial fibrosis as defined in Braunwald (involving one or both ventricles, located in the inflow tracts of the ventricles, commonly involving the chordae tendinea, with partial obliteration of either ventricle commonly present)[38], focal fibrosis secondary to valvular regurgitation (*e.g.*, "jet lesions"), focal fibrosis secondary to catheter instrumentation, and hypertrophic

---

[37]  *See id.*

[38]  *See* Braunwald I, *supra* note 1 at 1433-34.

cardiomyopathy with septal fibrosis, have been excluded; or

(b)   Left sided valvular heart disease with severe complications, defined as Matrix Levels I(b) (as described in Section IV.B.2.c.(1)(b) above), III or IV above with one or more of the following:

   i)   A severe stroke caused by aortic and/or mitral valve surgery or due to bacterial endocarditis contracted after use of Pondimin[®] and/or Redux[™] or as a consequence of chronic atrial fibrillation with left atrial enlargement as defined in Section IV.B.2.c.(2)(b)(ii) and the severe stroke has resulted in a permanent condition which meets the criteria of AHA Stroke Outcome Classification[39] Functional Levels IV or V, determined six months after the event;

   ii)   The individual has the following:

      a)   Qualification for payment at Matrix Levels III or IV; and

      b)   New York Heart Association Functional Class III or Class IV symptoms as documented by the attending Board-Certified Cardiothoracic Surgeon or Board-Certified Cardiologist; and

      c)   Valvular repair or replacement surgery or ineligibility for surgery due to medical reasons as documented by the attending Board-Certified Cardiothoracic Surgeon or

---

[39]   *See* Kelley-Hayes, *supra* note 35.

Board-Certified Cardiologist; and

d)   Significant damage to the heart muscle, defined as: (i) a left ventricular ejection fraction < 30% with aortic regurgitation or a left ventricular ejection fraction < 35% with mitral regurgitation, in patients who have not had surgery and meet the criteria in Section IV.B.2.c.(3)(b) above or (ii) a left ventricular ejection fraction < 40% six months after valvular repair or replacement surgery in patients who have had such surgery; or

iii)   Heart transplant;

iv)   Irreversible pulmonary hypertension (PH) secondary to valvular heart disease defined as peak-systolic pulmonary artery pressure > 50 mm Hg[40] (by cardiac catheterization) at rest following repair or replacement surgery of the aortic and/or mitral valve(s);

v)   Persistent non-cognitive state[41] caused by a complication of valvular heart disease (e.g., cardiac arrest) or valvular repair/replacement surgery supported by a statement from the attending Board-Certified Cardiothoracic Surgeon or Board-Certified Cardiologist, supported by medical records; or

---

[40]   *See* Braunwald I, *supra* note 1 at 796-98.

[41]   *See* Encyclopedia of Neuroscience 268 (George Adelman ed., 1987).

    (c)    Death resulting from a condition caused by valvular heart disease or valvular repair/replacement surgery which occurred post-Pondimin® and/or Redux™ use supported by a statement from the attending Board-Certified Cardiothoracic Surgeon or Board-Certified Cardiologist, supported by medical records; or

    (d)    The individual otherwise qualifies for payment at Matrix Level II, III, or IV and suffers from ventricular fibrillation or sustained ventricular tachycardia which results in hemodynamic compromise.

d.    The circumstances which determine whether Matrix A-1 or Matrix B-1 is applicable to a claim for Matrix compensation benefits are as follows:

    (1)    **FOR MATRIX A-1**: Diet Drug Recipients who ingested Pondimin® and/or Redux™ for sixty-one (61) or more days, who were diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period, whose conditions are eligible for Matrix payments but who do not have any condition or circumstance which makes Matrix B-1 applicable, or their Representative Claimants, shall be entitled to receive Matrix Compensation Benefits determined by application of Matrix A-1, provided that such Diet Drug Recipients or Representative Claimants have registered (or are deemed to have registered) for settlement benefits by Date 2.

    (2)    **FOR MATRIX B-1**: Diet Drug Recipients who are eligible for Matrix Compensation Benefits and to whom one or more of the following conditions apply, or their Representative Claimants, will receive Matrix Compensation Benefits determined by application of Matrix B-1, provided that such Diet Drug Recipients or Representative Claimants have registered (or are deemed to have registered) for settlement benefits by Date 2:

(a)    For claims as to the mitral valve, Diet Drug Recipients who were diagnosed by a Qualified Physician as having Mild Mitral Regurgitation by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period (regardless of the duration of ingestion of Pondimin® and/or Redux™); or

(b)    Diet Drug Recipients who ingested Pondimin® and/or Redux™ for sixty (60) days or less, who were diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period; or

(c)    Diet Drug Recipients who ingested Pondimin® and/or Redux™ for sixty-one (61) or more days, who were diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period, with any of the following conditions:

    i)    With respect to an aortic valve claim:

        a)    The following congenital aortic valve abnormalities: unicuspid, bicuspid or quadricuspid aortic valve, ventricular septal defect associated with aortic regurgitation;

        b)    Aortic dissection involving the aortic root and/or aortic valve;

        c)    Aortic sclerosis in people who are $\geq$ 60 years old as of the time they are first diagnosed as FDA Positive;

        d)    Aortic root dilatation > 5.0 cm;

e)    Aortic stenosis with an aortic valve area < 1.0 square centimeter by the Continuity Equation.

ii)    With respect to a mitral valve claim:

a)    The following congenital mitral valve abnormalities: parachute valve, cleft of the mitral valve associated with atrial septal defect;

b)    Mitral Valve Prolapse;

c)    Chordae tendineae rupture or papillary muscle rupture; or acute myocardial infarction associated with acute mitral regurgitation;

d)    Mitral annular calcification;

e)    M-Mode and 2-D echocardiographic evidence of rheumatic mitral valves (doming of the anterior leaflet and/or anterior motion of the posterior leaflet and/or commissural fusion), except where a Board-Certified Pathologist has examined mitral valve tissue and determined that there was no evidence of rheumatic valve disease.

iii)    With respect to claims for the aortic and/or mitral valve(s):

a)    Heart valve surgery prior to Pondimin® and/or Redux™ use on the valve that is the basis of claim;

b)    Bacterial endocarditis prior to Pondimin® and/or Redux™ use;

---

IV.  CLASS MEMBER RIGHTS AND BENEFITS                                    50

c)   FDA Positive regurgitation (confirmed by Echocardiogram) prior to Pondimin® and/or Redux™ use for the valve that is the basis of claim;

d)   A diagnosis of Systemic Lupus Erythematosus or a diagnosis of Rheumatoid Arthritis[42] and valvular abnormalities of a type associated with those conditions;[43]

e)   Carcinoid tumor of a type associated with aortic and/or mitral valve lesions;

f)   History of daily use of methysergide or ergotamines for a continuous period of longer than 120 days.

e.   Matrix A-2 and Matrix B-2 describe the amount of compensation to which Derivative Claimants are entitled if the Diet Drug Recipient with whom they are associated has a Matrix-Level Condition, to the extent that applicable state law recognizes that they have a claim for loss of consortium, services or support. Derivative Claimants will be paid based on the Matrix-Level Condition and age of diagnosis of the Diet Drug Recipient whose alleged injury forms the basis of their claim for loss of consortium, services, or support under applicable state law. Matrix A-2 will apply if the Diet Drug Recipient, whose alleged injury forms the basis of the claim for loss of consortium, services, or support under applicable state law, meets the criteria for payment under Matrix A-1. Matrix B-2 will apply if the Diet Drug Recipient, whose alleged injury forms the basis of the claim for loss of consortium, services, or support under applicable state law, meets the criteria for payment on Matrix B-1.

---

[42]   See Harrison's Principles of Internal Medicine 1878, 1885 (14th ed. 1998).

[43]   See C. Otto, The Practice of Clinical Echocardiography 589-93 (1997) [hereinafter "Otto"].

IV.   CLASS MEMBER RIGHTS AND BENEFITS                                      51

f.      If a Diet Drug Recipient qualifies for Matrix payments due
        to more than one condition, the Diet Drug Recipient and/or
        his or her associated Representative and Derivative
        Claimants who have registered (or who are deemed to have
        registered) for settlement benefits by Date 2 shall be
        entitled to receive only the higher of such payments, but
        not both such payments.

g.      Matrices A-1 and B-1 set forth the maximum aggregate
        amount to which the Diet Drug Recipient or his or her
        Representative Claimants are collectively entitled to
        receive from Fund B. Where there is more than one
        Representative Claimant associated with any particular Diet
        Drug Recipient eligible for such Matrix Compensation
        Benefits, the Trustees and/or Claims Administrator(s) shall
        allocate this amount among all of the Representative
        Claimants who have made a claim for such benefits
        according to applicable law. Matrices A-2 and B-2 set
        forth the maximum aggregate amount to which all
        Derivative Claimants associated with any particular Diet
        Drug Recipient are collectively entitled to receive from
        Fund B. Where there is more than one Derivative Claimant
        associated with any particular Diet Drug Recipient eligible
        for such Matrix Compensation Benefits, the Trustees and/or
        Claims Administrator(s) shall allocate the Matrix amount,
        *pro rata* among all of the Derivative Claimants who have
        made a claim for such benefits, to the extent that applicable
        state law recognizes that they have a claim for loss of
        consortium, services or support.

h.      Diet Drug Recipients who have been diagnosed by a
        Qualified Physician as FDA Positive (but not also as
        having Mild Mitral Regurgitation) by an Echocardiogram
        performed between the commencement of Diet Drug use
        and the end of the Screening Period and have registered for
        settlement benefits by Date 2, and their associated
        Representative and Derivative Claimants who have
        registered (or who are deemed to have registered) for
        settlement benefits by Date 2, shall be eligible for Matrix
        payments for Matrix-Level Conditions resulting from the
        valve or valves for which there was an FDA Positive
        diagnosis by a Qualified Physician by the end of the
        Screening Period, subject to the above provision that if
        he/she qualifies for more than one benefit, he/she shall be
        entitled to the higher benefit, but not both.

IV.  CLASS MEMBER RIGHTS AND BENEFITS                                    52

i.   Diet Drug Recipients who have been diagnosed by a Qualified Physician as having Mild Mitral Regurgitation (but not also as FDA Positive) by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period and have registered for settlement benefits by Date 2, and their associated Representative and Derivative Claimants who have registered (or who are deemed to have registered) for settlement benefits by Date 2, shall be eligible for Matrix payments only for claims based upon the mitral valve, subject to the above provision that if he/she qualifies for more than one benefit, he/she shall be entitled to the higher benefit, but not both.

j.   Diet Drug Recipients who have been diagnosed by a Qualified Physician both as FDA Positive (due to mild or greater aortic regurgitation) and as having Mild Mitral Regurgitation by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period and who have registered for settlement benefits by Date 2, and their associated Representative and Derivative Claimants who have registered (or who are deemed to have registered) for settlement benefits by Date 2, shall be eligible for Matrix payments based upon either the aortic or the mitral valve.

k.   Diet Drug Recipients who have been diagnosed by a Qualified Physician as having Endocardial Fibrosis by September 30, 2005, and have registered for Matrix Compensation Benefits for Endocardial Fibrosis by January 31, 2006, and their associated Representative and Derivative Claimants who have registered (or who are deemed to have registered) for these settlement benefits by January 31, 2006, shall be entitled to the Endocardial Fibrosis benefits as set forth in Sections IV.B.2.a and IV.B.2.c.(5)(a), regardless of whether or not the Diet Drug Recipient had valvular regurgitation.

l.   A Representative Claimant is deemed to have registered for settlement benefits either when the Representative Claimant registers for benefits or, if applicable, as of the date when the Diet Drug Recipient to which the claim relates has registered for settlement benefits.

C.    PAYMENT PROVISIONS

1.    The Matrix payment amounts set forth in Section IV.B.2.a above
will be increased by two percent (2%) per year, compounded
annually, beginning one year after the Final Judicial Approval
Date.  In the event that the Settlement does not receive Final
Judicial Approval or is terminated by AHP in accordance with its
terms for any other reason, then for purposes of providing benefits
to each Class Member who has entered into an Individual
Agreement pursuant to the Accelerated Implementation Option
(described in Section V below), the Matrix payment amounts shall
be increased by two percent (2%) per year, compounded annually,
beginning in the second "AIO Fiscal Year" (as defined in Section
I.6 and as discussed in Section V.H.3 hereof).

2.    A "Matrix Payment Cut-Off Date" is established for purposes of
this Settlement. The Matrix Payment Cut-Off Date shall be a date
which is fourteen years from the Final Judicial Approval Date or
December 31, 2015, whichever is earlier.  Those Class Members
who fail to qualify for payment on the Matrices by the Matrix
Payment Cut-Off Date shall have no further right to claim benefits
under Fund B or to exercise a Back-End Opt-Out (as described in
Section IV.D.4 below).  However, where a Diet Drug Recipient
does qualify for payment on the Matrices by the Matrix Payment
Cut-Off Date, the Diet Drug Recipient and/or the associated
Representative and Derivative Claimants may continue to receive
higher amounts of Matrix Compensation Benefits, if any, if the
condition of the Diet Drug Recipient which qualified such person
for such payment progresses to a more severe condition after the
Matrix Payment Cut-Off Date.

3.    Once a Diet Drug Recipient has reached a Matrix-Level Condition
before the Matrix Payment Cut-Off Date, the Diet Drug Recipient
and any associated Representative and/or Derivative Claimants can
step up to higher Matrix-Level Conditions and will be paid the
incremental dollar amount, if any, by which the Matrix payment
for the higher Matrix-Level Condition exceeds the Matrix payment
previously received. Notwithstanding the foregoing, Class
Members who seek benefits for Endocardial Fibrosis must qualify
for payment on the Matrices for that condition by September 30,
2005, and register (or be deemed to have registered) for Matrix
Compensation Benefits for Endocardial Fibrosis by January 31,
2006.

4.    Prior to the payment of Fund B benefits to any Class Member, the
Trustees and/or Claims Administrator(s) shall deduct the amount

provided for in Section VIII.E.1.b for the payment of attorneys' fees.

### D.    OPT-OUT RIGHTS

1.    **DERIVATIVE CLAIMANTS.** As to all opt-outs, where there is both a Diet Drug Recipient or a Representative Claimant and one or more Derivative Claimants, the Diet Drug Recipient's or the Representative Claimant's exercise or failure to exercise an opt-out right shall be binding on the associated Derivative Claimant(s).

2.    **INITIAL OPT-OUT**

   a.    **ELIGIBILITY:** All Class Members are eligible to exercise an Initial Opt-Out right.

   b.    **METHOD OF EXERCISE:** Each Class Member wishing to opt out from this Settlement must sign and submit timely written notice to the Claims Administrator(s), with a copy to AHP, clearly manifesting the Class Member's intent to opt out of the Settlement. The Claims Administrator(s) shall then submit all Opt-Out forms to the Court. The Court shall be the official registry of Opt-Outs. This written notice shall be in the form appended hereto as Exhibit "6" or in a substantially identical written manifestation of intent. To be effective, this written notice must be signed and submitted by the expiration of the Initial Opt-Out Period. The Parties will recommend that the Court approve an Initial Opt-Out Period of 120 days from the date on which class notice commences.

   c.    **EFFECT OF EXERCISE:** Any Class Member who timely and properly exercises an Initial Opt-Out right may initiate, continue with, or otherwise prosecute any legal claim against AHP and the Released Parties without any limitation, impediment or defense arising from the terms of the Settlement Agreement and subject to all defenses and rights which AHP and the Released Parties would otherwise have in the absence of the Settlement Agreement. AHP agrees that it will not use the Settlement Agreement or any proceedings connected therewith to cause delay to any Class Member who timely and properly exercises his/her Initial Opt-Out right and initiates, continues with, or otherwise prosecutes a claim against AHP. Lawsuits initiated by Class Members who timely and properly exercise an Initial Opt-Out shall be subject to the provisions of Section VIII.F.3.

d.  **REVOCATION OF EXERCISE:** Any Class Member may revoke an election to exercise a right of Initial Opt-Out and thereby receive the benefits of the Settlement, provided that the revocation takes place with the written consent of AHP, which shall not be unreasonably withheld.

3.  **INTERMEDIATE OPT-OUT**

a.  **ELIGIBILITY:** All Diet Drug Recipients (other than those who have entered into AIO Individual Agreements pursuant to the Accelerated Implementation Option) who are not members of Subclasses 2(a), 2(b) or 3, and who have been diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period, and their associated Representative and/or Derivative Claimants, are eligible to exercise a right to Intermediate Opt-Out.

b.  **METHOD OF EXERCISE:** Each Class Member who wants to exercise a right of Intermediate Opt-Out must do so by completing, signing, and timely submitting a written notice of the Class Member's intent to do so in the form appended hereto as Exhibit "7." This written notice must be submitted to the Court, the Trustees and/or Claims Administrator(s), and to AHP, no later than Date 2. In that form, the Class Member must clearly express his/her desire to exercise a right of Intermediate Opt-Out, certify that he/she is eligible to do so, and expressly acknowledge an understanding of the Settlement rights and benefits that will be relinquished by the exercise of the Intermediate Opt-Out right. A Class Member may not exercise an Intermediate Opt-Out right after receiving either $6,000 in cash or any portion of $10,000 in medical services in the case of members of Subclass 1(b) (pursuant to Section IV.A.1.c above), or $3,000 in cash or any portion of $5,000 in medical services in the case of members of Subclass 1(a) (pursuant to Section IV.A.2.c above). If a member of Subclass 1(a) or 1(b) is diagnosed with a Matrix-Level Condition and exercises an opt-out right after the end of the Initial Opt-Out Period, the opt-out shall be deemed a Back-End Opt-Out.

c.  **EFFECT OF EXERCISE:** The Intermediate Opt-Out is subject to the following provisions. A Class Member who timely and properly exercises an Intermediate Opt-Out right may pursue all of his or her Settled Claims (except for those claims set forth in subparagraphs (e) and (g) of Section I.53), against the AHP Released Parties and/or the Non-

AHP Released Parties, but may only assert a claim against AHP Released Parties and/or the Non-AHP Released Parties based on the heart valve of the relevant Diet Drug Recipient which was diagnosed by a Qualified Physician as FDA Positive by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Program. If, at any time after a Class Member exercises an Intermediate Opt-Out right, the Class Member initiates a lawsuit seeking to pursue a Settled Claim against AHP or any other Released Party, the Released Party shall have the right to challenge, in such lawsuit only, whether the opt-out was timely and proper, including whether the Class Member was eligible to exercise such an opt-out right. With respect to each Class Member who timely and properly exercises the Intermediate Opt-Out right and who initiates a lawsuit against any of the Released Parties within one year from the date on which the Intermediate Opt-Out right is exercised, the AHP Released Parties shall not assert any defense based on any statute of limitations or repose, the doctrine of laches, any other defense predicated on the failure to timely pursue the claim, any defense based on "splitting" a cause of action, any defense based on any release signed pursuant to the Settlement Agreement, and/or any other defense based on the existence of the Settlement Agreement, except to the extent provided herein. A Class Member timely and properly exercising an Intermediate Opt-Out right may not seek punitive, exemplary, or any multiple damages against the AHP Released Parties or the Non-AHP Released Parties; provided, however, as consideration for being a Non-AHP Released Party and for receiving the benefit of this waiver of punitive, exemplary, and multiple damages, the Non-AHP Released Party must agree in writing not to assert any defense based on any statute of limitations or repose, the doctrine of laches, or any other defense predicated on the failure to timely pursue the claim, any defense based on "splitting" a cause of action, any defense based on any release signed pursuant to the Settlement Agreement, and/or any other defense based on the existence of the Settlement Agreement, except to the extent provided herein; and provided further that if the Non-AHP Released Party so agrees, then the Class Member may not recover more than the total amount of compensatory damages he or she is entitled to from all persons or entities in connection with any claimed injury arising from his/her use of Diet Drugs, except where such limitation is inconsistent with applicable law. A Class Member timely and properly exercising an Intermediate Opt-Out right may

not use any previous verdicts or judgments against the AHP Released Parties, or factual findings necessary to such verdicts or judgments, for purposes of establishing claims or facts in order to obtain a verdict or judgment against the AHP Released Parties under the doctrines of res judicata, collateral estoppel or other doctrines of claim or issue preclusion. Nor may a Class Member timely and properly exercising an Intermediate Opt-Out right seek to introduce into evidence against the AHP Released Parties, for any purpose, such a verdict, judgment, or factual finding. Lawsuits initiated by Class Members who timely and properly exercise an Intermediate Opt-Out shall be subject to the provisions of Section VIII.F.3.

4.    **BACK-END OPT-OUT**

    a.    **ELIGIBILITY:**

        (1)    As to Matrix-Level claims based upon valvular regurgitation, all Diet Drug Recipients (other than those who have entered into AIO Individual Agreements pursuant to the Accelerated Implementation Option) who have been diagnosed by a Qualified Physician as FDA Positive or as having Mild Mitral Regurgitation by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period, and who reach a Matrix-Level Condition after September 30, 1999, but before the Matrix Payment Cut-Off Date, and their associated Representative and/or Derivative Claimants, may exercise a Back-End Opt-Out right, provided that the Class Member has registered or is deemed to have registered for settlement benefits by Date 2. Class Members who knew prior to September 30, 1999, that they had injury to one or more of their left-side heart valves and a condition which would entitle them to payments on the Matrices may not exercise a Back-End Opt-Out.

        (2)    As to Matrix-Level claims based upon Endocardial Fibrosis, all Diet Drug Recipients who have not received the diagnosis of Endocardial Fibrosis from a Qualified Physician by September 30, 1999, and who have subsequently been diagnosed by a Qualified Physician as having Endocardial Fibrosis by September 30, 2005, and their associated

Representative and/or Derivative Claimants, may exercise a Back-End Opt-Out.

(3)     Class Members who are not eligible for Matrix Compensation Benefits may not exercise the Back-End Opt-Out right provided by this Settlement.

b.     **METHOD OF EXERCISE:** Each Class Member who wishes to exercise a right of Back-End Opt-Out must complete, sign, and timely submit written notice of the Class Member's intention to do so in the form appended hereto as Exhibit "8." This written notice must be submitted to the Court, the Trustees and/or Claims Administrator(s), and to AHP, within 120 days after the date on which the Class Member first knows or should have known in the exercise of reasonable diligence that the relevant Diet Drug Recipient developed a Matrix-Level Condition or by Date 2, whichever is later. In that notice, the Class Member must clearly express his or her decision to exercise a Back-End Opt-Out right, certify that he or she is eligible to do so, and acknowledge an understanding of the Settlement rights and benefits that will be relinquished by the exercise of the Back-End Opt-Out. A Class Member may not exercise a Back-End Opt-Out right after claiming any Matrix Compensation Benefits. For this purpose, a Class Member is claiming Matrix Compensation Benefits if the Interim Claims Administrators and/or the Trust receive: (i) Part I of a GREEN FORM signed by the Class Member (or Representative Claimant of such Class Member); and/or (ii) Part II of a GREEN FORM signed by a physician relating to the Class Member and a BLUE FORM signed by that Class Member (or Representative Claimant of such Class Member) in which the Class Member (or Representative Claimant of such Class Member) indicated a belief or assertion of a Matrix-Level condition.

c.     **EFFECT OF EXERCISE:** The Back-End Opt-Out is subject to the following provisions. A Class Member who timely and properly exercises a Back-End Opt-Out may pursue all of his or her Settled Claims (except for those claims set forth in subparagraphs (e) and (g) of Section I.53) against the AHP Released Parties and/or the Non-AHP Released Parties, but may only assert a claim against the AHP Released Parties and/or the Non-AHP Released Parties as follows: (i) if such person has opted out by reason of a Matrix-Level Condition of one or more heart valves diagnosed by a Qualified Physician as FDA Positive or

Mild Mitral Regurgitation by an Echocardiogram performed between the commencement of Diet Drug use and the end of the Screening Period, such lawsuit may only assert a claim based on that heart valve or valves and condition; and (ii) if such person has opted out by reason of Endocardial Fibrosis, such lawsuit may only assert a claim based on Endocardial Fibrosis.  If, at any time after a Class Member exercises a Back-End Opt-Out right, the Class Member initiates a lawsuit seeking to pursue a Settled Claim against AHP or any other Released Party, the Released Party shall have the right to challenge, in such lawsuit only, whether the opt-out was timely and proper, including whether the Class Member was eligible to exercise such an opt-out right.  With respect to each Class Member who timely and properly exercises the Back-End Opt-Out right and who initiates a lawsuit against any of the Released Parties within one year from the date on which the Back-End Opt-Out right is exercised, the AHP Released Parties shall not assert any defense based on any statute of limitations or repose, the doctrine of laches, any other defense predicated on the failure to timely pursue the claim, any defense based on "splitting" a cause of action, any defense based on any release signed pursuant to the Settlement Agreement, and/or any other defense based on the existence of the Settlement Agreement, except to the extent provided herein.  A Class Member timely and properly exercising a Back-End Opt-Out may not seek punitive, exemplary, or any multiple damages against the AHP Released Parties or the Non-AHP Released Parties; provided, however, as consideration for being a Non-AHP Released Party and for receiving the benefit of this waiver of punitive, exemplary, and multiple damages, the Non-AHP Released Party must agree not to assert any defense based on any statute of limitations or repose, the doctrine of laches, or any other defense predicated on the failure to timely pursue the claim, any defense based on "splitting" a cause of action, any defense based on any release signed pursuant to the Settlement Agreement, and/or any other defense based on the existence of the Settlement Agreement, except to the extent provided herein; and provided further that if the Non-AHP Released Party so agrees, then the Class Member may not recover more than the total amount of compensatory damages he or she is entitled to from all persons or entities in connection with any claimed injury arising from his/her use of Diet Drugs, except where such limitation is inconsistent with applicable law.  A Class Member timely and properly exercising a

Back-End Opt-Out may not use any previous verdicts or judgments against the AHP Released Parties, or factual findings necessary to such verdicts or judgments, for purposes of establishing claims or facts in order to obtain a verdict or judgment against the AHP Released Parties under the doctrines of res judicata, collateral estoppel or other doctrines of claim or issue preclusion.  Nor may a Class Member timely and properly exercising a Back-End Opt-Out right seek to introduce into evidence against the AHP Released Parties, for any purpose, such a verdict, judgment, or factual finding. Lawsuits initiated by Class Members who timely and properly exercise a Back-End Opt-Out shall be subject to the provisions of Section VIII.F.3.

5.     **SIXTH AMENDMENT OPT-OUT**

a.     **ELIGIBILITY:** A Class Member (a Diet Drug Recipient or Representative Claimant of such Diet Drug Recipient) who would otherwise qualify to exercise a right of Back-End Opt-Out under Section IV.D.4 if the Class Member had not claimed Matrix Compensation Benefits, and who has claimed Matrix Compensation Benefits (within the meaning of Section IV.D.4.b) on or before May 3, 2003, is eligible to exercise a Sixth Amendment Opt-Out if: (i) the Trust has determined, after audit of the claim, that the Class Member qualifies for Matrix Compensation Benefits, including without limitation that the Class Member satisfies the requirements of the Settlement Agreement for medical eligibility for Matrix Compensation Benefits; (ii) the Class Member has not received any Matrix Compensation Benefits from the Trust or received payment of any settlement amount from Wyeth; (iii) the Maximum Available Fund B Amount at such time is $255 million or less, the Class Member's claim for Matrix Compensation Benefits was included in a Fund B Level Notice (as defined below), a Fund B Quarterly Notice, or Settlement Fund Quarterly Notice, and a Fund B Suspension (as defined below) has occurred; (iv) AHP has elected not to deposit additional funds into Fund B to pay such Class Member's Matrix Compensation Benefits; and (v) the Class Member agrees in writing that if the Class Member files any action as a Sixth Amendment Opt-Out, the Class Member will name only AHP as the defendant and no other defendants, the Class Member (and any Derivative Claimants of such Class Member) will be the sole plaintiff(s) in such action, and the Class Member will not agree to or cause

consolidation of such action with any other claims or
actions (other than consolidation for purposes of pretrial
discovery pursuant to 28 U.S.C. § 1407 or a similar state
statute) and will dismiss such action if consolidation is
nonetheless ordered by any court, subject to the right to re-
file the action in conformity with this Section IV.D.4.c
within 120 days of any such dismissal.

b.   **METHOD OF EXERCISE:** Each Class Member who wants to
exercise a Sixth Amendment Opt-Out must do so by
completing, signing, and timely submitting an ORANGE
FORM #4 (in the form to be adopted by the Trust and the
Parties if the conditions giving rise to a Sixth Amendment
Opt-Out should occur) to the Trust and AHP postmarked
no later than 120 days after the date of a notice from the
Trust to the Class Member that the Class Member is
eligible for the exercise of a Sixth Amendment Opt-Out.

c.   **EFFECT OF EXERCISE:** The Sixth Amendment Opt-Out is
subject to all the provisions of Section IV.D.4.c relating to
the Back-End Opt-Out and to the additional provisions
imposed pursuant to Section IV.D.5.a(v) above.

d.   **IMPLEMENTATION OF THE SIXTH AMENDMENT OPT-OUT:**
To effectuate this Section IV.D.5, if deposit by AHP into
the Trust of the amount requested in a Fund B Quarterly
Notice or Settlement Fund Quarterly Notice would reduce
the Maximum Available Fund B amount to $255 million or
less, the Trust shall notify AHP in writing of this
circumstance at the time that it issues such Fund B
Quarterly Notice or Settlement Fund Quarterly Notice and
set forth the amount that if deposited would cause the
Maximum Available Fund B Amount to be reduced below
$255 million (a "Fund B Level Notice"), and shall identify
the Class Members whose claims form the basis of the
Notice and the gross amount of Matrix Compensation
Benefits that the Trust finally determined each Class
Member was entitled to be paid. Within fifteen days after
receipt of a Fund B Quarterly Notice or Settlement Fund
Quarterly Notice accompanied by a Fund B Level Notice,
AHP shall advise the Trust as to whether it intends to
deposit the full amount requested in the Fund B Level
Notice. Any deposits by AHP of amounts described in a
Fund B Level Notice shall not reduce the Maximum
Available Fund B Amount below $255 million. If AHP
fails to respond timely to a Notice of Fund B Level or
notifies the Trust that it does not intend to pay the full

amount requested in the Notice of Fund B Level, then a "Fund B Suspension" has occurred. If a Fund B Suspension has occurred:

(i)    AHP shall not be entitled to claim or receive any Credits under Section VII.A unless such Credits have been claimed and applied to reduce the Maximum Available Fund B Amount before the date of the Notice of Fund B Level that results in a Fund B Suspension;

(ii)   Subject to Section III.C.4 and the Settlement Trust Agreement, within ten Business Days after the date of the Fund B Suspension, and in subsequent Fiscal Quarters within ten Business Days after the date of a Fund B Quarterly Notice or Settlement Fund Quarterly Notice, AHP shall deposit into Fund B the portion of the amount requested in the Fund B Quarterly Notice or Settlement Fund Quarterly Notice attributable to supplemental claims by eligible Class Members for Matrix Compensation Benefits pursuant to Section IV.C.3 ("Supplemental Matrix Claims") as identified by the Trust in the Fund B Quarterly Notice or Settlement Fund Quarterly Notice and to maintain the Administrative Reserve in Fund B pursuant to Section III.C.3, with such deposit applied to reduce the Maximum Available Fund B Amount, and the Trust shall pay such Supplemental Claims in accordance with this Settlement Agreement;

(iii)  Within ten Business Days after the date of the Fund B Suspension, and in subsequent Fiscal Quarters within ten Business Days after the date of a Fund B Quarterly Notice or Settlement Fund Quarterly Notice, AHP shall elect in writing to the Trust which, if any, of the claims for Matrix Compensation Benefits identified in the Fund B Quarterly Notice or Settlement Fund Quarterly Notice as ready for payment shall be paid by the Trust, and with such election AHP shall deposit into Fund B the amounts necessary for such payments. Deposits for this purpose shall not reduce the Maximum Available Fund B Amount.

e.    **PROCESSING OF CLAIMS IF A FUND B SUSPENSION OCCURS:** If a Fund B Suspension occurs, the Trust shall continue to process

claims for Matrix Compensation Benefits to a Final Determination for each Class Member who has filed a GREEN FORM with the Trust, and shall continue to provide AHP with Fund B Quarterly Notices or Settlement Fund Quarterly Notices stating the amount of Matrix Compensation Benefits subject to Final Determination by the Trust as of the close of the Fiscal Quarter preceding the Fund B Quarterly Notice. Each such Fund B Quarterly Notice or Settlement Fund Quarterly Notice issued by the Trust to AHP shall identify each Class Member whose claim for Matrix Compensation Benefits was subject to a Final Determination by the Trust during the Fiscal Quarter preceding the date of the Fund B Quarterly Notice and shall state the gross amount of Matrix Compensation Benefits that the Trust finally determines each Class Member was entitled to be paid. The provisions of Sections IV.D.5.d(ii) through (iii) above shall apply to each such Fund B Quarterly Notice or Settlement Fund Quarterly Notice.

## V.    ACCELERATED IMPLEMENTATION OPTION

A.    All Class Members shall be offered the option of obtaining settlement benefits prior to the Final Judicial Approval Date (the "Accelerated Implementation Option" or "AIO") subject to the conditions defined below.

B.    Any Class Member may elect the AIO at any time from the Preliminary Approval Date until the Final Judicial Approval Date or, unless AHP elects to extend the offer date thereafter, the date on which it is determined that the Settlement Agreement will not receive Final Judicial Approval. Persons electing the AIO will begin receiving benefits thereunder at such time as the Trial Court makes an oral or written ruling on the approval or non-approval of the Settlement or at such time as AHP exercises its "walkaway rights" pursuant to Section VII.E hereof. A Derivative Claimant may not elect the AIO if the Diet Drug Recipient with whom he or she is associated (or the Representative Claimant of the Diet Drug Recipient) has not elected the AIO.

C.    In order to elect the AIO, a Class Member must complete and sign the "PINK FORM" appended to this Settlement Agreement as Exhibit "9" and submit it to the Trustees and/or Claims Administrator(s). Any person properly executing the "PINK FORM" and delivering it to the Trustees and/or Claims Administrator(s) during the period in which AHP is offering the AIO, including any extension of the AIO offer, will have entered into an individual agreement with AHP, separate from this Settlement Agreement, under which the parties thereto shall have all the same rights, benefits and obligations to one another as the rights, benefits and obligations accorded to Class Members and to AHP under the Settlement Agreement, except as provided below. Class Members will have all the rights, benefits and obligations provided in Section IV.A, IV.B, and IV.C, except for Section IV.A.1.b herein. AHP will have all the rights, benefits and obligations provided in Section VII, except subsection E thereof. Such executed and delivered PINK FORMS shall be referred to as "Individual Agreements."

D.    Such Individual Agreements shall be effective prior to the Final Judicial Approval Date and, even if AHP exercises its "walkaway right" under Section VII.E, the Individual Agreements entered into prior to the date of such exercise shall nevertheless be binding and effective. If AHP does not exercise its "walkaway right," and the Settlement Agreement with the Settlement Class does not receive Final Judicial Approval or is terminated for any other reason, such Individual Agreements shall nevertheless continue to be effective and binding.

E.    No person exercising an Initial Opt-Out right will be eligible to enter into an Individual Agreement, unless such Initial Opt-Out has been revoked with AHP's consent pursuant to Section IV.D.2.d hereof. Persons signing

Individual Agreements will, by entering into such Individual Agreements, knowingly and affirmatively waive all Intermediate and Back-End Opt-Out rights otherwise provided for by the Settlement Agreement regardless of whether or not the Settlement Agreement receives Final Judicial Approval. Notwithstanding the preceding sentence, Class Members who enter into Individual Agreements pursuant to the Accelerated Implementation Option will be eligible to exercise the Financial Insecurity Opt-Out Right described in Section III.E.9 above. In addition, such persons will agree not to object to approval of the Settlement by the Court and will agree not to appeal from Trial Court Approval. The Individual Agreements shall also provide for a Screening Period to commence on or about the AIO Start Date and to conclude twelve months after the date on which the Settlement Agreement obtains Final Judicial Approval or the date on which it is determined that the Settlement Agreement will not receive Final Judicial Approval or is otherwise terminated.   Persons signing Individual Agreements pursuant to the AIO shall also agree to be bound by the provisions contained in Sections VII.C.1 through VII.C.4 herein with respect to the protection of AHP from claims by Non-Settling Defendants, notwithstanding the absence of any order enjoining and barring all Non-Settling Defendants from commencing or prosecuting any claim against AHP or any other Released Party for contribution and/or non-contractual indemnity as set forth in Section VII.C.1.a and Section VII.C.2 herein.

F.    After Trial Court Approval or in the event Trial Court Approval is denied and an appeal from that denial is taken in a timely manner, but prior to the Final Judicial Approval Date, the following provisions shall apply:

1.    Fund A benefits for individuals accepting the AIO will be payable only out of Fund A of the Settlement Trust and AHP's obligation to make payments to Fund A for this and any other purpose shall be unchanged from that set forth in Section III.B hereof;

2.    Fund B benefits for eligible individuals accepting the AIO will be payable only out of Fund B of the Settlement Trust. Beginning on the AIO Start Date, the Trustees may request in writing on a monthly basis (each a "Request for Fund B AIO Payment") payment of an amount (such amount being referred to as a "Fund B AIO Deposit") to pay claims for Fund B benefits by eligible individuals who have accepted the AIO which have not been paid due to an insufficient cash balance in Fund B and to pay the reasonable costs of administration associated with providing such benefits. AHP shall pay the Fund B AIO Deposit amount so requested no later than fifteen (15) days after the date on which AHP receives from the Trustees a Request for Fund B AIO Payment requesting such Fund B AIO Deposit; provided however, that AHP's obligation to pay Fund B Deposits shall at all times be limited to the Maximum Available Fund B Amount. The payment

of attorneys' fees by AHP in the circumstances described by this paragraph shall be in accordance with Sections VIII.E.2, VIII.E.3 and VIII.E.4.

G.   In the event of Final Judicial Approval, all benefits due under the AIO shall be paid from Fund A or Fund B, as applicable, and AHP shall continue to have obligations as set forth in Sections III.B and III.C hereof to make payments to Fund A and Fund B, but AHP shall have no further obligation to make any Fund B AIO Deposits to Fund B pursuant to Section V.F above for the payment of such AIO benefits. All Individual Agreements shall be administered after Final Judicial Approval in all respects as if they were part of the Settlement, other than as set forth in Section V.E hereof; provided, however, that all persons who have entered into Individual Agreements shall be deemed to have registered for all benefits under the Settlement Agreement. Such persons will be subject to the requirements for submission of documentation and other evidence to establish their entitlement to settlement benefits, including but not limited to submission of the "GREEN FORM" in order to claim Matrix Compensation Benefits.

H.   If Final Judicial Approval is not obtained or if the Settlement Agreement is terminated by AHP for any reason, the following provisions shall apply with respect to the Individual Agreements which have been entered into pursuant to the AIO:

1.   The Settlement Trust shall not automatically terminate, but shall remain in effect to administer the Individual Agreements, subject to Sections V.H.2, V.H.3, V.H.4 and V.H.5 hereof.

2.   Notwithstanding the provisions of Section V.H.1 hereof, within five Business Days after the date on which Final Judicial Approval is not obtained or the date on which Settlement Agreement is terminated for any other reason, the Trustees shall transfer to AHP all amounts in the Settlement Trust after payment of any charges and expenses which the Settlement Agreement expressly authorized or required to be incurred and expended prior thereto, including any amounts expended to assist in seeking Final Judicial Approval, except that the Trust shall retain the sum of $50 million and any additional amount which the Trustees reasonably determine to be required to provide Fund A and Fund B benefits to individuals who have qualified for benefits pursuant to Individual Agreements but have not yet received them. Thereafter, and subject to any changes negotiated or determined by arbitration pursuant to Sections V.H.4 and V.H.5 hereof, AHP shall make payments to the Trust on a quarterly basis of amounts required by the Trust to provide Fund A and Fund B benefits to individuals who have qualified for such benefits pursuant to Individual

Agreements but have not yet received them and to maintain a $50 million Administrative Reserve. Such quarterly payments shall be based upon an AIO Fiscal Year. For this purpose, AHP agrees to pay into the Settlement Trust such amount as the Trustees may request in writing on such a quarterly basis, no later than fifteen (15) days after the date on which the Trustees provide AHP with such a quarterly request, subject to Section V.H.3 below.

3.      AHP's obligations to make payments pursuant to Individual Agreements, including but not limited to payments to the Trust pursuant to Section V.F and pursuant to Section V.H.2 above, shall be subject in the aggregate to the same maximum limitations on its obligations as would have been applicable to its Fund A and Fund B obligations to the Settlement Trust had the Settlement received Final Judicial Approval, subject to the following modifications:

    a.      The payment amounts specified in Section III.B.1 hereof shall be deemed to be AHP's maximum aggregate obligation pursuant to all Individual Agreements to pay for or otherwise provide benefits or other amounts which would have been payable from Fund A had Final Judicial Approval been obtained and for the cost of administration thereof.

    b.      In calculating the Adjusted Maximum Available Fund B Amount (i) the AIO Fiscal Year shall be used in lieu of the Fiscal Year; and (ii) no deduction shall be made for any Credits pursuant to Section VII.A or any Cross-Claim Credits pursuant to Section VII.C hereof.

4.      During the sixty-day period following the termination of the Settlement Agreement, AHP and the Class Counsel shall engage in good faith negotiations with respect to a mechanism to administer the Individual Agreements in a manner designed to assure that individuals electing the AIO have the same rights and benefits as the rights and benefits accorded to Class Members under this Agreement (except as provided in Section V.E hereof); to reduce the cost of administering the Individual Agreements to an amount which is reasonable in relation to the number of such agreements which have been entered into; and to assure that AHP obtains the most favorable tax treatment available under those circumstances, and to assure that AHP receives all information requested by it to permit it to take appropriate tax deductions and otherwise calculate its taxes. Such negotiations shall address, without limitation, the following matters:

a.    whether a different mechanism other than the Settlement Trust should be established for administering the Individual Agreements; whether such an alternative mechanism is necessary to reduce the cost of administering the Individual Agreements to an amount which is reasonable in relation to the number of such agreements which have been entered into; or whether the Settlement Trust shall be retained as the mechanism for administering the Individual Agreements, but with changes in its structure or level of expenditures; provided however that the Settlement Trust shall remain in effect, as modified in accordance with Sections V.H.2 and V.H.3 above, unless and until such changes or alternative mechanisms are agreed upon pursuant to this Section V.H.4 or are determined pursuant to Section H.5;

b.    whether and to what extent an alternative means for resolving disputes in the administration of the Individual Agreements, including but not limited to disputes as to whether or not AHP has failed to make any required payment, should be used in lieu of the resolution of such disputes by the Court;

c.    whether and to what extent changes should be made to the Security Fund structure and terms (including a reduction in the amount of collateral and the treatment of the Financial Insecurity Opt-Out Right) in light of the number of such agreements which shall have been entered into and to reflect the different circumstances then in effect;

d.    in the event that the Settlement Trust is retained for the purpose of administering the Individual Agreements, the amount by which the Administrative Reserve is to be reduced to reflect the reasonable administrative needs of the Trust for the purpose of administering the Individual Agreements, which shall be reasonable in relation to the number of such agreements which have been entered into.

5.    In the event that Class Counsel and AHP are not able to reach agreement as to any or all of the matters described in Section V.H.4, such matters shall be resolved by binding arbitration by a panel of three arbitrators, one of whom shall be selected by AHP, one of whom shall be selected by Class Counsel and the third of whom shall be selected by the first two such arbitrators. The cost of such arbitration shall be paid by the Settlement Trust as an administrative expense. Such arbitration shall be conducted under the rules of the American Arbitration Association and shall be

concluded in no more than sixty (60) days after the end of the sixty-day period referred to in Section V.H.4 above, including the rendering of a decision by the arbitrators.

I.    If AHP exercises its "walkaway right" under Section VII.E hereof, the Individual Agreements previously entered into shall nevertheless be binding and effective on AHP and the other parties thereto. The exercise of the "walkaway right" by AHP will not affect its obligations to those Class Members who have accepted the AIO prior to AHP's exercise of its "walkaway right" or during any subsequent period in which AHP continues to offer the AIO, nor those Class Members' obligations to AHP thereunder.

J.    The Parties shall ask the Court to supervise the award of attorneys' fees relating to the Individual Agreements, as set forth in Section VIII.E hereof, whether or not the Settlement receives Final Judicial Approval.

## VI.    CLAIMS ADMINISTRATION

### A.    THE INTERIM ESCROW AGENT, INTERIM CLAIMS ADMINISTRATOR(S), CLAIMS ADMINISTRATOR(S) AND TRUSTEES.

1.    In connection with their request for Preliminary Approval of the Settlement, AHP and the Class Counsel Representative(s) shall mutually select an Interim Escrow Agent, such selection being subject to approval by the Court. Until such time as the Court approves the appointment of Trustees, the Interim Escrow Agent shall have all of the rights and responsibilities of the Trustees under the Settlement Agreement with regard to the receipt and investment of Settlement Funds and any payments which AHP is required to make to the Trustees shall be paid to the Interim Escrow Agent.

2.    In connection with their request for Preliminary Approval of the Settlement, AHP and the Class Counsel Representative(s) shall request that the Court approve the appointment of two (2) Interim Claims Administrator(s). The Interim Claims Administrator(s) will be nominated by the Parties, and each nomination will be subject to agreement of the Parties and subject to approval by the Federal District Court.

3.    The Trustees shall consist of seven (7) independent individuals, all of whom shall be jointly nominated by the Parties and subject to agreement of AHP and the Class Counsel Representative(s). Four (4) of the nominees shall be subject to the approval by the Judges who will participate in the State Court Judicial Advisory Committee referred to in Sections VIII.B.3-6 of this Agreement. These four Trustees shall serve for a period ending December 31, 2004. The initial Trustees shall be those persons named on the signature pages of the Trust Agreement, and the Trustees who shall serve until December 31, 2004, shall be designated as such on the signature pages of the Trust Agreement. Beginning on January 1, 2005, the Trust will be comprised of three (3) Trustees until the termination of the Trust. All nominee Trustees shall be subject to the approval of and appointment by the Federal District Court. AHP and the Class Counsel Representative(s) shall use their best efforts to assure that such Trustees will be appointed within sixty (60) days of this Settlement Agreement. If any nominee is not approved, the Parties shall jointly nominate another nominee, who will be subject to agreement of AHP and the Class Counsel Representative(s). If any vacancy occurs among the Trustees, the successor Trustee, if any, shall be selected in accordance with Article 3.06 of the Trust Agreement, subject to approval of the Court.

4. The Interim Escrow Agent, Interim Claims Administrator(s), Trustees and Claims Administrator(s), shall have the following qualifications:

a. The Interim Claims Administrator(s), Trustees and Claims Administrator(s) shall have relevant medical, financial, legal, or administrative experience.

b. The following individuals and/or entities, may not be nominated, approved, or serve as the Interim Escrow Agent or any other escrow agent appointed hereunder, Interim Claims Administrator(s), Claims Administrator(s), or Trustees:

   i. Past or present officers, directors, agents, or employees of AHP, Interneuron or Servier, or any successor or any affiliates thereof.

   ii. Past or present officers, directors, agents, or employees of any manufacturer, seller, wholesaler, or distributor of any Phentermine hydrochloride or Phentermine resin pharmaceutical product.

   iii. Attorneys or other persons who represent or have represented or been retained to represent Interneuron, Servier, or any of the Parties to this Agreement, including but not limited to, AHP, any Diet Drug Recipients, Representative Claimants or Derivative Claimants.

   iv. Diet Drug Recipients, Class Members, Representative Claimants, or Derivative Claimants.

   v. Persons or entities related to or affiliated with any attorneys or representatives of Diet Drug Recipients, Representative Claimants, or Derivative Claimants.

   vi. Persons who own any securities of AHP, Interneuron, Servier, or any successor corporations or any affiliates thereof, or who have any other financial interest in AHP, Interneuron, Servier or, any successor corporations or any affiliates thereof.

   vii. Persons who own any securities of any manufacturer, seller, wholesaler or distributor of any Phentermine hydrochloride or Phentermine resin pharmaceutical product.

Notwithstanding the foregoing, upon written request and full disclosure of any and all disqualifications under this subsection, said disclosed disqualifications may be waived in writing by the Parties to this Agreement, subject to Court approval.

5.      The rights and duties of the Interim Escrow Agent shall be set forth in an escrow agreement substantially in the form appended hereto as Exhibit "10."

6.      Until the effective date of the Trust, the Interim Claims Administrator(s) shall jointly exercise all of the functions which are to be exercised by the Claims Administrator(s) and/or Trustees under the terms of this Settlement Agreement, except those functions which will be exercised by the Interim Escrow Agent. Each Interim Claims Administrator that was or is a party, or is threatened to be made a party, to any threatened, pending, or completed action, suit or proceeding of any kind, whether civil, administrative or arbitrative, by reason of such Interim Claims Administrator being or having been an Interim Claims Administrator, shall be indemnified by the Trust against expenses, costs and fees of attorneys, judgments, awards, costs, amounts paid in settlement, and liabilities of all kinds incurred by such Interim Claims Administrator in connection with or resulting from such action, suit, or proceeding if he or she acted in good faith and in a manner such Interim Claims Administrator reasonably believed to be in or not opposed to the best interests of the Trust and/or the Interim Escrow established pursuant to the Interim Escrow Agreement contemplated in this Section VI.A. Any indemnification under this Section VI.A.6 shall be made only upon a determination by the Court that indemnification of such Interim Claims Administrator is proper in the circumstances. Reasonable expenses, costs, and fees of attorneys incurred by or on behalf of an Interim Claims Administrator in connection with any such action, suit, or proceeding, whether civil, administrative or arbitrative, may be paid by the Trust in advance of the final disposition thereof upon receipt of an undertaking by or on behalf of such Interim Claims Administrator to repay such amount unless it shall be determined ultimately that such Interim Claims Administrator or former Interim Claims Administrator is entitled to be indemnified by the Trust. If any disbursements are required to be made for indemnification purposes pursuant to this Section VI.A.6 prior to the effective date of the Trust, and are ordered to be paid by the Court, the Interim Escrow Agent shall have the authority to make disbursements from the Interim Escrow for such purposes. Each Interim Claims Administrator may purchase and maintain reasonable amounts and types of insurance against