liability asserted against or incurred by such individual in that capacity or arising from his or her status as an Interim Claims Administrator. Each Interim Claims Administrator shall have a prior lien upon the Trust and the Interim Escrow Account to secure the payment of any amounts payable to such Interim Claims Administrator pursuant to this Section VI.A.6. The Interim Claims Administrators shall not be required to post any bond or other form of surety unless otherwise ordered by the Court.

7.    In addition to the duties, obligations and procedures described in this Settlement Agreement, the Interim Claims Administrator(s) (if required), Claims Administrator(s) and Trustees shall hire personnel, including personnel qualified to provide expert medical advice.

8.    Until the effective date of the Trust:

a.    Disbursements for purposes of paying claims or providing benefits under the Settlement Agreement shall be made by the Interim Escrow Agent subject to the direction of the Interim Claims Administrator(s); and

b.    Disbursements for purposes of claims administration, including the cost of providing notice to the Settlement Class, shall be made by the Interim Escrow Agent subject to the joint direction of AHP and Class Counsel. All disbursements will be subject to review and approval by the Court.

9.    As promptly as possible, after the effective date of the Trust, for purposes of administering the Settlement Trust:

a.    Control over Fund A and Fund B shall be transferred by the Interim Escrow Agent to the Trustees and upon such transfer, the Interim Escrow Agent shall cease to have any responsibility for the future receipt, preservation, maintenance, investment, and disbursement of the Settlement funds;

b.    The Trustees shall have responsibility for each matter entrusted to the "Trustees and/or Claims Administrator(s)" under the terms of the Settlement Agreement. Until such time as Claims Administrator(s) are appointed and approved by the Court according to Section VI.A.9.c below, the Trustees may delegate any portion of their responsibility for claims administration to the Interim Claims Administrator(s);

c.  The Trustees shall have responsibility for appointing Claims Administrator(s) within 120 days of the date on which the Trustees are appointed by the Court, and the appointment of the Claims Administrator(s) shall be subject to approval of the Court. At the time of such approval, the Interim Claims Administrator(s) shall have no further duties or responsibilities under the Settlement.

10.  The Trustees (and the Interim Claims Administrator(s) and Interim Escrow Agent prior to the effective date of the Trust shall make reports to the Court, AHP, and Class Counsel as follows:

a.  Annual Reporting Obligations

(1)  On an annual (calendar year) basis, the Trustees shall cause an audit to be performed by a Certified Public Accountant upon the calendar year financial statements of each of the following (each financial statement being prepared in accordance with generally accepted accounting principles) and shall issue a report stating the result of each such audit:

(a)  the Settlement Trust and each Fund established thereunder;

(b)  the Security Fund; and

(c)  each escrow account then in effect hereunder (including, as to the Security Fund Escrow Account, the amounts transferred from the Security Fund upon an Uncured Failure to Make Payment).

(2)  On an annual basis based on the calendar year, the Trustees shall provide AHP with information sufficient to allow AHP to calculate in a timely fashion its estimated taxes and taxes in connection with payments made by AHP to the Trust, including without limitation the actual payments made by the Trust.

(3)  The Trustees shall provide annual reports for each Fiscal Year to be sent to AHP and to Class Counsel, reporting, among other appropriate items, the following:

(i)  the total amount paid out of each of Fund A and Fund B for each category of benefit

---

VI. CLAIMS ADMINISTRATION                                              75

payable by each such Fund for that Fiscal Year and cumulatively from the Preliminary Approval Date;

(ii)    the amounts incurred by the Settlement Trust in administrative expenses and for any other purpose for that Fiscal Year and cumulatively from the Preliminary Approval Date, and how such disbursements have been allocated between Fund A and Fund B;

(iii)    the amount of cash and other liquid assets held by the Settlement Trust at the end of that Fiscal Year;

(iv)    the Trustees' calculation of the Fund B amounts paid by AHP during that Fiscal Year;

(v)    the Trustees' calculation of the Maximum Available Fund B Amount as of the end of the Fiscal Year and appropriate accretions thereto for that Fiscal Year;

(vi)    the Trustees' calculation of the Credits and Cross-Claim Credits to which AHP became entitled during that Fiscal Year; and

(vii)    the Trustees' calculation of the accumulated Initial Opt-Out Credits which have become final as of the end of that Fiscal Year, but which have not yet been applied to reduce the Maximum Available Fund B Amount.

(4)    On an annual (calendar year) basis for each year beginning one (1) year after Final Judicial Approval, the Trustees shall issue a report stating the value of Fund B Payment Matrices payments, which are to be increased two percent (2%) per year compounded annually.

(5)    On an annual (calendar year) basis, the Trustees shall cause an audit to be performed by a health care consulting firm nominated and agreed to by the Parties and approved by the Court(s) to conduct an audit regarding the processing of claims and a report based on that audit shall be prepared by the

health care consulting firm conducting the audit stating the results of the audit. The purpose of this audit shall be to ensure that the claims administration process is being administered in a manner which reasonably ensures that Class Members who claim benefits are actually entitled to receive them and that payments are not made to Class Members who are not entitled to receive them.

b.    Quarterly Reporting Obligations

(1)    The Trustees shall cause to be prepared at the end of each of the first three quarters of each calendar year, a quarterly accounting containing unaudited financial statements of the Trust as of the end of such quarter, including without limitation, a balance sheet of the Trust, a statement of receipts and disbursements, a statement of profit and loss prepared on an accrual basis, and a supplementary schedule of investments and assets, listing both principal and income reported on, subject to normal year-end adjustments, as to fairness of presentation in accordance with generally accepted trust accounting principles consistently applied, by the Trustees or by an accountant or financial officer or agent regularly employed by the Trust.

(2)    On a calendar quarter basis, the Trustees shall provide AHP with information sufficient to allow AHP to calculate in a timely fashion its estimated taxes and taxes in connection with payments made by AHP to the Trust, including without limitation the actual payments made by the Trust.

(3)    On a Fiscal Year quarterly basis, the Trustees shall provide AHP and the Class Counsel with a report with respect to each of the items required to be reported annually under Section VI.A.10.a(3) hereof.

(4)    The Trustees shall report, on a quarterly (calendar) basis, the following:

(a)    Opt-Outs.

       i)      The number and identities of Class Members revoking an Initial Opt-Out;

       ii)     The number and identities of Class Members exercising an Intermediate Opt-Out; and

       iii)    The number and identities of Class Members exercising a Back-End Opt-Out.

(b)    Accelerated Implementation Option.

       i)      The number and identities of Class Members electing the Accelerated Implementation Option;

       ii)     The number and identities of Initial Opt-Outs who have revoked such opt-out and have elected the Accelerated Implementation Option;

       iii)    All amounts paid to provide Fund A benefits to Class Members electing the Accelerated Implementation Option; and

       iv)    All payments from Fund B to Class Members electing the Accelerated Implemented Option.

(c)    General Registration.

       i)      The total number of Class Members who have registered for settlement benefits;

       ii)     The number of Subclass 1(a) members who have registered for benefits of any kind, and have not exercised an opt-out right; and

       iii)    The number of Subclass 1(b) members who have registered for benefits of any kind, and have not exercised an opt-out right;

iv)    The number of Subclass 2(a) members who have registered for benefits of any kind, and have not exercised an opt-out right;

v)    The number of Subclass 2(b) members who have registered for benefits of any kind, and have not exercised an opt-out right; and

vi)    The number of Subclass 3 members, who have registered for benefits of any kind, and have not exercised an opt-out right.

(d)    Refund Benefits.

i)    The number of Class Members who have registered for refund benefits for use of Pondimin® and/or Redux™;

ii)    The number of Subclass 1(a) members who have timely registered for a refund for use of Pondimin® and/or Redux™; the number of these Subclass 1(a) members who qualify for refund; and the number of these Subclass 1(a) members who do not qualify for refund;

iii)    The number of Subclass 2(a) members who have registered for a refund for use of Pondimin® and/or Redux™; the number of these Subclass 2(a) members who qualify for refund; and the number of these Subclass 2(a) members who do not qualify for refund; and

iv)    Amounts paid from Fund A for refund benefits.

(e)    Screening Program Benefits.

i)    The number of Class Members who register for Screening Program benefits;

       ii)     The number of Subclass 1(a) members who qualify for a Transthoracic Echocardiogram and associated interpretative physician visit for compassionate and/or humanitarian reasons;

       iii)    The amounts paid from Fund A for Transthoracic Echocardiograms and associated interpretative physician visits for compassionate and/or humanitarian reasons;

       iv)    The number of Subclass 1(b) members who have registered for Screening Program benefits; the number of these Subclass 1(b) members who qualify for Screening Program benefits; and the number of these Subclass 1(b) members who do not qualify for Screening Program benefits; and

       v)     The number of Subclass 1(b) members who actually participate in the Screening Program.

  (f)    Independent Echocardiogram And Associated Interpretive Physician Visit.

       i)     The number of Subclass 1(a) members who have obtained an independent FDA Positive Echocardiogram, and have registered pursuant to Section IV.A.2.b.(2) to obtain the lesser of (i) the Trust's direct cost of providing such an Echocardiogram and an associated interpretive physician visit under the Screening Program, and (ii) the actual amount paid by the Class Member for the Echocardiogram and associated interpretive physician visit, less amounts paid or reimbursed by an insurance carrier or other third-party payor; and the amounts paid from Fund A therefore.

ii)   The number of Diet Drug Recipients or Representative Claimants who have applied pursuant to Section IV.A.3.d to obtain the lesser of (i) the Trust's direct cost of providing such an Echocardiogram and an associated interpretive physician visit under the Screening Program, and (ii) the actual amount paid by the Class Member for the Echocardiogram and associated interpretive physician visit, less amounts paid or reimbursed by an insurance carrier or other third-party payor; and the amounts paid from Fund A therefore.

iii)  The number of Subclass 1(b) members who have registered pursuant to Section IV.A.1.b to obtain the lesser of (i) the Trust's direct cost of providing such an Echocardiogram and an associated interpretive physician visit under the Screening Program, and (ii) the actual amount paid by the Class Member for the Echocardiogram and associated interpretive physician visit, less amounts paid or reimbursed by an insurance carrier or other third-party payor; and the amounts paid from Fund A therefore.

(g)   Valve-Related Medical Services or $6,000 In Cash From Fund A.

The number of Subclass 1(b) and 2(b) members who have registered and have obtained an FDA Positive diagnosis by the end of the Screening Period and have elected to receive either (i) valve-related medical services up to $10,000 in value to be provided by the Trust; or (ii) $6,000 in cash from Fund A; the number electing each; and the amount paid in cash from Fund A for such.

---

**VI. CLAIMS ADMINISTRATION**                                                81

(h)    Valve-Related Medical Services or $3,000 In Cash From Fund A.

The number of Subclass 1(a) and 2(a) members who have registered and have obtained an FDA Positive diagnosis by the end of the Screening Period and have elected to receive either (i) valve-related medical service up to $5,000 in value to be provided by the Trust; or (ii) $3,000 in cash from Fund A; the number electing each; and the amounts paid in cash from Fund A for such.

(i)    Credits To AHP Pursuant To Judgment Or Settlement Of Claims.

All credits to AHP against its Fund B obligations stemming from payments by AHP, pursuant to judgment or settlement, of the claims of Initial, Intermediate and/or Back-End Opt-Outs.

(j)    Subrogation Claims.

i)    All subrogation claims asserted against the Trust; identification of subrogation claims approved for payment; identification of subrogation claims not approved for payment; and amounts to be paid from Fund B in resolution of such.

ii)    All subrogation claims asserted against AHP and/or Released Parties.

(k)    Accelerated Implementation Option (AIO); Attorneys' Fees And Costs.

All amounts deposited for individual attorneys' fees and costs pursuant to the authorized deduction from Fund B benefits paid to claimants accepting the AIO; the applications for payment of individual attorneys' fees and costs from such; and the payments for attorneys' fees and costs being made from such monies.

(l)    Matrix Level Claims.

   i)    The number of Matrix Level I
         claims; the number of Matrix Level I
         claims approved; the number of
         Matrix I claims rejected; and the
         total amount of Matrix I claims paid;

   ii)   The number of Matrix Level II
         claims; the number of Matrix Level
         II claims approved; the number of
         Matrix II claims rejected; and the
         total amount of Matrix II claims
         paid;

   iii)  The number of Matrix Level III
         claims; the number of Matrix Level
         III claims approved; the number of
         Matrix III claims rejected; and the
         total amount of Matrix III claims
         paid;

   iv)   The number of Matrix Level IV
         claims; the number of Matrix Level
         IV claims approved; the number of
         Matrix IV claims rejected; and the
         total amount of Matrix IV claims
         paid; and

   v)    the number of Matrix Level V
         claims; the number of Matrix Level
         V claims approved; the number of
         Matrix V claims rejected; and the
         total amount of Matrix V claims
         paid.

(m)    Assignment Of Indemnity Rights.

       The indemnity rights of AHP against Class
       Members assigned by AHP to the Trustees
       for which AHP receives a credit against its
       Fund B obligations, including the amount
       thereof.

c.    Periodic Reporting Obligations.

   (1)    The Trustees and/or Claims Administrator(s) shall
          report within five (5) Business Days all AHP

payments into the Settlement Trust, including but not limited to:

    (a)    All AHP payments deposited into Fund A;

    (b)    All AHP payments deposited into Fund B; and

    (c)    All requests for additional cash deposits into Fund B and payments deposited in accordance with each request.

    (2)    The Trustees and/or Claims Administrator(s) shall report within five (5) Business Days an Uncured Failure To Make Payment by AHP.

    (3)    At the conclusion of the Initial Opt-Out Period, the Trustees and/or Claims Administrator(s) shall report within fifteen (15) Business Days the number and identities of Class Members exercising an Initial Opt-Out.

11.    The Trustees shall have the duty to administer and resolve all Claims according to the terms of this Agreement, while minimizing the costs of administration of the Trust associated with the processing and resolution of Claims and the operations of the Trust.

**B.**    **NOTICE.**

1.    Within ten (10) days of the execution of this Settlement Agreement, the parties shall apply to the Court for an Order in the form appended hereto as Exhibit "11":

    a.    Granting Preliminary Approval of the Settlement;

    b.    Approving the appointment of Interim Claims Administrator(s) and an Interim Escrow Agent pursuant to Section VI.A.2 and Section VI. A.1;

    c.    Approving a written notification to the Settlement Class which shall contain A Class Member's Guide to Settlement Benefits (Exhibit "12"), an Official Court Notice Package (Exhibit "13"), and a Matrix Compensation Benefits Guide for Physicians, Attorneys and Class Member (Exhibit "14");

---

d.　　Approving a summary publication notice to the Settlement Class in the form appended hereto as Exhibit "15";

e.　　Approving the establishment of and maintenance of a "1-800" telephone number and website to receive requests from Class Members for written notice;

f.　　Directing written notice to all those Class Members whose names and addresses are known or presently knowable to the Parties as a result of:

　　(1)　The filing of legal claims by Class Members against AHP;

　　(2)　The creation and maintenance of a database of Class Members who registered to receive benefits pursuant to a proposed limited fund Class Action Settlement with Interneuron Pharmaceuticals, Inc. in *Sharyn Wish v. Interneuron Pharmaceuticals, Inc.*, Civil Action No. 98-CV-20594 (E.D. Pa.);

　　(3)　The establishment and operation of the "1-800-386-2070" telephone number and www.settlementdietdrugs.com website incident to the publication of the Memorandum of Understanding which was executed among the Parties on October 7, 1999;

　　(4)　Any database within the possession, custody, or control of AHP which reflects the names and addresses of Class Members;

　　(5)　Any database which is readily obtainable from any pharmacy chain which reflects the names and addresses of Class Members;

g.　　Directing that the person or entity who will mail the individual notices shall have access to the names and addresses of individuals who requested the mailing of individual notices to them by contacting "1-800-386-2070" and www.settlementdietdrugs.com;

h.　　Directing that all names and addresses of Class Members collected for the purpose of providing notice shall be kept strictly confidential and shall not be disclosed to any person or used for any purpose other than for issuance of notice to Class Members upon prior order of the Court;

VI. CLAIMS ADMINISTRATION                                        85

i.    Authorizing Publication Notice in the form appended hereto as Exhibit "15" in accordance with the Plan of Media Notice appended hereto as Exhibit "16";

j.    Authorizing television notice in accordance with the Script of Television Notice appended hereto as Exhibit "17," and in accordance with the Plan of Media Notice appended hereto as Exhibit "16";

k.    Authorizing the distribution of Summary Notice to Physicians in the form appended hereto as Exhibit "18," to physicians for display to their patients; and

l.    Authorizing the distribution of Summary Notice to Pharmacists in the form appended hereto as Exhibit "5," to pharmacists for display to their customers.

2.    The Claims Administrator(s) and/or the Interim Claims Administrator(s) shall maintain a list of the names and addresses of each person to whom written notice was transmitted in accordance with any order entered by the Court pursuant to the preceding paragraph of this Settlement Agreement (hereinafter "the Notice List"). These names and addresses shall be kept strictly confidential and shall be used only by appropriate persons for administrative purposes of the Trust, except on prior order of the Court.

3.    Within forty-five (45) days after Final Judicial Approval, the Trustees and/or Claims Administrator(s) shall transmit a written notice to all individuals whose names and addresses are contained in the Notice List advising all recipients of the notice that the Settlement has received Final Judicial Approval, advising all Class Members of the day on which Date 1 falls, advising the recipients of the notice that Class Members in Subclasses 1(a) and 1(b) must Register to receive Refund and/or Screening Program benefits from Fund A by Date 1 and that Class Members in Subclasses 2(a) and 2(b) must register to receive Refund Benefits from Fund A by Date 1, advising all recipients of the notice of the period of time in which Date 2 may fall, and advising all recipients of the notice that if they wish to receive Matrix Compensation Benefits in the future they must be registered as having Mild Mitral Regurgitation or an FDA Positive level of valvular regurgitation by Date 2. This notice shall also contain information concerning the rights of certain Class Members to exercise Intermediate and Back-End Opt-Outs. It shall contain the BLUE FORM, GREEN FORM and Intermediate and Back-End Opt-Out forms as described below, which will allow Class Members the opportunity to register for

settlement benefits or exercise Intermediate or Back-End Opt-Out rights. In addition, it will advise members of Subclass 1(a) of their right to obtain payment of the net cost of any FDA Positive Echocardiogram which they may have had during the Screening Period but independent of the Screening Program pursuant to the terms and conditions of Sections IV.A.2.b(2) and shall provide Class Members with the WHITE FORM appended hereto as Exhibit "19" in order to make a claim for such benefits. It will also advise members of Subclass 1(b) of their right to obtain payment of the net cost of a Transthoracic Echocardiogram obtained independent of the Screening Program performed after the end of the Initial Opt-Out Period but before the Final Judicial Approval Date, pursuant to the terms and conditions of Section IV.A.1.b and shall provide Class Members with the WHITE FORM appended hereto as Exhibit "19" in order to make a claim for such benefits. It will also advise Diet Drug Recipients who had an Echocardiogram and associated interpretive visit after the commencement of Diet Drug use, or their Representative Claimants, of their right to seek reimbursement of the net cost of the Echocardiogram and associated interpretive visit, pursuant to and subject to the limitations of, the terms and conditions of Section IV.A.3.d, and shall provide Class Members with the WHITE FORM appended to the Settlement Agreement as Exhibit "19" in order to make a claim for such benefits. The Parties shall prepare this class notice for Court approval. The notice shall reflect the fact that the Settlement Agreement has been approved, that there are no further rights to object to the Settlement, and that there is no longer any Initial Opt-Out right in effect.

4.    Three (3) months prior to Date 2, the Trustees and/or Claims Administrator(s) shall transmit a written notice to all individuals whose names and addresses are contained in the Notice List advising all recipients of the notice of the day on which Date 2 falls and advising all recipients of the notice, that if they wish to receive Matrix Compensation Benefits in the future they must be registered as having Mild Mitral Regurgitation or an FDA Positive level of valvular regurgitation by Date 2. This notice shall also contain information concerning the rights of certain Class Members to exercise Intermediate and Back-End Opt-Outs. It shall contain the BLUE FORM, the GREEN FORM and Intermediate and Back-End Opt-Out forms, as described below, which will allow Class Members the opportunity to register for settlement benefits or exercise Intermediate or Back-End Opt-Out rights. In addition, it will advise members of Subclass 1(a) of their right to obtain payment of the net cost of any FDA Positive Echocardiogram which they may have had during the Screening Period but independent of the Screening Program pursuant to the

terms and conditions of Section IV.A.2.b(2) and shall provide Class Members with the WHITE FORM appended hereto as Exhibit "19" in order to make a claim for such benefits. It will also advise members of Subclass 1(b) of their right to obtain a limited refund of the net cost of any Transthoracic Echocardiogram obtained independent of the Screening Program after the end of the Initial Opt-Out Period but before the Final Judicial Approval Date, pursuant to the terms and conditions of Section IV.A.1.b and shall provide Class Members with the WHITE FORM appended hereto as Exhibit "19" in order to make a claim for such benefits. The Parties shall prepare this class notice for court approval. The notice shall reflect the fact that the Settlement has been approved, that there are no further rights to object to the Settlement, that there is no longer any Initial Opt-Out right in effect, and that the time to register for the Screening Program has been completed.

C.    **CLAIMS ADMINISTRATION AND CRITERIA FOR BENEFITS DETERMINATIONS.**

1.    **ECHOCARDIOGRAM CRITERIA.**

a.    Where a Diet Drug Recipient has had an Echocardiogram between the commencement of Diet Drug use and September 30, 1999, the results of that Echocardiogram as contained in the written report issued by a Qualified Physician shall be used by the Trustees/Claims Administrator(s) to determine the level of mitral and/or aortic valvular regurgitation for that Diet Drug Recipient as of the date of the Echocardiogram for purposes of Fund A benefits determinations under the Settlement Agreement, except (i) where the report of the Echocardiogram does not clearly state the level of valvular regurgitation for the mitral and/or aortic valves or (ii) where in an audit conducted pursuant to Section VI.E, it is determined that the conclusions of the written report are not supported by the videotape or disk of the Echocardiogram.

Such an Echocardiogram shall not be used to qualify a Diet Drug Recipient for Matrix Compensation Benefits unless, upon re-reading, it is determined that (i) prior to the end of the Screening Period, the Diet Drug Recipient met the definition for "FDA Positive" set forth in Section I.22.b and (ii) the Echocardiogram met the criteria set forth in Section VI.C.1.b below. Such a determination may be made by the Trustees and/or Claims Administrator(s) upon submission of a GRAY FORM (appended hereto as Exhibit "20")

which has been completed by a Board-Certified Cardiologist or a Board-Certified Cardiothoracic Surgeon.

b. Each Echocardiogram performed after September 30, 1999, which is used to determine whether the condition of a Diet Drug Recipient qualifies a Class Member for Fund A or Fund B (Matrix) settlement benefits, shall be one which was:

(1) conducted in accordance with the standards and criteria as outlined in Feigenbaum (1994)[44] or Weyman (1994);[45]

(2) evaluated following the grading system of valvular regurgitation defined in Singh (1999);[46]

(3) conducted by a Diagnostic Cardiac Sonographer who is able to produce and evaluate ultrasound images and related data used by physicians to render a medical diagnosis; and

(4) conducted under the supervision of, and read and interpreted by, a Board-Certified Cardiologist or Board-Certified Cardiothoracic Surgeon with level 2 training in echocardiography as specified in the *Recommendations of the American Society of Echocardiography Committee on Physician Training in Echocardiography.*[47]

c. A Diet Drug Recipient who demonstrates to the Trustees and/or Claims Administrator(s) that he or she had an Echocardiogram conducted between September 30, 1999, and the date of commencement of Class Notice which a Qualified Physician reported as showing that he or she had FDA Positive regurgitation shall not be disqualified from receiving settlement benefits if the Echocardiogram does not meet all of the requirements of Section VI.C.1.b above.

---

[44]    *See* Feigenbaum, *supra* note 3.

[45]    *See* Weyman, *supra* note 4.

[46]    *See* Singh, *supra* note 2.

[47]    *See* A.S. Pearlman et al., *Guidelines for Optimal Physician Training in Echocardiography: Recommendations of the American Society of Echocardiography Committee on Physician Training in Echocardiography*, 60 Am. J. Cardiology 158-163 (1987).

=========================

**VI. CLAIMS ADMINISTRATION**                                               89

      d.      A claimant who qualifies for a particular Matrix payment, by virtue of a properly interpreted Echocardiogram showing the required levels of regurgitation and/or complicating factors, after exposure to fenfluramine and/or dexfenfluramine, shall not be disqualified from receiving that Matrix payment in the event that a subsequent Echocardiogram shows that the required levels of regurgitation and/or complicating factors are no longer present.

2.      **CLAIMS INFORMATION.**

      a.      Each Claim for Benefits under the Settlement Agreement shall be made on one of two forms signed and submitted to the Trustees and/or Claims Administrator(s), as follows:

      (1)      The "PINK FORM" appended to the Settlement Agreement as Exhibit "9" shall be used by Class Members who want to elect the AIO; and

      (2)      The "BLUE FORM" appended to the Settlement Agreement as Exhibit "21" shall be used by all other Class Members who wish to make a claim for the benefits available under the Settlement Agreement.

      b.      Submission of a PINK FORM or BLUE FORM that has not been fully completed shall be sufficient to "register" the Class Member for benefits, provided, however, that the missing information must be submitted in order for the Class Member to receive any benefits under this Settlement Agreement.

      c.      In addition, each person who wants to make a claim for Matrix Compensation Benefits under Section IV.B of the Settlement Agreement or pursuant to the AIO must complete and submit to the Trustees and/or Claims Administrator(s) the "GREEN FORM" which is appended to this Settlement Agreement as Exhibit "22."

      d.      In order to complete the submission of a Claim and to qualify for any benefits under the Settlement Agreement, each Class Member must submit documentary proof to the Trustees and/or Claims Administrator(s) of the period of time for which the Diet Drugs Pondimin® and/or Redux™ were prescribed and dispensed to the Diet Drug Recipient

who is the subject of the Claim. This proof must include one of the following:

(1)     If the diet drug was dispensed by a pharmacy, the identity of each pharmacy that dispensed Diet Drugs to the Diet Drug Recipient, including its name, address, and telephone number, and a copy of the prescription dispensing record(s) from each pharmacy, which should include the medication name, quantity, frequency, dosage and number of refills prescribed, prescribing physician's name, assigned prescription number, original fill date and each subsequent refill date; or,

(2)     If the diet drug was dispensed directly by a physician or weight loss clinic, or the pharmacy record(s) is unobtainable, the identity of each prescribing physician, including the prescribing physician's name, address, and telephone number and a copy of the medical record(s) prescribing or dispensing the diet drug(s). The medical record(s) must include records which identify the Diet Drug Recipient, the Diet Drug name, the date(s) prescribed, the dosage, and duration the drug was prescribed or dispensed;

(3)     If the pharmacy records and medical records are unobtainable, an affidavit under penalty of perjury from the prescribing physician or dispensing pharmacy identifying the Diet Drug Recipient, the drug(s) prescribed or dispensed, the date(s), quantity, frequency, dosage and number of prescriptions or refills of the Diet Drug(s).

e.     In order to complete the submission of a Claim and qualify for Fund A benefits under the Settlement Agreement, where a Class Member relies on a result of an Echocardiogram to establish that a Diet Drug Recipient had FDA Positive levels of regurgitation by the end of the Screening Period and where that Echocardiogram took place between the commencement of Diet Drug use and September 30, 1999, the Class Member must provide the Trustees and/or Claims Administrator(s) with a copy of the report of the results of the Echocardiogram and the videotape or disk of the Echocardiogram. In order to complete the submission of a Claim and qualify for Matrix Compensation Benefits under the Settlement Agreement,

where a Class Member relies on a result of an Echocardiogram to establish that a Diet Drug Recipient had FDA Positive levels of regurgitation or Mild Mitral Regurgitation by the end of the Screening Period and where that Echocardiogram took place between the commencement of Diet Drug use and September 30, 1999, the Class Member must provide the Trustees and/or Claims Administrator(s) with a copy of the report of the results of the Echocardiogram and the videotape or disk of the Echocardiogram and a certification from a Qualified Physician on the GRAY FORM which is appended to the Settlement Agreement as Exhibit "20" or a certification regarding the results of the Echocardiogram on the GREEN FORM which is appended to the Settlement Agreement as Exhibit "22." If the Class Member does not have custody of such videotape or disk, the Class Member must submit an executed authorization which will allow the Trustees and/or Claims Administrator(s) to obtain a videotape or disk of the Echocardiogram from the physician or health care provider who has custody of such videotape or disk as a condition to considering the Class Member's Claim for Benefits. If the videotape or disk is no longer in existence, the Class Member must supply an affidavit under penalty of perjury from the person who last had custody of the videotape or disk stating that the videotape or disk is no longer in existence and describing the circumstances under which it came to be misplaced or destroyed.

f.   In order to complete the submission of a Claim and qualify for benefits under the Settlement Agreement, where a Class Member relies on the results of an Echocardiogram to establish that a Diet Drug Recipient had FDA Positive regurgitation levels of regurgitation or Mild Mitral Regurgitation by the end of the Screening Period and where that Echocardiogram took place after September 30, 1999, and where that Echocardiogram took place outside of the Screening Program, the Class Member must report the results of the Echocardiogram to the Trustees and/or Claims Administrator(s) in the form of a certification from a Board-Certified Cardiologist on the GRAY FORM which is appended to the Settlement Agreement as Exhibit "20," or a certification regarding the results of the Echocardiogram on the GREEN FORM which is appended to the Settlement Agreement as Exhibit "22," and provide the Trustees and/or Claims Administrator(s) with a copy of the videotape or disk which reflects the results of the Echocardiogram. If the Class Member does not have

custody of such videotape or disk, the Class Member must submit an executed authorization which will allow the Trustees and/or Claims Administrator(s) to obtain a videotape or disk of the Echocardiogram from the physician or health care provider who has custody of such videotape or disk as a condition to considering the Class Member's Claim for Benefits. If the videotape or disk is no longer in existence, the Class Member must supply an affidavit under penalty of perjury from the person who last had custody of the videotape or disk stating that the videotape or disk is no longer in existence and describing the circumstances under which it came to be misplaced or destroyed.

g.    Each Cardiologist who is responsible for performing Echocardiograms pursuant to the Screening Program provisions of the Settlement Agreement shall report the results of those Echocardiograms to the Trustees and/or Claims Administrator(s) on the "GRAY FORM" which is appended to the Settlement Agreement as Exhibit "20" and shall supply a copy of the videotape or disk of the results of the Echocardiogram to the Claims Administrator(s) and/or Trustees. If a Class Member submits to the Trustees and/or Claims Administrator(s) a GREEN FORM with the Doctor's Evaluation Form in Part II of such Form (or the equivalent section of the GREEN FORM in any subsequent printing of such forms) properly completed and signed by a Board-Certified Cardiologist or Cardiothoracic Surgeon, that Class Member and Board-Certified Cardiologist or Cardiothoracic Surgeon are not required to submit a GRAY FORM to report on the same Echocardiogram referenced in such GREEN FORM. If, however, a Cardiologist submits a GRAY FORM reporting on an Echocardiogram performed on a Class Member, in order to seek Matrix Compensation Benefits, such Class Member must submit a complete GREEN FORM, including the Doctor's Evaluation Form in Part II (or its equivalent in any subsequent printings) completed and signed by a Board-Certified Cardiologist or Cardiothoracic Surgeon.

h.    In order to complete the submission of a claim and qualify for benefits under the Settlement Agreement, each Class Member who submits a claim as a Representative Claimant must supply the Trustees and/or Claims Administrator(s) with written proof that such person has legal authority to act in a representative capacity.

=====================
VI. CLAIMS ADMINISTRATION                                                    93

i.  In order to complete submission of a Claim for reimbursement of the actual amount paid for an Echocardiogram by a Class Member pursuant to Sections IV.A.1.b, IV.A.2.b.(2), or IV.A.3.d above, a Class Member must submit the following documents:

(1)  A copy of the report of the Echocardiogram;

(2)  A copy of the bill or invoice reflecting the charges for the Echocardiogram; and

(3)  A copy of the cancelled check or other documentary evidence of the amount actually paid by the Class Member for the Echocardiogram.

j.  In order to complete the submission of a Claim by a Class Member who has ingested Pondimin® and/or Redux™ for sixty (60) days or less to receive an Echocardiogram and interpretive physician visit for compassionate and humanitarian reasons pursuant to the provisions of Section IV.A.2.b(3), the Class Member must submit documentary proof supporting the Claim that there are compassionate and humanitarian reasons which would justify the Trustees and/or Claims Administrator(s) to exercise their discretion to provide the Diet Drug Recipient with the benefit of a Transthoracic Echocardiogram and associated interpretive physician visit.

k.  In order to complete the submission of a claim and qualify to receive an Echocardiogram after Trial Court Approval but prior to Final Judicial Approval by reason of "true financial hardship" pursuant to Section IV.A.3.c of the Settlement Agreement, a Diet Drug Recipient must provide the Trustees and/or Claims Administrator(s) with documentary proof of the Diet Drug Recipient's financial situation including a copy of the Diet Drug Recipient's most recent federal income tax return or other documentary proof of the Diet Drug Recipient's income where the Diet Drug Recipient submits a sworn declaration, under oath, that he or she has not filed such tax returns.

3.  **GENERAL CLAIMS PROCESSING PROCEDURES AND THE REGISTRY.**

a.  Within thirty (30) days of the date on which the Trustees and/or Claims Administrator(s) receive a Claim for

Benefits from a Class Member, the Claims Administrator(s) shall:

(1)     assign a unique identifying number to the Claim;

(2)     review the Claim which has been submitted, together with supporting documentation, and determine whether the Claim is complete or requires a submission of additional information to make it complete;

(3)     confirm that any required physician certification submitted in support of a claim for Matrix Compensation Benefits was submitted by a physician who actually is a Board-Certified Cardiologist, Cardiothoracic Surgeon, Pathologist, Neurologist or Neurosurgeon; and

(4)     inform the Class Member, in writing, of the unique identifying number assigned to the Class Member's Claim and the information which the Class Member must submit to the Trustees and/or Claims Administrator(s), if any, in order for the claim to be completed and ready for processing.

During the first full twelve (12) calendar months following the AIO Start Date, the Trustees and/or Claims Administrator(s) shall take these actions within sixty (60) days of the date on which they receive a Claim for Benefits from a Class Member, rather than the thirty-day period stated above.

b.     With respect to each Claim submitted by a Class Member as part of the claims administration process, the Trustees and/or Claims Administrator(s) shall afford each Class Member at least three (3) separate opportunities to supply any missing or omitted information and documentation which are necessary to support a Claim for Benefits under the Settlement Agreement.

c.     All information submitted by Class Members to the Trustees and/or Claims Administrator(s) shall be recorded in a computerized database suitable for use with standard medical research software such as SAS and for all purposes of claims administration. This database, throughout the duration of its use, shall be kept in a form that can be accessed and read, which may in the future involve, as

evolving technology warrants, placing the information in a more modern database.

d.    The database created pursuant to the preceding paragraph shall be maintained as a "Registry" for purposes of administering the Settlement and for purposes of medical education and research. After taking appropriate steps to maintain the confidentiality of Class Members, the Trustees and/or Claims Administrator(s) shall make the database, or any portion thereof, available to qualified scientists, physicians, and other researchers subject to the following conditions:

(1)    First, the Trustees and/or Claims Administrator(s) shall make the deidentified[48] database available only to such persons who:

(a)    provide the Trustees and/or Claims Administrator(s) with written proof of their training, qualifications, and experience to conduct medical or scientific research;

(b)    provide a research protocol setting forth the purposes for which they seek access to the Registry/database, their research methodology, source of funding, a description of how the proposed research will benefit the Settlement Class and any other information that may be requested by the Trustees and/or Claims Administrator(s);

(c)    undertake, in writing, to use the information which they receive from the Registry/database solely for medical, scientific, and educational purposes and not to disclose confidential information concerning any Class Member in the event that they should inadvertently come into possession of such confidential information through their access to the database;

---

[48]    As set forth in Section VI.C.3.f below, "deidentified" shall mean redaction of all patient identifying information, including but not limited to patient name, address, telephone number, e-mail address, social security number and other personal identifying information.

(d)    undertake, in writing, to provide, upon completion of the research, the Trustees and/or Claims Administrator(s), the Court, AHP, and Class Counsel with a copy of any published or unpublished abstract, article, or report which is based, in whole or in part, on the information contained in the Registry/ database; and

(e)    undertake, in writing, not to testify at any time on behalf of any party in any lawsuit relating to the use of Pondimin® and/or Redux™.

(2)    Second, the Trustees and/or Claims Administrator(s) shall make the deidentified database, or any portion thereof, available to qualified scientists, physicians, and other researchers only when, considering the training, qualifications and experience of such persons and the purposes for which they seek access to the Registry/database, the Trustees and/or Claims Administrator(s) form a reasoned opinion that disclosure of database information to any given scientist, physician, or other researcher will be beneficial to the Settlement Class.

e.    Copies of all videotapes and disks of Echocardiograms submitted by or on behalf of Diet Drug Recipients to the Trustees and/or Claims Administrator(s) shall be preserved and maintained. Copies of these videotapes and disks shall be available to qualified scientists, physicians, and other researchers subject to the conditions stated in Section VI.C.3.d above, and subject to the following additional conditions:

(1)    In making copies of videotapes and disks to be provided to qualified scientists, physicians and other researchers for purposes of medical and scientific research, the Trustees and/or Claims Administrator(s) shall redact all information identifying the Diet Drug Recipient who was the subject of the Echocardiogram; and

(2)    The Trustees and/or Claims Administrator(s) shall require that the scientists, physicians, and/or other researchers requesting a copy of the videotapes pay

all costs reasonably incurred by the Trustees and/or Claims Administrator(s) in making copies of the videotapes and in redacting patient identifying information from the videotapes as a condition to receiving copies thereof.

f.    In making arrangements for the disclosure of information contained in the Medical Registry/database, the Trustees and/or Claims Administrator(s) shall assure that an alpha-numeric designation is used for each claimant and that the name, address, telephone number, social security number, e-mail address, and other personal identifying information pertaining to the Diet Drug Recipient and/or Class Member is not disclosed.

g.    PROCESSING CLAIMS FOR SCREENING PROGRAM BENEFITS FOR SUBCLASS 1(B) MEMBERS:

(1)    Within forty-five (45) days of the date on which the Trustees and/or Claims Administrator(s) receive a completed Claim which adequately documents that a Diet Drug Recipient is a member of Subclass 1(b), the Trustees and/or Claims Administrator(s) shall certify that the Diet Drug Recipient is eligible for a Transthoracic Echocardiogram and associated interpretive physician visit in the Screening Program pursuant to Section IV.A.1.a or Section IV.A.3.c of this Settlement Agreement and shall furnish to the Diet Drug Recipient the appropriate documentation and information to receive such benefits and will provide those benefits in accordance with the timetable set forth in Section VI.C.3.m, below.

(2)    Within forty-five (45) days of the date on which the Trustees and/or Claims Administrator(s) receive a completed Claim which adequately documents that a Diet Drug Recipient is a member of Subclass 1(b) and which requests payment of the net cost of an Echocardiogram pursuant to Section IV.A.1.b, the Trustees and/or Claims Administrator(s) shall determine whether the Diet Drug Recipient is entitled to such payment, and if so, the amount of such payment. The Trustees and/or Claims Administrator(s) shall provide such payments in accordance with the timetable set forth in Section VI.C.3.m, below.  If the Trustees and/or Claims

Administrator(s) deny such a claim, they shall send the Diet Drug Recipient written notification of that decision and the reasons therefore within this forty-five (45) day period.

h.    PROCESSING CLAIMS FOR SCREENING PROGRAM BENEFITS FOR SUBCLASS 1(A) MEMBERS:

(1)    Within forty-five (45) days of the date on which the Trustees and/or Claims Administrator(s) receive a completed Claim which adequately documents that a Diet Drug Recipient is a member of Subclass 1(a) and requests a Transthoracic Echocardiogram and associated interpretive physician visit pursuant to Section IV.A.2.b or Section IV.A.3.c of the Settlement Agreement, the Trustees and/or Claims Administrator(s) shall promptly transmit to each such person the BROWN FORM, appended to the Settlement Agreement as Exhibit "23." The BROWN FORM explains the circumstances under which such Diet Drug Recipients may receive a Transthoracic Echocardiogram and associated interpretive physician visit and allows them to make a request for that benefit by completing, signing and submitting the form, together with supporting documentation, to the Trustees and/or Claims Administrator(s). Within forty-five (45) days after receiving a completed BROWN FORM, the Trustees and/or Claims Administrator(s) shall make a determination concerning whether the Diet Drug Recipient will receive a Transthoracic Echocardiogram and associated interpretive physician visit and will either reject the request for such benefits or shall furnish to the Diet Drug Recipient the appropriate documentation and information to receive such benefits and will provide those benefits in accordance with the timetable set forth in Section VI.C.3.m, below.

(2)    Within forty-five (45) days of the date on which the Trustees and/or Claims Administrator(s) receive a completed Claim which adequately documents that a Diet Drug Recipient is a member of Subclass 1(a) and which requests payment of the net cost of an Echocardiogram pursuant to Section IV.A.2.b.(2), the Trustees and/or Claims Administrator(s) shall determine whether the Diet Drug Recipient is

entitled to such payment, and if so, the amount of such payment. The Trustees and/or Claims Administrator(s) shall provide such payments in accordance with the timetable set forth in Section VI.C.3.m, below. If the Trustee(s) and/or Claims Administrator(s) deny such a claim, they shall send the Diet Drug Recipient written notification of that decision and the reasons therefore within this forty-five (45) day period.

i.   PROCESSING CLAIMS FOR ADDITIONAL MEDICAL SERVICES OR CASH FOR SUBCLASS 1(B) AND 2(B) MEMBERS:

Within forty-five (45) days of the date on which the Trustees and/or Claims Administrator(s) receive a completed Claim which adequately documents that a Diet Drug Recipient is a member of Subclass 2(b), or is a member of Subclass 1(b) and obtained an FDA Positive diagnosis by a Qualified Physician after Pondimin® and/or Redux™ use but by the end of the Screening Period, the Trustees and/or Claims Administrator(s) shall, in accordance with the Diet Drug Recipient's election, certify that the Diet Drug Recipient is entitled to either $6,000 in cash or $10,000 in valve-related medical services and shall either make payment to the Diet Drug Recipient or furnish to the Diet Drug Recipient the appropriate documentation and information to receive such valve-related services and will provide those benefits in accordance with the timetable set forth in Section VI.C.3.m, below.

j.   PROCESSING CLAIMS FOR ADDITIONAL MEDICAL SERVICES OR CASH FOR SUBCLASS 1(A) AND 2(A) MEMBERS:

Within forty-five (45) days of the date on which the Trustees and/or Claims Administrator(s) receive a completed Claim which adequately documents that a Diet Drug Recipient is a member of Subclass 2(a), or is a member of Subclass 1(a) and obtained an FDA Positive diagnosis by a Qualified Physician after Pondimin® and/or Redux™ use but by the end of the Screening Period, the Trustees and/or Claims Administrator(s) shall in accordance with the Diet Drug Recipient's election certify that the Diet Drug Recipient is entitled to $3,000 in cash or $5,000 in valve-related medical services and shall either make payment to the Diet Drug Recipient or furnish to the Diet Drug Recipient the appropriate documentation and information to receive such valve-related services and will

provide those benefits in accordance with the timetable set forth in Section VI.C.3.m, below.

k.  PROCESSING CLAIMS FOR REFUNDS FOR SUBCLASS 1(A) AND 2(A) MEMBERS:

Within forty-five (45) days of the date on which the Trustees and/or Claims Administrator(s) receive a completed Claim which adequately documents that the Diet Drug Recipient is a member of Subclass 1(a) or 2(a) and which adequately documents the duration of his or her Diet Drug use for which a refund is sought, the Trustees and/or Claims Administrator(s) shall certify the amount of the refund to which that Diet Drug Recipient or the Representative Claimant for that Diet Drug Recipient is entitled and shall make payment to the Diet Recipient or Representative Claimant in accordance with the timetable set forth in Section VI.C.3.m, below.

l.  PROCESSING CLAIMS FOR REFUNDS FOR SUBCLASS 1(B) AND 2(B) MEMBERS:

Within ninety (90) days after Date 2, the Trustees and/or Claims Administrator(s) shall determine, pursuant to Section IV.A.1.d, the amount, if any, of the refunds to which Diet Drug Recipients who are members of Subclasses 1(b) or 2(b) or the Representative Claimants for those Diet Drug Recipients are entitled. Within forty-five (45) days of such time, the Trustees and/or Claims Administrator(s) shall pay all Diet Drug Recipients or Representative Claimants who have adequately documented membership in Subclasses 1(b) or 2(b), the refund amounts to which they are entitled, if any. In the event that it is determined that the Settlement Agreement will not receive Final Judicial Approval or in the event that the Settlement Agreement is terminated for any reason, the Trustees and/or Claims Administrator(s) shall determine within ninety (90) days after the conclusion of the period for providing Echocardiograms and associated physician visits to Diet Drug Recipients who have elected the AIO whether there are sufficient assets to make refund payments to Subclass 1(b) or 2(b) members who have entered into Individual Agreements pursuant to the AIO. Within forty-five (45) days of making such determination, the Trustees and/or Claims Administrator(s) shall pay to all Diet Drug Recipients or Representative Claimants who have adequately documented membership in Subclass 1(b) or

2(b) and have entered into Individual Agreements pursuant to the AIO, the amounts to which they are entitled, if any.

m.   The timetable for the benefits described in Sections VI.C.3. g-k above shall be as follows:

   (1)   For Class Members who have elected the AIO, such benefits cannot be provided until after the AIO Start Date;

   (2)   For Class Members who qualify for benefits under Section IV.A.3.c, such benefits cannot be provided until after the Trial Court Approval Date;

   (3)   For all other Class Members, such benefits cannot be provided until after the Final Judicial Approval Date.

During the first full twelve (12) calendar months following the AIO Start Date, the time periods for the actions required within forty-five (45) days in Sections VI.C.3.g (1) and (2), Sections VI.C.3.h (1) and (2), Section VI.C.3.i, Section VI.C.3.j, Section VI.C.3.k, and Section VI.C.3.l, are extended to sixty (60) days.

n.   PROCESSING CLAIMS FOR REIMBURSEMENT FOR CERTAIN PRIVATELY-OBTAINED ECHOCARDIOGRAMS

Within ninety (90) days after Date 2, the Trustees and/or Claims Administrator(s) shall determine whether a Diet Drug Recipient or Representative Claimant who has submitted a claim requesting reimbursement pursuant to Section IV.A.3.d is entitled to such reimbursement and, if so, the amount of reimbursement. Within forty-five (45) days of such time, the Trustees and/or Claims Administrator(s) shall pay all such Class Members the reimbursement amounts to which they are entitled, if any, subject to the limitation of Section IV.A.3.d that said reimbursement benefits will be paid only if, and to the extent that, Fund A possesses sufficient assets to pay such benefits after paying or creating a reserve for payment of all other authorized expenses and benefits to be provided by Fund A, except for the refund benefits described in Section IV.A.1.d hereof, which shall be subordinate to this reimbursement benefit. In the event that it is determined that the Settlement Agreement will not receive Final Judicial Approval or in the event that the Settlement Agreement is terminated for any reason, the Trustees

and/or Claims Administrator(s) shall determine within ninety (90) days after the conclusion of the period for providing Echocardiograms and associated physician visits to Diet Drug Recipients who have elected the AIO whether there are sufficient assets to make reimbursement payments pursuant to Section IV.A.3.d to Class Members who have entered into Individual Agreements pursuant to the AIO. Within forty-five (45) days of making such determination, the Trustees and/or Claims Administrator(s) shall pay to all such Class Members who have entered into Individual Agreements pursuant to the AIO, the reimbursement amounts to which they are entitled, if any.

4. **ADMINISTRATION OF MATRIX COMPENSATION BENEFIT CLAIMS.**

a. To receive Matrix benefits, the Class Member must provide the Trustees and/or Claims Administrator(s) with appropriate documentation of the condition of the Diet Drug Recipient that forms the basis for the claim. As set forth in the "GREEN FORM," attached as Exhibit "22," such documentation shall include:

(1) all hospital reports of the admitting history and physical examination of the Diet Drug Recipient, operative reports, pathology reports, Echocardiogram reports, cardiac catheterization reports, and discharge summaries which relate to the condition of the Diet Drug Recipient that forms the basis of the Claim;

(2) a copy of the videotape or disk of the Echocardiogram results which, in whole or in part, forms the basis for the Claim for Matrix Compensation Benefits;

(3) a declaration under penalty of perjury from the Diet Drug Recipient that, to the best of his/her knowledge, such condition was not present prior to usage of Pondimin® and/or Redux™;

(4) a declaration under penalty of perjury from a Board-Certified Cardiologist or Cardiothoracic Surgeon setting forth an opinion to a reasonable degree of medical certainty that (a) the Diet Drug Recipient has the condition which qualifies the Class Member for a particular Matrix payment, including, where applicable, that the causation requirements

applicable to conditions (b)(v) and (c) of Matrix-Level V, as defined in Section IV.B.2.c.(5) either are or are not present; (b) to the best of such physician's knowledge after reasonable inquiry, such condition which qualifies the Class Member for a particular Matrix payment was not present prior to usage of Pondimin® and/or Redux™; and (c) all the conditions set forth in Section IV.B.2.d which determine whether Matrix A-1 or B-1 is applicable, either are present or are not present;

(5)     a declaration under penalty of perjury from a Board-Certified Cardiologist, Cardiothoracic Surgeon, Neurologist or Neurosurgeon with regard to the functional outcome which the patient has had six months after a stroke, if applicable;

(6)     a declaration under penalty of perjury from a Board-Certified Cardiologist, Cardiothoracic Surgeon or Pathologist regarding the existence of the pathological criteria for Endocardial Fibrosis defined in Section I.21, if applicable;

(7)     any other documentation which the Trustees and/or Claims Administrator(s) are otherwise authorized to request under this Settlement Agreement; and

(8)     for an Echocardiogram that took place outside of the Screening Program, and if not previously submitted in a GREEN FORM, a certification from a Qualified Physician on the GRAY FORM which is appended to the Settlement Agreement as Exhibit "20" that the Diet Drug Recipient met the criteria for having FDA Positive regurgitation as defined in Section I.22 or Mild Mitral Regurgitation as defined in Section I.38 prior to the end of the Screening Period.

The records and information described in (1) through (8), inclusive, together with, if applicable, the information described in Section VI.C.4.b below, are referred to as the "Medical Information." Subject to the provisions of Section VI.C.4.b, a Claim for Matrix Compensation Benefits shall not be considered completed within the meaning of Section VI.C.2 and Section VI.C.4 and ready for determination until the Trustees and/or Claims Administrator(s) have received, either from the Class