## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY ANDRUS; ELEANOR ARCHAMBEAU; DIANE BONNEAU; LERTIS CALDWELL; PRISCILLA COTE; THERESA DEJOY; LAURAL FANKHAUSER; NANCY KENNEDY; BARBARA WILLIAMS; LUCINDA YOUELL,<br><br>PLAINTIFFS,<br><br>v.<br><br>INDEVUS PHARMACEUTICALS, INC., F/K/A INTERNEURON PHARMACEUTICALS, INC.; WYETH, INC., F/K/A AMERICAN HOME PRODUCTS CORPORATION; WYETH PHARMACEUTICALS, INC., F/K/A WYETH-AYERST PHARMACEUTICALS, INC., A DIVISION OF AMERICAN HOME PRODUCTS CORPORATION; AND BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.,<br><br>DEFENDANTS. | CIVIL ACTION NO. 04-10911 GAO |

## WYETH'S MEMORANDUM IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR REMAND

### Preliminary Statement

This is a diet drug case. The national diet drug litigation has been characterized by extensive and often elaborate efforts by the plaintiffs' bar to prevent Wyeth from exercising its statutory right to remove cases to federal court. Presumably, this effort is motivated by a desire to evade the diet drug MDL Court, the court most knowledgeable about diet drug issues. Plaintiffs have attempted to evade that court by suing in state court and naming a variety of non-diverse parties as defendants even though plaintiffs have no viable claims against these parties and do not intend to pursue them to judgment. The MDL Court, when surveying the overwhelming evidence of such improper forum manipulation, found that such joinder is nothing more than a "sham." *Anderson v. Am.*

*Home Prods. Corp.*, 220 F. Supp. 2d 414, 425 (E.D. Pa. 2002). As it explained in one case, plaintiffs "are engaging in improper efforts to prevent [Wyeth] from exercising its statutory right to remove cases based on diversity of citizenship to the federal courts in Louisiana and Mississippi." *Id.*

One of plaintiffs' counsel in this case -- the Florida firm of Alystock, Witkin & Sasser -- has been among the firms at the forefront of these forum-shopping efforts. That firm filed numerous cases in Mississippi, attempting to defeat removal by joining local doctors, sales representatives and pharmacies. It also was one of several firms that collectively filed cases on behalf of 14,600 plaintiffs from around the country in Fulton County, Georgia, attempting to defeat diversity by joining a variety of Georgia residents. Those strategies were soundly rejected. *E.g.*, *Broom v. Hogan*, No. 03-20587, PTO 3532 (E.D. Pa. May 14, 2004) (one of numerous decisions denying remand of cases removed from Mississippi) (Ex. 1) (all exhibits have been filed in hard copy with the Clerk's Office); *In re Fen-Phen Litigation*, No. 1:03-MD-1 (N.D. Ga. Oct. 15, 2003) (denying remand in 168 cases involving 14,600 plaintiffs) (Ex. 2).

Now the plaintiffs' bar has brought its tactics to Massachusetts. It has filed 195 cases, on behalf of 2624 plaintiffs in Middlesex County, even though the vast majority of those plaintiffs are from states other than Massachusetts. *Andrus* is one of those cases. The Alystock firm attempts to defeat federal jurisdiction by naming Indevus Pharmaceuticals, Inc. ("Indevus"), a resident of Massachusetts. But Indevus is fraudulently joined because the statute of limitations expired on any claims against that defendant long ago. As the MDL Court has already found, any heart valve injury caused by diet drugs (as opposed to the many other potential causes of such injuries) occurred

and was detectable no later than the date the person ceased using diet drugs. That date necessarily was before September, 1997, the date the drugs were taken off the market. Further, diet drug users were on notice of any potential claims by late 1997 as a result of the massive publicity concerning the link between diet drugs and valvular heart disease. The MDL Court has therefore held claims against doctors time-barred in jurisdictions with a discovery rule similar to that of Massachusetts. The same analysis applies to Indevus. Indeed, most of the arguments plaintiffs make to the contrary in this case have already been rejected by the MDL Court.

For the reasons set forth in Wyeth's Motion for a Stay filed June 18, 2004, this Court should stay this case and the other 194 cases recently removed or to be removed pending transfer so that the MDL Court can decide the jurisdictional issue. However, if the Court elects to rule on the motion for remand in this case, it should decide the motion in a manner consistent with the MDL Court's decisions and deny remand.[1]

## **Factual Background**

This case is brought by ten plaintiffs. Complaint ¶ 2. They filed the case on March 10, 2004, in Superior Court in Middlesex County, Massachusetts. Plaintiffs all allege that they suffered heart valve damage as a result of ingesting a diet drug called dexfenfluramine (Redux). *Id.* ¶ 3. Plaintiffs are residents of ten states as distant as Washington State and Florida. *Id.* ¶ 2. None are residents of Massachusetts. *Id.* Plaintiffs are members of a class of diet drug users bound by a Nationwide Diet Drug

---

[1] If the Court elects to decide remand issues in all 195 cases, it may wish to order consolidated briefing of the issues in all cases so that the motions can be addressed in an efficient and consistent manner. Some of the cases involve issues in addition to the fraudulent joinder of Indevus.

Settlement Agreement ("Settlement Agreement"). *Id.* ¶ 4. Plaintiffs purport to bring this case pursuant to a provision of the Settlement Agreement that permits class members to file lawsuits under certain circumstances. *Id.* ¶ 4.[2] Under the Settlement Agreement, Wyeth waived the statute of limitations as a defense, with certain exceptions. Indevus, which is not a party to the Settlement, is free to assert the statute of limitations.

There is complete diversity between all plaintiffs and Wyeth, which sold Redux (and another diet drug called fenfluramine (Pondimin)). Plaintiffs are also diverse from defendant Boehringer Ingelheim Pharmaceuticals, Inc. However, in an attempt to defeat diversity, plaintiffs have sued Indevus, a company involved with the development of Redux (but not Pondimin). Indevus maintains its principal place of business in Massachusetts. (Complaint ¶ 12.) Plaintiffs assert claims against Wyeth and Indevus for breach of warranty defective design (*id.* ¶¶ 118-123), breach of warranty failure to warn (*id.* ¶¶ 124-133), negligence (*id.* ¶¶ 134-140), fraud (*id.* ¶¶ 141-155) and fraudulent concealment (*id.* ¶¶ 156-170). Plaintiffs also assert a claim against Interneuron and Boehringer for unfair trade practices (*id.* ¶¶ 171-184).

Wyeth timely removed the case to this Court based on diversity of citizenship jurisdiction. Plaintiffs have moved to remand.

### <u>Argument</u>

I.      **<u>THE COURT MUST DISREGARD THE CITIZENSHIP OF PARTIES AGAINST WHOM THERE IS NO REASONABLE BASIS FOR A CLAIM</u>**

---

[2] It is yet to be determined whether plaintiffs meet the medical and other criteria to be permitted to assert such claims. If plaintiffs do not meet the criteria, then they are barred and enjoined by an MDL Court injunction from asserting the claims. *See Brown, et al. v. Am. Home Prods. Corp.*, Nos. 1203, 99-20593, PTO 1415, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000).

Removal to federal court is a right provided by Congress when the elements of federal jurisdiction exist.  28 U.S.C. § 1441.  *See, e.g., Federated Dep't. Stores, Inc., v. Moitie*, 452 U.S. 394, 397 n.2 (1981) (recognizing "defendant's right to a federal forum"(citation omitted)).  The Supreme Court has therefore instructed that federal courts are to reject any device designed improperly to circumvent removal:

> While the plaintiff, in good faith, may proceed in the state courts upon a cause of action which he alleges to be joint, it is equally true that the *Federal courts should not sanction devices intended to prevent a removal to a Federal court where one has that right, and should be equally vigilant to protect the right to proceed in the Federal Court* as to permit the state courts, in proper cases, to retain their own jurisdiction.

*Wecker v. Nat'l Enameling & Stamping Co.*, 204 U.S. 176, 185-86 (1907) (emphasis added).  As one Court of Appeals has explained: "Congress created the removal process to protect defendants.  It did not extend such protection with one hand, and with the other give plaintiffs a bag of tricks to overcome it."  *McKinney v. Bd. of Trs.*, 955 F.2d 924, 928 (4th Cir. 1992); *see also Tedford v. Warner-Lambert Co.*, 327 F.3d 423, 427 (5th Cir. 2003) ("Congress may have intended to limit diversity jurisdiction, but it did not intend to allow plaintiffs to circumvent it altogether.")

To prevent plaintiffs from improperly defeating federal jurisdiction, federal courts ignore the citizenship of fraudulently joined parties in determining whether diversity jurisdiction exists.  Fraudulent joinder exists where plaintiff has no reasonable basis for a claim against the defendant.  Contrary to plaintiffs' assertion that there must be "no basis" for a claim, the law is clear that the linchpin is whether plaintiff's claim has a "*reasonable basis* in law and fact."  *Mills v. Allegiance Healthcare Corp.*, 178 F. Supp.

2d 1, 4 (D. Mass. 2001) (emphasis added); *Gabrielle v. Allegro Resorts Hotels*, 210 F.

Supp. 2d 62, 67 (D.R.I. 2002). "A mere theoretical possibility of recovery under state

law does not suffice to preclude removal." *Mills* 178 F. Supp. 2d at 6.[3]

Numerous Circuit Courts of Appeals have applied the "no reasonable basis"

standard. *E.g., Ross v. CitiFinancial, Inc.*, 344 F.3d 458, 462 (5th Cir. 2003) ("There

must be a *reasonable* possibility of recovery, not merely a *theoretical* one.") (emphasis in

original); *Filla v. Norfolk S. Ry. Co.*, 336 F.3d 806, 810 (8th Cir. 2003) ("We believe that,

despite the semantical differences, there is a common thread in the legal fabric guiding

fraudulent-joiner review. It is reason. Thus, a proper review should give paramount

consideration to the reasonableness of the basis underlying the state claim."); *Schwartz v.*

*State Farm Mut. Auto Ins. Co.*, 174 F.3d 875, 879 (7th Cir. 1999) ("We only hold that

[plaintiffs' prevailing against allegedly fraudulently joined defendant] is not a reasonable

possibility based on current Indiana law and the facts before us … Therefore the joinder

was fraudulent …"); *Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990)

(joinder is fraudulent "where there is no reasonable basis in fact or colorable ground

supporting the claim against the joined defendant…") (internal quotations and citations

omitted).[4]

---

[3] While some decisions refer to the test for fraudulent joinder as requiring "no possibility" of a claim, the Fifth Circuit recently explained that the "no possibility" language, which the Fifth Circuit itself used in certain of its decisions, cannot be taken literally; "no possibility" means "no reasonable possibility." *Ross v. Citifinancial, Inc.*, 344 F.3d 458, 462 (5th Cir. 2003). Otherwise, no action would ever be removable under the fraudulent joinder doctrine, because it is always at least theoretically or remotely possible that a claim might be upheld.

[4] A defendant is also fraudulently joined if the plaintiff does not have a good faith intent to pursue a claim against the defendant. *See Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 98 (1921).

In determining whether a party has been fraudulently joined, the court must conduct a thorough inquiry into its jurisdiction.  *See Burden v. Gen. Dynamics Corp.*, 60 F.3d 213, 217 (5th Cir. 1995); *see also Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999) ("[O]ur removal jurisdiction is no exception to a federal court's obligation to inquire into its own jurisdiction.").  "[T]he proceeding appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under Fed. R. Civ. P., Rule 56(b)."  *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 549 n.9 (5th Cir. Unit A Dec. 1981); *accord Jernigan v. Ashland Oil Inc.*, 989 F.2d 812, 815-816 (5th Cir. 1993); *see also Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97-98 (1921).  The Court should, therefore, consider all affidavits, deposition transcripts, and other evidence before it.  *See Mills*, 178 F. Supp. 2d at 6 ("the Court may also examine affidavits of the parties in determining the propriety of joinder"); *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 311 (5th Cir. 2002) (stating that district courts should "examine affidavits and deposition testimony for evidence of fraud or the possibility that the plaintiff can state a claim under state law").

While the Court should generally resolve disputed questions of fact in favor of the non-removing party, it should do so "only when there exists an actual controversy, that is, when *both* parties have submitted *evidence* of contradictory facts."  *Badon v. RJR Nabisco Inc.*, 224 F.3d 382, 393-94 (5th Cir. 2000) (citations omitted); *see also Mills*, 178 F. Supp. 2d at 6 (quoting *Fields v. Pool Offshore, Inc.*, 182 F. 3d 353, 357 (5th Cir. 1999), for proposition that party is fraudulently joined where court "determines, after resolving 'all disputed questions of fact and any ambiguities in the current controlling substantive law in plaintiff's favor' that there is 'no reasonable basis for predicting that

the plaintiff might establish liability'").  Further, as in a summary judgment context, a

disputed issue of fact will not defeat removal where it does not create a material issue

with respect to the basis for fraudulent joinder raised by the defendant.  As the MDL

Court explained, "[w]e are not to decide automatically in favor of remand simply because

some facts may be said to be in dispute."  *Anderson*, 220 F. Supp. 2d at 420 (citing

*Wilson*, 257 U.S. at 98.

## II.    INDEVUS IS FRAUDULENTLY JOINED BECAUSE PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

Claims for breach of warranty, negligence, and fraudulent misrepresentation are

each governed by a three-year limitations period under Massachusetts law.  *See* M.G.L.A.

260 § 2A; M.G.L.A. 106 § 2-318; *see also Martinez v. Sherwin Williams Co.*, 737 N.E.2d

927, 928 (Mass. App. Ct. 2000); *McEneaney v. Chestnut Hill Realty Corp.*, 650 N.E.2d

93, 96 (Mass. App. Ct. 1995).  A claim for alleged violations of Massachusetts'

Consumer Protection Act is governed by a four-year statute of limitations.  *See* M.G.L.A.

260 § 5A.[5]

Statutes of limitations generally begin to run from the time plaintiff is injured.

*See Cannon v. Sears, Roebuck & Co.*, 374 N.E.2d 582, 584 (Mass. 1978); M.G.L.A. 106

§ 2-318.  However, if plaintiff can show that she could not reasonably have known of the

injury at the time it occurred, Massachusetts applies a discovery rule.  Under that rule, a

claim accrues when plaintiff learns, *or reasonably should have learned*, that she has been

harmed by the defendant's conduct.  *See Olsen v. Bell Tele. Labs., Inc.*, 445 N.E.2d 609,

---

[5] Wyeth does not concede that the claims of all plaintiffs would be governed by Massachusetts law.  Wyeth cites Massachusetts law because that is the law cited by plaintiffs.

611-12 (Mass. 1983); *Fidler v. E.M. Parker Co.*, 476 N.E.2d 595, 601-02 (Mass. 1985).

Plaintiff has the burden of proving that she could not have discovered her claim any

earlier with reasonable diligence. *Zamboni v. Aladam Corp.*, 304 F. Supp. 2d 218, 224

(D. Mass. 2004).

Under the discovery rule, "[t]he statute of limitations starts to run when an event

or events have occurred that were *reasonably likely to put the plaintiff on notice that

someone may have caused her injury*." *Bowen v. Eli Lilly & Co.*, 577 N.E.2d 739, 741

(Mass. 1990) (emphasis added). The question is when a "reasonable person in [the

plaintiff's] position would have possessed knowledge or sufficient notice that they were

harmed and what the cause of harm was." *Phinney v. Morgan*, 654 N.E.2d 77, 81 (Mass.

App. Ct. 1995). The discovery rule does not require plaintiff to know the full extent of

her injuries for the statute of limitations to run. *Olsen*, 445 N.E.2d at 612. Nor need

plaintiff discover each element of her potential cause of action (such as breach of duty,

causation and damages). *Bowen*, 557 N.E.2d at 742; *Sheila S. v. Commonwealth*, 783

N.E.2d 868, 874 (Mass. App. Ct. 2003).

A plaintiff's alleged ignorance that she suffered an injury will not prevent the

statute from running if reasonable investigation would have caused her to discover the

alleged injury. *Albrect v. Clifford*, 767 N.E.2d 42, 49-50 (Mass. 2002); *Myers v.

Agoritsas*, No. 930844, 1994 WL 879696, at *3 (Mass. Super. Ct. May 4, 1994). Thus, a

plaintiff's failure to seek medical confirmation in a timely fashion will not delay accrual

of claims. *Martinez,* 737 N.E.2d at 928-29 (claims barred where plaintiff experienced

symptoms in 1985, but did not see a specialist until 1990); *Lareau v. Page*, 840 F. Supp.

920 (D. Mass. 1993) (plaintiff on notice when doctor advised that "there was a

'theoretical possibility'" that a radioactive dye "could 'induce a tumor in surrounding

brain tissue'" despite contrary second opinion); *Kay v. Johnson & Johnson*, 722 F. Supp.

874 (D. Mass. 1989) (statute began to run when plaintiff had symptoms notwithstanding

conflicting medical advice received by the plaintiff).

Here, plaintiffs' claims against Indevus are plainly barred by the statute of

limitations.

**A.    Any Alleged Diet-Drug Injury Occurred No Later Than September, 1997**

Any alleged diet drug injury suffered by plaintiffs occurred no later than

September 15, 1997, when Redux was withdrawn from the market.

An overwhelming mass of medical evidence shows, and the MDL Court has

found, that any heart valve disease attributable to diet drugs manifests itself, and is

detectable, no later than the time a person ceases to use diet drugs. Wyeth attaches as

Exhibit 3 a collection of studies published in medical journals demonstrating that fact. In

approving the diet drug settlement, the MDL Court found that "these [valvular] lesions

are not latent. If they are going to occur, they are going to occur during drug use (or

shortly thereafter) and be demonstrable on echocardiograms." *In re Diet Drugs*, Nos.

1203, 99-20593, 2000 WL 1222042, at *18 (E.D. Pa. Aug. 28, 2000). The Court further

explained:

> The clinical and epidemiological studies demonstrate – and
> all the experts agree – that insofar as the use of
> fenfluramine or dexfenfluramine results in an increased
> prevalence of valvular regurgitation, that regurgitation is
> detectable by echocardiogram shortly after the patients
> discontinue use of diet drugs. Conversely, there is no
> evidence that the use of the drugs results in any increased

> risk of regurgitation that is "latent" and not detectable by
> today's sophisticated echocardiographic technology.
>
> The absence of a latency period between ingestion of
> fenfluramine and/or dexfenfluramine and the development
> of clinically detectable VHD [valvular heart disease] is also
> confirmed by a number of studies that have followed
> former fenfluramine/dexfenfluramine patients for a number
> of years, either through the use of echocardiograms or
> comprehensive medical record review.  Each of these
> studies finds that there was no emergence of new disease
> after some latency period.

*Id.* at *46. (citations and footnote omitted).

The MDL Court subsequently has relied on these findings to hold that statute of limitations had expired as to doctor defendants in various cases and to grant summary judgment in favor of those defendants.  *E.g.*, *Bishop v. Lowe*, No. 03-20601, PTO 3536 (E.D. Pa. May 18, 2004) (fraudulent joinder of doctors and sales representatives) (Ex. 4); *Green v. Wyeth*, No. 03-2034, PTO 3534 (E.D. Pa. May 17, 2004) (fraudulent joinder of doctors and pharmacies) (Ex. 5); *Chambliss v. Todd*, No. 03-20288, PTO 3533 (E.D. Pa. May 17, 2004) (fraudulent joinder of doctors and sales representatives) (Ex. 6); *Ferrell v. Wyeth*, No. 03-20094, PTO 2996, at 7 n.5 (E.D. Pa. Sept. 5, 2003) (Ex. 7); *Rainey v. Wyeth*, No. 03-20128, PTO 2886, at 7 n.4 (E.D. Pa. June 12, 2003) (Ex. 8); *French v. Wyeth*, No. 03-20353, PTO 3281 (E.D. Pa. Feb. 18, 2004) (fraudulent joinder of doctors) (Ex. 9).

Diet drug class members, including the plaintiffs in this case, are barred by collateral estoppel from contesting the finding that diet drug heart valve injuries are not latent.  *See French v. Wyeth*, No. 03-20353, PTO 3281 (E.D. Pa. Feb. 18, 2004) (Ex. 9); *Alexander v. Wyeth*, No. 03-20206, PTO 3230 (E.D. Pa. Jan. 29, 2004) (Ex. 10). Collateral estoppel bars a party from relitigating an issue where (1) the issue decided in

the prior case is identical to one presented in the later case; (2) there was a final judgment

on the merits; (3) the party against whom the plea is asserted was a party or in privity

with a party in the prior case; (4) the party or person privy to the party against whom the

doctrine is asserted had a full and fair opportunity to litigate the issue in the prior

proceeding and (5) the determination in the prior proceeding was essential to the

judgment. *See City of Pittsburgh v. Zoning Bd. of Adjustment*, 559 A.2d 896, 901 (Pa.

1989); *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984); *Miles v.

Aetna Cas. & Sur. Co.*, 589 N.E.2d 314, 316-17 (Mass. 1992).[6]

      Collateral estoppel plainly applies here. The question whether diet drug heart

valve injuries are latent considered in the fairness hearing is identical to the issue

presented here. The MDL Court's approval of the Settlement Agreement is a final and

valid judgment. *See French,* PTO 3281 (Ex. 9) at 13; *Alexander*, PTO 3230 (Ex. 10) at

14-15. Plaintiffs in this case are members of the National Diet Drug Settlement Class and

are therefore bound by the holdings in the class action.[7] Plaintiffs, through their class

counsel, had a full and fair opportunity to litigate latency. Indeed, the fairness hearing

lasted several days, during which extensive testimonial and documentary proof was

submitted. *In re Diet Drugs*, 2000 WL 1222042 at *6 ("[T]he proponents of the

---

[6] The collateral estoppel effect of a decision of a federal court sitting in diversity is governed by federal law, which looks to the law of the state in which the federal court sits. *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507 (2001). The effect of the MDL Court's findings therefore are governed by Pennsylvania law. However, there is no material difference between the collateral estoppel law of the United States, Pennsylvania, and Massachusetts.

[7] *See Golden v. Pacific Mari. Ass'n*, 786 F.2d 1425, 1427 (9th Cir. 1986) (holding that class member's suit against class counsel was barred by court's implicit finding of adequacy of representation); *Laskey v. Int'l Union, United Auto. Aero. & Agric. Implement Workers of Am.*, 638 F.2d 954, 957 (6th Cir. 1981) (same, noting that adequacy of representation was "essential to approving the [class] settlement'); *Thomas v. Albright*, 77 F. Supp. 2d 114, 121-22 (D.D.C. 1999), *aff'd sub nom Thomas v. Powell*, 247 F.3d 260 (D.C. Cir. 2001).

Settlement Agreement and the persons who objected to the settlement had a full and fair opportunity to offer all of the evidence they wished to tender to the court concerning" the settlement). Finally, the finding that diet drug injuries were not latent was essential to approval of the Settlement. Under *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), it was necessary for the court to conclude that there was no conflict of interest between persons presently injured and any who might be injured in the future. *See id.* at 610-11. The court was able to find that there was no conflict of interest because there was no possibility that diet drug users could suffer injury for the first time in the future. *See Alexander*, PTO 3230 (Ex. 10) at 14-15 (explaining that no latency finding was an essential finding for approving the Settlement).

Plaintiffs are also barred from relitigating the latency issue by the doctrine of judicial estoppel, which prohibits a party who successfully convinced a court to adopt a position in one case from taking a contrary position in another case. *Ryan Operations, G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996); *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 395-96 (5th Cir. 2003).[8] Plaintiffs, through their class counsel in the settlement proceeding, took the position that diet drug injuries were not latent – i.e., that they were detectable no later than the time use of diet drugs ended. *See, e.g.,* Class Counsel's Memorandum In Support of Final Settlement Approval at 25 (Ex. 11); Declaration of Dean G. Karalis, M.D., ¶ 42 (cardiology expert proffered by class counsel) (Ex. 12) ("There is no reason to believe that there is a potential 'latent

---

[8] Federal courts apply federal judicial estoppel law in deciding matters pending before them, especially where the prior action was also in federal court, because judicial estoppel is designed to protect federal courts from manipulation. *Hall*, 327 F.3d at 395-96; *see also Ryan Operations*, 81 F.3d at 359 n.2.

period' of any significance between the termination of diet drug exposure and the onset of valvular regurgitation. There is nothing in the experience with carcinoid disease, use of ergotamines and methyasersides or in the published literature which suggests the possibility of such latency"). Thus, Judge Bechtle noted in his fairness opinion that all experts presented by class counsel at the fairness hearing testified that diet drug injuries are not latent. *In re Diet Drugs*, 2000 WL 1222042, at *6-7 (listing plaintiffs' experts including expert on cardiology and valvular disease), *47 ("All of the experts who testified in this case agreed that fenfluramine, dexfenfluramine and the fen-phen combination do not cause latent valvular regurgitation…"). Plaintiffs cannot change their position now.

In short, had plaintiffs conducted a reasonable inquiry of their potential claims in September, 1997, they would have discovered any alleged injury.

**B.    Plaintiffs Had A Duty To Investigate Their Claims And Were On Inquiry Notice Of Those Claims By The Fall Of 1997**

All diet drug users knew or should have known that Redux could cause valvular heart disease by September, 1997, and plaintiffs were put on notice at that time that they should investigate whether they had that disease.

On September 15, 1997, Redux and Pondimin were withdrawn from the market, accompanied by an extraordinary amount of prominent national and local publicity. An illustrative sample of this massive publicity is summarized in the accompanying Declaration of Sharon Taylor (Ex. 13). In July, 1997, the Mayo Clinic and the United States Department of Health and Human Services issued press releases describing health risks possibly associated with the use of these diet drugs. Taylor Decl. ¶ 5. Those

announcements were widely reported in front-page headlines in national newspapers such as *USA Today* and *The New York Times*, as well as in local newspapers and national and local television news broadcasts throughout the country.  *See id.* ¶ 6.

Wyeth's subsequent withdrawal of Pondimin and Redux from the market in September, 1997 was subject to an extraordinary amount of further publicity.  *Id.* ¶ 24. Wyeth issued a press release stating that new information indicated that "heart valve abnormalities" were associated with diet drugs and that even "asymptomatic patients" may have such a condition.  Wyeth included similar information in advertisements that it purchased in leading national and regional newspapers.  *Id.* ¶¶ 19, 20.  These advertisements led with a banner in large print, stating "An Important Message To Patients Who Have Used Pondimin or Redux."  Wyeth also sent similar information directly to 450,000 doctors and pharmacists.  *Id.* ¶21.

At the same time, the United States Food and Drug Administration issued a press release, again mentioning that the findings had occurred in patients "even though they had no symptoms."  *Id.* ¶ 22.  These announcements were prominently reported throughout the country in lead reports in national television network news and morning show broadcasts, and in national and major metropolitan front page newspaper articles and television broadcasts.  *See id.* ¶¶ 24-29.  This included programs on NBC Nightly News and CBS Evening News.  *Id.* ¶ 24.  For example, *USA Today*, a daily newspaper with a national readership, ran a front-page story regarding the withdrawal of diet drugs, its effects, and the response by various organizations throughout the United States regarding the news.  *Id.* ¶ 27..  The article went so far as to report that potential litigation

was imminent and people who had taken diet drugs were signing up with attorneys to take part in a large class action lawsuit. *Id.* ¶ 27 and Ex. 101 to Ex. 13.

Government health warnings about Pondimin and Redux were repeated in November, 1997, similarly garnering enormous print and broadcast media attention both nationally and locally. *See id.* ¶¶ 47-62. For example, on November 13, 1997, Tom Brokaw stated on the NBC Nightly News that "the government is urging [all of the millions of Americans who took the diet drug phen-fen] to see their doctors, even if they feel fine." *Id.* ¶ 48. An unprecedented volume of publicity continued through the spring of 2000. *Id.* at ¶ 68.

This overwhelming mass of media attention put plaintiffs on inquiry notice of their claims no later than the fall of 1997. *See Allen v. Wyeth*, No. 03-20310, PTO 3305, at 9 (E.D. Pa. Feb. 24, 2004) (Ex. 14) ("we find that plaintiffs can reasonably be held to have knowledge of their injuries, the cause of their injuries and the conduct of their prescribing physicians *as early as September, 1997* and at the very latest by March 2000). The MDL Court has held in numerous other decisions that diet drug users were on inquiry notice of their claims by March, 2000 "at the very latest." *See, e.g., French,* PTO 3281 (Ex. 9) at 13. In those cases, it was sufficient to hold that plaintiffs were on notice by March, 2000 because plaintiffs' claims against doctor defendants were time-barred even based on that generous date. But, as the *Allen* decision makes clear, plaintiffs were clearly on notice of their claims by the fall of 1997.

The same result applies under the law of Massachusetts. In *Bowen v. Eli Lilly & Co.*, *Inc.*, 557 N.E.2d 739 (Mass. 1990) (which plaintiffs ironically cite in support of their position, Pl. Mem. at 7-8), the Court held that the plaintiff suffered cancer as a result of *in*

*utero* exposure to DES taken by her mother.  The Court held that she was on notice of her

claim as a result from a letter from a doctor stating that there was an "association"

between the ingestion of DES by pregnant mothers and tumors in their daughters and by

magazine articles and scientific publications noting such an association:

> We conclude that, on the summary judgment record, the
> prospect of a significant causal connection between DES
> and the plaintiff's cancer was brought to the plaintiff's
> attention more than three years before this action was
> commenced.  The fact it was not until June, 1982, that the
> plaintiff believed that DES caused her cancer does not aid
> her because we test the accrual of her cause of action by
> what a reasonable person in her position would have known
> or on inquiry would have discovered at various relevant
> times.

*Bowen*, 557 N.E.2d at 743.[9]

A substantial body of other case law holds that widespread publicity about the

events underlying a cause of action puts plaintiffs on inquiry notice of their claims.  For

example, in *Winters v. Diamond Shamrock Chemical Co*., 149 F.3d 387, 403-04 (5th Cir.

1998), the Fifth Circuit affirmed dismissal of plaintiffs' claims for injuries allegedly

caused by Agent Orange as time-barred.  The trial court had found that Agent Orange and

its possible link with cancer had received much national and local media coverage a

decade earlier in 1984 when Congress passed a bill to provide disability benefits to

veterans exposed to Agent Orange, and when a class action lawsuit involving two million

veterans exposed to Agent Orange was settled for $180 million.  *Winters v. Diamond

Shamrock Chem. Co*., 941 F. Supp. 617, 622 (E.D. Tex. 1996).  The court held that

---

[9] In *Bowen*, this was evidence plaintiff actually saw some of the articles at issue.  No such evidence is
required here.  The publicity concerning the hazard of Redux was so widespread that no reasonable person
could claim to have missed it.  See cases cited in text below.

because a reasonable person could not miss this coverage, the plaintiff should be "charged with knowledge of information that has been made public through the media." *Id.; see also United Klans of Am. v. McGovern*, 621 F.2d 152, 154 (5th Cir. 1980) (publicity put plaintiff on "inquiry notice" and plaintiff should have known that it had a claim); *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000) (publicity was "sufficient to charge [the plaintiff] with constructive knowledge of the events underlying her cause of action" even where plaintiff contended that she did not see or hear media reports).

Because plaintiffs were under a duty to investigate their potential claims against Indevus by the fall of 1997 and because reasonable investigation would have revealed those claims at that time, the statute of limitations began to run no later than the fall of 1997. Plaintiffs' claims filed almost seven years later, on March 10, 2004, are clearly time-barred.

### C.    Plaintiffs' Efforts To Evade The Statute Of Limitations Fail

Plaintiffs make a variety of desperate arguments to avoid the effect of the statute of limitations. All fail. Indeed, several of the arguments have already been rejected by the MDL Court.

### 1.    Plaintiffs May Not Relitigate The Issue of Latency

Plaintiffs make three arguments that they may relitigate whether diet drug heart valve injuries are latent. First, they contend that relying on the MDL Court's finding of no latency violates the Settlement Agreement. Pl. Mem. at 11-12. Second, they contend that they did not have a "full and fair" opportunity to litigate the latency issue in the

fairness hearing.  *Id.* at 13.  Third, they argue that applying collateral estoppel would violate due process.  None of these arguments has merit.[10]

The MDL Court has implicitly rejected plaintiffs' argument that the Settlement Agreement precludes reliance on the no latency finding by repeatedly citing that finding in decisions holding that doctors were fraudulently joined due to the expiration of the statute of limitations.  *See* pp. 11 above.  The MDL Court is the court most knowledgeable about the agreement and, indeed, has "continuing and exclusive jurisdiction" over class members to "interpret and enforce the Settlement."  PTO 1415 at *72, ¶ 11.  Its view should be dispositive.

The MDL Court is plainly correct.  Plaintiffs rely on section VIII.F.3 of the Settlement Agreement, which precludes the parties from doing only two things (except as necessary to enforce the Settlement Agreement):

> 1.    "[I]ntroduc[ing] or offer[ing]" into evidence:
>    a.    The terms of the Settlement Agreement;
>    b.    Any statement, transaction or proceeding in connection with the negotiation, execution or implementation of the Settlement Agreement;
>    c.    Any statements in the notice documents appended to the Settlement Agreement;
>    d.    Stipulations, agreements, or admissions made or entered into in connection with the fairness hearing;
>    e.    Any finding of fact or conclusion of law made by the Trial Court;
>
> OR

---

[10] Plaintiffs assert that the question whether diet drug heart valve injuries are latent is "irrelevant."  *Id.* at 9. Plaintiffs' efforts to escape the MDL Court's findings show the opposite.  The fact that any such injuries occurred and were detectable by September, 1997 is an essential step in determining what plaintiffs would have discovered with reasonable diligence.

      2.      "[O]therwise rely[ing]" on the terms of the
              Settlement Agreement.

*See* Settlement Agreement § VIII.F.3 (Ex. 15).  Wyeth has not done either of these things.

Wyeth is not attempting to "rely on the terms" of the Settlement Agreement. Wyeth relies only on the findings of the MDL Court, as set forth in its order approving the Settlement.  The actual terms of the Settlement are irrelevant – what is important is the fact that the Court approved the Settlement Agreement, and the reasons for that approval.  Wyeth also is not introducing or offering the court's findings into "evidence" at trial.  Wyeth is citing the findings in support of a pretrial motion.  Nothing in Settlement Agreement precludes that use.

It makes sense that Wyeth may cite the MDL Court's findings in support of the pretrial motions, but not introduce them as evidence at trial.  It is plain that the parties would not want evidence of the settlement negotiations to be presented to a jury. Likewise, to the extent the MDL Court's order approving the Settlement did not conclusively decide an issue, and that issue were to be decided by a jury, admitting the MDL Court's related findings of fact or conclusions of law might be prejudicial.  But there is no reason not to use the MDL Court's findings for pretrial motions, especially for matters conclusively determined.

The Third Circuit decision cited by plaintiffs, *In re Diet Drugs*, 2004 WL 1152824 (3rd Cir. 2004), is not to the contrary.  In that case, the Third Circuit held that certain provisions of the Settlement Agreement should not be read as precluding plaintiffs authorized to bring lawsuits from introducing certain evidence.  In the process, the court summarized the Settlement Agreement's language precluding the introduction into

evidence on the MDL Court's findings.  As discussed above, Wyeth is not presenting
those findings into "evidence."

Plaintiffs' contention that they did not have a "full and fair opportunity to litigate
the issue of latency" is absurd.  As explained above, the issue of latency was the subject
of extensive evidence and testimony at the fairness haring.  *See* pp. 12-14 above.  All
class members had a full incentive to litigate the issue because it would effect whether
the Settlement would be approved.  The MDL Court found in approving the Settlement
that class members were fairly represented.  *In re Diet Drugs*, Nos. 1203, 99-20593, 2000
WL 1222042, at *44-53.   Thus, the MDL Court has repeatedly rejected arguments by
plaintiffs seeking to avoid the collateral estoppel effect of the Court's no latency holding
that they were not fully and fairly represented.  *E.g.*, *Alexander*, PTO 3230 (Ex. 10) at 13.
Most recently, plaintiffs' Florida counsel sought reconsideration of a remand denial on
this very ground and the MDL Court denied the motion (*See* Motion for Reconsideration
in *Dillon v. Sims*, Ex. 16); *Dillon v. Sims*, PTO 3590 (E.D. Pa. June 9, 2004) (denying
reconsideration).[11]

Finally, plaintiffs' assertion that the application of collateral estoppel is "unfair"
and would violate due process is without merit.  Plaintiffs' argument is founded on the
contention that plaintiffs were not notified in the Settlement that they "were effectively
waiving their right of action against third parties such as Indevus."  Pl. Mem. at 14.  No
provision of the Settlement "waived" any right of action against Indevus.  The Settlement
did not prohibit plaintiffs from suing Indevus.  The fact that plaintiffs are now subject to

---

[11] In *Dillon*, the Alystock firm presented expert affidavits supposedly supporting a finding of latency.

the law of collateral estoppel and that their claims are barred by the statute of limitations is a function of federal and state law, not any provision of the Settlement Agreement.

Further, there is nothing "unfair" about binding plaintiffs with the MDL Court's findings. Plaintiffs received the benefits of the Settlement Agreement, including Wyeth's waiver of the statute of limitations. They received those benefits only because the Court's finding that diet drug heart valve injuries are not latent enabled the Court to find the Settlement fair. Plaintiffs, through their class counsel, supported that finding. It would be radically unfair to permit plaintiffs, who have enjoyed and continue to enjoy the benefits of the Settlement, to now disavow an essential predicate for the Settlement.

### 2. Plaintiffs' Three Self-Serving Affidavits Do Not Save Their Claims

Three of the plaintiffs proffer self-serving affidavits asserting that they saw their regular physicians for ordinary check-ups following their use of diet drugs, that their doctors detected no heart murmurs, and that their doctors did not advise them to have an echocardiogram. Pl. Mem. at 10-11. They claim that their injury was not detected until they had echocardiograms in 2001 or 2002, presumably administered by echocardiogram technicians hired by plaintiffs' counsel. These affidavits are nearly identical to affidavits the plaintiffs' bar -- including plaintiffs' Florida counsel -- has submitted in numerous other cases and that the MDL Court has rejected as insufficient to avoid the statute of limitations. *See* Ex. 17 (attaching affidavits from other cases and MDL orders denying remand in those cases). This Court should reach the same conclusion.

It is not clear whether plaintiffs offer their affidavits to show that their injuries supposedly occurred within the limitations period or to show that the injuries occurred

earlier but were not detected despite reasonable diligence. Either way, the affidavits fail. The MDL Court has held that any diet drug valve injury occurred and was detectable as of September, 1997. Plaintiffs are barred by collateral estoppel from contesting that finding. Thus, if plaintiffs' alleged heart valve injuries did not occur until later, they were not caused by diet drugs as a matter of law. *See, e.g., Lawhorn v. Wyeth*, No. 03-20226, PTO 3470 (E.D. Pa. April 26, 2004) (Ex. 18) (MDL Court found that plaintiff could not avoid statute of limitations as to claims against doctor by showing that her alleged injury arose sometime after April, 2001 because any injury after that date was not caused by diet drugs); *Bishop v. Lowe*, No. 03-20601, PTO 3536 (E.D. Pa. May 18, 2004) (Ex. 4) (same).

If, on the other hand, plaintiffs use the affidavits to attempt to show reasonable diligence, they likewise fail. The issue is not whether a general member of the public unexposed to diet drugs acted reasonably by getting regular routine checkups. Instead, the question is whether plaintiffs – on notice that they had used diet drugs, that they might have a non-symptomatic disease, that such a disease could be conclusively detected by echocardiogram, and that they might have a legal claim as a result -- acted reasonably in investigating their claims. Plaintiffs' affidavits do not demonstrate that they even told their physicians that they had used diet drugs, much less that they requested an echocardiogram. In any event, as the MDL Court has already held, any diet drug heart valve injury was detectable by reasonable investigation. *See* pg. 16 above.

Accordingly, as a matter of law, plaintiffs are charged with knowledge of their claims by September, 1997.[12]

### 3.    Plaintiffs Cannot Rely On The Doctrine Of Fraudulent Concealment

Plaintiffs' fraudulent concealment count does not provide a basis for exempting plaintiffs from the statute of limitations.  The statute of limitations will not be tolled for fraudulent concealment claims "if the plaintiff has actual knowledge of the facts giving rise to [her] cause of action" or "the means to acquire the facts on which [her] cause of action is based."  *Stark v. Advanced Magnetics, Inc.*, 736 N.E.2d 434, 442 (Mass. App. Ct. 2000); *see also Burbridge v. Board of Assessors of Lexington*, 417 N.E.2d 477, 480 (Mass. App. Ct. 1981) (citing *Walker v. Soule*, 138 Mass. 570, 572 (1885); *Lynch v. Signal Fin. Co.*, 327 N.E.2d 732, 735 (1975)) ("[E]stoppel provision of G.L. c. 260, § 12, is generally not available if the plaintiff is capable of discovering the facts allegedly concealed.").  In this case, plaintiffs not only had the means to learn of their causes of action, but are charged with knowledge of their claims as a matter of law.  *See* pg. 16 above.  The fact that scores of plaintiffs filed personal injury claims against Indevus in 1997 and immediately thereafter shows that plaintiffs had the means to discover the facts underlying their claims.

---

[12] Plaintiffs cite two cases (*Zamboni* and *Lindsay)* in which plaintiffs went to a doctor but were misdiagnosed and the court therefore found that their claims could not be found time-barred on summary judgment.  Pl.' Mem. at 10.  Those cases did not involve a circumstance where was an immense amount of publicity that defendant may have harmed plaintiff and where, as the MDL Court has held here, any reasonable investigation would have revealed the harm.  *Castillo*, *id.*, dealt with the entirely different circumstance of whether certain information received by plaintiff's lawyer should be deemed to have put plaintiff on notice of his claims.

Further, the supposed "concealment" alleged by plaintiffs is that Indevus has denied liability in diet drug litigation. However, it is well-established that a company's mere denial of liability for a particular act does not constitute fraudulent concealment. *See Estate of Sarocco v. Gen Elec. Co.*, 939 F. Supp. 91, 97-98 (D. Mass. 1996) ("The defendants' general, repeated public denial of any link between PCBs and cancer does not constitute fraudulent concealment as a matter of law. A defendant is not obliged to acknowledge liability, or to adopt a plaintiffs' theory of a case, in order to avoid a defense of this sort."). Even more specific statements concerning liability do not rise to the level of fraudulent concealment. In *Olsen v. Bell Telephone Laboratories, Inc.*, 445 N.E.2d 609 (Mass. 1983), representatives of the defendant told the plaintiff that his condition was not permanent and that the substance at issue did not cause the plaintiffs' injuries. The court refused to find that defendants' conduct rose to the level of fraudulent concealment. "Unless the defendants 'made representations they knew or should have known would induce the plaintiff to put off bringing suit and … the plaintiff did in fact delay in reliance on the representations,' there is no estoppel. *Id.* at 612 (quoting *White v. Peabody Constr. Co.*, 434 N.E.2d 1015, 1023 (Mass. 1982)).

**4.      Plaintiffs Cannot Rely On A Class Action Tolling Theory**

Plaintiffs make a half-hearted argument that the statute of limitations was tolled by the pendency of a class action against Indevus captioned *Dohery v. Interneuron*, No. 98-0128. Complaint ¶ 5. That class action was dismissed on July 11, 2001. Plaintiffs contend that Massachusetts has adopted *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). In that case, the United State Supreme Court held, as a matter of federal law, that the statute of limitations on a putative class member's claim against a defendant

is tolled with respect to claims asserted against the defendant in a class action.  Plaintiffs are wrong.

Plaintiffs do not – and cannot – point to any decision of a Massachusetts Court adopting *American Pipe*.  To the contrary, the Massachusetts Supreme Judicial Court has explained that "[e]quitable tolling is used 'only sparingly,' and is generally limited to specified exceptions."  *Shamacker v. Raymond James & Assoc., Inc.*, 683 N.E.2d 662, 665 (1997).  Massachusetts law nowhere identifies class action tolling as such an exception.  Indeed, Massachusetts has rejected equitable tolling based on the pendency of another action.  *See id.* at 665-67 (filing of arbitration did not stay running of statute of limitations for filing lawsuit).  The Massachusetts Supreme Judicial Court has made clear that class action tolling is not the law by expressly noting in a decision that it was not necessary in that case to address whether to adopt the doctrine.  *Mass Elec. Co. v. Mass. Comm'n. Against Discrimination*, 375 N.E.2d 1192, 1197 n.2 (Mass. 1978).

Plaintiffs' citations do not support their argument to the contrary.  In the section of *Baldissari v. Public Finance Trust,* 337 N.E.2d 701 (Mass. 1975), cited by plaintiffs, the court did not even address class action tolling.  It merely stated in dictum that class actions are "designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions." *Id.* at 707 (citation omitted).  In *Dicerbo v. Commissioner*, 763 N.E.2d 566, 572 n.13 (Mass. App. Ct. 2002), the court stated in dictum in a footnote that "as to putative class members who wish to intervene, the statute of limitations is tolled upon the filing of the complaint."  The assertion that this dictum constitutes an adoption of *American Pipe* is misguided, especially in light of the Supreme Judicial Court's holding in *Massachusetts Electric,* 375 N.E.2d at 1197 n.2.

Even if, against all odds, Massachusetts were to change the law to adopt

*American Pipe*, it would be extraordinarily unlikely that it would adopt the doctrine in a

form that would help plaintiffs.  For example, it is unlikely that the Commonwealth

would adopt the doctrine for personal injury suits because those courts that have adopted

the doctrine generally have held that the policies underlying it do not apply in personal

injury cases.  Further, even if Massachusetts were to adopt class action tolling in personal

injury cases, it is extremely unlikely that Massachusetts would give class members more

than one year after the class action ended to file suit.  One year is the period the

Massachusetts "saving statute" provides plaintiffs to refile claims dismissed for reasons

other than the merits.  *See* M.G.L.A. c. 260, § 32.  In that event, as *Doherty* was

dismissed in July, 2001, plaintiffs would have had to file their claims no later than July,

2002.  The reasons that Massachusetts would impose these limitations in the unlikely

event it would be amenable to otherwise adopting class action tolling are set forth in a

memorandum in support of summary judgment filed by Indevus in *Sawyer v. Indevus*

(Ex. 19).  Thus, even if Massachusetts changed the law to adopt some version of class

action tolling, there is no reasonable possibility such a change in the law would make

plaintiffs' claims here timely.

In light of the fact that Massachusetts has not adopted class action tolling and that

the Commonwealth takes a restrictive view of equitable tolling generally, any possibility

that Massachusetts might someday change the law to adopt *American Pipe* in a form

helpful to plaintiffs is highly speculative and theoretical at best.  Such speculation does

not provide a reasonable basis for a claim under the doctrine of fraudulent joinder.  To

hold otherwise would be to eviscerate the doctrine of fraudulent joinder, as it is always

theoretically possible that a court may change the law.

Respectfully submitted,


/s/ Janice W. Howe_____
William A. McCormack, BBO # 329580
Janice W. Howe, BBO # 242190
David Yamin, BBO # 562216
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000


Dated:    June 21, 2004

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2004, a true copy of the above document was

served upon the following counsel by hand and by United States First Class Mail, postage

prepaid:


*Counsel for Plaintiffs*

**By Hand**
Edward J. Barshak (BBO No. 032040)
Michael S. Appel (BBO No. 543898)
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street, 9th Floor
Boston, MA 02114

**By United States First Class Mail**
Samuel W. Lanham, Jr.
Cuddy & Lanham, P.A.
470 Evergreen Woods
Bangor, ME 04401

**By United States First Class Mail**

Neil D. Overholtz

Aylstock, Witkin & Sasser, P.L.C.

55 Baybridge Drive

PO Box 1147

Gulf Breeze, FL 32562-1147

*Counsel for Defendants Indevus*
*Pharmaceuticals, Inc. and Boehringer*
*Ingelheim Pharmaceuticals, Inc.*

**By Hand**

Matthew J. Matule (BBO #632075)

Skadden, Arps, Slate, Meagher & Flom LLP

One Beacon Street

Boston, Massachusetts 02108

/s/ Janice W. Howe_____

Janice W. Howe

*Counsel for Defendants Wyeth*
*and Wyeth Pharmaceuticals, Inc.*