diagnoses.

*2. Standard*

Summary judgment will be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law." Mass. R. Civ. P. 56(c). *Kourouvacilis v. General Motors Corp.*, 410 Mass. 706, 716 (1991). "A plaintiff who invokes the discovery rule by claiming that her delay in filing suit stems from a failure to recognize the cause of her injuries bears the burden of proving both an actual lack of causal knowledge and the objective reasonableness of that lack of knowledge." *Doe v. Creighton*, 439 Mass. 281, 284 (2003); *Lindsey v. Romano*, 427 Mass. 771, 773-74 (1998). This question is "one of fact which in most instances will be decided by the trier of fact." *Riley v. Presnell*, 409 Mass. 239, 240 (1991).

Because the plaintiffs bear the burden of proof on the discovery rule, "to survive the defendant's motion for summary judgment the plaintiff[s] must demonstrate a reasonable expectation of proving that [their] suit was timely filed." *Doe*, 439 Mass. at 284. In determining whether the plaintiffs have met this burden, the court will view the evidence produced and draw all reasonable inferences in a light most favorable to the plaintiffs. *Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 821 (1997).

*3. The Discovery Rule in Massachusetts*

Where a defendant's conduct causes an undetected injury to the plaintiff, Massachusetts applies the 'discovery rule' to determine "when [the] cause of action accrues and triggers the

beginning of the statutory period." *Mohr v. Commonwealth*, 421 Mass. 147, 156 (1995). "[A]ccrual of the cause of action is held to be in abeyance until the time when a modicum of knowledge [of the injury] supplants ignorance in the mind of the claimant, or may be reasonably imputed to her." *Lijoi v. MBTA*, 28 Mass. App. Ct. 926, 928 (1990). The critical date is "when a plaintiff discovers, or any earlier date when she should reasonably have discovered, that she has been harmed or may have been harmed by the defendant's conduct.'" *Mohr*, 421 Mass. at 156, quoting *Bowen v. Eli Lilly & Co.*, 408 Mass. 204, 205 (1990).[16] The test is an objective one: "Only if a *reasonable person in the plaintiff's position* would have been able to discern the harm or the cause of the harm will the cause of action accrue and the limitations period begin to run." *Riley v. Presnell*, 409 Mass. 239, 245 (1991) (emphasis added). Thus, the clock will not start ticking until the plaintiff has "(1) knowledge *or sufficient notice that she was harmed* and (2) knowledge or sufficient notice of what the cause of harm was." *Bowen*, 408 Mass. at 205 (emphasis added).

The discovery rule often surfaces in cases involving disease, where a disease or its symptoms may lie latent or undetected after the fact of the defendant's negligent act is first known. E.g., *Olsen v. Bell Tel. Labs., Inc.* 388 Mass. 171, 175 (1983); *Gore v. Daniel O'Connell's Sons, Inc.*, 17 Mass. App. Ct. 645, 647 (1984). " 'Latent [harms] are conditions that are hidden or concealed, and are not discoverable by reasonable and customary observation or

---

[16] The critical time may also be characterized as the point when the harm or cause thereof is no longer 'inherently unknowable.' The standards are the same and can be used interchangeably. *Albrecht v. Clifford*, 436 Mass. 706, 714 (2002), quoting *Williams v. Ely*, 423 Mass. 467, 473 n. 7 (1996). See also *Melrose Hous. Auth. v. N.H. Ins. Co.*, 402 Mass. 27 (1988) (discovery rule tolls statute of limitations until the harm and its cause ceases to be inherently unknowable by reasonable inquiry). Indevus emphasizes this language, claiming that if the disease was "*knowable*" then the plaintiffs should have discovered it. See n.19, *infra*, and accompanying text.

inspection.' " *Albrecht v. Clifford*, 436 Mass. 706, 713 (2002), quoting Black's Law Dictionary 429, 887 (7th ed. 1999). For purposes of the statute of limitations, the action accrues when the plaintiff "knew or should reasonably have known that he had contracted [the disease] as a result of conduct of the defendants." *Id.*

The justification for the discovery rule lies in the "unfairness of a rule that holds that the statute of limitations has run even before a plaintiff knew or reasonably should have known that she may have been harmed by the conduct of another." *Id.* "Not only does it offend fairness to require of claimants the gift of prophecy, cf. *Franklin v. Albert*, 381 Mass. at 618, but it is unsound judicial policy to encourage the initiation of law suits in anticipation that a grave disease will manifest itself pendente lite." *Gore*, 17 Mass. App. Ct. at 648. At the same time, the rule is limited by it own objective character–*i.e.*, the statute of limitations will only be held in abeyance until the plaintiff *reasonably should discover* the harm. This limitation is premised on the following reasoning:

> A man should not be allowed to close his eyes to facts readily observable by ordinary attention, and maintain for his own advantage the position of ignorance. Such a principle would enable a careless man, and by reason of his carelessness, to extend his right to recover for an indefinite length of time, and thus defeat the very purpose the statute was designed and framed to accomplish.

*Melrose Hous. Auth. v. N.H. Ins. Co.*, 402 Mass. 27, 35 (1988), quoting *Fulcher v. U.S.*, 696 F.2d 1073, 1077 (4th Cir. 1982). Thus, the objective character of the discovery rule strikes a balance between competing concerns–on the one hand it recognizes the unfairness of closing the courthouse doors to a claimant based on facts unknown to her despite reasonable diligence, and, on the other hand, it recognizes that the plaintiff should not be allowed to hide behind her own inexcusable neglect.

22

*4. The Discovery Rule Applied to the Circumstances of This Case*

The issue in this case is whether, as of December 11, 1999 (for Count V) and December 11, 2000 for the remaining counts, the plaintiffs knew or should have known that (1) they had VHD, and (2) the cause of that harm was the Diet Drugs.

*A. The Arguments of the Parties*

Indevus argues that the plaintiffs should have been aware of their condition in the fall of 1997. As a result of intense media coverage in the late summer of 1997, Indevus argues, the plaintiffs were on inquiry notice and should have taken adequate measures to ascertain whether they had been affected by the Diet Drugs. They contend that VHD is not a latent disease–that is, it is detectable, if at all, soon after the ingestion of Redux.[17] The issue of latency is therefore critical to Indevus' argument that the plaintiffs, as a matter of law, reasonably should have discovered their condition shortly after Redux was pulled from the market in the fall of 1997.

The plaintiffs, on the other hand, dispute that they should have discovered their injuries before 2001 or 2002 when they were first diagnosed. First, they argue the issue is not whether VHD is latent *per se*, but whether a reasonable person in their position should have discovered her injury before Dec. 11, 1999. They contend that their actions in attempting to ascertain whether they had been harmed by the Diet Drugs were manifestly reasonable–they did precisely what the FDA, independent medical organizations, and Indevus itself encouraged them to do: consult their physicians. As a result of those examinations and uniformly negative diagnoses,

---

[17] Although the plaintiffs vigorously dispute this contention, Indevus argues that the plaintiffs are collaterally and judicially estopped from making this argument. See *infra*.

they argue, there was no basis for them reasonably to be expected to know, or even suspect, that they had VHD. Thus, they argue there is, at minimum, a factual issue as to whether they should have known they had VHD and that summary judgment is therefore inappropriate.

*B. Analysis of the Parties' Positions*

The difference in the parties' positions is how they frame the relevant inquiry. Indevus takes the position that the inquiry is purely objective and to be performed in the abstract–*i.e.*, whether *hypothetically*, a reasonable person should discover VHD if he consulted a physician after exposure to Redux.[18] In Indevus' counsel's own words: "the issue is whether or not it is knowable" or, similarly, "whether or not the injuries were discoverable."[19] Thus, the defendants contend that if plaintiffs' VHD *could have been* discovered in 1997 then the plaintiffs should be charged with knowledge thereof.

The plaintiffs add a more subjective element to the test, asking whether *these plaintiffs* should have known they had VHD, even after consulting physicians who told them they were fine. Under this formulation, the issue of latency is largely irrelevant. Regardless of whether VHD is or is not latent, they argue that it was reasonable under the circumstances for them not to have discovered their injuries.[20]

---

[18] In its reply brief, Indevus presents the issue as: "whether there exists any judicially cognizable reason why the doctrine of collateral estoppel does not preclude Plaintiffs from contending that their injuries were inherently unknowable or latent at or about the time they discontinued use of Redux..."

[19] As counsel stated at the hearing held June 16, 2004.

[20] Another Court addressing essentially the same facts adopted a similar position:

Defendants strongly argue that the MDL litigation has determined that valvular heart disease is not a latent disease and as such the parties in this case are bound by such a finding. The fallacy of Defendant's argument in this regard is that the issue is not whether or not the condition is latent, but

24

Under Massachusetts law, the plaintiffs' position is correct.[21] Although most of the reported cases discussing the discovery rule deal with the second prong of the inquiry—whether the plaintiff should have discovered *the cause* of the injury, they are nevertheless instructive. Those cases make clear that the objective test must take into account the specific facts and circumstances of the plaintiff and the information known to her. E.g., *Lindsey v. Romano*, 427 Mass. 771, 774 (1998), quoting *McGuinness v. Cotter*, 412 Mass. 617, 620 (1992) (" 'In determining whether a party has sufficient notice of causation, our inquiry is whether, *based on the information available to the plaintiff*, a reasonably prudent person *in the plaintiff's position* should have discovered the cause of his or her injuries' " (emphasis added)); *Riley*, 409 Mass. at 245 ("Only if a reasonable person in the plaintiff's position would have been able to discern the harm . . . will the cause of action accrue and the limitations period begin to run... The reasonable person who serves as the standard in this evaluation, however, is not a detached, outside observer assessing the situation without being affected by it"); *Bowen*, 408 Mass. at 208-209 ("whether a reasonable person in the position of the plaintiff would have been on notice . . . depends on the facts"); *Castillo v. Mass. Gen. Hosp.*, 38 Mass. App. Ct. 513, 516 (1995), quoting *Malapanis v. Shirazi*, 21 Mass. App. Ct. 378, 383 (1986) ("a limitations period commences to run when a reasonably prudent person (in the tort claimant's position), reacting to any suspicious circumstances of which he might have been aware . . ., should have discovered that he had been

---

whether... the condition should have been found with 'reasonable diligence.' That is the issue. The issue is not whether or not the condition is latent. Whether Plaintiff should have discovered her condition ... is a fact question.
*Dykes v. Reeves*, No. 2:03CV121PG at 6-7 (S.D. Miss. Nov. 65, 2003).

[21] Courts analyzing the same issue under other states' discovery rules have come to the opposite conclusion. See, e.g., *French v. Wyeth*, MDL No. 1203, Civil Action No. 03-20206 (E.D. Pa. Feb. 16, 2004).

25

harmed"). See also *Gore*, 17 Mass. App. Ct. at 647 & n.3 (as a matter of law, plaintiff on notice of cause of injury upon first positive diagnosis linking injury to defendant's conduct); *Zamboni v. Aladan Corp.*, 304 F.Supp.2d 218, 225-26 (D. Mass. 2004) (and cases cited) (where initial diagnosis did not implicate the defendant, knowledge of causation not imputed to plaintiff until subsequent diagnosis implicating the defendant).

Four cases dealing with undiscovered medical conditions are particularly relevant to this case. In *Riley*, the plaintiff had been seeing the defendant psychotherapist who provided drugs and alcohol to the plaintiff and then engaged him in sexual activity. 409 Mass. at 241. This resulted in severe emotional problems to the plaintiff, the source of which he did not realize for several years despite seeing a new psychiatrist. *Id.* at 241-42. The new psychiatrist did not tell the plaintiff that any of his emotional problems were caused by the defendant's conduct. *Id.* at 242. The plaintiff finally realized the source of his emotional problems when the psychiatrist arranged for him to meet with another victim of the defendant. *Id.* at 241-42. The Court disagreed with the defendant's claim that an average reasonable person would have recognized the source of his problems before this time, and emphasized that the standard is not a 'detached' reasonable person, but a "reasonable person *in the position of the plaintiff*." *Id.* at 245 (emphasis added). Thus, the Court held that it was improper to grant summary judgment in the defendant's favor; while the cause of the plaintiff's problems was *knowable*, it was improper to charge the plaintiff with knowledge thereof as a matter of law, before his meeting with the other victim. *Id.*

Also instructive is *Gore v. Daniels O'Connell's Sons, Inc.* In *Gore*, the plaintiff suffered a concussion at work on August 16, 1976 and became deeply depressed and lethargic immediately after the accident. He consulted a series of physicians to help deal with his mental

issues. His initial few neurological examinations revealed no identifiable neurological symptoms that would have linked his emotional problems to his accident. In August, 1977, he was diagnosed with anxiety and depression. Finally, on February 28, 1978, a doctor opined that it was his "impression that the symptoms are related to [Gore's] accident." The Appeals Court affirmed summary judgment against the plaintiff who filed his complaint on April 30, 1981, more than three years after that diagnosis. Somewhat cryptically in a footnote, the Court noted: "The plaintiffs' action was filed April 30, 1981, and, therefore, not within three years of this relatively specific diagnosis. The Lahey Clinic had earlier -- in August, 1977 -- diagnosed Gore's condition as anxiety with depression." The reference to the earlier diagnosis apparently suggests that the limitations period was tolled until the plaintiff–while exercising reasonable diligence–*actually received a positive diagnosis* correlating his disorder to the accident. 17 Mass. App. Ct. at 647 & n.3.

The Supreme Judicial Court's analysis in *Bowen* provides additional guidance. In *Bowen*, the 21 year old plaintiff had surgery to cure vaginal cancer allegedly caused by a drug her mother took during pregnancy. 408 Mass. at 204. She filed suit fourteen years after the surgery. *Id.* The Court held "that the plaintiff had such direct information bearing on the cause of her cancer that the statute of limitations ran before this action was commenced." *Id.* at 208. Specifically, the plaintiff's doctor wrote a letter to the plaintiff and her mother two years after the surgery explaining the recently discovered association between the drug and vaginal cancer in offspring. *Id.* at 209. In addition, the doctor sent a copy of an article published in the *New England Journal of Medicine* detailing those findings. *Id.* Thus, the plaintiffs had been provided with such detailed information that they should have understood both that they had been injured and the

27

potential cause of that injury. *Id.*

Finally, in *Castillo*, the Appeals Court held that knowledge of technical information in medical records would not be imputed to the plaintiff until an expert later explained the significance of that information to the plaintiff's attorney. 38 Mass. App. Ct. at 516-17. Specifically, a blood test indicating elevated lead levels was performed on the plaintiff in 1981. *Id.* at 514. Those abnormal results were not made known to the plaintiff and the plaintiff was not treated for lead poisoning. *Id.* A subsequent test in 1982 revealed lead poisoning and a suit commenced against the plaintiff's landlord. *Id.* In 1986, during discovery in that case, the plaintiff's attorney obtained the 1981 test results, which were examined and explained by an expert on January 16, 1987. *Id.* As a result, the plaintiff filed suit against the hospital for damages arising from the hospital's failure to inform and treat the plaintiff in 1981. In reversing the allowance of the hospital's motion for summary judgment, the Court held, "we discern no basis for concluding, as matter of law, that a reasonably prudent person in the position of any of the plaintiffs should have discovered, prior to January 16, 1987, that he had been harmed by not having been informed of the 1981 test results." *Id.* at 516. Moreover, the Court held that "[a] determination that receipt of the 1982 blood test results would have aroused the suspicions of that reasonable person sufficiently to spur investigation of the results and implications of the [1981] test and would have led to the discovery that he had been harmed by the failure to inform him of those results, involves a decisional process fraught with resolution of factual issues and, is, therefore, peculiarly within the province of the trier of fact." *Id.* at 516.

These cases illustrate two critical points. First, when a medical condition is at issue, one must evaluate the specific medical, diagnostic or other information *provided to the plaintiff* to

determine whether she should have known of her injury (or its cause). The issue is not whether the condition (or its cause) could have been detected, discovered or diagnosed by an appropriate expert, but whether the plaintiff, in the exercise of reasonable diligence, received "such direct information" that she should have known of her injury and its cause. *Bowen*, 408 Mass. at 208; *Riley*, 409 Mass. at 245; *Castillo*, 38 Mass. App. Ct. at 516; *Gore*, 17 Mass. App. Ct. at 647 & n.3. See also *Zamboni v. Aladan Corp.*, 304 F. Supp.2d 218, 225-26 (D. Mass. 2004) (where doctor initially diagnosed plaintiff's condition as unrelated to defendant's conduct, knowledge of causation not imputed to plaintiff until subsequent correct diagnosis implicating defendant was made); *Harris v. McIntyre*, Civil No. 94-3597-II (Suffolk Superior Ct., June 27, 2000) (Gants, J.) (court must determine what knowledge the plaintiff actually had and when he had it to determine when the plaintiff should have known about the harm). Second, whether a plaintiff exercised reasonable diligence in investigating his/her injuries, and whether, based on the information reasonably available, the plaintiff should have know of the injury typically "involves a decisional process fraught with resolution of factual issues." *Castillo*, 38 Mass. App. Ct. at 516; *Riley*, 409 Mass. at 240.

C. *Analysis of the Circumstances of this Case*

The plaintiffs have raised, at minimum, a disputed issue of fact as to whether they should have known they had VHD as of December 11, 1999 (for Count V) and December 11, 2000 for the remaining counts. First, a jury could find that the plaintiffs exercised reasonable diligence in discovering their conditions by regularly visiting their physicians. Any argument by Indevus that, as a matter of law, the plaintiffs failed to exercise reasonable diligence in failing to obtain an

29

echocardiogram is belied by the undisputed evidence in the record that the government, professional cardiac associations, *and the pharmaceutical companies themselves* all instructed that patients merely visit their physicians—not that they routinely obtain an echocardiogram. There was simply not sufficient notice to these plaintiffs, or their physicians for that matter, to say, as a matter of law, that they should have requested and obtained an echocardiogram.[22] In short, a jury could find that these plaintiffs did precisely what other reasonable persons would have done under the circumstances: consult their physicians.

Although the intense media coverage should have put these plaintiffs on notice of the *potential* that they had been harmed by the defendant's conduct, there is nothing in the record which suggests that, as a matter of law, they should have discovered before 2001 or 2002 that they had, in fact, been so harmed. Specifically, based on the summary judgment record before the Court, the first time there was *any indication* of injury conveyed to these plaintiffs was when they received the results of their echocardiograms in 2001 and 2002. Notably, each plaintiff was told during the preceding years that her cardiac examinations were normal. Indeed, Sawyer was told in 1997 that her echocardiogram was normal. Additionally, the plaintiffs suffered no recognizable symptoms which could have put them on notice of cardiac problems. In short, a jury could find that the plaintiffs, after exercising reasonable diligence in routinely visiting their physicians, received no information from which they should have discovered they had been injured by the defendant's conduct. As such, summary judgment must be denied.

---

[22] Indeed, in light of the government and professionally endorsed protocols, it is not at all clear that a physician would have indulged such a request by any of the plaintiffs absent some independent indication of cardiac abnormality.

## 5. Collateral Estoppel, Judicial Estoppel, Latency and the Discovery Rule

Indevus argues that because VHD is not latent and an echocardiogram examination in 1997 should have revealed its presence, as a matter of law, the plaintiffs should have discovered their condition at that time. Although the plaintiffs present evidence that VHD is, in fact, latent, Indevus maintains that they are collaterally and judicially estopped from making this argument as a result of the MDL proceedings.

Indevus' argument fails for two reasons. First, as noted above, the issue of latency is not material to when the plaintiffs should have discovered their condition.[23] Second, even if latency were determinative, this court would not apply the doctrines of collateral or judicial estoppel under the circumstances of this case.

"The judicial doctrine of collateral estoppel provides that '[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.'" *Alba v. Raytheon Co.*, 441 Mass. 836, 841 (2004), quoting *Martin v. Ring*, 401 Mass. 59, 61 (1987). "The purpose of the doctrine is 'to conserve judicial resources, to prevent the unnecessary costs associated with multiple litigation, and to ensure the finality of judgments.'" *Id.* " 'The guiding principle in determining whether to allow defensive use of collateral estoppel is whether the party against whom it is asserted 'lacked full and fair opportunity to litigate the issue in the first action or [whether] other circumstances

---

[23] There is a critical distinction between latency and progression. Even if VHD was not latent, Indevus does not contest that it is often progressive, such that it may be asymptomatic for a period of time and then emerge in more serious symptomatic forms. Similarly, symptoms may go undetected on auscultation if a follow up echocardiogram is not performed. The relevant point in time is not the point of onset of valvular lesions, but rather the point in time at which the plaintiffs should have been aware they had VHD.

31

justify affording him an opportunity to relitigate the issue.'" *Id.* at 842.

Before reaching the issue of whether fairness justifies permitting the plaintiffs to litigate the issue of latency, this "court must answer affirmatively four questions: (1) was there a final judgment on the merits in the prior adjudication; (2) was the party against whom estoppel is asserted a party (or in privity with a party) to the prior adjudication; (3) was the issue decided in the prior adjudication identical with the one presented in the action in question; and (4) was the issue decided in the prior adjudication essential to the judgment in the prior adjudication?" *Id.*[24]

This case arguably meets those requirements; collateral estoppel could apply to preclude the plaintiffs' latency arguments. There was a final judgment in *Brown*; the plaintiffs were class members in *Brown*; the issue of latency was concretely decided by Judge Bechtle; and under *Amchem*, this finding was arguably essential to the final judgment. However, as the Supreme Judicial Court noted, the key inquiry is whether the plaintiffs had a full and fair opportunity to litigate the issue or whether other circumstances justify permitting them to litigate it here. *Id.* For the following reasons, this court agrees with the plaintiffs that it would be grossly unfair to preclude them from litigating the issue of latency.[25]

First, as Judge Bechtle recognized, the terms of the Agreement largely marginalized the

---

[24] Indevus asserts that the Pennsylvania law of collateral estoppel would govern in the event of a conflict of laws. However, there is no such conflict. Compare *Alba*, 441 Mass. at 841-42, and *City of Pittsburg v. Zoning Bd. of Adjustment*, 559 A.2d 896, 901 (Pa. 1989). Under Pennsylvania law, whether the party against whom collateral estoppel is being asserted had a full and fair opportunity to litigate the issue is considered a fifth formal element. *Id.*

[25] Other courts have concluded that class members are collaterally estopped from challenging Judge Bechtle's latency findings. E.g., *Williams v. Wyeth (In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.)*, MDL No. 1203, Civ. Nos. 03-20244 et al. slip op. at 7-8 (E.D. Pa. Feb. 24, 2004); *Alexander v. Wyeth (In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.)*, MDL No. 1203, Civ. Nos. 03-20206 (E.D. Pa. Jan. 29, 2004). The continuing vitality of those decisions, however, is called into question by a recent decision by the United States Court of Appeals for the Third Circuit. See *In re Diet Drugs*, 369 F.3d 293 (3rd Cir. 2004).

issue of latency.[26] Most notably, the Agreement protected those class members, like the plaintiffs, who were not diagnosed with VHD until January 3, 2003 or whose conditions worsened to symptomatic levels by the year 2015. For those class members, claims asserted against Wyeth through the intermediate or back-end opt-outs were protected against statutes of limitations defenses. Indeed, Judge Bechtle specifically noted that the opt-out provisions adequately safeguarded claims from the very statute of limitations defense asserted here by Indevus. *Brown*, 2000 WL 1222042, at *18 - *19. Thus, because the Agreement was structured to provide sufficient protection against statute of limitations defenses, the class members in the plaintiffs' position lacked a true incentive to fully and vigorously litigate the issue of latency–it simply was not critical to protecting their rights against Wyeth.

On that same score, the evidence presented to this court suggests that class counsel did not, in fact, vigorously litigate this issue. For one, Judge Bechtle noted there was no evidence presented at the fairness hearing indicating that VHD was latent. *Brown*, 2000 WL 1222042, at *47. However, it appears that class counsel possessed such information (Dr. Oury's expert opinion) and simply chose not to present it to that Court. Second, despite the fact that counsel was appointed for all defined "sub-classes," there was no counsel appointed to represent the potential class of Diet Drug users with latent VHD (if any such class existed at all). Accordingly, the interests of this potential sub-class may have gone under-represented, except for the very few objectors who presented *no* scientific evidence to support their latency concerns. Thus, the issue of latency appears, at minimum, not to have been as fully litigated as it could have been.

Additionally, all parties to the Agreement understood that the Agreement or any related

---

[26] This also indicates that Judge Bechtle's latency finding was not "essential" to the judgment.

findings and statements could not be used beyond enforcing the Agreement itself. There was no reason for any party to anticipate that Judge Bechtle's findings regarding latency would have any preclusive effects at a later time. To the contrary, there were very specific and explicit protections against this. As noted above, Sections VIII.F.3 & VIII.F.4 provided that any findings or statements made in connection with the Agreement could not subsequently be used by either settling party against the other, *or by any third party against either settling party*. Thus, class members would have been justified in expecting that any of Judge Bechtle's findings would have no preclusive effects against them in the future. In sum, where the rights of putative class members with latent or progressive VHD were protected by the Agreement and where they reasonably may have expected any findings regarding latency to have no preclusive effects, there was little, if any, incentive to fully litigate the issue of latency at the fairness hearing.

Finally and most importantly, it would be especially unfair to preclude the plaintiffs from arguing latency in light of the notice they were given regarding the non-preclusive effects of the Agreement. As the Third Circuit Court of Appeals noted:

> The average class member has had no hand in negotiating the terms of the settlement.... As in *Georgine v. Amchem Prods.*, the individual class members here have claims "that frequently receive huge awards in the tort system." 83 F.3d at 633. They can hardly knowingly waive some of their tort rights without a clear notice of what they are waiving. They may be entirely dependent on the class notice for this information. ... *It follows that the preclusion language in the Diet Drugs class notice and settlement agreement must, in order to avoid due process concerns, be strictly construed against those who seek to restrict class members from pursuing individual claims.*

*In re Diet Drugs*, 369 F.3d at 308 (emphasis added). Here, Class members were explicitly told that their rights "to pursue legal claims against Non-Settling Defendants is not affected by this Settlement Agreement..." Thus, class members were justified in believing that there was no risk

34

of adverse findings by Judge Bechtle carrying preclusive effects against non-settling defendants like Indevus. Even if class counsel conceded latency for purposes of getting the Agreement approved, it would be grossly unfair to bind unwitting class members to that concession because they were explicitly and unequivocally told that those proceedings would not affect their rights against non-settling parties.

For similar reasons of fairness, this court would not invoke the doctrine of judicial estoppel to preclude the plaintiffs' latency arguments. The doctrine of judicial estoppel "precludes a party in certain circumstances from asserting a position in one proceeding that is contrary to a position that the party previously asserted successfully in another proceeding." *E. Cambridge Sav. Bank v. Wheeler*, 422 Mass. 621, 621 (1996). The precise circumstances when the doctrine applies have not been clearly defined. *Tinkham v. Jenny Craig, Inc.*, 45 Mass. App. Ct. 567, 574 (1998). However, the primary purpose of the doctrine is to prevent litigants from playing "fast and loose" with the courts–*i.e.*, using "intentional self-contradiction . . . as a means of obtaining unfair advantage in a forum for suitors seeking justice." *Patriot Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d 208, 212 (1st Cir. 1987). Thus, the key factor in whether to apply judicial estoppel is "whether [the] party is seeking to use the judicial process in an inconsistent way that courts should not tolerate." *E. Cambridge Sav. Bank*, 422 Mass. at 623; *Correia v. DeSimone*, 34 Mass. App. Ct. 601, 604 (1993) (primary function of judicial estoppel is to protect integrity of the courts).

As the above discussion makes clear, these plaintiffs are not playing "fast and loose" with the courts and are not abusing the judicial process. The Third Circuit's observation that "the average class member has had no hand in negotiating the terms of the settlement" is particularly

35

relevant here. *In re Diet Drugs*, 369 F.3d at 308. Whatever position class counsel took at the fairness hearing,[27] it would be inappropriate to charge the current plaintiffs with abusing the judicial process when they had essentially no involvement in the earlier proceeding. The plaintiffs are not using "intentional self-contradiction" to gain an unfair advantage in the courts. In addition, the "objectors" to the Agreement argued that VHD was latent. Thus, the plaintiffs' current position on latency is, in fact, consistent with the one asserted by the objectors (who could be said to have represented the current plaintiffs at the fairness hearing) and the doctrine of judicial estoppel is therefore inapposite.

Therefore, even if this court were to adopt Indevus' understanding of the discovery rule in which latency is a material issue, there would still be a genuine dispute of fact as to whether VHD is a latent condition. Namely, the plaintiffs submit the affidavits of Dr. George Massing, M.D. and Dr. James Oury, M.D., who both opine that VHD is a latent condition. This court would not preclude those opinions and would permit the plaintiffs to argue latency. For these additional reasons, summary judgment must be denied.

---

[27] Although it appears from the decision in *Brown* that all of the experts, including those proffered by class counsel, testified that VHD is not latent, it does not necessarily follow that class counsel definitively adopted this position. As noted above, class counsel's brief in support of the settlement explicitly recognized that the rights of class members whose conditions worsened over time or were not detected until 2003 were protected by the Agreement.