# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE MASSACHUSETTS DIET DRUG LITIGATION FILED IN ALL CASES )<br><br>MARY ANDRUS; ELEANOR ARCHAMBEAU; DIANE BONNEAU; LERTIS CALDWELL; PRISCILLA COTE; THERESA DEJOY; LAURAL FANKHAUSER; NANCY KENNEDY; BARBARA WILLIAMS; LUCINDA YOUELL,<br><br>PLAINTIFFS,<br><br>v.<br><br>INDEVUS PHARMACEUTICALS, INC., F/K/A INTERNEURON PHARMACEUTICALS, INC.; WYETH, INC., F/K/A AMERICAN HOME PRODUCTS CORPORATION; WYETH PHARMACEUTICALS, INC., F/K/A WYETH-AYERST PHARMACEUTICALS, INC., A DIVISION OF AMERICAN HOME PRODUCTS CORPORATION; AND BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.,<br><br>DEFENDANTS. | CIVIL ACTION<br>NO. 04-10911 GAO |

## WYETH'S MEMORANDUM IN OPPOSITION TO ALL PLAINTIFFS' MOTIONS FOR REMAND

Page(s)

## <u>TABLE OF CONTENTS</u>

Page(s)

Table of Authorities ...........................................................................................................iii

WYETH'S MEMORANDUM IN OPPOSITION TO ........................................................ i

ALL PLAINTIFFS' MOTIONS FOR REMAND ............................................................... i

WYETH'S MEMORANDUM IN OPPOSITION TO ........................................................1

ALL PLAINTIFFS' MOTIONS FOR REMAND ...............................................................1

I.    THE COURT MUST DISREGARD THE CITIZENSHIP OF
      PARTIES AGAINST WHOM THERE IS NO REASONABLE BASIS
      FOR A CLAIM .......................................................................................................6

II.   INDEVUS IS FRAUDULENTLY JOINED BECAUSE PLAINTIFFS'
      CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS ..................10

      A.    Plaintiffs Had A Duty To Investigate Their Claims By The Fall
            Of 1997 ......................................................................................................12

      B.    Any Alleged Diet-Drug Injury Occurred No Later Than
            September 1997 And Was Discoverable At That Time.............................21

      C.    Plaintiffs' Efforts To Evade The Statute Of Limitations Fail...................26

            1.    Plaintiffs May Not Relitigate The Issue of Latency .....................26

            2.    The Self-Serving Affidavits Of Nine Plaintiffs Do Not
                  Save Plaintiffs Claims...................................................................31

            3.    The "Common Defense" Rule Does Not Apply ............................34

            4.    Plaintiffs Cannot Rely On The Doctrine Of Fraudulent
                  Concealment ..................................................................................35

            5.    Plaintiffs Cannot Rely On A Class Action Tolling
                  Theory ............................................................................................36

      D.    The *Sawyer* Decision Should Be Given No Weight For A
            Number Of Independent Reasons ..............................................................38

Page(s)

1.    The Vast Majority Of Plaintiffs In These Cases Have
       Not Proffered Affidavits Comparable To Those In
       *Sawyer* ............................................................................................ 40

2.    Judge Brassard Appears To Have Been Unaware Of
       Unambiguous Advice That All Diet Drug Users Obtain
       Echocardiograms, Or That Advice Was Not Relevant In
       The *Sawyer* Case ........................................................................... 40

3.    Judge Brassard Erred In Believing Plaintiffs Are Not
       Barred From Relitigating Latency ................................................. 42

III.    THE PRESENCE OF NEW JERSEY AND DELAWARE
          PLAINTIFFS IN A HANDFUL OF CASES DOES NOT DEFEAT
          DIVERSITY JURISDICTION IN THOSE CASES .............................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*Albrect v. Clifford*, 767 N.E.2d 42 (Mass. 2002) .........................................................11

*Alexander v. Wyeth*, No. 03-20206, PTO 3230 (E.D. Pa. Jan. 29, 2004 ) .......................22, 23, 28

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) .............................................23

*Am. Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) .........................................34

*B., Inc. v. Miller Brewing Co.*, 663 F.2d 545 (5th Cir. 1981) ...........................................8

*Badon v. RJR Nabisco Inc.*, 224 F.3d 382 (5th Cir. 2000) ...............................................9

*Baldissari v. Pub. Fin. Trust*, 337 N.E.2d 701 (Mass. 1975) ........................................35

*Bowen v. Eli Lilly & Co., Inc.*, 557 N.E.2d 739 (Mass. 1990) .........................................11, 18, 19

*Boyer v. Snap-On Tools Corp.*, 913 F.2d 108 (3d Cir. 1990) ...........................................8

*Bell v. Wyeth*, No. CV-20-BE-3136-S (N.D. Ala. Dec. 31, 2002); .................................17

*Bejarano v. Wyeth, et al.*, No. L-03-53 (S.D. Tex. June 27, 2003); .................................17

*Allen v. Wyeth*, No. 03-20310, PTO 3305 (E.D. Pa. Feb. 24, 2004) ...............................16

*Brown v. Wyeth,* No. 03-20335, PTO 3501 (E.D. Pa. May 4, 2004) .............................16

*Berry v. Wyeth,* No. 03-20243, PTO 3531 (E.D. Pa. May 14, 2004 ) ...........................16

*Broom v. Hogan,* No. 03-20587, PTO 3532, (E.D. Pa. May 14, 2004) .........................16

*Bishop v. Lowe*, No. 03-20601, PTO 3536 (E.D. Pa. May 18, 2004 ) ..........................21, 30, 41

*Accadia v. Wyeth*, No. 03-20546, PTO 3666 (E.D. Pa. June 29, 2004 ) ........................21, 31

*Burbridge v. Bd. of Assessors,* 417 N.E.2d 477
    (Mass. App. Ct. 1981) ...............................................................................33

*Burden v. Gen. Dynamics Corp.*, 60 F.3d 213 (5th Cir. 1995) ......................................8

*Cannon v. Sears, Roebuck & Co.*, 374 N.E.2d 582 (Mass. 1978) ...............................10

*City of Pittsburgh v. Zoning Bd. of Adjustment*, 559 A.2d 896 (Pa. 1989) ....................22

Page(s)

*Chouteau v. Wyeth,* No. 03-20315, PTO 3517 (E.D. Pa. May 12, 2004) ....................................16

*Chambliss v. Todd,* No. 03-20288, PTO 3533 (E.D. Pa. May 17, 2004) ...............................16, 21

*Cooper v. Wyeth,* No. 03-20246, PTO 3665 (E.D. Pa. June 29, 2004) .........................................16

*Collett v. Freid*, No. 03-526 (E.D. Ky. July 15, 2004) .........................................................17, 32

*DiCerbo v. Comm'r. of the Dep't. of Employment & Training*,
     763 N.E.2d 566 (Mass. App. Ct. 2002) .........................................................................35

*Dillon v. Sims*, No. 03-20385, PTO 3590 (E.D. Pa. June 9, 2004) ...............................................28

*Dykes v. Reeves*, No 2:03CV121 (PG) (S.D. Miss. Nov. 6, 2003) ...............................................17

*Estate of Sarocco v. Gen Elec. Co.*, 939 F. Supp. 91 (D. Mass. 1996) .......................................33

*Federated Dep't. Stores, Inc. v. Moitie*, 452 U.S. 394 (1981) ........................................................6

*Ferrell v. Wyeth*, No. 03-20094, PTO 2996 (E.D. Pa. Sept. 5, 2003) ..........................................21

*Fidler v. E.M. Parker Co.*, 476 N.E.2d 595 (Mass. 1985) ..........................................................10

*Filla v. Norfolk S. Ry. Co.*, 336 F.3d 806 (8th Cir. 2003) .............................................................7

*French v. Wyeth*, No. 03-20353, PTO 3281 (E.D. Pa. Feb. 18, 2004 ) ...................................21, 22

*Golden v. Pac. Mar. Ass'n*, 786 F.2d 1425 (9th Cir. 1986) .........................................................22

*Good v. Wyeth*, No. 03-20763, PTO 3769 (E.D. Pa. July 30, 2004 ) ...........................................28

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*,
     313 F.3d 305 (5th Cir. 2002) ............................................................................................9

*Green v. Wyeth*, No. 03-2034, PTO 3534 (E.D. Pa. May 17, 2004 ) ...........................................21

*Haggard v. Wyeth*, No. CIV-02-446-S (E.D. Okla. Oct. 8, 2002); ...............................................17

*Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391 (5th Cir. 2003) ...........................................23, 24

*Hamilton v. Wyeth*, No. 2:03CV00043GH (E.D. Ark. June 17, 2003); .......................................17

*Harting v. Wyeth, Inc.*, No. CIV-03-379-F (W.D. Okla. Apr. 22, 2003); .....................................17

*Hughes v. Vanderbilt Univ.*, 215 F.3d 543 (6th Cir. 2000) .........................................................19

Page(s)

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine)*
    *Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 1222042
    (E.D. Pa. Aug. 28, 2000) ........................................................................... *passim*

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine)*
    *Prods. Liab. Litig.,* 220 F.Supp.2d 414 (E.D. Pa. 2002)................................2, 9

*In re Diet Drugs*, 369 F.3d 293 (3rd Cir. 2004) ........................................................27

*In re Fen-Phen Litig.*, No. 1:03-MD-1-RLV (N.D. Ga. Oct. 15, 2003) ....................................2, 4

*In re New England Mut. Life Ins. Co. Sales Practices Litig.*
    2004 WL 1567871 (D. Mass. July 6, 2004) ........................................................7

*Jernigan v. Ashland Oil Inc.,* 989 F.2d 812 (5th Cir. 1993) ........................................8

*Kay v. Johnson & Johnson,* 722 F. Supp. 874 (D. Mass. 1989) ..................................11

*Kershenstine v. Wyeth Co.*, No. 03-0237 (W.D. La. May 6, 2003); ..............................17

*Lareau v. Page*, 840 F. Supp. 920 (D. Mass. 1993) ..................................................11

*Laskey v. UAW,* 638 F.2d 954 (6th Cir. 1981) ........................................................ 22-23

*Lawhon v. Wyeth,* No. 03-20226, PTO 3470 (E.D. Pa. Apr. 26, 2004) ..........................16, 30, 41

*Martinez v. Sherwin Williams Co.*, 737 N.E.2d 927 (Mass. App. Ct. 2000) ..........................10, 11

*Mass Elec. Co. v. Mass. Comm'n. Against Discrimination*,
    375 N.E.2d 1192 (Mass. 1978) ..................................................................35

*McCurdy v. Wyeth*, No. A-03-CA-054-SS (W.D. Tex. Feb. 14, 2003); ..........................17

*McEneaney v. Chestnut Hill Realty Corp.*, 650 N.E.2d 93 (Mass. App. Ct. 1995) ..................10

*McKee v. Wyeth*, No. CIV-02-1119-C (W.D. Okla. Oct. 1, 2002). ..............................17

*McKinney v. Bd. of Trs.*, 955 F.2d 924 (4th Cir. 1992) ............................................ 6-7

*Miles v. Aetna Cas. & Sur. Co.*, 589 N.E.2d 314 (Mass. 1992) ..................................22

*Mills v. Allegiance Healthcare Corp.*, 178 F. Supp. 2d 1 (D. Mass. 2001) ..........................7, 9

*Moseley v. Wyeth*, No. CIV-02-1120-M (W.D. Okla. Sept. 13, 2002) ..........................17

Page(s)

*Myers v. Agoritsas*, No. 930844, 1994 WL 879696 (Mass. Super. Ct. May 4, 1994) .................11

*Olsen v. Bell Tele. Labs., Inc.*, 445 N.E.2d 609 (Mass. 1983) .........................................10, 11, 34

*Phinney v. Morgan*, 654 N.E.2d 77 (Mass. App. Ct. 1995) ..........................................................11

*Rainey v. Wyeth*, No. 03-20128, PTO 2886 (E.D. Pa. June 12, 2003) .........................................21

*Ross v. Citifinancial, Inc.*, 344 F.3d 458 (5th Cir. 2003) ...............................................................7

*Ryan Operations, G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355 (3d Cir. 1996) ..........23, 24

*Sawyer v. Indevus Pharms., Inc.,* No. 03-5028-B
    (Mass. Super. Ct. July 21, 2004) ............................................................................... *passim*

*Schwartz v. State Farm Mut. Auto Ins. Co.*, 174 F.3d 875 (7th Cir. 1999) ....................................8

*Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001) ...............................................22

*Shafnacker v. Raymond James & Assocs., Inc.*, 683 N.E.2d 662 (Mass. 1997) ..........................33

*Sheila S. v. Commonwealth*, 783 N.E.2d 868 (Mass. App. Ct. 2003) ..........................................11

*Spence v. Wyeth,* No. W-03-CA-127 (W.D. Tex. July 16, 2003); ................................................17

*Stark v. Advanced Magnetics, Inc.*, 736 N.E.2d 434 (Mass. App. Ct. 2000) ...............................33

*Stittum v. Wyeth,* No. 4:03CV531CDP (E.D. Mo. July 16, 2003); ...............................................17

*Tedford v. Warner-Lambert Co.*, 327 F.3d 423 (5th Cir. 2003) .....................................................7

*Thomas v. Albright*, 77 F. Supp. 2d 114, 121-22 (D.D.C. 1999),
    *aff'd sub nom. Thomas v. Powell*, 247 F.3d 260 (D.C. Cir. 2001) ...................................23

*United Klans of Am. v. McGovern*, 621 F.2d 152 (5th Cir. 1980) ................................................19

United States v. Mendoza, 464 U.S. 154 (1984) .........................................................................22

*Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405 (11th Cir. 1999) .............................................8

*Weaver v. Am. Home. Prods.*, No. 03-20153, PTO 2946 (E.D. Pa. July 30, 2003).......................43

*Wecker v. Nat'l Enameling & Stamping Co.*, 204 U.S. 176 (1907) ................................................6

*Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92 (1921) .............................................................8

Page(s)

*Winters v. Diamond Shamrock Chem. Co.*, 941 F. Supp. 617 (E.D. Tex. 1996) .........................19

*Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998) ..................................19

*Zamboni v. Aladan Corp.*, 304 F. Supp. 2d 218 (D. Mass. 2004) ................................................10


**STATUTES:**

28 U.S.C. § 1441 .................................................................................................................................6


**MISCELLANEOUS:**

Mass. Gen. Laws Ann. ch. 106, § 2-318 (West 1999) ....................................................................10

Mass. Gen. Laws Ann. ch. 260, § 2A (West 2004) ........................................................................10

Mass. Gen. Laws Ann. ch. 260, § 5A (West 2004) ........................................................................10

Page(s)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE MASSACHUSETTS DIET DRUG LITIGATION FILED IN ALL CASES | ) ) |
| MARY ANDRUS; ELEANOR ARCHAMBEAU; DIANE BONNEAU; LERTIS CALDWELL; PRISCILLA COTE; THERESA DEJOY; LAURAL FANKHAUSER; NANCY KENNEDY; BARBARA WILLIAMS; LUCINDA YOUELL, | ) ) ) ) ) ) |
| PLAINTIFFS, | ) ) |
| v. | ) |
| INDEVUS PHARMACEUTICALS, INC., F/K/A INTERNEURON PHARMACEUTICALS, INC.; WYETH, INC., F/K/A AMERICAN HOME PRODUCTS CORPORATION; WYETH PHARMACEUTICALS, INC., F/K/A WYETH-AYERST PHARMACEUTICALS, INC., A DIVISION OF AMERICAN HOME PRODUCTS CORPORATION; AND BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) ) ) ) ) ) ) |
| DEFENDANTS. | ) |

CIVIL ACTION
NO. 04-10911 GAO

## WYETH'S MEMORANDUM IN OPPOSITION TO ALL PLAINTIFFS' MOTIONS FOR REMAND

### Preliminary Statement

Wyeth respectfully submits this memorandum in opposition to plaintiffs' Motions to Remand the 193 diet drug cases that Wyeth has removed to this Court. Plaintiffs' motions should be denied.

The nation-wide diet drug litigation has been characterized by extensive and often elaborate efforts by the plaintiffs' bar to prevent Wyeth from exercising its statutory right to remove cases to federal court. Presumably, this effort is motivated by a desire to evade the diet drug MDL Court, the court most knowledgeable about

diet drug issues. Plaintiffs have attempted to evade that court by suing in state court and naming a variety of non-diverse parties as defendants even though plaintiffs have no viable claims against these parties and do not intend to pursue them to judgment. The MDL Court, when surveying the overwhelming evidence of such improper forum manipulation, found that such joinder is nothing more than a "sham." *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 220 F. Supp. 2d 414, 425 (E.D. Pa. 2002). As it explained in one case, plaintiffs "are engaging in improper efforts to prevent [Wyeth] from exercising its statutory right under 28 U.S.C. § 1441 to remove cases based on diversity of citizenship to the federal courts in Louisiana and Mississippi." *Id.* Last summer, a Georgia federal court rejected the plaintiff bar's bold effort at forum shopping when it denied remand of 168 cases that were filed by 14,600 plaintiffs from around the country in Fulton County, Georgia, and that attempted to defeat federal jurisdiction by naming a handful of local defendants. *In re Fen-Phen Litig.*, No. 1:03-MD-1-RLV (N.D. Ga. Oct. 15, 2003) (Ex. 1).

Now the plaintiffs' bar has brought its tactics to Massachusetts. It has filed 193 cases on behalf of 2624 plaintiffs in Middlesex County, even though the vast majority of those plaintiffs are from states other than Massachusetts. The plaintiffs' bar attempts to defeat federal jurisdiction by naming Indevus Pharmaceuticals, Inc. ("Indevus") (formerly known as Interneuron Pharmaceuticals, Inc.), a resident of Massachusetts. Plaintiffs name Indevus even though it has only $75 million in assets and negative shareholder equity and therefore could not even begin to pay the

damages that the 2624 plaintiffs seek.  It is obvious that plaintiffs join Indevus solely

to defeat diversity jurisdiction.

Plaintiffs' tactics fail because plaintiffs have no reasonable basis for a claim

against Indevus, and that defendant therefore is fraudulently joined.  The statute of

limitations expired on any claims against Indevus long ago.  That date necessarily

was before September 1997, the date the drugs were taken off the market.  Further,

diet drug users were on notice of any potential claims by late 1997 or by the very

beginning of 2000 at the very latest as a result of the massive publicity concerning the

link between diet drugs and valvular heart disease.  The MDL Court and courts in at

least *eight* other federal districts have held claims against doctors time-barred,

including in jurisdictions with a discovery rule similar to that of Massachusetts.  The

same analysis applies to Indevus.  Because all of the plaintiffs before this Court were

on notice of their claims against Indevus at least by February 2000, the relevant

Massachusetts statute of limitations had already run before these actions were filed

between March and April 2004.  Most of the arguments that plaintiffs make to the

contrary in this case have already been rejected by the MDL Court.

In a gambit to obtain a favorable holding here, the plaintiffs' bar first filed suit

against Indevus (without naming Wyeth) in Middlesex County in a case captioned

*Sawyer v. Indevus*.  Judge Brassard recently denied a statute of limitations summary

judgment motion filed by Indevus in that case.  That decision should be accorded no

weight here for three independent reasons.  First, the decision in *Sawyer* was fact-

specific – *i.e.*, it was based on affidavits that plaintiffs submitted in that case about

their purported due diligence.  Because all but nine of the 2624 plaintiffs in these

cases have not submitted comparable affidavits, *Sawyer* has no application to them.

Second, Judge Brassard incorrectly believed that diet drug users had not been advised

to obtain echocardiograms (as opposed to obtaining general check-ups).  In fact, diet

drug users were in fact advised to get echocardiograms, including in the official

notice of the Nationwide Class Action Settlement Agreement (the "Settlement

Agreement") distributed by February 2000, which also was widely publicized in the

media.  Third, the result in *Sawyer* was based, at least in part, on the mistaken

conclusion that plaintiffs were not barred, as a result of proceedings at the fairness

hearing for that Settlement, from contesting that diet drug injuries occur, if at all, by

the time drugs use ceases, and not long afterward.  Judge Brassard based this

conclusion on an erroneous interpretation of the Settlement Agreement and a

misunderstanding of the events at the fairness hearing.  His decision is contrary to

countless decisions of the MDL Court and the decisions of numerous other federal

courts.  That incorrect decision does not provide a reasonable basis for a claim against

Indevus.  *See* Section II.D. below.

    For the reasons set forth in Wyeth's fully briefed Motion for a Stay, filed June

18, 2004, this Court should stay these cases pending transfer so that the MDL Court

can decide the jurisdictional issue.  However, if the Court elects to rule on the

motions for remand, it should decide the motions in a manner consistent with the

MDL Court's decisions and deny remand.  *See In re Fen-Phen Litig.*, No. 1:03-MD-

1-RLV (N.D. Ga. Oct. 15, 2003) (Ex. 1) (denying remand of 14,600 plaintiffs, finding

<u>Page(s)</u>

the reasoning of MDL Court decision more persuasive than contrary decisions by several judges in Northern District of Georgia).

### <u>Factual Background</u>

Plaintiffs filed these cases in March and April 2004, almost seven years after diet drugs were taken off the market in September 1997 due to their well-publicized association with valvular heart disease. The vast majority of plaintiffs are residents of states other than Massachusetts. They allege that they suffered heart valve damage as a result of ingesting a diet drug called dexfenfluramine (Redux). They are members of a class of diet drug users bound by the Settlement Agreement (Ex. 2). Plaintiffs purport to bring this case pursuant to a provision of the Settlement Agreement that permits class members to file lawsuits under certain circumstances. Under the Settlement Agreement, Wyeth waived the statute of limitations as a defense in those lawsuits if the class member met the Settlement Agreement's requirements to file such a lawsuit and if the class member filed that suit within a specified time after meeting those requirements. Indevus, which is not a party to the Settlement Agreement, is free to assert the statute of limitations.

Wyeth sold Redux (and another diet drug called fenfluramine (Pondimin)). In an attempt to defeat diversity, plaintiffs have sued Indevus, a company involved with the development of Redux (but not Pondimin). Indevus maintains its principal place of business in Massachusetts. Plaintiffs assert various tort claims against Wyeth and Indevus. Plaintiffs also assert a claim against Indevus for unfair trade practices.

Page(s)

Plaintiffs in three cases originally also sued current or former Wyeth sales representatives resident in Massachusetts.  Plaintiffs subsequently dismissed those defendants.  Ex. 3 (Stipulations of Dismissal).  Plaintiffs also have waived any argument that the presence of Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer") (a citizen of Delaware and Connecticut) is a bar to diversity jurisdiction in cases involving Delaware and Connecticut plaintiffs.[1]  Plaintiffs base their motions for remand solely on the presence of Indevus as a defendant.

## Argument

### I.     THE COURT MUST DISREGARD THE CITIZENSHIP OF PARTIES AGAINST WHOM THERE IS NO REASONABLE BASIS FOR A CLAIM

Removal to federal court is a right provided by Congress when the elements of federal jurisdiction exist.  28 U.S.C. § 1441.  *See,* e.g., *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 397 n.2 (1981) (recognizing "defendant's right to a federal forum") (citation omitted).  The Supreme Court has therefore instructed that federal courts are to reject any device designed improperly to circumvent removal:

> While the plaintiff, in good faith, may proceed in the state courts upon a cause of action which he alleges to be joint, it is equally true that the *Federal courts should not sanction devices intended to prevent a removal to a Federal court where one has that right, and should be equally vigilant to protect the right to proceed in the Federal court* as to permit the state courts, in proper cases, to retain their own jurisdiction.

---

[1]  In any event, claims against Boehringer are barred by the statute of limitations for the same reasons that claims against Indevus are barred.

Page(s)

*Wecker v. Nat'l Enameling & Stamping Co.*, 204 U.S. 176, 185-86 (1907) (emphasis added).  As one Court of Appeals has explained: "Congress created the removal process to protect defendants.  It did not extend such protection with one hand, and with the other give plaintiffs a bag of tricks to overcome it."  *McKinney v. Bd. of Trs.*, 955 F.2d 924, 928 (4th Cir. 1992) (quoting district court); *see also Tedford v. Warner-Lambert Co.*, 327 F.3d 423, 427 (5th Cir. 2003) ("Congress [by enacting 28 U.S.C. § 1446(b)] may have intended to limit diversity jurisdiction, but it did not intend to allow plaintiffs to circumvent it altogether.").

To prevent plaintiffs from improperly defeating federal jurisdiction, federal courts ignore the citizenship of fraudulently joined parties in determining whether diversity jurisdiction exists.  Fraudulent joinder exists where plaintiff has no reasonable basis for a claim against the defendant.  Contrary to plaintiffs' assertion that there must be "no possibility" for a claim, the law is clear that the linchpin is whether plaintiff's claim has a "*reasonable basis* in law and fact."  *Mills v. Allegiance Healthcare Corp.*, 178 F. Supp. 2d 1, 4 (D. Mass. 2001) (emphasis added); *In re New England Mut. Life Ins. Co. Sales Practices Litig.*, 2004 WL 1567871, at *9 (D. Mass. July 6, 2004) (quoting *Mills*); *Gabrielle v. Allegro Resorts Hotels*, 210 F. Supp. 2d 62, 67 (D.R.I. 2002) (quoting *Mills*).  "A mere theoretical possibility of recovery under state law does not suffice to preclude removal."  *Mills*, 178 F. Supp. 2d at 5.[2]

---

[2] While some decisions refer to the test for fraudulent joinder as requiring "no possibility" of a claim, the Fifth Circuit recently explained that the "no possibility" language, which the Fifth Circuit itself used in certain of its decisions, cannot be taken literally; "no possibility" means "no reasonable possibility."  *Ross v. Citifinancial, Inc.*, 344 F.3d 458, 462 (5th Cir. 2003).  Otherwise, no action would

Footnote continued on next page

Page(s)

Numerous Circuit Courts of Appeals have applied the "no reasonable basis" standard. *E.g.*, *Ross v. CitiFinancial, Inc.*, 344 F.3d 458, 462 (5th Cir. 2003) ("[T]here must be a *reasonable* possibility of recovery, not merely a *theoretical* one.") (emphasis added); *Filla v. Norfolk S. Ry. Co.*, 336 F.3d 806, 810 (8th Cir. 2003) ("We believe that, despite the semantical differences, there is a common thread in the legal fabric guiding fraudulent-joiner review. It is reason. Thus, a proper review should give paramount consideration to the reasonableness of the basis underlying the state claim."); *Schwartz v. State Farm Mut. Auto. Ins. Co.*, 174 F.3d 875, 879 (7th Cir. 1999) ("We only hold that [plaintiffs' prevailing against allegedly fraudulently joined defendant] is not a reasonable possibility based on current Indiana law and the facts before us. Therefore the joinder was fraudulent ….") (citation omitted); *Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990) (joinder is fraudulent "where there is no reasonable basis in fact or colorable ground supporting the claim against the joined defendant") (internal quotations and citation omitted).[3]

In determining whether a party has been fraudulently joined, the court must conduct a thorough inquiry into its jurisdiction. *See Burden v. Gen. Dynamics Corp.*, 60 F.3d 213, 217 (5th Cir. 1995); *see also Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999) ("[O]ur removal jurisdiction is no exception to a

---

Footnote continued from previous page

ever be removable under the fraudulent joinder doctrine, because it is always at least theoretically or remotely possible that a claim might be upheld.

[3] A defendant is also fraudulently joined if the plaintiff does not have a good faith intent to pursue a claim against the defendant. *See Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 98 (1921).

federal court's obligation to inquire into its own jurisdiction.").  "[T]he proceeding

appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling

on a motion for summary judgment under Fed. R. Civ. P., Rule 56(b)."  *B., Inc. v.*

*Miller Brewing Co.*, 663 F.2d 545, 549 n.9 (5th Cir. Unit A Dec. 1981); *accord*

*Jernigan v. Ashland Oil Inc.*, 989 F.2d 812, 815-816 (5th Cir. 1993); *see also Wilson*

*v. Republic Iron & Steel Co.*, 257 U.S. 92, 97-98 (1921) (describing the burden of

proof).  The Court should, therefore, consider all affidavits, deposition transcripts,

and other evidence before it.  *See Mills*, 178 F. Supp. 2d at 6 ("The Court may also

examine affidavits of the parties in determining the propriety of joinder."); *Great*

*Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 311 (5th Cir.

2002) (stating that district courts may "examine affidavits and deposition testimony

for evidence of fraud or the possibility that the plaintiff can state a claim under state

law").

    While the Court should generally resolve disputed questions of fact in favor of

the non-removing party, it should do so "only when there is an actual controversy,

that is, when *both* parties have submitted *evidence* of contradictory facts."  *Badon v.*

*RJR Nabisco Inc.*, 224 F.3d 382, 393-94 (5th Cir. 2000) (emphasis added) (internal

quotations and citations omitted); *see also Mills*, 178 F. Supp. 2d at 6 (citing *Fields v.*

*Pool Offshore, Inc.*, 182 F.3d 353, 357 (5th Cir. 1999), for the proposition that a party

is fraudulently joined where the court "determines, after resolving 'all disputed

questions of fact and any ambiguities in the current controlling substantive law in

plaintiff's favor' that there is 'no reasonable basis for predicting that the plaintiff

Page(s)

might establish liability'"). Further, as in a summary judgment context, a disputed

issue of fact will not defeat removal where it does not create a material issue with

respect to the basis for fraudulent joinder raised by the defendant. As the MDL Court

explained, "[w]e are not to decide automatically in favor of remand simply because

some facts may be said to be in dispute." *In re Diet Drugs*, 220 F. Supp. 2d at 420

(citing *Wilson*, 257 U.S. at 98).

## II.    INDEVUS IS FRAUDULENTLY JOINED BECAUSE PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

Claims for breach of warranty, negligence, and fraudulent misrepresentation

are each governed by a three-year limitations period under Massachusetts law. *See*

Mass. Gen. Laws Ann. ch. 260, § 2A (West 2004); *id.* ch. 106, § 2-318 (West 1999);

*see also Martinez v. Sherwin Williams Co.*, 737 N.E.2d 927, 928 (Mass. App. Ct.

2000) (statute of limitations for negligence and breach of warranty claims);

*McEneaney v. Chestnut Hill Realty Corp.*, 650 N.E.2d 93, 96 (Mass. App. Ct. 1995)

(statute of limitations for a claim of misrepresentation). A claim for alleged

violations of Massachusetts' Consumer Protection Act is governed by a four-year

statute of limitations. *See* Mass. Gen. Laws Ann. ch. 260, § 5A (West 2004).[4]

Statutes of limitations generally begin to run from the time plaintiff is injured.

*See Cannon v. Sears, Roebuck & Co.*, 374 N.E.2d 582, 584 (Mass. 1978); Mass. Gen.

Laws Ann. ch. 106, § 2-318. However, if a plaintiff can show that she could not

---

[4] Wyeth does not concede that the claims of all plaintiffs would be governed by Massachusetts law. Wyeth cites Massachusetts law because that is the law cited by plaintiffs.

reasonably have known of the injury at the time it occurred, Massachusetts applies a discovery rule.  Under that rule, a claim accrues when plaintiff learns, *or reasonably should have learned*, that she has been harmed and that the harm was allegedly caused by the defendant's conduct.  *See Olsen v. Bell Tel. Labs., Inc.*, 445 N.E.2d 609, 611-12 (Mass. 1983); *Fidler v. E.M. Parker Co.*, 476 N.E.2d 595, 601-02 (Mass. 1985).  Plaintiff has the burden of proving that she could not have discovered her claim any earlier with reasonable diligence.  *Zamboni v. Aladan Corp.*, 304 F. Supp. 2d 218, 224 (D. Mass. 2004).

Under the discovery rule, "the statute of limitations starts to run when an event or events have occurred that were *reasonably likely to put the plaintiff on notice that someone may have caused her injury*."  *Bowen v. Eli Lilly & Co.*, 557 N.E.2d 739, 741 (Mass. 1990) (emphasis added).  The question is when a "reasonable person in [the plaintiff's] position would have possessed knowledge or sufficient notice that they were harmed and what the cause of harm was."  *Phinney v. Morgan*, 654 N.E.2d 77, 81 (Mass. App. Ct. 1995).  The discovery rule does not require plaintiff to know the full extent of her injuries for the statute of limitations to run.  *Olsen*, 445 N.E.2d at 612.  Nor need plaintiff discover each element of her potential cause of action (such as breach of duty, causation and damages).  *Bowen*, 557 N.E.2d at 742; *Sheila S. v. Commonwealth*, 783 N.E.2d 868, 874 (Mass. App. Ct. 2003).

A plaintiff's alleged ignorance that she suffered an injury will not prevent the statute from running if reasonable investigation would have caused her to discover the alleged injury.  *Albrecht v. Clifford*, 767 N.E.2d 42, 49-50 (Mass. 2002); *Myers v.*

Page(s)

*Agoritsas*, No. 930844, 1994 WL 879696, at *3 (Mass. Super. Ct. May 4, 1994).

Thus, a plaintiff's failure to seek medical confirmation in a timely fashion will not

delay accrual of claims. *Martinez,* 737 N.E.2d at 928-29 (claims barred where

plaintiff experienced symptoms in 1985, but did not see a specialist until 1990);

*Lareau v. Page*, 840 F. Supp. 920, 923, 925-27 (D. Mass. 1993) (plaintiff on notice

when doctor advised that "there was a 'theoretical possibility'" that a radioactive dye

"could 'induce a tumor in surrounding brain tissue'" despite contrary second

opinion); *Kay v. Johnson & Johnson*, 722 F. Supp. 874, 881-82 (D. Mass. 1989)

(statute began to run when plaintiff had symptoms notwithstanding conflicting

medical advice received by the plaintiff).

     Here, plaintiffs' claims against Indevus are plainly barred by the statute of

limitations.

**A.    Plaintiffs Had A Duty To Investigate Their Claims By The Fall Of 1997**

     All the plaintiffs here allege that they have been injured because they claim to

have valvular heart disease, which they claim was caused by their having used Redux.

All diet drug users knew or should have known that Redux could cause valvular heart

disease by September 1997, and plaintiffs were put on notice at that time that they

should investigate whether they had that disease. Because the statute of limitations

on the Consumer Protection Act claim is four years and the statute of limitations and

all other claims is three years (see page 10 above), plaintiffs would have had to bring

suit by September 2001.  Because they did not do so, their claims against Indevus are untimely.

On September 15, 1997, Redux and Pondimin were withdrawn from the market, accompanied by an extraordinary amount of prominent national and local publicity.  An illustrative sample of this massive publicity is summarized in the accompanying Declaration of Sharon Taylor (Ex. 4).  In July 1997, the Mayo Clinic and the Food and Drug Administration issued press releases describing health risks possibly associated with the use of these diet drugs.  Taylor Decl. ¶ 5.  Those announcements were widely reported in front-page headlines in national newspapers such as *USA Today* and *The New York Times*, as well as in local newspapers and national and local television news broadcasts throughout the country.  *See id.* ¶¶ 6-7.

Wyeth's subsequent withdrawal of Pondimin and Redux from the market in September 1997 was subject to an extraordinary amount of further publicity.  *Id.* ¶ 24. Wyeth issued a press release stating that it was removing the drugs from the market because new information indicated that "heart valve abnormalities" were associated with the drugs and that even "asymptomatic patients" might have such a condition. *Id.* ¶ 19.  Wyeth included similar information in advertisements that it purchased in leading national and regional newspapers.  *Id.* ¶ 20.  These advertisements led with a banner in large print, stating "An Important Message To Patients Who Have Used Pondimin or Redux."  *Id.*  Wyeth also sent similar information directly to 450,000 doctors and pharmacists.  *Id.* ¶21.

<u>Page(s)</u>

At the same time, the FDA issued a press release, again mentioning that the heart valve findings had occurred in patients "even though they had no symptoms." *Id.* ¶ 22.  These announcements were prominently reported throughout the country in lead reports in national television network news and morning show broadcasts, and in national and major metropolitan front page newspaper articles and television broadcasts.  *See id.* ¶¶ 24-29.  This included programs on NBC Nightly News and CBS Evening News.  *Id.* ¶ 24.  For example, *USA Today*, a daily newspaper with a national readership, ran a front-page story regarding the withdrawal of diet drugs, its effects, and the response by various organizations throughout the United States regarding the news.  *Id.* ¶ 27 & Ex. 189 to Taylor Declaration (Ex. 5).[5]  The article went so far as to report that potential litigation was imminent and people who had taken diet drugs were signing up with attorneys to take part in a large class action lawsuit.

Government health warnings about Pondimin and Redux were repeated in November 1997, similarly garnering enormous print and broadcast media attention both nationally and locally.  *See id.* ¶¶ 47-62.  For example, on November 13, 1997, Tom Brokaw stated on the NBC Nightly News that "[t]he government is urging [all of the millions of Americans who took the diet drugs phen-fen] to see their doctors, even if they feel fine."  *Id.* ¶ 48.  Publicity continued through 1999, as the press reported on various diet drug lawsuits throughout the country.  *Id.* ¶¶ 63-64.

---

[5]  The exhibits to the Taylor Declaration were filed with the Court with Wyeth's first Opposition to Remand in *Andrus*, and are on record there.

Then, beginning in October 1999, there was a massive wave of national and local publicity about the Settlement, the terms of which were first announced at that time. *Id.* ¶ 65. Not only was the Settlement Agreement of interest to the almost six million people who had used these diet drugs, but it also involved the unprecedented settlement amount of $3.75 billion, which Wyeth was committing to pay under the Settlement Agreement. *Id.* The Settlement Agreement would not become effective, however, until approved by the MDL Court, after notice to the class members and an opportunity for them opt out or object. *Id.*; *In re Diet Drugs*, 2000 WL 1222042, at *34. An "elaborate and extensive plan of notice" was therefore employed to ensure that notice of the Settlement Agreement would likely reach all those affected by the settlement – almost 6,000,000 people – as the MDL Court explained in its subsequent opinion that approved the Settlement as fair, reasonable and adequate. *In re Diet Drugs*, 2000 WL 1222042, at *35. The notice program ran in January and February 2000 and employed sophisticated media techniques designed to reach all diet drug users. Taylor Declaration ¶ 68. The campaign included a television commercial that was broadcast 106 times over a period of 5 weeks on network television. *Id.* The campaign also included 781 broadcasts of the commercial for six consecutive weeks on various cable networks. *Id.* The campaign also included the publication of a notice in several magazines, four national newspapers, 77 local newspapers, three newspapers distributed throughout the U.S. Territories and four newspapers targeted to the Hispanic market. *In re Diet Drugs*, 2000 WL 1222042, at *35. A form of notice was also published in a variety of publications targeted to health care providers

and pharmacists. *Id.* Internet advertisements were used. *Id.* Notices were mailed to all pharmacists and doctors who were likely to have prescribed these drugs or who were likely to be treating patients for complications. *Id.* at *36. That notice program advised readers of the existence of the Settlement Agreement and of its importance to their legal rights if they had used these diet drugs. *Id.* at *35. The program also advised them how to obtain a complete notice package and other information, providing them with a website and a toll-free 800 number to use in that regard. *Id.*

As the MDL Court concluded, "[t]he media program … was highly successful," in part because it was "greatly enhanced by the enormous publicity that has surround[ed] the diet drugs involved in this litigation and the publicity of this Settlement." Taylor Declaration ¶ 70. More than 700,000 people called the 800 number to receive a notice package, all of whom received it in the mail. *In re Diet Drugs*, 2000 WL 1222042, at *36. Almost 1.5 million "page views" of the information on the website were recorded. *Id.* at *36 n.17. In addition, another almost 300,000 copies of the notice package were mailed to individuals whose names and information were in the settling parties' possession. *Id.* at *37. According to a media analysis, 97% of women between the ages of 25 and 54 viewed one or more forms of televised or printed notice an average of 10 times, and almost 80% of women in the same age group were exposed to the televised or printed notice a minimum of five times. Taylor Declaration ¶ 70.

The MDL Court has repeatedly held that this overwhelming mass of media attention put diet drug users on inquiry notice of their claims no later than the fall of

Page(s)

1997, or at the latest by early 2000, as a matter of law. *See Cooper v. Wyeth*, No. 03-
20246, PTO 3665, at 4 (E.D. Pa. June 29, 2004) (Ex. 6) ("[T]he publicity surrounding
the withdrawal of diet drugs put plaintiffs on inquiry notice of their claims *in
September, 1997* or, at the very latest by the end of March, 2000, at the height of
Wyeth's extensive media campaign.") (emphasis added); *Chambliss v. Todd*, No. 03-
20288, PTO 3533, at 5 (E.D. Pa. May 17, 2004) (Ex. 7) (same); *Berry v. Wyeth*, No.
03-20243, PTO 3531, at 4 (E.D. Pa. May 14, 2004) (Ex. 8) (same); *Chouteau v.
Wyeth*, No. 03-20315, PTO 3517, at 4 (E.D. Pa. May 12, 2004) (Ex. 9) (same); *Brown
v. Wyeth*, No. 03-20335, PTO 3501, at 5 (E.D. Pa. May 4, 2004) (Ex. 10) (same);
*Broom v. Hogan*, No. 03-20587, PTO 3532, at 6 (E.D. Pa. May 14, 2004) (Ex. 11)
(same); *Lawhon v. Wyeth*, No. 03-20226, PTO 3470, at 4 (E.D. Pa. Apr. 26, 2004)
(Ex. 12) (same); *Allen v. Wyeth*, No. 03-20310, PTO 3305, at 9 (E.D. Pa. Feb. 24,
2004) (Ex. 13) ("[W]e find that plaintiffs can reasonably be held to have knowledge
of their injuries, the cause of their injuries and the conduct of their prescribing
physicians *as early as September, 1997* and at the latest by March, 2000.") (emphasis
added).[6]

       Numerous other federal courts, many applying discovery rules similar to that
of Massachusetts, have agreed with the MDL Court that diet drug users were placed

---

[6] The MDL Court had previously noted in connection with the fairness hearing for the Settlement
Agreement that Wyeth has a strong argument that "diet drug users, acting with reasonable diligence,
should have learned that they had heart valve damage as a result of using Pondimin and Redux
*beginning with the withdrawl of the drugs from the market in September 1997*." *In re Diet Drugs*,
2000 WL 1222042, at *18 (emphasis added).

Page(s)

on notice of their claims by the massive publicity.  *See Collett v. Freid*, No. 03-526
(E.D. Ky. July 15, 2004) (Ex. 14); *Moseley v. Wyeth*, No. CIV-02-1120-M (W.D.
Okla. Sept. 13, 2002) (Ex. 15)*; Spence v. Wyeth*, No. W-03-CA-127 (W.D. Tex. July
16, 2003) (Ex. 16); *Stittum v. Wyeth*, No. 4:03CV531 CDP (E.D. Mo. July 16, 2003)
(Ex. 17); *Bejarano v. Wyeth*, No. L-03-53 (S.D. Tex. June 27, 2003) (Ex. 18);
*Hamilton v. Wyeth*, No. 2:03 CV00043GH (E.D. Ark. June 17, 2003) (Ex. 19);
*Kershenstine v. Wyeth Co*., No. 03-0237 (W.D. La. May 6, 2003) (Ex. 20) (report and
recommendation of magistrate judge); *Harting v. Wyeth, Inc.*, No. CIV-03-379-F
(W.D. Okla. Apr. 22, 2003) (Ex. 21); *McCurdy v. Wyeth*, No. A-03-CA-054-SS
(W.D. Tex. Feb. 14, 2003) (Ex. 22); *Bell v. Wyeth*, No. CV-02-BE-3136-S (N.D. Ala.
Dec. 31, 2002) (Ex. 23); *Haggard v. Wyeth*, No. CIV-02-446-S (E.D. Okla. Oct. 8,
2002) (Ex. 24); *McKee v. Wyeth*, No. CIV-02-1119-C (W.D. Okla. Oct. 1, 2002) (Ex.
25).

 Courts in some of these decisions have indicated that diet drug users were on
inquiry notice of their claims by March 2000 at the very latest.  In those cases, it was
sufficient to hold that plaintiffs were on notice by March 2000 because plaintiffs'
claims against doctor defendants were time-barred even based on that generously late
date.  But, as the numerous MDL Court decisions discussed above make clear,
plaintiffs were clearly on notice of their claims by the fall of 1997.[7]  However, even if

---

[7] Plaintiffs ignore this overwhelming weight of authority and instead cite *Dykes v. Reeves*, No
2:03CV121PG (S.D. Miss. Nov. 6, 2003).  In *Dykes*, Judge Pickering from Mississippi held that there
was no evidence plaintiff had manifest symptoms until 2001 and it was a question of fact whether a
reasonable plaintiff in that position would have gone to the doctor.  Judge Pickering overlooked the
key point that the public information warning about diet drugs told diet drug users that valvular heart

Footnote continued on next page

plaintiffs were not on inquiry notice of their claims until the class notice campaign, plaintiffs' claims against Indevus in these cases filed in March and April 2004 are clearly time-barred.

The same result applies under the law of Massachusetts.  In *Bowen v. Eli Lilly & Co., Inc.*, 557 N.E.2d 739 (Mass. 1990) (which some plaintiffs ironically cite in support of their position), the Court affirmed summary judgment in favor of a drug manufacturer on the ground that plaintiff's claims were time-barred.  Plaintiff, who suffered cancer as a result of *in utero* exposure to DES taken by her mother, was on notice of her claim as a result of a letter from a doctor stating that there was an "association" between the ingestion of DES by pregnant mothers and tumors in their daughters and by magazine articles and scientific publications noting such an association:

> We conclude that, on the summary judgment record, the prospect of a significant causal connection between DES and the plaintiff's cancer was brought to the plaintiff's attention more than three years before this action was commenced.  The fact it was not until June, 1982, that the plaintiff believed that DES caused her cancer does not aid her because we test the accrual of her cause of action by what a reasonable person in her position would have known or on inquiry would have discovered at the various relevant times.

---

Footnote continued from previous page

disease may have no outward symptoms.  A plaintiff who is told that her disease may not have manifest symptoms, and who has all of the additional information described in the text at pages 12-15 above, cannot reasonably wait until having symptoms to go to the doctor.  The MDL Court implicitly rejected the *Dykes* decision in its many decisions finding fraudulent joinder of doctors.  *See* pp. 16-17 above.

Page(s)

*Bowen*, 557 N.E.2d at 743.  Thus, plaintiffs' assertions in this case that publicity cannot give rise to a duty of inquiry and that the court cannot decide the statute of limitations issue as a matter of law are, quite simply, wrong.[8]

A substantial body of additional case law holds that widespread publicity about the events underlying a cause of action puts plaintiffs on inquiry notice of their claims.  For example, in *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 403-04 (5th Cir. 1998), the Fifth Circuit affirmed dismissal of plaintiffs' claims for injuries allegedly caused by Agent Orange as time-barred.  The trial court had found that Agent Orange and its possible link with cancer had received much national and local media coverage a decade earlier in 1984 when Congress passed a bill to provide disability benefits to veterans exposed to Agent Orange, and when a class action lawsuit involving two million veterans exposed to Agent Orange was settled for $180 million.  *Winters v. Diamond Shamrock Chem. Co.*, 941 F. Supp. 617, 622 (E.D. Tex. 1996), *aff'd*, 149 F.3d 387 (5th Cir. 1998).  The court held that because a reasonable person could not miss this coverage, the plaintiff should be "charged with knowledge of information that has been made public through the media."  *Id.*; *see also United Klans of Am. v. McGovern*, 621 F.2d 152, 154 (5th Cir. 1980) (publicity put plaintiffs on inquiry notice and plaintiffs should have known that they had a claim); *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000) (publicity was "sufficient to

---

[8] In *Bowen*, there was evidence that plaintiff actually saw some of the articles at issue.  No such evidence is required here.  The publicity concerning the hazards of Redux was so widespread that no reasonable person could claim to have missed it.  *See* cases cited in text below.

Page(s)

charge [the plaintiff] with constructive knowledge of the events underlying her cause

of action" even where plaintiff contended that she did not see or hear media reports).

Because plaintiffs were under a duty to investigate their potential claims

against Indevus by the fall of 1997 and because reasonable investigation would have

revealed those claims at that time (*see* pages 20-21 below), the statute of limitations

began to run no later than the fall of 1997 (or by February 2000 at the very latest).

Plaintiffs' claims filed in March and April 2004 are clearly time-barred.

## B.    Any Alleged Diet-Drug Injury Occurred No Later Than September 1997 And Was Discoverable At That Time

Any alleged diet drug injury suffered by plaintiffs occurred no later than

September 15, 1997, when Redux was withdrawn from the market, and was

discoverable at that time.

An overwhelming mass of medical evidence shows, and the MDL Court has

found, that any heart valve disease attributable to diet drugs manifests itself, and is

detectable, no later than the time a person ceases to use diet drugs.  Wyeth attaches as

Exhibit 26 a collection of studies published in medical journals demonstrating that

fact.  In approving the diet drug settlement, the MDL Court found that "these

[valvular] lesions are not latent.  If they are going to occur, they are going to occur

during drug use (or shortly thereafter) and be demonstrable on echocardiogram." *In

re Diet Drugs*, 2000 WL 1222042, at *18.  The Court further explained:

> The clinical and epidemiological studies demonstrate –
> and all the experts agree – that insofar as the use of
> fenfluramine or dexfenfluramine [the chemical names
> for Pondimin and Redux, respectively] results in an

> increased prevalence of valvular regurgitation, that regurgitation is detectable by echocardiogram shortly after the patients discontinue use of diet drugs. Conversely, there is no evidence that the use of the drugs results in any increased risk of regurgitation that is "latent" and not detectable by today's sophisticated echocardiographic technology.
>
> The absence of a latency period between ingestion of fenfluramine and/or dexfenfluramine and the development of clinically detectable VHD [valvular heart disease] is also confirmed by a number of studies that have followed former fenfluramine/dexfenfluramine patients for a number of years, either through the use of echocardiograms or comprehensive medical record review. Each of these studies finds that there was no emergence of new disease after some latency period.

*Id.* at *46 (citations and footnote omitted).

The MDL Court subsequently has relied on these findings to hold that statute of limitations had expired as to doctor defendants in various cases and to grant summary judgment in favor of those defendants.[9] *E.g.*, *Accadia v. Wyeth*, No. 03-20546, PTO 3666 (E.D. Pa. June 29, 2004) (Ex. 27); *Bishop v. Lowe*, No. 03-20601, PTO 3536 (E.D. Pa. May 18, 2004) (Ex. 28); *Green v. Wyeth*, No. 03-20234, PTO 3534 (E.D. Pa. May 17, 2004) (Ex. 29); *Chambliss v. Todd*, No. 03-20288, PTO 3533 (E.D. Pa. May 17, 2004) (Ex. 7); *Ferrell v. Wyeth*, No. 03-20094, PTO 2996, at 7 n.5 (E.D. Pa. Sept. 5, 2003) (Ex. 30; *Rainey v. Wyeth*, No. 03-20128, PTO 2886, at 7 n.4 (E.D. Pa. June 12, 2003) (Ex. 31); *French v. Wyeth*, No. 03-20353, PTO 3281 (E.D. Pa. Feb. 18, 2004) (Ex. 32).

---

[9] Doctor defendants, like Indevus, are not parties to the settlement and therefore may plead the statute of limitations.

As the MDL Court has held, diet drug class members, including the plaintiffs in this case, are barred by collateral estoppel from contesting the finding that diet drug heart valve injuries are not latent. *See Accadia*, PTO 3666 (Ex. 27); *French*, PTO 3281 (Ex. 32); *Alexander v. Wyeth*, No. 03-20206, PTO 3230 (E.D. Pa. Jan. 29, 2004) (Ex. 33). The recent decision to the contrary by Judge Brassard relects a misunderstanding of the diet drug settlement and fairness hearing and is therefore not persuasive. *See* pp. 38-43 below.

Collateral estoppel bars a party from relitigating an issue where (1) the issue decided in the prior case is identical to one presented in the later case; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding and (5) the determination in the prior proceeding was essential to the judgment. *See City of Pittsburgh v. Zoning Bd. of Adjustment*, 559 A.2d 896, 901 (Pa. 1989); *United States v. Mendoza*, 464 U.S. 154, 158-59 (1984); *Miles v. Aetna Cas. & Sur. Co.*, 589 N.E.2d 314, 316-17 (Mass. 1992).[10]

Collateral estoppel plainly applies here. The question whether diet drug heart valve injuries are latent was considered in the fairness hearing, and that identical issue

---

[10] The collateral estoppel effect of a decision of a federal court sitting in diversity is governed by federal law, which looks to the law of the state in which the federal court sits. *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507-08 (2001). The effect of the MDL Court's findings therefore are governed by Pennsylvania law. However, there is no material difference between the collateral estoppel law of the United States, Pennsylvania, and Massachusetts.

is presented here. The MDL Court's approval of the Settlement Agreement is a final

and valid judgment. *See French,* PTO 3281 (Ex. 32) at 13; *Alexander*, PTO 3230

(Ex. 33) at 14-15. Plaintiffs in this case are members of the settlement class and are

therefore bound by the holdings in the class action.[11] Plaintiffs, through their class

counsel, had a full and fair opportunity to litigate latency. Indeed, the fairness

hearing lasted eight days, during which extensive testimonial and documentary proof

was submitted. *In re Diet Drugs*, 2000 WL 1222042, at *6 (stating that "the

proponents of the Settlement Agreement and the persons who objected to the

settlement … had a full and fair opportunity to offer all of the evidence that they

wished to tender to the court concerning" the settlement).

      Finally, the finding that diet drug injuries were not latent was essential to

approval of the Settlement. Under *Amchem Products, Inc. v. Windsor*, 521 U.S. 591

(1997), it was necessary for the court to conclude that there was no conflict of interest

between persons presently injured and any who might be injured in the future. *See id.*

at 626. The court was able to find that there was no conflict of interest because there

was no possibility that diet drug users could suffer injury for the first time in the

future. *See Alexander*, PTO 3230 (Ex. 33) at 14-15 (explaining that no latency

finding was an essential finding for approving the Settlement).

---

[11] *See Golden v. Pac. Mari. Ass'n*, 786 F.2d 1425, 1427 (9th Cir. 1986) (holding that class member's suit against class counsel was barred by court's implicit finding of adequacy of representation); *Laskey v. UAW*, 638 F.2d 954, 957 (6th Cir. 1981) (same, noting that adequacy of representation was "essential to approving the [class] settlement"); *Thomas v. Albright*, 77 F. Supp. 2d 114, 121-22 (D.D.C. 1999), *aff'd sub nom Thomas v. Powell*, 247 F.3d 260 (D.C. Cir. 2001).

Plaintiffs are also barred from relitigating the latency issue by the doctrine of judicial estoppel, which prohibits a party who successfully convinced a court to adopt a position in one case from taking a contrary position in another case. *Ryan Operations, G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996); *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 395-96 (5th Cir. 2003).[12]  Plaintiffs, through their class counsel in the settlement proceeding, took the position that diet drug injuries were not latent – i.e., that they were detectable no later than the time use of diet drugs ended.  *See,* e.g., Class Counsel's Memorandum In Support Of Final Settlement Approval at 25 (Ex. 34); Declaration of Dean G. Karalis, M.D. ¶ 42 (cardiology expert proffered by class counsel) (Ex. 35) ("There is no reason to believe that there is a potential 'latent period' of any significance between the termination of diet drug exposure and the onset of valvular regurgitation.  There is nothing in the experience with carcinoid disease, use of ergotamines and methyasergides or in the published literature which suggests the possibility of such latency.").  Thus, the MDL Court stated in its fairness opinion that all experts presented by class counsel at the fairness hearing testified that diet drug injuries are not latent.  *In re Diet Drugs*, 2000 WL 1222042, at *6-7 (listing plaintiffs' experts including expert on cardiology and valvular disease); *id.* at *47 ("All of the experts who testified in this case agreed that

---

[12]  Federal courts apply federal judicial estoppel law in deciding matters pending before them, especially where the prior action was also in federal court, because judicial estoppel is designed to protect federal courts from manipulation. *Hall*, 327 F.3d at 395-96; *see also Ryan Operations*, 81 F.3d at 358 n.2.

fenfluramine, dexfenfluramine and the fen-phen combination do not cause latent valvular regurgitation ….").

Plaintiffs received substantial benefits under the Settlement Agreement, including the right to receive certain benefits while retaining the right to sue Wyeth without being subject to the statute of limitations.  If it were not for the benefits granted by the Settlement Agreement, none of the plaintiffs now before this Court would be able to sue Wyeth at this late date without Wyeth's assertion of an overwhelmingly strong statute of limitations defense.  Having received the benefits of the Settlement, including Wyeth's waiver of the statute of limitations, plaintiffs cannot now change their position, a position that was essential to approval of the Settlement.

In short, had plaintiffs conducted a reasonable inquiry of their potential claims in September 1997, they would have discovered any alleged heart valve injury caused by diet drugs at that time.

### C.     Plaintiffs' Efforts To Evade The Statute Of Limitations Fail

Plaintiffs make a variety of arguments to avoid the effect of the statute of limitations.  All fail.  Indeed, several of the arguments have already been rejected by the MDL Court on numerous occasions.

### 1.     Plaintiffs May Not Relitigate The Issue of Latency

Plaintiffs assert that the question whether diet drug heart valve injuries are latent is "irrelevant."  Plaintiffs' efforts to escape the MDL Court's findings show the opposite.  The fact that any such injuries occurred and were detectable by September

1997 is an essential step in determining what plaintiffs would have discovered had they exercised reasonable diligence.  Plaintiffs make three arguments that they may relitigate whether diet drug heart valve injuries are latent.  First, they contend that relying on the MDL Court's finding of no latency violates the Settlement Agreement.  Second, they contend that they did not have a "full and fair" opportunity to litigate the latency issue in the fairness hearing.  Third, they argue that applying collateral estoppel would violate due process.  None of these arguments has merit.

The MDL Court has implicitly rejected plaintiffs' argument that the Settlement Agreement precludes reliance on the no latency finding by repeatedly citing that finding in decisions holding that doctors were fraudulently joined due to the expiration of the statute of limitations.  *See* pp. 16-17 above.  The MDL Court is the court most knowledgeable about the Settlement Agreement and, indeed, has "continuing and exclusive jurisdiction" over class members to "interpret and enforce the Settlement."  *In re Diet Drugs*, 2000 WL 1222042, at *72, PTO 1415 ¶ 11.  Its view should be dispositive.

The MDL Court is plainly correct.  Plaintiffs rely on section VIII.F.3. of the Settlement Agreement, which precludes the parties from doing only two things (except as necessary to enforce the Settlement Agreement):

    1.    "[I]ntroduc[ing] or offer[ing]" into evidence:
        a.    The terms of the Settlement Agreement;
        b.    Any statement, transaction or proceeding in connection with the negotiation, execution or implementation of the Settlement Agreement;

    c.     Any statements in the notice documents appended to the Settlement Agreement;

    d.     Stipulations, agreements, or admissions made or entered into in connection with the fairness hearing;

    e.     Any finding of fact or conclusion of law made by the Trial Court;

OR

2.     "[O]therwise rely[ing]" on the terms of the Settlement Agreement.

*See* Settlement Agreement § VIII.F.3 (Ex. 2). Wyeth has not done either of these things.

Wyeth is not attempting to "rely on the terms" of the Settlement Agreement. Wyeth relies only on the findings of the MDL Court, as set forth in its order approving the Settlement. The actual terms of the Settlement are irrelevant to this issue – what is important is the fact that the Court approved the Settlement Agreement and the reasons for that approval. Wyeth also is not introducing or offering the court's findings into "evidence" at trial. Wyeth is citing the findings in support of a pretrial motion. Nothing in Settlement Agreement precludes that use.

It makes sense that Wyeth may cite the MDL Court's findings in support of the pretrial motions, but not introduce them as evidence at trial. It is plain that the parties would not want evidence of the settlement negotiations to be presented to a jury. Likewise, to the extent the MDL Court's order approving the Settlement did not conclusively decide an issue, and that issue were to be decided by a jury, admitting the MDL Court's related findings of fact or conclusions of law might be prejudicial.

<u>Page(s)</u>

But there is no reason not to use the MDL Court's findings for pretrial motions, especially for matters conclusively determined.

The Third Circuit decision cited by plaintiffs and referred to by Judge Brassard, *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liability Litigation*, 369 F.3d 293 (3rd Cir. 2004), is not to the contrary. In that case, the Third Circuit held that certain provisions of the Settlement Agreement should not be read as precluding plaintiffs authorized to bring lawsuits from introducing certain evidence. In the process, the court referred to the Settlement Agreement's language precluding the introduction of other evidence, including the provision relied on by plaintiffs here, to demonstrate that the Settlement Agreement did not preclude the introduction of the different type of evidence at issue in that appeal. *See id.* at 309-10 & n.9. The court did not analyze that language and the provision played no role in the court's decision. Demonstrating that the Third Circuit decision has no bearing on the issue at hand, the MDL Court has continued to find fraudulent joinder of doctors, relying on the findings made in 2000, even after that Third Circuit decision was handed down. *See, e.g.*, *Good v. Wyeth*, No. 03-20763, PTO 3769 (E.D. Pa. July 27, 2004) (Ex. 36).

Plaintiffs' contention that they did not have a "full and fair opportunity to litigate the issue of latency" is without basis. As explained above, the issue of latency was the subject of extensive evidence and testimony at the fairness hearing. *See* pp. 20-21 above. All class members had a full incentive to litigate the issue because it would affect whether the Settlement would be approved. The MDL Court found in

approving the Settlement that class members were fairly represented.  *In re Diet Drugs*, 2000 WL 1222042, at *44-53.   Thus, the MDL Court has repeatedly rejected arguments by plaintiffs seeking to avoid the collateral estoppel effect of the Court's no latency holding that they were not fully and fairly represented.  *E.g.*, *Alexander*, PTO 3230 (Ex. 33) at 13.  Most recently, the Aylstock firm, which represents some of the plaintiffs in the cases here, sought reconsideration of a remand denial on this very ground and the MDL Court denied the motion.  *See* Motion For Reconsideration in *Dillon v. Sims* (Ex. 37); *Dillon v. Sims*, No. 03-20385, PTO 3590 (E.D. Pa. June 9, 2004) (Ex. 38) (denying reconsideration).

Finally, plaintiffs' assertion that the application of collateral estoppel is "unfair" and would violate due process is without merit.  Plaintiffs' argument is founded on the contention that plaintiffs were not notified in the Settlement that they "were effectively waiving their right of action against third parties such as Indevus." No provision of the Settlement "waived" any right of action against Indevus.  The Settlement did not prohibit plaintiffs from suing Indevus.  The fact that plaintiffs are now – four years later – subject to the law of collateral estoppel and that their claims are barred by the statute of limitations is a function of federal and state law, not any provision of the Settlement Agreement.

Further, there is nothing "unfair" about binding plaintiffs with the MDL Court's findings.  Plaintiffs received the benefits of the Settlement Agreement, including Wyeth's waiver of the statute of limitations.  They received those benefits only because the Court's finding that diet drug heart valve injuries are not latent

Page(s)

enabled the Court to approve the Settlement. Plaintiffs, through their class counsel,

supported that finding. It would be radically unfair to permit plaintiffs, who have

enjoyed and continue to enjoy the benefits of the Settlement, to disavow now an

essential predicate for the Settlement.

**2.      The Self-Serving Affidavits Of Nine Plaintiffs Do Not Save Plaintiffs Claims**

Eight plaintiffs in these cases proffer self-serving affidavits asserting that they

saw their regular physicians for ordinary check-ups following their use of diet drugs,

that their doctors detected no heart murmurs, and that their doctors did not advise

them to have an echocardiogram. One additional plaintiff, Kenneth Marshall, proffers

a conclusory affidavit of a treating physician asserting that there was no basis for Mr.

Marshall to know of his alleged injury. Even if these affidavits were relevant, they

would do nothing to save the claims of the plaintiffs who do not proffer any affidavits.

The affidavits do not even save the claims of the plaintiffs who submitted

them. The affidavits claim that plaintiffs' alleged injuries were not detected until they

had echocardiograms in 2001 or 2002, presumably administered by echocardiogram

technicians hired by plaintiffs' counsel. These affidavits are nearly identical to

affidavits the plaintiffs' bar – including the Aylstock firm representing some of the

plaintiffs here – has submitted in numerous other cases and that the MDL Court has

rejected as insufficient to avoid the statute of limitations. *See* Ex. 39 (attaching

affidavits from other cases and MDL orders denying remand in those cases). This

Court should reach the same conclusion.

It is not clear whether plaintiffs offer their affidavits to show that their injuries supposedly occurred within the limitations period or to show that the injuries occurred earlier, but were not detected despite reasonable diligence.  Either way, the affidavits fail.  The MDL Court has held that any diet drug valve injury occurred and was detectable by September 1997.  Plaintiffs are barred by collateral estoppel from contesting that finding.  Thus, if plaintiffs' alleged heart valve injuries did not occur until later, they were not caused by diet drugs as a matter of law.  *See,* e.g., *Lawhon*, PTO 3470 (Ex. 12) (MDL Court found that plaintiff could not avoid statute of limitations as to claims against doctor by showing that her alleged injury arose sometime after April 2001 because any injury after that date was not caused by diet drugs); *Bishop*, PTO 3536 (Ex. 28) (same result where plaintiff alleged her injury arose after August 2000).

If, on the other hand, plaintiffs use the affidavits to attempt to show reasonable diligence, they likewise fail.  The issue is not whether a general member of the public unexposed to diet drugs acted reasonably by getting regular routine checkups.  Instead, the question is whether plaintiffs – on notice that they had used diet drugs, that they might have an a symptomatic disease, that such a disease could be conclusively detected by echocardiogram and that they might have a legal claim as a result – acted reasonably in investigating their claims.  *Plaintiffs' affidavits do not demonstrate that they even told their physicians that they had used diet drugs.*  Under these circumstances, that is critical information that any doctor would need to have in order properly to examine a patient for diet drug-induced heart valve injuries.

Page(s)

Further, plaintiffs were unambiguously advised to obtain an echocardiogram.  *See* pp. 39-40 below.  In any event, as the MDL Court has already held, any diet drug-induced heart valve injury was detectable by reasonable investigation, and plaintiffs are barred from contesting that fact.  *See* pp. 20-21 above.  The MDL Court has repeatedly rejected efforts by plaintiffs to avoid that conclusion with self-serving affidavits.  *See,* e.g., *Accadia*, PTO 3666 (Ex. 27) at 23-24.  Accordingly, as a matter of law, plaintiffs are charged with knowledge of their claims prior to the limitations period.[13]

---

[13] Plaintiffs cite two cases (*Zamboni* and *Lindsay*) in which plaintiffs went to a doctor but were misdiagnosed and the court therefore found that their claims could not be found time-barred on summary judgment.  Those cases did not involve a circumstance where there was an immense amount of publicity that defendant may have harmed plaintiff and where, as the MDL Court has held here, any reasonable investigation would have revealed the harm.  The *Castillo* case, dealt with the entirely different circumstance of whether certain information received by plaintiff's lawyer should be deemed to have put plaintiff on notice of his claims.

### 3.    The "Common Defense" Rule Does Not Apply

Some plaintiffs contend that Wyeth may not base the fraudulent joinder of Indevus on the expiration of the statute of limitations because fraudulent joinder cannot be predicated on a defense that applies to all defendants and therefore would dispose of the entire case. This argument is without merit because Wyeth may not plead the statute of limitations under the Settlement Agreement. The Settlement Agreement clearly provides that where a party has properly invoked a so-called "intermediate opt out," Wyeth "shall not assert any defense based on any statute of limitations or repose." Settlement Agreement § IV.D.3. (Ex. 2). Language in cases cited by plaintiffs to the effect that defendants cannot manipulate jurisdiction by electing to refrain from pleading the statute of limitations is inapplicable. Wyeth is not simply electing to refrain from pleading the defense, it may not do so under the Settlement Agreement, which defines the parties' rights and obligations. Thus, it is plain that Wyeth may base its showing that a non-party to the Settlement Agreement is fraudulently joined on the expiration of the statute of limitations. *See Collett v. Freid*, No. 03-526 (E.D. Ky. July 15, 2004) (Ex. 14) (common defense rule does not prevent Wyeth from demonstrating fraudulent joinder based on the expiration of the statute of limitations). Indeed, the MDL Court and numerous federal courts have held that Wyeth may predicate its showing that a defendant is misjoined on the expiration of the statute of limitations. *See* pp. 16-17 above.

### 4.    Plaintiffs Cannot Rely On The Doctrine Of Fraudulent Concealment

Plaintiffs' fraudulent concealment count does not provide a basis for exempting plaintiffs from the statute of limitations. The statute of limitations will not be tolled for fraudulent concealment claims "if the plaintiff has actual knowledge of the facts giving rise to [her] cause of action" or "the means to acquire the facts on which [her] cause of action is based." *Stark v. Advanced Magnetics, Inc.*, 736 N.E.2d 434, 442 (Mass. App. Ct. 2000); *see also Burbridge v. Bd. of Assessors*, 417 N.E.2d 477, 480 (Mass. App. Ct. 1981) ("[E]stoppel provision of G.L. c. 260, § 12, is generally not available where the plaintiff is capable of discovering the facts allegedly concealed.") (citing *Walker v. Soule*, 138 Mass. 570, 572 (1885); *Lynch v. Signal Fin. Co.*, 327 N.E.2d 732 (1975)). In this case, plaintiffs not only had the means to learn of their causes of action, but also are charged with knowledge of their claims as a matter of law. *See* p. 16 above. The fact that scores of plaintiffs filed personal injury claims against Indevus in 1997 and immediately thereafter shows that plaintiffs had the means to discover the facts underlying their claims.

Further, the supposed "concealment" alleged by plaintiffs is that Indevus has denied liability in diet drug litigation. However, it is well-established that a company's mere denial of liability for a particular act does not constitute fraudulent concealment; concealment requires some other affirmative act that prevents plaintiff from discovering her claim. *See Estate of Sarocco v. Gen Elec. Co.*, 939 F. Supp. 91, 97 (D. Mass. 1996) ("The defendants' general, repeated public denial of any link

between PCBs and cancer does not constitute fraudulent concealment as a matter of law. A defendant is not obliged to acknowledge liability, or to adopt a plaintiff's theory of a case, in order to avoid a defense of this sort."). Even more specific statements concerning liability do not rise to the level of fraudulent concealment. In *Olsen v. Bell Telephone Laboratories, Inc.*, 445 N.E.2d 609 (Mass. 1983), representatives of the defendants told the plaintiff that his condition was not permanent and that the substance at issue did not cause the plaintiffs' injuries. The court refused to find that defendants' conduct rose to the level of fraudulent concealment. "Unless the defendants 'made representations they knew or should have known would induce the plaintiff to put off bringing suit and … the plaintiff did in fact delay in reliance on the representations,' there is no estoppel." *Id.* at 612 (quoting *White v. Peabody Constr. Co.*, 434 N.E.2d 1015, 1023 (Mass. 1982)).

## 5.    Plaintiffs Cannot Rely On A Class Action Tolling Theory

Plaintiffs make a half-hearted argument that the statute of limitations was tolled by the pendency of a class action against Indevus captioned *Dohery v. Interneuron*, No. 98-0128. That class action was dismissed on July 11, 2001. Plaintiffs contend that Massachusetts has adopted *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). In that case, the United State Supreme Court held, as a matter of federal law, that the statute of limitations on a putative class member's claim against a defendant is tolled with respect to claims asserted against the defendant in a class action. Plaintiffs are wrong.

Plaintiffs do not – and cannot – point to any decision of a Massachusetts Court adopting *American Pipe*.  To the contrary, the Massachusetts Supreme Judicial Court has explained that "[e]quitable tolling is used 'only sparingly,' and is generally limited to specified exceptions."  *Shafnacker v. Raymond James & Assocs., Inc.*, 683 N.E.2d 662, 665 (Mass. 1997) (citation omitted).  Massachusetts law nowhere identifies class action tolling as such an exception.  Indeed, Massachusetts has rejected equitable tolling based on the pendency of another action.  *See id.* at 665-67 (filing of arbitration did not stay running of statute of limitations for filing lawsuit). The Massachusetts Supreme Judicial Court has made clear that class action tolling is not the law by expressly noting in a decision that it was not necessary in that case to address whether to adopt the doctrine.  *Mass. Elec. Co. v. Mass. Comm'n Against Discrimination*, 375 N.E.2d 1192, 1197 n.2 (Mass. 1978).

Plaintiffs' citations do not support their argument to the contrary.  In the section of *Baldassari v. Public Finance Trust*, 337 N.E.2d 701 (Mass. 1975), cited by plaintiffs, the court did not even address class action tolling.  It merely stated in dictum that class actions are "designed to avoid, rather than encourage, unnecessary filing of repetitious papers and motions."  *Id.* at 707 (citation omitted).  In *DiCerbo v. Commissioner of the Department of Employment and Training*, 763 N.E.2d 566, 572 n.13 (Mass. App. Ct. 2002), the court stated in dictum in a footnote that "as to putative class members who wish to intervene, the statute of limitations is tolled upon the filing of the complaint."  The assertion that this dictum constitutes an adoption of

Page(s)

*American Pipe* is misguided, especially in light of the Supreme Judicial Court's

holding in *Massachusetts Electric*, 375 N.E.2d at 1197 n.2.

In light of the fact that Massachusetts has not adopted class action tolling and

that the Commonwealth takes a restrictive view of equitable tolling generally, any

possibility that Massachusetts might someday change the law to adopt *American Pipe*

in a form helpful to plaintiffs is highly speculative and theoretical at best.  Such

speculation does not provide a reasonable basis for a claim under the doctrine of

fraudulent joinder.  To hold otherwise would be to eviscerate the doctrine of

fraudulent joinder, as it is always theoretically possible that a court may change the

law.

> **D.    The *Sawyer* Decision Should Be Given No Weight For A Number Of Independent Reasons**

Plaintiffs rely on the decision in *Sawyer v. Indevus Pharmaceuticals, Inc.*, No.

03-5028-B (Mass. Super. Ct. July 21, 2004), denying a statute of limitations motion

for summary judgment by Indevus.  Judge Brassard recognized that the *Sawyer*

plaintiffs filed their suit as a tactic to obtain a ruling that could help them attempt to

block removal of the 193 cases at issue here, but then indicated he would decide

*Sawyer* based on its particular facts without reference to the other litigation pending

in Massachusetts.  Slip op. at 19.  Judge Brassard then found that it was a question of

fact whether the four specific plaintiffs in Sawyer exercised due diligence to

investigate their claims and whether they could have reasonably known of their

claims by December, 1999, four years before that case was filed.  *Id.* at 29.

<u>Page(s)</u>

Judge Brassard began with the well-established proposition that the statute of limitations began to run when a plaintiff exercising reasonable diligence knew or should have known of her alleged injury. *Id.* at 22. Thus, the Massachusetts discovery rule is substantially identical to that of Mississippi, Texas and several other states under whose laws claims against non parties to the settlement have been held time-barred. *See* pp. 16-17 above. Next, the judge correctly noted that "the intense media coverage should have put these plaintiffs on notice of the *potential* that they had been harmed by the defendant's conduct." Slip op. at 30. However, the court then found it was a question of fact whether the four plaintiffs in that case should have known of their injuries by December, 1999.

Judge Brassard relied on affidavits submitted by the four plaintiffs. The lead plaintiff, Sawyer, stated in her affidavit that she went to see her doctor and obtained an echocardiogram in 1997, shortly after ceasing her use of diet drugs. *Id.* at 17. She claims that the echocardiogram was normal and that she did not learn of her alleged injury until having another echocardiogram in 2002. *Id.* Three other plaintiffs claimed that they had gone to doctors for regular check-ups in the years following their use of diet drugs, that their doctors never advised them to have an echocardiogram, that their doctors never advised them that they had a heart condition and that they were unaware they had a heart condition until having an echocardiogram in 2001 or 2002. *Id. Sawyer* should not be accorded any weight here for three <u>independent</u> reasons.

Page(s)

     **1.**     **The Vast Majority Of Plaintiffs In These Cases Have Not Proffered Affidavits Comparable To Those In *Sawyer***

As noted above, Judge Brassard's decision was highly fact specific, as it was predicated on the affidavit testimony of each of the plaintiffs described above.  The court found that plaintiffs had provided sufficient evidence, in response to Indevus' prima facie showing that the claims were time-barred, to raise a question of fact with respect to the whether they were on inquiry notice of their claims.  *Id.* at 29-30.  In sharp contrast, the vast majority of the plaintiffs in these cases – all but nine – have not submitted any affidavits at all.  This is not surprising, because any effort by the plaintiffs to provide such affidavits simply would not be credible.  It is just not plausible that 2624 people – all "coincidentally" represented by counsel in these cases – would have gone to doctors on a regular basis for routine checkups without even one doctor finding the heart valve injury they now claim, an injury that would have appeared by 1997 if at all.  Because all but nine of the plaintiffs have not submitted affidavits, they have failed to overcome Wyeth's showing that their claims are time-barred even under the reasoning of the *Sawyer* decision.  Moreover, even those plaintiffs before this Court who have submitted affidavits have failed to establish a critical fact, namely that they told their examining physicians that they had used the diet drugs and were therefore concerned about possible resulting heart valve injury.

     **2.**     **Judge Brassard Appears To Have Been Unaware Of Unambiguous Advice That All Diet Drug Users Obtain Echocardiograms, Or That Advice Was Not Relevant In The *Sawyer* Case**

In *Sawyer*, three of the plaintiffs claimed that they visited doctors for regular check-ups, but did not have echocardiograms until 2001 or 2002. *Id.* at 17. Judge Brassard rejected Indevus's argument that three plaintiffs should have obtained echocardiograms (the best method of diagnosing heart valve disease) in 1997. The judge believed that, despite publicity about echocardiograms as a method of detecting heart valve disease, "the government, professional cardiac associations, *and the pharmaceutical companies themselves* all instructed that patients merely visit their physicians – not that they routinely obtain an echocardiogram. There was simply not sufficient notice to these plaintiffs, or their physicians for that matter, to say, as a matter of law, that they should have requested and obtained an echocardiogram." *Id.* at 29-30. But either Judge Brassard was unaware of or overlooked the implications of the Settlement Agreement notice campaign or he did not consider it relevant under the circumstances of the *Sawyer* case. *Sawyer* was filed in December 2003, four years after the class notice campaign had begun in December 1999. However, all the cases before this Court were filed after February 2004, *which was more than four years after* the notice program had been concluded in February 2000, as discussed above.

The Settlement Notice advised that heart valve disease "can be diagnosed through a simple, painless test called an 'echocardiogram.'" Official Court Notice of Settlement at 3 (Ex. 40). The Notice advised that, under the Settlement Agreement, qualifying class members could obtain a free echocardiogram or reimbursement from Wyeth for the cost of obtaining an echocardiogram from other sources. The Notice

<u>Page(s)</u>

also explained that persons diagnosed with valvular heart disease by echocardiogram

could receive substantial cash compensation.  *Id.* at 5-7.  Another part of the Notice –

designed for layperson's easy understanding – explained further as follows:

> Valvular heart disease may be without symptoms.
> Doctors can often determine if regurgitation is present
> by listening for a heart "murmur" with a stethoscope,
> but some studies show that they sometimes miss
> hearing the "murmurs."  *There is a way, however, that*
> *doctors can determine more accurately whether or not*
> *someone has valvular regurgitation or whether*
> *diagnosed regurgitation is progressing to more severe*
> *levels of valvular heart disease — that is by performing*
> *an echocardiogram.*
>
> An echocardiogram is a simple, safe, quick and painless
> outpatient test in which high frequency sound waves are
> used to create a moving picture image of the heart and
> its valves.

Official Court Notice Brochure at 6 (Ex. 41) (emphasis added).  As discussed above

at page 16, approximately one million copies of these documents were mailed to class

members, and all class members were put on notice that the documents were available

to them by calling an 800 number or logging on to a website.  Thus our diet drug

users exercising reasonable diligence would have known to obtain an echocardiogram

no later than February 2000 (if they did not know to do so earlier).

### 3.    Judge Brassard Erred In Believing Plaintiffs Are Not Barred From Relitigating Latency

Finally, Judge Brassard's decision should have no weight with this Court

because he erred in concluding that the plaintiffs in the *Sawyer* case were not barred

from re-litigating whether diet drug-included heart valve disease could be latent.  The

plaintiffs in *Sawyer* argued that they did not develop valvular heart disease until long

after their diet drug use ceased.  *See Sawyer* Plaintiffs' Opp. to Defendant's Mot. for

Summ. Judgment at 17-18 ("Indevus seeks the imposition of a judicially-enforced

Catch-22 in which the plaintiffs' cause of action would accrue before the plaintiff had

sustained, much less discovered, an appreciable injury.") (Ex. 43).  Thus, none of the

plaintiffs in *Sawyer* introduced any evidence that their doctors erred in not diagnosing

any valvular heart disease prior to 2002.  In the absence of such evidence, Judge

Brassard apparently accepted plaintiffs' argument and believed it possible that diet

drug injuries could first manifest themselves years after diet drug use, contrary to all

of the medical evidence and prior findings.

 This is illustrated starkly by plaintiff Karla Sawyer who had a normal

echocardiogram in 1997 following diet drug use and did not have an echocardiogram

purportedly showing regurgitation until 2002, five years later.  In the absence of any

evidence that the persons administering the 1997 echocardiogram engaged in

malpractice, Judge Brassard must have believed that Ms. Sawyer's alleged injury did

not become detectable until long after 1997 – i.e., that it was latent – and plaintiff's

case at trial would necessarily be based on that same premise.  Yet, Ms. Sawyer has

no basis for a claim on that theory because she is barred from taking the position that

diet drug heart valve injuries are latent.  The correct interpretation of Ms. Sawyer's

evidence is that any heart valve injury shown in the 2002 echocardiogram cannot be

attributed to diet drugs as a matter of law and that she therefore has no reasonable

basis for a claim against Indevus for that injury.  *See, e.g.*, *Lawhon*, PTO 3470 (Ex.

12) (MDL Court found that plaintiff could not avoid statute of limitations as to claims

against doctor by showing that her alleged injury arose sometime after April 2001 because any injury after that date was not caused by diet drugs); *Bishop*, PTO 3536 (Ex. 28) (same result where plaintiff alleged injury occurred after August 2000).

Judge Brassard's view that plaintiffs could relitigate the issue of latency was central to his opinion. That centrality is underscored by the fact that the judge devoted a substantial portion of his opinion to defending that view. *See* slip op. at 31-36. The court accepted plaintiffs' argument that collateral estoppel should not apply because plaintiffs did not have a full and fair opportunity to litigate the issue. *Id.* at 34. In so holding, the court relied heavily on the fact that plaintiffs submitted affidavits from two doctors, Drs. Oury and Massing, claiming there is evidence that diet drug heart valve injuries are latent and that class counsel chose not to present this evidence at the Settlement Agreement fairness hearing. *Id.* at 33, 36. Judge Brassard substituted his view in this regard (reached without any Daubert hearing) for the MDL Court's conclusion reached after that extensive hearing. Judge Brassard stated that diet drug users with latent injuries were not fully and fairly represented at the fairness hearing. *Id.* at 33. Judge Brassard further was of the view that the Settlement Agreement prohibited Wyeth from relying on the no-latency finding. *Id.* at 34. Each of these views is contrary to holdings of the MDL Court, the language of the Settlement Agreement and the facts surrounding the Settlement. *See* pp. 16-17, 20-22, 26-27 above. Because the applicability of collateral estoppel is governed by Pennsylvania law through the application of federal law and the facts surrounding the Settlement, this Court should follow the holdings of the MDL Court, a federal court

which sits in Pennsylvania and is totally familiar with the facts surrounding the Settlement, not the conclusions of Judge Brassard.

Judge Brassard also erred by finding that judicial estoppel did not bar plaintiffs from relitigating the issue of latency. He believed that plaintiffs were not changing their position between the time of the fairness hearing and today in order to play "fast and lose" with the courts. Slip op. at 35-36. Wyeth respectfully submits that this conclusion is without basis. Plaintiffs received numerous benefits under the Settlement, including the right to sue Wyeth, free from the statute of limitations. *See* Settlement Agreement § IV.D. (Ex. 2). Plaintiffs have the benefit of this waiver solely because the MDL Court approved the Settlement Agreement, which was made possible only by the conclusion plaintiffs here seeks to challenge, that diet drug heart valve injuries are not latent. Having received the benefits of the Settlement Agreement by taking one position on the absence of latency, it is nothing short of playing "fast and loose" for plaintiffs to now take a contrary position.

* * *

For any one of these reasons, this Court should apply the decisions of the MDL Court and the numerous consistent federal court decisions, not *Sawyer*.

## III. THE PRESENCE OF NEW JERSEY AND DELAWARE PLAINTIFFS IN A HANDFUL OF CASES DOES NOT DEFEAT DIVERSITY JURISDICTION IN THOSE CASES

A handful of the cases at issue include plaintiffs from Delaware and New Jersey, who are not diverse from Wyeth. Plaintiffs have waived any argument that the presence of those plaintiffs defeats federal jurisdiction in these cases by not

<u>Page(s)</u>

making the argument in their motions for remand.  In any event, plaintiffs cannot

defeat jurisdiction by misjoining the claims of plaintiffs from different states who

were prescribed diet drugs by different doctors at different times.  For the reasons set

forth in the notices of removal in cases involving plaintiffs from Delaware and New

Jersey, the Courts should sever and retain jurisdiction over those plaintiffs diverse

from Wyeth.  *See also Weaver v. Am. Home Prods. Corp.*, No. 03-20153, PTO 2946

(E.D. Pa. July 30, 2003) (Ex. 42) (finding New Jersey plaintiffs in Georgia actions to

be fraudulently joined, as "the claims of plaintiffs clearly do not arise out of the same

transaction, occurrence, or series of occurrences").[14]

---

[14] Wyeth has not briefed this issue in detail because plaintiffs have not raised it.  Should the Court
desire more briefing on this issue, Wyeth would be happy to provide it.

Plaintiff Mary Mullaney has asked that Rule 11 sanctions be imposed against Wyeth for not
agreeing to a remand of her case.  Plaintiff's request is an obvious attempt at posturing, and should be
denied, as Wyeth's opposition to remand in these cases is well-grounded.

Page(s)

## Conclusion

The Court should apply the holdings of the MDL Court and deny plaintiffs'

Motions for Remand.

Respectfully submitted,

/s/ Janice W. Howe
William A. McCormack, BBO # 329580
Janice W. Howe, BBO # 242190
David Yamin, BBO # 562216
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
(617) 951-8000

Ingo W. Sprie, Jr.
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY  10022-4690
(212) 715-1000

Robert D. Rosenbaum
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004-1206
(202) 942-5000

**Counsel for Defendant Wyeth, Inc.
and Wyeth Pharmaceuticals, Inc.**

Dated:  August 9, 2004

Page(s)

**SERVICE LIST**

Russell T. Abney
Watts Law Firm, LLP
The Mellie Esperson Building, 16th Floor
815 Walker Street
Houston, TX  77002
(713) 225-0500
(713) 225-0566 fax

T. Bryan Akin, III
Watts Law Firm, LLP
The Mellie Esperson Building, 16th Floor
815 Walker Street
Houston, TX  77002
(713) 225-0500
(713) 225-0566 fax

Edward J. Barshak (BBO No. 032040)
Michael S. Appel (BBO No. 543898)
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street, 9th Floor
Boston, MA  02114
(617) 227-3030

Donald G. Beebe
William K. Grisham
Donald G. Beebe, P.C.
P.O. Drawer 85029
Mobile, AL  36685-0249

Robert J. Binstock (SBN 02328350)
Reich & Binstock, LLP
4265 San Felipe Street, Suite 1000
Houston, TX  77027
(713) 622-7271

Riley L. Burnett
Johnson, Burnett & Chang, L.L.P.
5005 Riverway, Suite 250
Houston, TX  77056

J. Robert Davis
Mignon Angelette Gill
Law Offices of J. Robert Davis, LLP
440 Louisiana, Suite 1930
Houston, TX  77002
(713) 425-5255

Michael P. Friedman (BBO No. 180200)
Brickley, Sears & Sorett, P.A.
75 Federal Street
Boston, MA  02110

Page(s)

(617) 542-0896

William R. Gray
John A. Purvis
Patrick T. Murphy
Purvis, Gray & Murphy, LLP
1050 Walnut Street, Suite 501
Boulder, CO  80302

Steven W. Harris
Harris Law Firm
4407 Parliament Drive
Alexandria, LA  71315-3701
(318) 487-1978

Michael R. Hugo (BBO #243890)
Lopez, Hodes, Restaino, Milman & Skikos
95 Commercial Wharf
Boston, MA  02110
(617) 973-9777
(617) 227-4006 (fax)

J. Christopher Ide
Miller & Associates
105 North Alfred Street
Alexandria, VA  22314

K. Stephen Jackson
Joseph L. Tucker
K. Stephen Jackson, P.C.
2229 First Avenue North
Birmingham, AL  35203
(205) 252-3535

Keith M. Jensen
Law Offices of Keith M. Jensen, P.C.
514 E. Belknap
Fort Worth, TX 76102
(817) 334-0762

Dana G. Kirk (SBN 11507500)
Kirk Law Firm
4265 San Felipe Street, Suite 1450
Houston, TX  77027
(713) 651-0050

Samuel W. Lanham, Jr.
Cuddy & Lanham, P.A.
470 Evergreen Woods
Bangor, ME  04401
(207) 942-2898

Michael A. Lee
Stuart V. Kusin

<u>Page(s)</u>

Susman Godfrey L.L.P.
1000 Louisiana, Suite 5100
Houston, TX  77002
(713) 651-9366
David P. Matthews (Texas Bar No. 13206200)
Julie L. Rhoades (Texas Bar No. 16811710)
Abraham, Watkins, Nichols,
   Sorrels, Matthews & Friend
800 Commerce Street
Houston, TX  77002-1776

Greg McEwen
McEwen Law Firm Ltd.
5850 Blackshire Path
Inver Grove Heights, MN  55076

J. Michael Moore
Guerra & Moore, Ltd., LLP
440 Louisiana, Suite 1510
Houston, TX  77002
(713) 223-4311

Robert J. Morris
Morris & McAnnally, LLC
10365 Holtville Road
P.O. Box 220406
Deatsvill, AL  36022
(334) 569-1820

Dante G. Mummolo (BBO No. 360980)
Iannella and Mummolo
One Boston Place, Suite 3615
Boston, MA  02108
(617) 742-1388
(617) 742-1424 fax

Napoli Kaiser Bern & Associates, LLP
3500 Sunrise Highway
Suite T-207
Great River, NY  11739
(631) 224-1133

John R. Oldham
Faddis, Oldham & Smith, P.A.
2709 W. Fairbank Avenue, Suite 200
Winter Park, FL  32789

Neil D. Overholtz
Aylstock, Witkin & Sasser, P.L.C.
55 Baybridge Drive
P.O. Box 1147
Gulf Breeze, FL  32562-1147
(850) 916-7450

<u>Page(s)</u>

Ellen A. Presby (Texas State Bar #16249600)
Amy M. Carter (Texas State Bar #24004580)
Amy J. Shahan (Texas State Bar #00797564)
Jory D. Lange, Jr. (Texas State Bar #24041294)
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX  75219
(214) 521-3605

Adam Pulaski
Pulaski & Middleman, L.L.C.
1177 West Loop South, Suite 400
Houston, TX  77027

David C. Strouss (BBO #546253)
Marilyn T. McGoldrick (BBO #561766)
Thornton & Naumes, LLP
100 Summer Street, 30th Floor
Boston, MA  02110
(617) 720-1333

W. Paul Wilkins
LeBlanc & Waddell
Essen Centre, Suite 420
Baton Rouge, LA  70809

Edward A. Williamson
Fenton B. Deweese, II
Tashia R. Shannon
The Edward A. Williamson Law Firm
509 Church Avenue
Philadelphia, MS  39350
(601) 656-5634

*Counsel for Co-Defendants:*

Matthew J. Matule, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
One Beacon Street
Boston, MA  02108

Michael D. Birnbaum Esq.
Skadden, Arps, Slate,
Meagher & Flom LLP
Four Times Square
New York, NY  10036